**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GMAC BANK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08 CV 1792 |
| | ) | |
| HOME MORTGAGE, INC., LAWRENCE | ) | Judge Grady |
| LUCKETT and JOHN DOES 1-10, inclusive, | ) | Magistrate Judge Cox |
| Defendants. | ) | |

## AFFIDAVIT OF KELLY JASPER IN SUPPORT OF AGREED MOTION FOR PREJUDGMENT ATTACHMENT OF ASSETS

I, Kelly Jasper, under penalty of perjury, hereby declare as follows:

1.  I am Lending Director, Warehouse and Finance Solutions for GMAC Bank.

2.  As a result of my position described above, I have personal knowledge of the facts and circumstances surrounding the borrowing activities of Home Mortgage, Inc. ("HMI") as those activities relate to warehouse lending activities by GMAC Bank to HMI. On behalf of GMAC Bank, I have been directly involved in managing HMI's borrowing activities in connection with GMAC Bank.

3.  I submit this affidavit in support of GMAC Bank's Emergency Motion for Attachment of Assets. I believe I am competent to testify as to the matters set forth within this affidavit and affirm that all of the facts contained herein are based upon my personal knowledge, my review of documents, which are attached hereto, and statements made to me by HMI employees, including but not limited to Lawrence Luckett.

4.  Defendant HMI is an Illinois Corporation. HMI's offices are located at 485 South Frontage Road, Suite 200, Burr Ridge, Illinois 60527.

5.  Defendant Lawrence Luckett resides at 59 Woodview Lane, Lemont, Illinois 60439. A true and correct copy of a credit application Mr. Luckett submitted to GMAC is attached hereto as Exhibit A.

## WAREHOUSE LENDING – BACKGROUND

6.  GMAC engages in the business of Warehouse Lending for residential mortgage loans. As a warehouse lender, GMAC provides revolving lines of credit to mortgage lenders like HMI. The warehouse line of credit GMAC offers is intended to provide liquidity to

mortgage lenders, allowing them to make mortgage loans to individual home borrowers. The mortgage loan originated to the individual home borrowers by the mortgage lender is pledged to GMAC, as the warehouse lender, as security for GMAC's advances to the mortgage lender under the warehouse line of credit. GMAC perfects its interest in such mortgage loans by: (a) filings under the Uniform Commercial Code and other applicable law; and (b) possession of the promissory notes that evidence the mortgage loans. GMAC's security interest is released upon sale of the mortgage loan.

7.    Warehouse advances, however, are intended only as temporary funding for any individual mortgage loan. The warehouse advance made to the mortgage lender must typically be repaid within 120 days because the mortgage lender is expected to sell the mortgage loans to a third-party investor in the secondary market. The proceeds of such a sale satisfy amounts outstanding under the warehouse line of credit. Any excess proceeds then go to the mortgage lender. Contemporaneous with the receipt of proceeds of the sale of a mortgage loan, GMAC releases its security interest in the mortgage loan.

8.    From August 2007 through March 2008, GMAC made advances under a line of credit to HMI pursuant to a Warehousing Credit and Security Agreement dated as of August 20, 2007 (the "Credit Agreement"). The Credit Agreement is attached hereto as Exhibit B. The Credit Agreement was amended by a First Amendment to Warehousing Credit and Security Agreement, dated as of January 31, 2008; by a Second Amendment to Warehousing Credit and Security Agreement, dated as of February 22, 2008; and by a Third Amendment to Warehousing Credit and Security Agreement, dated as of March 3, 2008. A working copy of the Credit Agreement that incorporates all amendments through the date hereof is attached hereto as Exhibit C.

9.    Under the Credit Agreement, HMI provided a promissory note to GMAC (the "Note") to evidence all advances made to HMI under the Credit Agreement. The Loan obligated HMI to repay the funds advanced under the Credit Agreement with interest and fees. A true and correct copy of the Note, dated August 20, 2007, is attached hereto as Exhibit D.

10.    To secure its obligations under the Credit Agreement, HMI granted GMAC security interests in, among other things: (i) all mortgage loans pledged to GMAC in connection with any warehousing advance request (collectively, the "Pledged Loans") and all mortgage notes, mortgages, security agreements and other documents; (ii) all mortgage-backed securities backed in whole or in part on the basis of the Pledged Loans evidencing and securing the Pledged Loans; and (iii) all products and proceeds of the foregoing (collectively, the "Collateral").

## INTENDED OPERATION OF THE CREDIT AGREEMENT

11.    Pursuant to Section 2.1 of the Credit Agreement, to obtain an advance on its line of credit, HMI was required to "deliver to [GMAC] either a completed and signed request for a Warehousing Advance on [GMAC's] then current form or an Electronic Advance Request . . . ." This submission was also known as a "Batch Request." The Batch Request included, among other information, the identity of the borrower on a particular

mortgage loan, various information about the home borrower (such as the home borrower's social security number), the amount of the home borrower's mortgage loan and wiring instructions for the funds to be advanced under the Credit Agreement. Upon receipt of a Batch Request and loan investor commitment to purchase the home borrower's mortgage loan from HMI, GMAC would advance funds in support of the transactions identified on the Batch Request. Typically within seven days of the closing of such a transaction, HMI would send to GMAC a mortgage note signed by the home borrower and an "Endorsement Allonge," or "Allonge to Loan" executed by HMI.

12.     Based on the written agreements and prior course of dealing of GMAC and HMI, GMAC expected HMI to have advances outstanding against mortgage loans for varying time periods, but typically for less than 120 days. At some point prior to the expiration of 120 days, GMAC expected HMI to sell the mortgage loan to a loan investor. GMAC expected HMI to use the proceeds of the sale to repay the advance to GMAC. GMAC then expected HMI to repeat the process for further transactions.

13.     GMAC believed this process to have generally been occurring from August 2007 until March 2008, when GMAC learned that HMI was, at Lawrence Luckett's direction as described in greater detail below, engaged in a scheme to defraud GMAC.

## GMAC'S DISCOVERY OF THE FRAUDULENT SCHEME

14.     On or about February 27, 2008, HMI submitted to GMAC the "Murphy Loan" at Luckett's direction. The Murphy Loan purported to be for a mortgage loan for $288,750.00 executed by Nelson Murphy for the property located at 3512 W. Melrose Street, Chicago, Illinois 60618. Luckett stamped and signed the Murphy Loan. The Murphy Loan is attached hereto as Exhibit E.

15.     On or about March 10, 2008, HMI submitted to GMAC the "Nemeth Loan" at Luckett's direction. The "Nemeth Loan" purported to be a mortgage loan for $288,750.00 executed by Nelson Nemeth for property located at 3512 W. Melrose Street, Chicago, Illinois 60618. Thus, the Nemeth Loan was secured by same property that secured the Murphy Loan. Luckett stamped and signed the Nemeth Loan. The "Nemeth Loan" is attached hereto as Exhibit F.

16.     This development prompted GMAC to further investigate HMI's transactions. I was personally involved in the investigation and have personal knowledge of the information learned pursuant to this investigation. The investigation included a review of available documents and conversations with relevant individuals at HMI and other entities. GMAC's investigation revealed the following:

## FRAUDULENT LOAN PACKAGES

17.     GMAC's investigation included the review of documents for dozens of transactions with HMI. These documents revealed that HMI, at the direction and under the control of Lawrence Luckett (as he has admitted to me), submitted fictitious mortgage notes,

endorsement allonges, Batch requests and purchase advices (collectively, the "Fictitious Documents") to GMAC for the purpose of drawing funds on HMI's line of credit.

18.     In investigating the Fictitious Documents, I spoke with several of HMI's employees regarding the transactions under the GMAC line of credit. HMI employee Ebenezer Antwi-Nsiah stated to me that he submitted Batch Requests and mortgage notes to GMAC at Lawrence Luckett's direction. As revealed by GMAC's review of documents, these Batch Requests sought advances on GMAC's line of credit that were not collateralized by legitimate mortgage loans, but instead were collateralized by fictitious mortgage loans created by Luckett. The mortgage notes that purported to evidence the fictitious loans bore Luckett's stamp and signature. After reviewing the documents, it is apparent that the Fictitious Documents used false names and listed property addresses that did not actually secure the mortgage loans submitted at Luckett's direction.

19.     In reliance on the Fictitious Documents submitted by HMI at Luckett's direction, GMAC advanced funds to HMI from the line of credit.

20.     The investigation, which included the review of relevant documents and discussions with HMI employees, revealed that HMI, at Luckett's direction, took numerous steps to avoid detection and to perpetuate the fraudulent scheme. One such step was the use of a defunct title insurance company, Companion Title Services, Inc. ("Companion"), to receive the funds advanced by GMAC for the purpose of closing the home borrower's mortgage.[1] The Batch Requests demonstrate that HMI directed GMAC to wire transfer warehouse advances against fraudulent mortgage loans to a Companion bank account at JPMorganChase bank. Luckett has confirmed that he controlled the Companion Account at JPMorgan. Luckett has also confirmed that there were no actual mortgage loan closings and that Companion never engaged in any legitimate business.

21.     Another step HMI took to avoid detection and to perpetuate the fraudulent scheme was to cause the fictitious mortgages to be listed on the Mortgage Electronic Records System database ("MERS"). In my position at GMAC, I am familiar with and have occasion to review GMAC reports that are generated based on searches of the MERS database. MERS is a database that identifies investors in, servicers of and interim funders (warehouse lenders) of mortgage loans as holding an interest in the mortgages that secure mortgage loans. GMAC reviews the MERS database every night to ensure that MERS identifies GMAC's interest in connection with mortgages in which GMAC has an interest. For the properties securing the collateral for warehouse advances under HMI's line of credit with GMAC, HMI always listed GMAC's interest as an interim funder on MERS.

22.     As a part of its regularly conducted business activities, GMAC generates a report that identifies those properties in which GMAC holds an interest that should be reported on MERS but that are not reported on MERS. The report identifies the number of days that have lapsed between the funding of a particular mortgage loan and the listing of GMAC's

---

[1] A review of the public records of the Illinois Secretary of State's Office demonstrates that Companion was incorporated in the State of Illinois on January 14, 2005, but was involuntarily dissolved on June 6, 2006.

interest in that mortgage loan on the MERS database. If GMAC's interest in any such properties were not listed on MERS, under GMAC's business practices those properties would have been listed on the report.

23.    My review of relevant documents in the investigation also revealed that another step HMI took to avoid detection and to perpetuate the fraudulent scheme was to pretend to sell the fictitious mortgage loans to a legitimate investor, but instead of payments coming from the investor to GMAC, the payments came from another company controlled by Luckett, International Paper Exchange, Inc. ("International Paper"). HMI would direct GMAC to ship the home borrower's mortgage note for the investor's review and purchase to a legitimate investor. HMI would then warehouse new bogus mortgage loans with GMAC, direct an advance from GMAC to Companion to close the mortgage loan and deposit sufficient funds in International Paper's account to repay the advance against the existing fraudulent loans. HMI would use the funds in the International Paper account to pay for the "purchase" of the existing fraudulent loans, but would submit to GMAC fraudulent purchase advices purporting to be from the legitimate investor. An example of a fraudulent purchase advice is attached hereto as Exhibit G. HMI would then inform the legitimate investor that mortgage loans had been delivered in error, and direct that they be returned to HMI instead of GMAC.

## PRIOR FICTITIOUS LOANS

24.    HMI and Luckett have been submitting Fictitious Documents to GMAC as collateral for line of credit advances during the entire term of the Credit Agreement. Indeed, HMI and Luckett have been perpetrating the scheme under a predecessor agreement with Residential Funding Company, LLC, GMAC's affiliate, since February 2005, long before the Credit Agreement was executed.

25.    Pursuant to the scheme, HMI and Luckett secured advances under the warehouse line of credit that were collateralized by hundreds of fictitious mortgage loans.

## CURRENT FICTITIOUS LOANS

26.    As discussed below, HMI submitted 54 fictitious mortgage loans as collateral in support of advances on its line of credit with GMAC to which, as of the date of this affidavit, HMI remains indebted to GMAC. All such mortgage loans were submitted by HMI to GMAC at Luckett's direction between January 15, 2008 and March 10, 2008. Other than the specific false names, loan amounts and other basic identifying information, the false submissions were identical in format. The following documents illustrate the fraudulent transactions that occurred:

### The "Rathing" Loan

27.    On February 26, 2008, HMI submitted to GMAC a Batch Request requesting an advance on GMAC's line of credit. The Batch Request indicated that the advance would be secured by a mortgage loan on a property located at 3317 N. Pontiac Avenue, Chicago,

Illinois, 60634. The Batch Request indicated that the home borrower borrowing the mortgage loan was Jacob Rathing. The Batch Request sought an advance of $305,744, 97 percent of the loan amount. The Batch Request instructed that the advance on the line be wired to Companion's bank account No. XXXXX2118 at JPMorgan Chase Bank, NA in New York City. On that date, in reliance on the purported accuracy of the Batch Request as well as on its anticipated receipt of appropriate mortgage loan documents, GMAC wired $305,744 to the account listed on the Batch Request. The Rathing Batch Request is attached hereto as Exhibit H.

28. On or about March 10, 2008, HMI submitted to GMAC the "Rathing Loan" at Luckett's direction. The "Rathing Loan" purported to be a mortgage loan for $315,200.00 executed by Jacob and Kimberly Rathing for property located at 3317 N. Pontiac Avenue, Chicago, Illinois 60634. Luckett stamped and signed the mortgage note evidencing the Rathing Loan. The "Rathing Loan" is a fictitious loan. The "Rathing Loan" is attached hereto as Exhibit I.

29. As part of its recent investigation, GMAC ran a search of the social security number identified on the Batch Request as belonging to Jacob Rathing. GMAC's social security number search revealed that, in fact, no such social security number exists.

**The "Partipilo" Loan**

30. On February 11, 2008, HMI submitted to GMAC a Batch Request requesting an advance on GMAC's line of credit. The Batch Request indicated that the advance would be secured by a mortgage loan on a property located at 7710 W. Victoria Street, Chicago, Illinois, 60631. The Batch Request indicated that the home borrower borrowing the mortgage loan was Partipilo. The Batch Request sought an advance of $276,207.50, 97 percent of the loan amount. The Batch Request instructed that the advance on the line be wired to Companion's bank account No. XXXXX2118 at JPMorgan Chase Bank, NA in New York City. On that date, in reliance on the purported accuracy of the Batch Request as well as on its anticipated receipt of appropriate mortgage loan documents, GMAC wired $276,207.50 to the account listed on the Batch Request. The Partipilo Batch Request is attached hereto as Exhibit J.

31. On or about February 15, 2008, HMI submitted to GMAC the "Partipilo Loan" at Luckett's direction. The "Partipilo Loan" purported to be a mortgage loan for $284,750 executed by Michael and Mary Partipilo for property located at 7710 W. Victoria Street, Chicago, Illinois 60631. Luckett stamped and signed the mortgage note evidencing Partipilo Loan. The "Partipilo Loan" is a fictitious loan. The "Partipilo Loan" is attached hereto as Exhibit K.

32. As part of its recent investigation, GMAC ran a search of the social security number identified on the Batch Request as belonging to Partipilo. GMAC's social security number search revealed that, in fact, the Partipilo social security number belongs to an individual named Lightfoot. Lightfoot passed away in December 2005.

6

**The "Chilelli" Loan**

33.     On February 11, 2008, HMI submitted to GMAC a Batch Request requesting an advance on GMAC's line of credit.  The Batch Request indicated that the advance would be secured by a mortgage loan on a property located at 3204 W. Belmont Avenue, Chicago, Illinois, 60618.  The Batch Request indicated that the home borrower borrowing the mortgage loan was Francesco Chilelli.  The Batch Request sought an advance of $270,048, 97 percent of the loan amount.  The Batch Request instructed that the advance on the line be wired to Companion's bank account No. XXXXX2118 at JPMorgan Chase Bank, NA in New York City.  On that date, in reliance on the purported accuracy of the Batch Request as well as on its anticipated receipt of appropriate mortgage loan documents, GMAC wired $270,048 to the account listed on the Batch Request.  The Chilelli Batch Request is attached hereto as Exhibit J.

34.     On or about February 15, 2008, HMI submitted to GMAC the "Chilelli Loan" at Luckett's direction.  The "Chilelli Loan" purported to be a mortgage loan for $278,400 executed by Francesco Chilelli for property located at 3204 W. Belmont Avenue, Chicago, Illinois 60618.  Luckett stamped and signed the mortgage note evidencing the Chilelli Loan.  The "Chilelli Loan" is a fictitious loan.  The "Chilelli Loan" is attached hereto as Exhibit L.

35.     As part of its recent investigation, GMAC ran a search of the social security number identified on the Batch Request as belonging to Francesco Chilelli.  GMAC's social security number search revealed that, in fact, no such social security number exists.

**The "Adkins" Loan**

36.     On February 8, 2008, HMI submitted to GMAC a Batch Request requesting an advance on GMAC's line of credit.  The Batch Request indicated that the advance would be secured by a mortgage loan on a property located at 3751 N. Ridgeway, Chicago, Illinois, 60618.  The Batch Request indicated that the home borrower borrowing the mortgage loan was Brandon Adkins.  The Batch Request sought an advance of $290,563.50, 97 percent of the loan amount.  The Batch Request instructed that the advance on the line be wired to Companion's bank account No. XXXXX2118 at JPMorgan Chase Bank, NA in New York City.  On that date, in reliance on the purported accuracy of the Batch Request as well as on its anticipated receipt of appropriate mortgage loan documents, GMAC wired $290,563.50 to the account listed on the Batch Request.  The Adkins Batch Request is attached hereto as Exhibit M.

37.     On or about February 11, 2008, HMI submitted to GMAC the "Adkins Loan" at Luckett's direction.  The "Adkins Loan" purported to be a mortgage loan for $299,550 executed by Brandon Adkins for property located at 3751 N. Ridgeway Avenue, Chicago, Illinois 60618.  Luckett stamped and signed the mortgage note evidencing the Adkins Loan.  The "Adkins Loan" is a fictitious loan.  The "Adkins Loan" is attached hereto as Exhibit N.

38.     As part of its recent investigation, GMAC ran a search of the social security number identified on the Batch Request as belonging to Brandon Adkins.  GMAC's social security number search revealed that, in fact, the Brandon Adkins social security number belongs to an individual named Durham.  Durham passed away in January 2008.

**The "Gennett" Loan**

39.     On February 8, 2008, HMI submitted to GMAC a Batch Request requesting an advance on GMAC's line of credit.  The Batch Request indicated that the advance would be secured by a mortgage loan on a property located at 5442 W. Cullum Avenue, Chicago, Illinois, 60641.  The Batch Request indicated that the home borrower borrowing the mortgage loan was Kenneth Gennett.  The Batch Request sought an advance of $286,054, 97 percent of the loan amount.  The Batch Request instructed that the advance on the line be wired to Companion's bank account No. XXXXX2118 at JPMorgan Chase Bank, NA in New York City.  On that date, in reliance on the purported accuracy of the Batch Request as well as on its anticipated receipt of appropriate mortgage loan documents, GMAC wired $286,054 to the account listed on the Batch Request.  The Gennett Batch Request is attached hereto as Exhibit M.

40.     On or about February 11, 2008, HMI submitted to GMAC the "Gennett Loan" at Luckett's direction.  The "Gennett Loan" purported to be a mortgage loan for $294,900 executed by Kenneth and Elizabeth Gennett for property located at 5442 W. Cullum Avenue, Chicago, Illinois 60641.  Luckett stamped and signed the mortgage note evidencing the Gennett Loan.  The "Gennett Loan" is a fictitious loan.  The "Gennett Loan" is attached hereto as Exhibit O.

41.     As part of its recent investigation, GMAC ran a search of the social security number identified on the Batch Request as belonging to Kenneth Gennett.  GMAC's social security number search revealed that, in fact, no such social security number exists.

**CURRENT OUTSTANDING BALANCE FOR FICTITIOUS LOANS**

42.     In total, of the 54 fictitious mortgage notes that HMI submitted to GMAC as purported collateral to secure advances on HMI's line of credit and pursuant to which GMAC did advance the requested funds to Companion at account No. XXXXX2118, 49 of them:  1) are accompanied by an allonge that was stamped and signed by Lawrence Luckett; and 2) purport to be executed by home borrowers for whom HMI submitted social security numbers that either do not exist, or do exist but belong to a living or deceased individual who is not the person identified by HMI.

43.     In total, of the 54 fictitious mortgage notes that HMI submitted to GMAC as purported collateral to secure advances on HMI's line of credit and pursuant to which GMAC did advance the requested funds to Companion at account No. XXXXX2118, five of them: 1) purport to be executed by home borrowers for whom HMI submitted social security numbers that either do not exist, or do exist but belong to a living or deceased individual who is not the person identified by HMI; but 2) were never physically received by

GMAC because GMAC discovered the fraudulent scheme and notified the Defendants of their discovery before Defendants created and transmitted the fictitious mortgage notes.

44.    HMI currently has drawn on its line of credit with GMAC funds that are collateralized by fictitious mortgage loans totaling $15,088,692.41. GMAC advanced that money to HMI in reliance on the Fictitious Documents. The entire sum remains unpaid by HMI.

45.    Pursuant to Title 28, United States Code, Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   April 14, 2008

GMAC BANK

By:     Kelly Jasper
Lending Director, Warehouse & Financing
        Solutions
GMAC Bank
4301 S. Baldwin Road, Suite 400
Lake Orion, MI  48359

## TABLE OF CONTENTS
## EXHIBITS A-O

Exhibit A                              Credit Application

Exhibit B                              Warehousing Credit and Security Agreement

Exhibit C                              Warehousing Credit and Security Agreement

Exhibit D                              Promissory Note

Exhibit E                              Note

Exhibit F                              Note

Exhibit G                              Funding Reconciliation

Exhibit H                              RFTConnects Loan File Upload Report

Exhibit I                              Note

Exhibit J                              RFTConnects Loan File Upload Report

Exhibit K                              Note

Exhibit L                              Note

Exhibit M                              RFTConnects Loan File Upload Report

Exhibit N                              Note

Exhibit O                              Note

**EXHIBIT A**

# GMAC RFC

**PERSONAL FINANCIAL STATEMENT AS OF** 4/20/07

Date

**SUBMITTED TO: Residential Funding Corporation**

## PERSONAL INFORMATION

| APPLICANT (NAME) Lawrence A. Lockett | CO - APPLICANT (NAME) N/A | | |
|---|---|---|---|
| Employer Home Mortgage, Inc. | Employer | | |
| Address of Employer 485 S. Frontage Rd. Burr Ridge, IL 60527 | Address of Employer | | |
| Business Phone No. 630 522-0140 | No. of Years with Employer 7 yrs | Title/Position CEO | Business Phone No. | No. of Years with Employer | Title/Position |
| Name of previous employer & position (if with current employer less than 3 yrs.) | No. of years | Name of previous employer & position (if with current employer less than 3 yrs.) | No. of years |
| Home Address 59 Woodview Ln. Lemont, IL 60449 | Home Address | | |
| Business Phone No. | Social Security No. | Date of Birth | Business Phone No. | Social Security No. | Date of Birth |
| Name, Phone No. of your Accountant Joe Leave (708) 574-3838 | Name, Phone No. of your Accountant | | |
| Name, Phone No. of your Attorney Tom Thenson (815) 375-0505 | Name, Phone No. of your Attorney | | |
| Name, Phone No. of your Investment Advisor/Broker N/A | Name, Phone No. of your Investment Advisor/Broker | | |
| Name, Phone No. of your Insurance Advisor Julie Schuld (815) 933-7732 | Name, Phone No. of your Insurance Advisor | | |

## Cash Income & Expenditures Statement For Year Ended

(Omit cents)

| ANNUAL INCOME | AMOUNT ($) | ANNUAL EXPENDITURES | AMOUNT ($) |
|---|---|---|---|
| Salary (applicant) | $ 150,000. | Federal Income and Other Taxes | $ 24,000. |
| Salary (co-applicant) | | State Income and Other Taxes | 2,000. |
| Bonuses & Commissions (applicant) And ... Home ... | 7,800. | Rental Payments, Co-op, or Condo Maintenance | -0- |
| Bonuses & Commissions (co-applicant) | | Mortgage Payments Residential Investment | 65,344. |
| Rental Income | 25,800. | Property Taxes Residential Investment | 15,000. |
| Interest Income | 8,000. | Interest & Principal Payments on Loans | |
| Dividend Income | 4,000. | Insurance | 800. |
| Capital Gains | N/A | Investments (including tax shelters) | |
| Partnership Income | | Alimony/Child Support | -0- |
| Other Investment Income | | Tuition | -0- |
| Other Income (List) | | Other Living Expenses | -0- |
| | | Medical Expenses | 300. |
| | | Other Expenses (List) | |
| **TOTAL INCOME** | $ 195,600. | **TOTAL EXPENDITURES** | $ 107,444. |

Any significant changes expected in the next 12 months?     Yes   (No) (If yes, attach information).
** Income from alimony, child support, or separate maintenance income need not be revealed if the applicant or co-applicant does not wish to have it considered as a basis for repaying this obligation.

Balance Sheet as of _____

| ASSETS | AMOUNT ($) | LIABILITIES | AMOUNT ($) |
|---|---|---|---|
| Cash in this Bank | | Notes Payable to this Bank | X X X |
| (including money market accounts, CDs) | $   -0- | Secured | $   -0- |
| Cash in other financial institutions (List) | | Unsecured | -0- |
| (including money market accounts, CDs) | | | |
| Chase Checking | 10,000. | Notes Payable to Others (Schedule E) | X X X |
| Chase Savings | 9,000. | Secured | -0- |
| | | Unsecured | -0- |
| Readily Marketable Securities (Schedule A) | 240,000. | Accounts Payable (including credit cards) | 11,000 |
| Non-Readily Marketable Securities (Schedule A) | 250,000 | Margin Accounts | -0- |
| Accounts and Notes Receivable | | Notes Due: Partnership (Schedule D) | -0- |
| Net Cash Surrender Value of Life Insurance (Schedule B) | 20,000 | Taxes Payable | -0- |
| Residential Real Estate (Schedule C) | 1,100,000. | Mortgage Debt (Schedule C) | 889,000 |
| Real Estate Investments (Schedule C) | 500,000 | Life Insurance Loans (Schedule B) | -0- |
| Partnerships / PC Interests (Schedule D) | -0- | Other Liabilities (List): | -0- |
| IRA, Keogh, profit-sharing & Other Vested Retirement Accts. | | | |
| Deferred Income (number of years deferred        ) | | | |
| Personal Property (including automobiles) | 175,000 | | |
| Other Assets (List): | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | TOTAL LIABILITIES | 990,000. |
| | | NET WORTH | 1,319,000. |
| | $2,309,000 | | $2,309,000 |

| CONTINGENT LIABILITIES | YES | NO | AMOUNT |
|---|---|---|---|
| Are you a guarantor, co-maker, or endorser for any debt of an individual, corporation, or partnership? | yes | | $ 19,000,000 |
| Do you have any outstanding letters of credit or surety bonds? | | no | |
| Are there any suits or legal actions pending against you? | | no | |
| Are you contingently liable on any lease or contract? | | no | |
| Are any of your tax obligations past due? | | no | |
| What would be your total estimated tax liability if you were to sell your major assets? | | no | -0- |
| If yes for any of the above, give details: | | | |

RFR
WAA

## Schedule A - All Securities (including non-money market mutual funds)

| No. of Shares (Stock) or Face Value (Bonds) | DESCRIPTION | OWNER(S) | WHERE HELD | COST | CURRENT MARKET VALUE | PLEDGED YES | PLEDGED NO |
|---|---|---|---|---|---|---|---|
| READILY MARKETABLE SECURITIES (including U.S. Governments and Municipals) | | | | | | | |
| E-Trade Securities | LLC | Lal Luckett | E-Trade | | 20,000. | | ✓ |
| 0 | | | | | | | |
| | | | | | | | |
| NON-READILY MARKETABLE SECURITIES (closely held, thinly traded, or restricted stock) | | | | | | | |
| 250 | Home Mortgage, Inc | L. Luckett | self | 250,000 | 250,000 | | ✓ |

' If not enough space, attach a separate schedule or brokerage statement and enter totals only.

## Schedule B - Insurance
### Life Insurance  (use additional sheet if necessary)

| Insurance Company | Face Amount of Policy | Type of Policy | Beneficiary | Cash Surrender Value | Amount Borrowed | Ownership |
|---|---|---|---|---|---|---|
| Mony | 2,000,000. | Term | L. Gene Luckett | ø | ø | L. Luckett |
| Liberty | 500,000. | Term | Home Mortgage, Inc. | ø | ø | Home Mortgage, Inc |

| Disability Insurance | Applicant | Co-Applicant |
|---|---|---|
| Monthly Distribution if Disabled | 5,000.00 | |
| Numbers of Years Covered | Life | |

## Schedule C - Personal Residence & Real Estate Investments, Mortgage Debt (majority ownership only)

| Personal Residence Property Address | Legal Owner | Purchase Year | Price | Market Value | Present Loan Balance | Interest Rate | Loan Maturity Date | Monthly Payment | Lender |
|---|---|---|---|---|---|---|---|---|---|
| 59 Westover Ln Lemont, IL. | Lal Luckett | 1996 | 80,000 | 1,100,000 | 551,173 | 6% | 2029 | 4,377 | World Savings |
| | | | | | | | | | |
| | | | | | | | | | |

| Investment Property Address | Legal Owner | Purchase Year | Price | Market Value | Present Loan Balance | Interest Rate | Loan Maturity Date | Monthly Payment | Lender |
|---|---|---|---|---|---|---|---|---|---|
| 10 E LaSalle Chicago | Lal Luckett | 2005 | 335,000 | 394,000 | 310,000 | 6% | 2035 | 1,817.00 | Wells Fargo Residential |
| Mound Mall V Prints Inc | Lal Luckett | 1999 | 14,000 | 25,000 | ø | n/a | n/a | ø | n/a |
| 1853 W Division Frontline | Lal Luckett | 2001 | 135,000 | 195,000 | 118,000 | 7% | 2031 | 96.5 | Homecity, Inc |

## Schedule D - Partnerships (less than majority ownership for real estate partnerships)*

| Type of Investment | Date of Initial Investment | Cost | Percent Owned | Current Market Value | Balance Due on Partnerships: Notes, Cash Call | Final Contribution Date |
|---|---|---|---|---|---|---|
| Business/Professional (indicate name): | | | | | | |
| | | | | | | |
| | | | | | | |
| Investments (including Tax Shelters): | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

*Note: For investments which represent a material portion of your total assets, please include the relevant financial statements or tax returns, or in the case of partnership investments or S-corporations, schedule K-1s.

## Schedule E - Notes Payable

| Due to | Type of Facility | Amount of Line | Secured | | Collateral | Interest Rate | Maturity | Unpaid Balance |
|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | | | | |
| N/A | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## Please Answer the Following Questions:

1. Income tax returns filed through (date): _2006_  Are any returns currently being audited or contested?  Yes  (No)
   If yes, what year(s)? _____

2. Have (either of) you or any firm in which you were a major owner ever declared bankruptcy?  Yes  (No)
   If yes, please provide details: _____

3. Have you drawn a will?  (Yes)  No
   If yes, please furnish the name of the executor(s) and year will was drawn: _1999_  _David Platt_

4. Number of dependents (excluding self) and relationship to applicant:  _4_  _wife & 3 children_

5. Have you ever had a financial plan prepared for you?  Yes  (No)

6. Did you include two years federal and state tax returns?  Yes  (No)

7. Do (either of) you have a line of credit or unused credit facility at any other institution(s)?  Yes  (No)
   If so, please indicate where, how much, and name of banker: _____
   _____
   _____

8. Do you anticipate any substantial inheritances?  Yes  (No)
   If yes, please explain: _____
   _____
   _____

Page 4 of 5
Personal Financial Statement
11/01/97

**Representations and Warranties**

The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon the guarantee of the undersigned. The undersigned acknowledge and understand that you are relying on the information provided herein in deciding to grant or continue credit or to accept a guarantee thereof. Each of the undersigned represents, warrants and certifies that the information provided herein is true, correct and complete. Each of the undersigned agrees to notify you immediately and in writing of any change in name, address, or employment and of any material adverse change (1) in any of the information contained in this statement or (2) in the financial condition of any of the undersigned or (3) in the ability of any of the undersigned to perform its (or their) obligations to you. In the absence of such notice or a new and full written statement, this should be considered as a continuing statement and substantially correct. If the undersigned fail to notify you as required above, or if any of the information herein should prove to be inaccurate or incomplete in any material respect, you may declare the indebtedness of the undersigned or the indebtedness guaranteed by the undersigned, as the case may be, immediately due and payable. You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein and to determine the credit-worthiness of the undersigned. The undersigned authorize any person or consumer reporting agency to give you any information it may have on the undersigned. Each of the undersigned authorizes you to answer questions about your credit experience with the undersigned. As long as any obligation or guarantee of the undersigned to you is outstanding, the undersigned shall supply annually an updated financial statement. This personal financial statement and any other financial or other information that the undersigned give you shall be your property.

_4/20/07_
Date

_Lannon Leifett_
Your Signature

_____
Date

_____
Co-Applicant's Signature (if you are requesting the financial accommodation jointly)

**Authorization/Release of Owners and Guarantors, if applicable \***

\*    If your Firm is a closely-held private entity, please request **each owner** of the Firm to complete the following Authorization/Release. If the commitment from GMAC-RFC is guaranteed by any individual(s), please have **each Guarantor** complete the following Authorization/Release.

## I CERTIFY THAT, TO THE BEST OF MY KNOWLEDGE, ALL INFORMATION BEING SUBMITTED IS TRUE AND CORRECT.

By executing this form, the individual designated below hereby authorizes Residential Funding Corporation ("GMAC-RFC") at its discretion, to verify information the Firm or the undersigned person has provided to GMAC-RFC and its representatives and agents in the process of applying for approval from GMAC-RFC, and to obtain credit reports, business reference reports, and other information that is of concern to us.   In addition, the undersigned consents and gives GMAC-RFC permission to submit his/her name for screening through any and all mortgage industry databases, including, without limitation, databases operated by Mortgage Asset Research Institute, Inc., such as the Mortgage Industry Data Exchange ("MIDEX").  Further, the undersigned consents to the release of any information about the undersigned regarding incidents that GMAC-RFC believes to involve material fraud or misrepresentation.  The undersigned releases and agrees to hold harmless GMAC-RFC, Mortgage Asset Research Institute, Inc., all MIDEX subscribers, any trade associations that endorse the MIDEX system, and any reporting agency providing information to GMAC-RFC from any and all liability for damages, losses, costs, and expenses that may arise from the reporting or use of any information submitted by GMAC-RFC or any other MIDEX subscriber to Mortgage Asset Research Institute, Inc., recorded in the MIDEX system, and used in any way by GMAC-RFC or any other MIDEX subscriber.  GMAC-RFC acknowledges that all reports and information obtained pursuant to this authorization will be used only in connection with GMAC-RFC's consideration and any resulting relationship, and not for any consumer credit purposes.  A photocopy of this release shall be deemed to have the same authority as an original hereof, and any recipient hereof shall be entitled to rely on such photocopy in providing information to GMAC-RFC.

Name of Firm:    _Home Mortgage, Inc._

By:    _Lawrence Luckett_
       Signature                                                        Date    _4/20/07_
By:    _LAWRENCE Luckett_
       Printed Name                                              Ownership %    _.24 %_
E-mail address:    _LLuckett@Home Mtg Inc. com_    SSN: _____
Home Address:    _59 Woodview Ln._
                 _Lemont, IL. 60439_
Home Telephone Number:    _(630) 243-8190_
Date of Birth:    _October 13, 1956_

**Please return this questionnaire and all required exhibits to:**
_Kelly Jasper_                              **, Account Officer GMAC-RFC**

**EXHIBIT B**

# WAREHOUSING CREDIT AND SECURITY AGREEMENT

BETWEEN

**HOME MORTGAGE, INC.,**
**an Illinois corporation**

AND

**GMAC BANK,**
**a Utah industrial bank**

**Dated as of August 20, 2007**

EXECUTED          EXECUTED

# TABLE OF CONTENTS

1.    THE CREDIT...................................................................................................1-1
      1.1.   The Warehousing Commitment......................................................1-1
      1.2.   Expiration of Warehousing Commitment.......................................1-1
      1.3.   Warehousing Note..........................................................................1-1
2.    PROCEDURES FOR OBTAINING ADVANCES................................................1-1
      2.1.   Warehousing Advances..................................................................2-1
3.    INTEREST, PRINCIPAL AND FEES.................................................................2-1
      3.1.   Interest............................................................................................3-1
      3.2.   Interest Limitation...........................................................................3-1
      3.3.   Principal Payments.........................................................................3-1
      3.4.   Buydowns........................................................................................3-1
      3.5.   Non-Usage Fees.............................................................................3-4
      3.6.   Loan Package Fees, Wire Fees, Check Fees and Warehousing Fees.......3-5
      3.7.   Earnings Credit...............................................................................3-5
      3.8.   Miscellaneous Fees and Charges..................................................3-5
      3.9.   Overdraft Advances.........................................................................3-5
      3.10.  Method of Making Payments...........................................................3-6
4.    COLLATERAL...................................................................................................3-6
      4.1.   Grant of Security Interest................................................................4-1
      4.2.   Maintenance of Collateral Records.................................................4-1
      4.3.   Release of Security Interest in Pledged Assets..............................4-2
      4.4.   Collection and Servicing Rights......................................................4-2
      4.5.   Return of Collateral at End of Warehousing Commitment.............4-4
      4.6.   Delivery of Collateral Documents...................................................4-4
5.    CONDITIONS PRECEDENT.............................................................................4-4
      5.1.   Initial Advance.................................................................................5-1
      5.2.   Each Advance..................................................................................5-1
      5.3.   Force Majeure..................................................................................5-2
6.    GENERAL REPRESENTATIONS AND WARRANTIES.....................................5-3
      6.1.   Place of Business............................................................................6-1
      6.2.   Organization; Good Standing; Subsidiaries....................................6-1
      6.3.   Authorization and Enforceability.....................................................6-1
      6.4.   Authorization and Enforceability of Guaranty.................................6-1
      6.5.   Approvals.........................................................................................6-1
      6.6.   Financial Condition..........................................................................6-2
      6.7.   Borrower SMMEA Qualification.......................................................6-2
      6.8.   Litigation..........................................................................................6-2
      6.9.   Compliance with Laws.....................................................................6-2
      6.10.  Regulation U....................................................................................6-3
      6.11.  Investment Company Act.................................................................6-3
      6.12.  Payment of Taxes............................................................................6-3
      6.13.  Agreements......................................................................................6-3
      6.14.  Title to Properties............................................................................6-3
      6.15.  ERISA...............................................................................................6-4
      6.16.  No Retiree Benefits..........................................................................6-4
      6.17.  Assumed Names..............................................................................6-4
      6.18.  Servicing..........................................................................................6-4

7.   **AFFIRMATIVE COVENANTS** ...................................................................................... 7-1
     7.1.   Payment of Obligations ............................................................................... 7-1
     7.2.   Financial Statements .................................................................................. 7-1
     7.3.   Other Borrower Reports .............................................................................. 7-1
     7.4.   Maintenance of Existence; Conduct of Business ........................................ 7-1
     7.5.   Compliance with Applicable Laws ............................................................... 7-2
     7.6.   Inspection of Properties and Books; Operational Reviews .......................... 7-2
     7.7.   Notice ........................................................................................................ 7-2
     7.8.   Payment of Debt, Taxes and Other Obligations ......................................... 7-3
     7.9.   Insurance ................................................................................................... 7-3
     7.10.  Closing Instructions ................................................................................... 7-4
     7.11.  Subordination of Certain Indebtedness ...................................................... 7-4
     7.12.  Other Loan Obligations .............................................................................. 7-4
     7.13.  ERISA ....................................................................................................... 7-4
     7.14.  Use of Proceeds of Warehousing Advances ............................................... 7-4
     7.15.  Quality Control ........................................................................................... 7-5
8.   **NEGATIVE COVENANTS** ........................................................................................ 7-5
     8.1.   Contingent Liabilities ................................................................................. 8-1
     8.2.   Pledge of Collateral or Servicing Contracts ............................................... 8-1
     8.3.   Restrictions on Fundamental Changes ....................................................... 8-1
     8.4.   Subsidiaries ............................................................................................... 8-1
     8.5.   Deferral of Subordinated Debt .................................................................... 8-1
     8.6.   Loss of Eligibility, Licenses or Approvals ................................................... 8-2
     8.7.   Accounting Changes .................................................................................. 8-2
     8.8.   Leverage Ratio ........................................................................................... 8-2
     8.9.   Minimum Tangible Net Worth ...................................................................... 8-2
     8.10.  Minimum Liquid Assets .............................................................................. 8-2
     8.11.  Permanent Buydown ................................................................................... 8-2
     8.12.  Net Income/Net Loss .................................................................................. 8-2
     8.13.  Distributions to Borrower's Equity Holders ................................................. 8-2
     8.14.  Transactions with Affiliates ........................................................................ 8-2
     8.15.  Recourse Servicing Contracts .................................................................... 8-3
9.   **SPECIAL REPRESENTATIONS, WARRANTIES AND COVENANTS
     CONCERNING COLLATERAL** ................................................................................. 8-3
     9.1.   Special Representations, Warranties and Covenants Concerning
            Eligibility as Seller/Servicer of Mortgage Loans ......................................... 9-1
     9.2.   Special Representations and Warranties Concerning Warehousing
            Collateral ................................................................................................... 9-1
     9.3.   Special Affirmative Covenants Concerning Warehousing Collateral .............. 9-1
     9.4.   Special Negative Covenants Concerning Warehousing Collateral ................ 9-3
10.  **DEFAULTS; REMEDIES** ......................................................................................... 9-4
     10.1.  Events of Default ....................................................................................... 10-1
     10.2.  Remedies ................................................................................................... 10-1
     10.3.  Application of Proceeds .............................................................................. 10-2
     10.4.  Lender Appointed Attorney-in-Fact ............................................................. 10-5
     10.5.  Right of Set-Off .......................................................................................... 10-5
11.  **MISCELLANEOUS** ................................................................................................. 10-6
     11.1.  Notices ...................................................................................................... 11-1
     11.2.  Reimbursement of Expenses; Indemnity ..................................................... 11-1
     11.3.  Financial Information .................................................................................. 11-1
     11.4.  Terms Binding Upon Successors; Survival of Representations ..................... 11-2
     11.5.  Assignment ................................................................................................ 11-3
     11.6.  Amendments .............................................................................................. 11-3
     11.7.  Governing Law ........................................................................................... 11-3

|        | 11.8.  | Participations ...................................................................................................... |        |
|--------|--------|-------------------------------------------------------------------------------------------------------|--------|
|        | 11.9.  | Relationship of the Parties ..................................................................................... | 11-3   |
|        | 11.10. | Severability ............................................................................................ | 11-3   |
|        | 11.11. | Consent to Credit References ................................................................................... | 11-4   |
|        | 11.12. | Consent to Information Sharing with GMAC Affiliates ............................................. | 11-4   |
|        | 11.13. | Counterparts ........................................................................................... | 11-4   |
|        | 11.14. | Headings/Captions .................................................................................... | 11-4   |
|        | 11.15. | Entire Agreement ..................................................................................... | 11-4   |
|        | 11.16. | Consent to Jurisdiction ................................................................................ | 11-4   |
|        | 11.17. | Waiver of Jury Trial ................................................................................... | 11-4   |
|        | 11.18. | Waiver of Punitive, Consequential, Special or Indirect Damages ............................... | 11-5   |
| 12.    | **DEFINITIONS** .................................................................................................. | | 11-5 |
|        | 12.1.  | Defined Terms .......................................................................................... | **12-1** |
|        | 12.2.  | Other Definitional Provisions; Terms of Construction ............................................. | 12-14  |

# EXHIBITS

| Exhibit A | Warehousing Advance Request |
| Exhibit B | Procedures and Documentation for Warehousing Mortgage Loans |
| Exhibit C | Schedule of Servicing Portfolio |
| Exhibit D | Borrower Ownership and Subsidiaries |
| Exhibit E | Compliance Certificate |
| Exhibit F | Schedule of Lines of Credit |
| Exhibit G | Assumed Names |
| Exhibit H | Eligible Assets |
| Exhibit I | Schedule of Miscellaneous Fees |

# WAREHOUSING CREDIT AND SECURITY AGREEMENT

**WAREHOUSING CREDIT AND SECURITY AGREEMENT,** dated as of August 20, 2007 between HOME MORTGAGE, INC., an Illinois corporation ("Borrower"), and GMAC BANK, a Utah industrial bank ("Lender").

A.   Borrower has requested certain financing from Lender.

B.   Lender has agreed to provide that financing to Borrower, subject to the terms and conditions of this Agreement.

C.   Subject to Borrower's satisfaction of the conditions set forth in Article 5, the "Closing Date" for the transactions contemplated by this Agreement is the date set forth as the Closing Date on the signature page to this Agreement.

NOW, THEREFORE, the parties to this Agreement agree as follows:

# 1.    THE CREDIT

## 1.1.    The Warehousing Commitment

On the terms and subject to the conditions and limitations of this Agreement, including <u>Exhibit H</u>, Lender agrees to make Warehousing Advances to Borrower from the Closing Date to the Business Day immediately preceding the Warehousing Maturity Date, during which period Borrower may borrow, repay and reborrow in accordance with the provisions of this Agreement. Lender has no obligation to make Warehousing Advances in an aggregate amount outstanding at any time in excess of the lesser of (a) the Warehousing Commitment Amount, or (b) the Aggregate Warehousing Collateral Value. While a Default or Event of Default exists, Lender may refuse to make any additional Warehousing Advances to Borrower. All Warehousing Advances under this Agreement constitute a single indebtedness, and all of the Collateral is security for the Warehousing Note and for the performance of all of the Obligations. If the initial Warehousing Advance has not been made within 15 days after the Closing Date, the Warehousing Commitment and Lender's obligation to make Warehousing Advances to Borrower under this Agreement will automatically terminate, and all Obligations (including any Obligations arising under Section 11.2) will automatically become due and payable, without presentment, demand or other Notice or requirements of any kind, all of which Borrower expressly waives.

## 1.2.    Expiration of Warehousing Commitment

The Warehousing Commitment expires on the earlier of ("<u>Warehousing Maturity Date</u>"): (a) May 1, 2008, as such date may be extended in writing by Lender, in its sole discretion, on which date the Warehousing Commitment will expire of its own term and the Warehousing Advances will become due and payable without the necessity of Notice or action by Lender, (b) the date that is 90 days after Lender gives Notice to the other of termination of the Warehousing Commitment, on which date the Warehousing Commitment will expire of its own term and the Warehousing Advances will become due and payable without the necessity of any further Notice or action by Lender, and (c) the date the Warehousing Commitment is terminated and the Warehousing Advances become due and payable under Section 10.2.

## 1.3.    Warehousing Note

Warehousing Advances are evidenced by Borrower's promissory note, payable to Lender on the form prescribed by Lender ("<u>Warehousing Note</u>"). The term "Warehousing Note" as used in this Agreement includes all amendments, restatements, renewals or replacements of the original Warehousing Note and all substitutions for it. All terms and provisions of the Warehousing Note are incorporated into this Agreement.

**End of Article 1**

## 2.    PROCEDURES FOR OBTAINING ADVANCES

### 2.1.    Warehousing Advances

To obtain a Warehousing Advance under this Agreement, Borrower must deliver to Lender either a completed and signed request for a Warehousing Advance on Lender's then current form or an Electronic Advance Request ("Warehousing Advance Request"), not later than (a) in the case of Electronic Advance Requests, 2:30 p.m. on the Business Day, and (b) in all other cases, 1 Business Day before the Business Day on which Borrower desires the Warehousing Advance. Subject to the delivery of a Warehousing Advance Request and the satisfaction of the conditions and limitations of this Agreement, including the conditions set forth in Sections 5.1 and 5.2, Borrower may obtain a Warehousing Advance under this Agreement upon compliance with the procedures set forth in this Section and in the applicable Exhibit B, including delivery to Lender of all required Collateral Documents. Lender's current form of Warehousing Advance Request is set forth in the applicable Exhibit A.  Upon not less than 3 Business Days' prior Notice to Borrower, Lender may modify its form of Warehousing Advance Request and any other Exhibit or document referred to in this Section to conform to current legal requirements or Lender practices and, as so modified, those Exhibits and documents will become part of this Agreement.

**End of Article 2**

## 3.    INTEREST, PRINCIPAL AND FEES

### 3.1.    Interest

3.1 (a)   Except as otherwise provided in this Section, Borrower must pay interest on the unpaid amount of each Warehousing Advance from the date the Warehousing Advance is made until it is paid in full at the Interest Rate specified in Exhibit H.

3.1 (b)   Lender computes interest on the basis of the actual number of days in each month and a year of 360 days. Borrower must pay interest monthly in arrears, not later than 9 days after the date of Lender's monthly invoice and on the Warehousing Maturity Date.

3.1 (c)   If, for any reason Borrower repays a Warehousing Advance on the same day that it was made by Lender, Borrower must pay Lender an administrative fee equal to 1 day of interest on that Warehousing Advance at the Interest Rate that would otherwise have been applicable under Exhibit H.  Borrower must pay all administrative fees within 9 days after the date of Lender's invoice.

3.1 (d)   Lender will adjust the rates of interest provided for in this Agreement as of the effective date of each change in the applicable Interest Rate Index. Lender's determination of such rates of interest as of any date of determination is conclusive and binding, absent manifest error.

3.1 (e)   After an Event of Default occurs and upon Notice to Borrower by Lender, the unpaid amount of each Warehousing Advance will bear interest at the Default Rate until paid in full.

### 3.2.    Interest Limitation

Lender does not intend, by reason of this Agreement, the Warehousing Note or any other Loan Document, to receive interest in excess of the amount permitted by applicable law. If Lender receives any interest in excess of the amount permitted by applicable law, whether by reason of acceleration of the maturity of this Agreement, the Warehousing Note or otherwise, Lender will apply the excess to the unpaid principal balance of the Warehousing Advances and not to the payment of interest. If all Warehousing Advances have been paid in full and the Warehousing Commitment has expired or has been terminated, Lender will remit any excess to Borrower. This Section controls every other provision of all agreements between Borrower and Lender and is binding upon and available to any subsequent holder of the Warehousing Note.

### 3.3.    Principal Payments

3.3 (a)   Borrower must pay Lender the outstanding principal amount of all Warehousing Advances on the Warehousing Maturity Date.

3.3 (b)   Except as otherwise provided in Section 3.1, Borrower may prepay any portion of the Warehousing Advances without premium or penalty at any time pursuant to Section 3.4 or Section 4.3(d).  If at any time the Warehousing Advances outstanding under this Agreement exceed the lesser of (i) the Warehousing Commitment Amount or (ii) the Aggregate Warehousing Collateral Value, Borrower must immediately pay to Lender without the necessity of prior demand or Notice from Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, the amount of such excess.

3.3 (c)   Borrower must pay to Lender, without the necessity of prior demand or Notice from Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, the amount of any outstanding Warehousing Advance against a specific Pledged Asset upon the earliest occurrence of any of the following events:

    (1)   One (1) Business Day elapses from the date a Warehousing Advance was made if the Pledged Loan to be funded by that Warehousing Advance has not closed and funded.

    (2)   Ten (10) Business Days elapse without the return of a Collateral Document delivered by Lender to Borrower under a Trust Receipt for correction or completion.

    (3)   On the date on which a Pledged Loan is determined to have been originated based on untrue, incomplete or inaccurate information or otherwise to be subject to fraud, whether or not Borrower had knowledge of the misrepresentation, incomplete or inaccurate information or fraud, or on the date on which Borrower knows, or has reason to know, or receives Notice from Lender, that (A) one or more of the representations and warranties set forth in Article 9 were inaccurate or incomplete in any material respect on any date when made or deemed made or became inaccurate or incomplete after any such date with respect to such Pledged Loan or (B) Borrower has failed to perform or comply with any covenant, term or condition set forth in Article 9 with respect to such Pledged Loan.

    (4)   On the date on which any other Pledged Asset is determined to be subject to fraud, whether or not Borrower had knowledge of the fraud, or on the date on which Borrower knows, or has reason to know, or receives Notice from Lender, that (A) one or more of the representations and warranties set forth in Article 9 were inaccurate or incomplete in any material respect on any date when made or deemed made or became inaccurate or incomplete after any such date with respect to such other Pledged Asset or (B) Borrower has failed to perform or comply with any covenant, term or condition set forth in Article 9 with respect to such other Pledged Asset.

    (5)   On the date on which a Pledged Loan or a Lien prior to the Mortgage securing repayment of the Pledged Loan has been in default for a period of 60 days or more.

    (6)   Upon the sale, other disposition or prepayment of any Pledged Asset or, with respect to a Pledged Loan included in an Eligible Mortgage Pool, upon the sale or other disposition of the related Agency Security.

    (7)   One (1) Business Day immediately preceding the date scheduled for the foreclosure or trustee sale of the Mortgaged Property securing a Pledged Loan.

3.3 (d)   Upon telephonic or written Notice to Borrower by Lender, Borrower must pay to Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, the amount of any outstanding Warehousing Advance against a specific Pledged Asset upon the earliest occurrence of any of the following events:

    (1)   For any Pledged Asset other than an Aged Pledged Asset, the Standard Warehouse Period elapses and, for any Aged Pledged Asset, the Aged Warehouse Period elapses.

(2)     Forty-five (45) days elapse from the date a Pledged Asset was delivered to an Investor or Approved Custodian for examination and purchase or for inclusion in a Mortgage Pool, without the purchase being made or an Eligible Mortgage Pool being initially certified, or upon rejection of a Pledged Asset as unsatisfactory by an Investor or Approved Custodian.

(3)     Seven (7) Business Days elapse from the date a Wet Settlement Advance was made against a Pledged Loan without receipt by Lender of all Collateral Documents relating to the Pledged Loan.

(4)     With respect to any Pledged Asset, any of the Collateral Documents, upon examination by Lender, are found not to be in compliance with the requirements of this Agreement or the related Purchase Commitment (if a Purchase Commitment is required by Exhibit H).

(5)     If, after giving effect to a new Warehousing Advance against a Pledged Asset or to the payment of existing Warehousing Advances against Pledged Assets, any of the limitations set forth in Exhibit H have been exceeded.

(6)     Three (3) Business Days after the mandatory delivery date of the related Purchase Commitment if the specific Pledged Asset has not been delivered under the Purchase Commitment prior to such mandatory delivery date, or on the date the related Purchase Commitment expires or is terminated, unless, in each case, the Pledged Asset is eligible for delivery to another Investor under a comparable Purchase Commitment.

3.3 (e)   In addition to the payments required by Sections 3.3(a), 3.3(c) and 3.3(d), if the principal amount owing by the obligor(s) on any Pledged Asset is prepaid in whole or in part while a Warehousing Advance is outstanding against the Pledged Asset, Borrower must pay to Lender, without the necessity of prior demand or Notice from Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, the amount of the prepayment, to be applied against the related Warehousing Advance.

3.3 (f)   The proceeds of the sale or other disposition of Pledged Assets must be paid directly by the Investor to the Cash Collateral Account. Borrower must give Notice to Lender in writing, by telephone or by RFConnects Delivery (and if by telephone, followed promptly by written Notice) of the Pledged Assets for which proceeds have been received. Upon receipt of Borrower's Notice, Lender will apply any proceeds deposited into the Cash Collateral Account to the payment of the Warehousing Advances related to the Pledged Assets identified by Borrower in its Notice, and those Pledged Assets will be considered to have been redeemed from pledge. Lender is entitled to rely upon Borrower's affirmation that deposits in the Cash Collateral Account represent payments from Investors for the purchase of the Pledged Assets specified by Borrower in its Notice. If the payment from an Investor for the purchase of Pledged Assets is less than the outstanding Warehousing Advances against the Pledged Assets identified by Borrower in its Notice, Borrower must pay to Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, an amount equal to that deficiency. As long as no Default or Event of Default exists, Lender will return to Borrower any excess payment from an Investor for Pledged Assets.

3.3 (g)   Lender reserves the right to revalue any Pledged Asset. Borrower must pay to Lender, without the necessity of prior demand or Notice from Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, any amount required after any such revaluation to reduce the principal amount of the

Warehousing Advance outstanding against the revalued Pledged Asset to an amount equal to the Advance Rate for the applicable type of Pledged Asset multiplied by the Fair Market Value of the Pledged Asset.

## 3.4.    Buydowns

3.4 (a)    Borrower may prepay a portion of the Warehousing Advances outstanding under this Agreement (individually "Buydown" and collectively "Buydowns") upon Notice to Lender not later than (a) 1:00 p.m. on the Business Day immediately preceding the Business Day on which Borrower desires to make a Buydown in the amount of $10,000,000 or more or (b) 1:00 p.m. on the Business Day on which Borrower desires to make a Buydown in an amount less than $10,000,000. Each Buydown must be in an amount not less than $5,000, and Borrower may not make Buydowns that, together with any outstanding Investor Proceeds Buydowns, exceed the aggregate principal balance of all Warehousing Advances outstanding under this Agreement. A Buydown is a reduction in the aggregate amount of the Warehousing Advances outstanding under this Agreement, but does not represent the prepayment of any particular Warehousing Advance for the purposes of any Pledged Assets specifically related to such Warehousing Advances, and does not entitle Borrower to the release of any Collateral, including Collateral consisting of the proceeds of Pledged Assets described in Sections 3.3(e) or 3.3(f). To reduce interest payable by Borrower, Lender may apply Buydowns to Warehousing Advances outstanding under this Agreement in any order determined by Lender in its sole discretion. Subject to the satisfaction of the conditions set forth in Sections 5.2(d) and 5.2(e) (which apply as if the requested reborrowing were a Warehousing Advance), Borrower may, from the Closing Date to the Business Day immediately preceding the Warehousing Maturity Date, reborrow all or any portion of the Buydowns in excess of any Permanent Buydown upon Notice to Lender not later than (c) 1:00 p.m. on the Business Day immediately preceding the Business Day on which Borrower desires to reborrow $10,000,000 or more or (d) 1:00 p.m. on the Business Day that Borrower desires to reborrow an amount less than $10,000,000. If Lender receives Buydowns or a combination of Buydowns, together with any outstanding Investor Proceeds Buydowns, and payments of Warehousing Advances that exceed the aggregate principal balance of the Warehousing Advances outstanding under this Agreement ("Excess Buydown"), as long as no Default or Event of Default exists, Borrower may request that Lender return all or any portion of an Excess Buydown in excess of any Permanent Buydown upon Notice to Lender not later than (y) 1:00 p.m. on the Business Day immediately preceding the Business Day on which Borrower requests the return of $10,000,000 or more or (z) 1:00 p.m. on the Business Day that Borrower requests the return of less than $10,000,000. Alternatively, Lender may, in its sole discretion, return to Borrower all or any portion of an Excess Buydown in excess of any Permanent Buydown by causing the Funding Bank to credit the Operating Account in that amount. Lender has no obligation to pay or provide to Borrower any interest, dividends or other benefits on an Excess Buydown.

3.4 (b)    From proceeds of each sale or other disposition of Pledged Assets, Borrower must prepay a portion of the Warehousing Advances outstanding under this Agreement (each an "Investor Proceeds Buydown" and collectively "Investor Proceeds Buydowns") in an amount equal to 0.25% of such sale or other disposition proceeds. Borrower must make Investor Proceeds Buydowns as long as any Obligations, other than Obligations arising under this Agreement, remain outstanding, whether or not disputed, until the aggregate amount of such Investor Proceeds Buydowns equals $300,000. An Investor Proceeds Buydown is a reduction in the aggregate amount of the Warehousing Advances outstanding under this Agreement, but does not represent the prepayment of any particular Warehousing Advance, and does not entitle Borrower to the release of any Collateral. Lender will apply Investor Proceeds Buydowns to Warehousing Advances outstanding under this Agreement to reduce interest payable by Borrower or apply

those Investor Proceeds Buydowns to outstanding Obligations, in each case, in any order determined by Lender in its sole discretion. Lender may, from time to time in its sole discretion, readvance all or any portion of the Investor Proceeds Buydowns and apply the amount readvanced to satisfy any Obligations of Borrower to Lender then due and payable. Any such readvance to Borrower will increase the amount of Warehousing Advances outstanding under this Agreement by the amount of such readvance. Unless a Default or Event of Default exists, Borrower may reborrow all or any portion of the Investor Proceeds Buydowns in excess of $300,000 upon Notice to Lender not later than (m) 1:00 p.m. on the Business Day immediately preceding the Business Day on which Borrower desires to reborrow $10,000,000 or more or (n) 1:00 p.m. on the Business Day that Borrower desires to reborrow an amount less than $10,000,000.

## 3.5.    Non-Usage Fees

Borrower must pay to Lender a fee ("Non-Usage Fee") in the amount set forth in Exhibit I. The Non-Usage Fee is payable monthly, in arrears and will be calculated and payable for each month during the term of this Agreement as further described in Exhibit I. Borrower must pay the Non-Usage Fee within 9 days after the date of Lender's invoice. On the Warehousing Maturity Date, Borrower must pay the prorated portion of the Non-Usage Fee for the period from and including the first day following the month and for which the Non-Usage Fee was last paid through and including the Warehousing Maturity Date. Each increase and each decrease in the Warehousing Commitment Amount will be given effect for purposes of calculating the Non-Usage Fee during the period any such increase or decrease applies. Lender's determination of the Non-Usage Fee for any period is conclusive and binding, absent manifest error.

## 3.6.    Loan Package Fees, Wire Fees, Check Fees and Warehousing Fees

At the time of each Warehousing Advance against an Eligible Asset, Borrower will incur a loan package fee ("Loan Package Fee") and either or both of (depending on the applicable disbursement methods) a wire fee ("Wire Fee") or a check fee ("Check Fee"). At Lender's discretion, Loan Package Fees, Wire Fees or Check Fees may be billed separately or combined into a single warehousing fee ("Warehousing Fee"). Borrower must pay all Loan Package Fees, Wire Fees and Check Fees, or as applicable, Warehousing Fees in the amount set forth in Exhibit I within 9 days after the date of Lender's invoice.

## 3.7.    Earnings Credit

Each month Funding Bank provides a benefit to Lender in the form of an earnings credit ("Earnings Credit") based on Borrower amounts held on deposit in Funding Bank Accounts. The Earnings Credit provided to Lender each month cannot exceed the Funding Bank Fees and Charges for the related month. Each month Lender will apply the Earnings Credit for such month (a) first against Funding Bank Fees and Charges for such month paid or payable by Borrower, and (b) second against Funding Bank Fees and Charges for such month paid or payable by Lender. The Earnings Credit for a particular month can only be applied against the Funding Bank Fees and Charges for such month and cannot and will not be applied (a) against any Funding Bank Fees and Charges for any other month, (b) against any other amount owing by Borrower under this Agreement, or (c) as any sort of cash benefit payable to Borrower.

## 3.8.    Miscellaneous Fees and Charges

Borrower must reimburse Lender for all Miscellaneous Fees and Charges. Borrower must pay all Miscellaneous Fees and Charges within 9 days after the date of Lender's invoice.

### 3.9. Overdraft Advances

If, under the authorization given by Borrower in the Funding Bank Agreement or pursuant to this Agreement, Lender debits Borrower's Operating Account or directs the Funding Bank to honor an item presented against the Operating Account or against the Check Disbursement Account, and that debit or direction results in an overdraft, Lender may make an additional advance to fund that overdraft ("Overdraft Advance"). Borrower must pay (a) the outstanding amount of any Overdraft Advance, within 1 Business Day after the date of the Overdraft Advance, and (b) interest on the amount of the Overdraft Advance, at a rate per annum equal to the Prime Rate plus 2%, within 9 days after the date of Lender's invoice.

### 3.10. Method of Making Payments

3.10 (a)   Unless otherwise specified in this Agreement, Borrower must make all payments under this Agreement to Lender by the close of business on the date when due unless the date is not a Business Day. If the due date is not a Business Day, payment is due on, and interest will accrue to, the next Business Day. Borrower must make all payments in United States dollars in immediately available funds transferred by wire transfer to accounts designated by Lender.

3.10 (b)   Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for any interest or fees due and payable to Lender on or after the 9th day after the date of Lender's invoice without the necessity of prior demand or Notice from Lender.

3.10 (c)   While a Default or Event of Default exists, Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for any Obligations due and payable to Lender, without the necessity of prior demand or Notice from Lender.

**End of Article 3**

## 4.    COLLATERAL

### 4.1.    Grant of Security Interest

Borrower pledges and assigns to Lender and grants Lender a continuing security interest in all of Borrower's right, title and interest in and to each and every asset, right and property described in this Section 4.1 whether now existing or later arising, whether presently owned or later acquired and wherever located ("Collateral"), as security for the payment and performance of each and all of the Obligations:

4.1 (a)   All Mortgage Loans (i) against which Lender has made a Warehousing Advance, (ii) identified as being pledged to Lender on any Warehousing Advance Request or other agreement of pledge, or (iii) for which the related Mortgage Note has been delivered to or has otherwise come into the possession, custody or control of Lender or a third party acting on Lender's behalf (collectively, the "Pledged Loans" and each a "Pledged Loan"), together with all Income from the foregoing;

4.1 (b)   All Mortgage Notes, Mortgages and Security Agreements and other instruments, documents, chattel paper and agreements evidencing or securing any or all of the Pledged Loans;

4.1 (c)   All Mortgage-backed Securities (i) that are backed in whole or in part by any Pledged Loan, (ii) identified as being pledged to Lender on any Warehousing Advance Request or other agreement of pledge, (iii) with respect to which Lender or a third party acting on Lender's behalf has been identified as the nominal or beneficial owner of such Mortgage-backed Security, or (iv) which have been delivered to or have otherwise come into the possession, custody or control of Lender or a third party acting on Lender's behalf, together with all cash and non-cash distributions in respect of the foregoing (collectively, the "Pledged Securities" and each a "Pledged Security");

4.1 (d)   All rights (but no obligations) under any and all Purchase Commitments relating to or covering Pledged Loans or Pledged Securities and any and all rights (but no obligations) to sell, transfer or otherwise deliver any Pledged Loan or Pledged Security to any Investor or other purchaser, whether arising under Purchase Commitments or otherwise;

4.1 (e)   All rights to service, administer or collect Pledged Loans (whether such rights are owned, arise under a Servicing Contract or otherwise) and all fees, income, reimbursements, damages, termination or cancellation rights, remedies or payments, interest, other rights to payment, rights under related subservicing arrangements, and all other rights relating to or arising out of the foregoing rights;

4.1 (f)   All insurance, guaranties, letters of credit and letter-of-credit rights and supporting obligations of any kind or nature insuring, guaranteeing or supporting the payment or performance of any Pledged Loan, including private mortgage insurance, any commitments, insurance or guaranties issued by the VA or FHA and any and all premiums or rights to the return of premiums relating to the foregoing;

4.1 (g)   All rights in and to the Mortgaged Property securing any Pledged Loan and in any insurance (whether title, casualty, fire, extended coverage, flood or otherwise), guarantee, supporting obligation, agreement, document, rents, leases, subleases, licenses, profits or other right with respect to such Mortgaged Property, all awards for any condemnation or taking with respect to such Mortgaged Property, and all impounds,

insurance premiums or rights to the return of premiums relating to the foregoing and other funds held on account of such Mortgaged Property;

4.1 (h)  All rights (but no obligations) under any Hedging Arrangements relating to any or all of the Pledged Loans or Pledged Securities and all securities accounts, securities entitlements and other investment property relating to such Hedging Arrangements;

4.1 (i)  With respect to any or all of the foregoing Collateral, all accounts, instruments, chattel paper, contract rights, general intangibles (including payment intangibles), documents, letter-of-credit rights, investment property, deposit accounts and money (whether held in a deposit account, in the possession of the Lender or a third party acting on Lender's behalf or otherwise);

4.1 (j)  All files, documents, instruments, surveys, certificates, correspondence, appraisals, broker price opinions, computer programs, software, tapes, discs, cards, accounting records, and other books and records, information and data necessary or useful in the servicing, administration, collection, disposition of or otherwise relating to the Collateral;

4.1 (k)  All products and Proceeds of the foregoing Collateral. For purposes of this Section 4.1, the term "Proceeds" has the meaning given in the Uniform Commercial Code, and will in all events include whatever is receivable or received when Collateral or proceeds of Collateral are sold, leased, licensed, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary;

4.1 (l)  All equipment and inventory, but only to the extent constituting Proceeds of any of the other Collateral;

4.1 (m)  The terms used in this Section 4.1 (whether or not capitalized) to describe the Collateral (whether directly or as part of another defined term) include the meanings ascribed to such terms in Articles 8 or 9 of the Uniform Commercial Code (including any terms used in such Articles which are defined in other Articles of the Uniform Commercial Code), except that (i) the meaning of such terms will not be limited by reason of any limitation on the scope of the Uniform Commercial Code, by reason of federal preemption or otherwise, and (ii) to the extent the definition of any category or type of Collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

## 4.2.    Maintenance of Collateral Records

As long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed under this Agreement or under any other Loan Document, Borrower must preserve and maintain, at its chief executive office and principal place of business or in a regional office approved by Lender, or in the office of a computer service bureau engaged by Borrower and approved by Lender and, upon request, make available to Lender the originals, or copies in any case where the originals have been delivered to Lender or to an Investor, of all documents, instruments, agreements, books, records, data, information and other materials necessary to identify, enforce or realize against any item of Collateral.

## 4.3.    Release of Security Interest in Pledged Assets

4.3 (a)  Except as provided in Section 4.3(b), Lender will release its security interest in a Pledged Asset only against payment to Lender of the Release Amount for such Pledged Asset. If Pledged Loans are transferred to a pool custodian or an Investor for inclusion in a Mortgage Pool and Lender's security interest in the Pledged Loans included in the

Mortgage Pool is not released before the issuance of the related Mortgage-backed Security, then that Mortgage-backed Security, when issued, is a Pledged Security. Lender's security interest continues in the Pledged Loans backing that Pledged Security and Lender is entitled to possession of the Pledged Security in the manner provided in this Agreement.

4.3 (b)  If Pledged Loans are transferred to an Approved Custodian and included in an Eligible Mortgage Pool, Lender's security interest in the Pledged Loans included in the Eligible Mortgage Pool will be released upon the delivery of the Agency Security to Lender (including delivery to or registration in the name of a third party on behalf of Lender) and that Agency Security is a Pledged Security. Lender's security interest in that Pledged Security will be released only against payment to Lender of the Release Amount in connection with the Mortgage Loans backing that Pledged Security.

4.3 (c)  Lender has the exclusive right to possession of all Pledged Securities or, if Pledged Securities are issued in book-entry form or issued in certificated form and delivered to a clearing corporation (as that term is defined in the Uniform Commercial Code) or its nominee, Lender has the right to have the Pledged Securities registered in the name of a securities intermediary (as that term is defined in the Uniform Commercial Code) in an account containing only customer securities and credited to an account of Lender. Lender has no duty or obligation to deliver Pledged Securities to an Investor or to credit Pledged Securities to the account of an Investor or an Investor's designee except against payment for those Pledged Securities. Borrower acknowledges that Lender may enter into one or more standing arrangements with securities intermediaries with respect to Pledged Securities issued in book entry form or issued in certificated form and delivered to a clearing corporation or its designee, under which the Pledged Securities are registered in the name of the securities intermediary, and Borrower agrees, upon request of Lender, to execute and deliver to those securities intermediaries Borrower's written concurrence in any such standing arrangements.

4.3 (d)  As long as no Default or Event of Default exists or would occur as a result, Borrower may redeem a Pledged Asset from Lender's security interest by notifying Lender of its intention to redeem the Pledged Asset from pledge and either (1) paying, or causing an Investor to pay, to Lender, for application as a prepayment on the principal balance of the Warehousing Note, the Release Amount in connection with the Pledged Asset, or (2) delivering substitute Collateral that, in addition to being acceptable to Lender in its sole discretion, will, when included with the remaining Collateral included in the calculation of Aggregate Warehousing Collateral Value, result in an Aggregate Warehousing Collateral Value that is at least equal to the aggregate outstanding Warehousing Advances.

4.3 (e)  After a Default or Event of Default occurs, Lender may, with no liability to Borrower or any Person, continue to release its security interest in any Pledged Asset against payment of the Release Amount for that Pledged Asset.

4.3 (f)  The amount to be paid by Borrower to obtain the release of Lender's security interest in a Pledged Asset ("Release Amount") will be (1) in connection with the sale of a Pledged Asset by Borrower, the payment required in any bailee letter pursuant to which Lender ships that Pledged Asset to an Investor, Approved Custodian, pool custodian or other party, (2) in connection with the sale of a Pledged Asset by Lender while an Event of Default exists, the amount paid to Lender in a commercially reasonable disposition of that Pledged Asset and (3) otherwise, until an Event of Default occurs, the principal amount of the Warehousing Advance outstanding against the Pledged Asset (which, with respect to the sale of a Pledged Asset constituting a Pledged Security backed by

Pledged Loans, will be the amount of the Warehousing Advances outstanding against the Pledged Loans backing such Pledged Security).

## 4.4.    Collection and Servicing Rights

4.4 (a)    If no Event of Default exists, Borrower may service and receive and collect directly all sums payable to Borrower in respect of the Collateral other than proceeds of any Purchase Commitment or proceeds of the sale of any Collateral.  All proceeds of any Purchase Commitment or any other sale of Collateral must be paid directly to the Cash Collateral Account for application as provided in this Agreement.

4.4 (b)    During the period beginning on the occurrence of an Event of Default and ending on the date Lender waives such Event of Default or determines that it has been cured (each such determination to be made in Lender's sole discretion), Lender or its designee is entitled to service and receive and collect all sums payable to Borrower in respect of the Collateral, and in such case (1) Lender or its designee in its discretion may, in its own name, in the name of Borrower or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but Lender has no obligation to do so, (2) Borrower must, pursuant to Section 4.4(a), continue to hold in trust for the benefit of Lender and, if Lender requests it to do so, immediately pay to Lender at its office designated by Notice, all amounts received by Borrower upon or in respect of any of the Collateral, advising Lender as to the source of those funds and (3) all amounts so received and collected by Lender will be held by it as part of the Collateral and applied by Lender as provided in this Agreement.

## 4.5.    Return of Collateral at End of Warehousing Commitment

If (a) the Warehousing Commitment has expired or been terminated and (b) no Warehousing Advances, interest or other Obligations are outstanding and unpaid, Lender will release its security interest and will deliver all Collateral in its possession to Borrower at Borrower's expense. Borrower's acknowledgement or receipt for any Collateral released or delivered to Borrower under any provision of this Agreement is a complete and full acquittance for the Collateral so returned, and Lender is discharged from any liability or responsibility for that Collateral.

## 4.6.    Delivery of Collateral Documents

4.6 (a)    Lender may deliver documents relating to the Collateral to Borrower for correction or completion under a Trust Receipt.

4.6 (b)    If no Default or Event of Default exists, upon delivery by Borrower to Lender of shipping instructions pursuant to the applicable Exhibit B, Lender will deliver the Mortgage Notes evidencing the Pledged Assets to be shipped together with all related loan documents and pool documents previously received by Lender under the requirements of the applicable Exhibit B, to the designated Investor or Approved Custodian or to another party designated by Borrower and acceptable to Lender in its sole discretion.

4.6 (c)    If a Default or Event of Default exists, Lender may, without liability to Borrower or any other Person, continue to deliver Pledged Assets, together with all related loan documents and pool documents in Lender's possession, to the applicable Investor or Approved Custodian or to another party acceptable to Lender in its sole discretion.

**End of Article 4**

## 5.     CONDITIONS PRECEDENT

### 5.1.   Initial Advance

Lender's obligation to make the initial Warehousing Advance, is subject to the satisfaction, in the sole discretion of Lender, of the following conditions precedent:

5.1 (a)   Lender must receive the following, all of which must be satisfactory in form and content to Lender, in its sole discretion:

   (1)   The Warehousing Note and this Agreement duly executed by Borrower.

   (2)   Borrower's Public Organizational Documents, together with all amendments, as certified by the Secretary of State of Illinois.

   (3)   Borrower's Non-Public Organizational Documents, together with all amendments, as certified by Borrower's Certifying Officer.

   (4)   Certificates of good standing dated not more than 30 days prior to the date of this Agreement, together with a certification from the Franchise Tax Board or other state tax authority stating that Borrower is in good standing with the Franchise Tax Board or such state tax authority, if applicable.

   (5)   A resolution of the Borrower's Governors, certified as of the date of the Agreement by its Certifying Officer, of Borrower authorizing the execution, delivery and performance of this Agreement and the other Loan Documents, each Warehousing Advance Request and all other agreements, instruments or documents to be delivered by or on behalf of Borrower under this Agreement.

   (6)   A certificate of Borrower's Certifying Officer as to the incumbency and authenticity of the signatures of the Persons executing this Agreement and the other Loan Documents on Borrower's behalf.

   (7)   Assumed Name Certificates dated not more than 30 days prior to the date of this Agreement for any assumed name used by Borrower in the conduct of its business.

   (8)   Fiscal year-end financial statements of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) containing a balance sheet as of December 31, 2006 and related statements of income, cash flows and changes in equity for the period ended on that date, all prepared in accordance with GAAP applied on a basis consistent with prior periods and accompanied by (A) an opinion as to those financial statements in form and substance satisfactory to Lender and prepared by independent certified public accountants of recognized standing acceptable to Lender and (B) any audit letters, management letters, management reports or other supplementary comments or reports delivered by those accountants to Borrower or its Governors.

   (9)   Interim financial statements of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) containing a balance sheet as of June 30, 2007, and a related statement of income, for the period ended on that date prepared in accordance with GAAP applied on a basis consistent with Borrower's most recent audited financial statements.

(10)  A Compliance Certificate as of the date of the financial statements required by Section (9) substantially in the form of Exhibit E.

(11)  The Guaranty, on the form prescribed by Lender, duly executed by the Guarantor.

(12)  Financial statements, signed by the applicable Guarantor, with respect to (i) Hward J. Siegel, dated as of December 31, 2006; and (ii) Larry Luckett, dated as of April 20, 2007.

(13)  A favorable written opinion of counsel to Borrower and the Guarantor (or of separate counsel at the option of Borrower and the Guarantor), addressed to Lender and dated as of the date of this Agreement, covering such matters as Lender may reasonable request.

(14)  Uniform Commercial Code, tax lien and judgment searches of the appropriate public records for Borrower that do not disclose the existence of any Lien on the Collateral other than in favor of Lender or as permitted under this Agreement.

(15)  Copies of the certificates, documents or other written instruments that evidence Borrower's eligibility described in Section 9.1, all in form and substance satisfactory to Lender.

(16)  Copies of Borrower's errors and omissions insurance policy (or mortgage impairment insurance policy) and blanket bond coverage policy, or certificates in lieu of policies, showing compliance by Borrower as of the date of this Agreement with the provisions of Section 7.9.

(17)  Receipt by Lender of any fees due on the date of this Agreement.

(18)  A fully-executed Funding Bank Agreement and evidence that all accounts into which Warehousing Advances will be funded have been established at the Funding Bank.

(19)  A fully-executed amendment to the GMAC-RFC Warehousing Agreement dated as of the date of this Agreement, which terminates all funding of warehousing advances under that agreement as of the Closing Date of this Agreement.

5.1 (b)  If, as of the date of this Agreement, Borrower has any indebtedness for borrowed money to any Covered Debt Holder, which indebtedness has a term of more than 1 year or is in excess of $25,000, the Covered Debt Holder must have executed a Subordination of Debt Agreement, on the form prescribed by Lender; and Lender must have received an executed copy of that Subordination of Debt Agreement, certified by the Borrower's Certifying Officer to be true and complete and in full force and effect as of the date of the Warehousing Advance.

5.1 (c)  Borrower must not have incurred any material liabilities, direct or contingent, other than in the ordinary course of its business, since the Audited Statement Date.

## 5.2.  Each Advance

Lender's obligation to make the initial and each subsequent Warehousing Advance is subject to the satisfaction, in the sole discretion of Lender, as of the date of each Warehousing Advance, of the following additional conditions precedent:

5.2 (a)   Borrower must have delivered to Lender the Warehousing Advance Request and Collateral Documents required by, and must have satisfied the procedures and substantive requirements set forth in, Article 2 and the Exhibits described in that Article. All items delivered to Lender must be satisfactory to Lender in form and content, and Lender may reject any item that does not satisfy the requirements of this Agreement or any applicable Purchase Commitment.

5.2 (b)   Receipt by Lender of evidence that, not later than immediately after the first Warehousing Advance, Borrower has made and continues to maintain Buydowns equal to or greater than the Permanent Buydown.

5.2 (c)   Lender must have received evidence satisfactory to it as to the making or continuation of any book entry or the due filing and recording in all appropriate offices of all financing statements and other instruments necessary to perfect the security interest of Lender in the Collateral under the Uniform Commercial Code or other applicable law.

5.2 (d)   The representations and warranties of Borrower contained in Article 6 and Article 9 must be accurate and complete in all material respects as if made on and as of the date of each Warehousing Advance.

5.2 (e)   Borrower must have performed all agreements to be performed by it under this Agreement, and after giving effect to the requested Warehousing Advance, no Default or Event of Default will exist under this Agreement.

5.2 (f)   After giving effect to the requested Warehousing Advance, the Warehousing Advances outstanding under this Agreement will not exceed the lesser of (i) the Warehousing Commitment Amount or (ii) the Aggregate Warehousing Collateral Value.

5.2 (g)   The Guarantor must have performed all agreements to be performed by the Guarantor under the Guaranty.

Delivery of a Warehousing Advance Request by Borrower will be deemed a representation by Borrower that all conditions set forth in this Section have been satisfied as of the date of the Warehousing Advance.

## 5.3.   Force Majeure

Notwithstanding Borrower's satisfaction of the conditions set forth in this Agreement, Lender has no obligation to make a Warehousing Advance if Lender is prevented from obtaining the funds necessary to make a Warehousing Advance, or is otherwise prevented from making a Warehousing Advance as a result of any fire, flood or other casualty, failure of power, strike, lockout or other labor trouble, banking moratorium, embargo, sabotage, confiscation, condemnation, riot, civil disturbance, insurrection, act of terrorism, war or other activity of armed forces, act of God or other similar reason beyond the control of Lender. Lender will make the requested Warehousing Advance as soon as reasonably possible following the occurrence of such an event.

**End of Article 5**

6.    **GENERAL REPRESENTATIONS AND WARRANTIES**

Borrower represents and warrants to Lender, as of the date of this Agreement and as of the date of each Warehousing Advance Request and the making of each Warehousing Advance, that:

6.1.    **Place of Business**

Borrower's chief executive office and principal place of business is 485 South Frontage Road, Suite 200, Burr Ridge, IL, 60527.

6.2.    **Organization; Good Standing; Subsidiaries**

Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois, and has the full legal power and authority to own its property and to carry on its business as currently conducted. Borrower is duly qualified to do business and is in good standing in each jurisdiction in which the transaction of its business makes qualification necessary, except in jurisdictions, if any, where a failure to be in good standing has no material adverse effect on Borrower's business, operations, assets or financial condition as a whole. For the purposes of this Agreement, good standing includes qualification for all licenses and payment of all taxes required in the jurisdiction of its organization and in each jurisdiction in which Borrower transacts business. The identity and percentage ownership of Borrower's Equity Holders is set forth on Exhibit D, and Exhibit D also lists each Subsidiary of Borrower and includes each such Subsidiary's name, address, jurisdiction of organization, each state in which it is qualified to do business and the percentage ownership of its Equity Interests by Borrower. Each of Borrower's Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and has the full legal power and authority to own its property and to carry on its business as currently conducted.

6.3.    **Authorization and Enforceability**

Borrower has the power and authority to execute, deliver and perform this Agreement, the Warehousing Note and the other Loan Documents to which Borrower is a party and to make the borrowings under this Agreement. The execution, delivery and performance by Borrower of this Agreement, the Warehousing Note and the other Loan Documents to which Borrower is party and the making of the borrowings under this Agreement, and the Warehousing Note, have been duly and validly authorized by all necessary organizational action on the part of Borrower (none of which actions has been modified or rescinded, and all of which actions are in full force and effect) and do not and will not conflict with or violate any provision of law, of any judgments binding upon Borrower, or of the Organizational Documents of Borrower, conflict with or result in a breach of, constitute a default or require any consent under, or result in or require the acceleration of any indebtedness of Borrower under any agreement, instrument or indenture to which Borrower is a party or by which Borrower or its property may be bound or affected, or result in the creation of any Lien upon any property or assets of Borrower (other than the Lien on the Collateral granted under this Agreement). This Agreement, the Warehousing Note and the other Loan Documents to which Borrower is a party constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their respective terms, except that enforceability may be limited by bankruptcy, insolvency or other such laws affecting the enforcement of creditors' rights and general principles of equity.

6.4.    **Authorization and Enforceability of Guaranty**

Each non-individual Guarantor has the power and authority, and each individual Guarantor has the legal capacity to execute, deliver and perform the Guaranty. The Guaranty constitutes the

legal, valid, and binding obligation of each Guarantor, enforceable in accordance with its terms, except that enforceability may be limited by bankruptcy, insolvency or other such laws affecting creditors' rights and general principles of equity.

## 6.5.   Approvals

The execution and delivery of this Agreement, the Warehousing Note and the other Loan Documents and the performance of Borrower's obligations under this Agreement, the Warehousing Note and the other Loan Documents and the validity and enforceability of this Agreement, the Warehousing Note and the other Loan Documents do not require any license, consent, approval or other action of any agency, board, bureau, commission, instrumentality or other administrative or regulatory body or authority (in each case, whether federal, state or local, domestic or foreign) other than those that have been obtained and remain in full force and effect.

## 6.6.   Financial Condition

The balance sheet of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) as of each Statement Date, and the related statements of income, cash flows and changes in equity for the fiscal period ended on each Statement Date, furnished to Lender, fairly present the financial condition of Borrower (and, if applicable, Borrower's Subsidiaries) as at that Statement Date and the results of its operations for the fiscal period ended on that Statement Date. Borrower had, on each Statement Date, no known material liabilities, direct or indirect, fixed or contingent, matured or unmatured, or liabilities for taxes, long-term leases or unusual forward or long-term commitments not disclosed by, or reserved against in, those financial statements, and at the present time there are no material unrealized or anticipated losses from any loans, advances or other commitments of Borrower except as previously disclosed to Lender in writing. Those financial statements were prepared in accordance with GAAP applied on a consistent basis throughout the periods involved. Since the Audited Statement Date, there has been no material adverse change in the business, operations, assets or financial condition of Borrower (and, if applicable, Borrower's Subsidiaries), nor is Borrower aware of any state of facts that (with or without notice or lapse of time or both) would or could result in any such material adverse change.

## 6.7.   Borrower SMMEA Qualification

If Borrower originates any First Mortgage Loans that are Prime Mortgage Loans or Government Mortgage Loans, Borrower is either (i) a savings and loan association, savings bank, commercial bank, credit union, insurance company or similar banking institution which is supervised by a federal or state authority of the United States, or (ii) a HUD approved non-supervised or correspondent mortgagee.

## 6.8.   Litigation

There are no actions, claims, suits or proceedings pending or, to Borrower's knowledge, threatened or reasonably anticipated against or affecting Borrower or any Subsidiary of Borrower in any court or before any arbitrator or before any agency, board, bureau, commission, instrumentality or other administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign) that, if adversely determined, may reasonably be expected to result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole, or that would affect the validity or enforceability of this Agreement, the Warehousing Note or any other Loan Document.

### 6.9. Compliance with Laws

Neither Borrower nor any Subsidiary of Borrower is in violation of any provision of any law, or of any judgment, award, rule, regulation, order, decree, writ or injunction of any court or any legislature, agency, board, bureau, commission, instrumentality or other legislative, administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign) that could result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole or that would affect the validity or enforceability of this Agreement, the Warehousing Note or any other Loan Document.

### 6.10. Regulation U

Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Warehousing Advance made under this Agreement will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

### 6.11. Investment Company Act

Borrower is not an "investment company" or controlled by an "investment company" within the meaning of the Investment Company Act.

### 6.12. Payment of Taxes

Borrower and each of its Subsidiaries has filed or caused to be filed all federal, state and local income, excise, property and other tax returns that are required to be filed with respect to the operations of Borrower and its Subsidiaries, all such returns are true and correct and Borrower and each of its Subsidiaries has paid or caused to be paid all taxes shown on those returns or on any assessment, to the extent that those taxes have become due, including all FICA payments and withholding taxes, if appropriate. The amounts reserved as a liability for income and other taxes payable in the financial statements described in Section 6.6 are sufficient for payment of all unpaid federal, state and local income, excise, property and other taxes, whether or not disputed, of Borrower and its Subsidiaries accrued for or applicable to the period and on the dates of those financial statements and all years and periods prior to those financial statements and for which Borrower and its Subsidiaries may be liable in their own right or as transferee of the assets of, or as successor to, any other Person. No tax Liens have been filed and no material claims are being asserted against Borrower, any Subsidiary of Borrower or any property of Borrower or any Subsidiary of Borrower with respect to any taxes, fees or charges.

### 6.13. Agreements

Neither Borrower nor any Subsidiary of Borrower is a party to any agreement, instrument or indenture or subject to any restriction materially and adversely affecting its business, operations, assets or financial condition, except as disclosed in the financial statements described in Section 6.6. Neither Borrower nor any Subsidiary of Borrower is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement, instrument, or indenture which default could result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole. No holder of any indebtedness of Borrower or of any of its Subsidiaries has given notice of any asserted default under that indebtedness, and no liquidation or dissolution of Borrower or of any of its Subsidiaries and no receivership, insolvency, bankruptcy, reorganization or other similar proceedings relative to Borrower or of any of any of its Subsidiaries or any of its or their properties is pending or, to the knowledge of Borrower, threatened.

### 6.14.  Title to Properties

Borrower and each Subsidiary of Borrower has good, valid, insurable and (in the case of real property) marketable title to all of its properties and assets (whether real, personal or mixed, tangible or intangible) reflected on the financial statements described in Section 6.6, except for those properties and assets that Borrower has disposed of since the date of those financial statements either in the ordinary course of business or because they were no longer used or useful in the conduct of Borrower's or the Subsidiary's business. All of Borrower's properties and assets are free and clear of all Liens except as disclosed in Borrower's financial statements.

### 6.15.  ERISA

Each Plan is in compliance with all applicable requirements of ERISA and the Internal Revenue Code and with all material applicable rulings and regulations issued under the provisions of ERISA and the Internal Revenue Code setting forth those requirements, except where any failure to comply would not result in a material loss to Borrower or any ERISA Affiliate. All of the minimum funding standards or other contribution obligations applicable to each Plan have been satisfied. No Plan is a Multiemployer Plan or a defined-benefit pension plan subject to Title IV of ERISA.

### 6.16.  No Retiree Benefits

Except as required under Section 4980B of the Internal Revenue Code, Section 601 of ERISA or applicable state law, neither Borrower nor any Subsidiary is obligated to provide post-retirement medical or insurance benefits with respect to employees or former employees.

### 6.17.  Assumed Names

Borrower does not originate Mortgage Loans or otherwise conduct business under any names other than its legal name and the assumed names set forth on Exhibit G. Borrower has made all filings and taken all other action as may be required under the laws of any jurisdiction in which it originates Mortgage Loans or otherwise conducts business under any assumed name. Borrower's use of the assumed names set forth on Exhibit G does not conflict with any other Person's legal rights to any such name, nor otherwise give rise to any liability by Borrower to any other Person.  Borrower may amend Exhibit G to add or delete any assumed names used by Borrower to conduct business.  An amendment to Exhibit G to add an assumed name is not effective until Borrower has delivered to Lender an assumed name certificate in the jurisdictions in which the assumed name is to be used, which must be satisfactory in form and content to Lender in its sole discretion.  In connection with any amendment to delete a name from Exhibit G, Borrower represents and warrants that it has ceased using that assumed name in all jurisdictions.

### 6.18.  Servicing

Exhibit C is a true and complete list of Borrower's Servicing Portfolio. All of Borrower's Servicing Contracts are in full force and effect, and are unencumbered by Liens other than Liens disclosed in Exhibit C. No default or event that, with notice or lapse of time or both, would become a default, exists under any of Borrower's Servicing Contracts.

**End of Article 6**

## 7.    AFFIRMATIVE COVENANTS

As long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed under this Agreement or under any other Loan Document, Borrower must:

### 7.1.    Payment of Obligations

Punctually pay or cause to be paid all Obligations, including the Obligations payable under this Agreement and the Warehousing Note, in accordance with their terms.

### 7.2.    Financial Statements

Deliver to Lender:

7.2 (a)    As soon as available and in any event within 30 days after the end of each month, including the last month of Borrower's fiscal year, an interim statement of income of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) for the immediately preceding month and for the period from the beginning of the fiscal year to the end of that month, and the related balance sheet as at the end of the immediately preceding month, all in reasonable detail, subject, however, to year-end audit adjustments.

7.2 (b)    As soon as available and in any event within 90 days after the end of each fiscal year of Borrower, fiscal year-end statements of income, cash flows and changes in equity of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) for that year, and the related balance sheet as of the end of that year (setting forth in comparative form the corresponding figures for the preceding fiscal year), all in reasonable detail and accompanied by (1) an opinion as to those financial statements in form and substance satisfactory to Lender and prepared by independent certified public accountants of recognized standing acceptable to Lender and (2) any audit letters, management letters, management reports or other supplementary comments or reports delivered by those accountants to Borrower or its Governors.

7.2 (c)    Together with each delivery of financial statements required by this Section, a Compliance Certificate substantially in the form of <u>Exhibit E</u>.

7.2 (d)    As soon as available and in any event within 90 days after the end of each fiscal year of Borrower, current financial statements of the Guarantor, signed by the Guarantor and dated not more than 90 days before the date the statements are delivered to Lender.

7.2 (e)    Copies of all regular or periodic financial and other reports that Borrower files with the Securities and Exchange Commission or any successor governmental agency or other entity.

### 7.3.    Other Borrower Reports

Deliver to Lender:

7.3 (a)    If Borrower has a Servicing Portfolio, then as soon as available and in any event within 30 days after the end of each month, a consolidated report ("<u>Servicing Portfolio Report</u>") as of the end of the month, as to all Mortgage Loans the servicing rights to which are owned by Borrower (specified by investor type, recourse and non-recourse) regardless of whether the Mortgage Loans are Pledged Loans. The Servicing Portfolio Report must

indicate which Mortgage Loans (1) are current and in good standing, (2) are more than 30, 60 or 90 days past due, (3) are the subject of pending bankruptcy or foreclosure proceedings, or (4) have been converted (through foreclosure or other proceedings in lieu of foreclosure) into real estate owned by Borrower.

7.3 (b)    As soon as available and in any event within 30 days after the end of each month, a consolidated loan production report as of the end of that month, presenting the total dollar volume and the number of Mortgage Loans originated and closed or purchased during that month and for the fiscal year-to-date, specified by property type and loan type.

7.3 (c)    Unless the Funding Bank has previously provided Lender with a copy of the Funding Bank's monthly statement for the Check Disbursement Account, as soon as available and in any event within 30 days after the end of each month, a copy of that monthly statement.

7.3 (d)    As soon as available and in any event within 30 days after the end of each month, a report as of the end of that month detailing all requests that Borrower repurchase Mortgage Loans from an Investor out of an Eligible Mortgage Pool or from any other Person, the status of each such request and any indemnification or similar agreement to which Borrower is a party in connection with any such request.

7.3 (e)    Other reports in respect of Pledged Assets, including copies of purchase confirmations issued by Investors purchasing Pledged Loans from Borrower, in such detail and at such times as Lender in its discretion may reasonably request.

7.3 (f)    With reasonable promptness, all further information regarding the business, operations, assets or financial condition of Borrower as Lender may reasonably request, including copies of any audits completed by HUD, Ginnie Mae, Fannie Mae or Freddie Mac.

## 7.4.    Maintenance of Existence; Conduct of Business

Preserve and maintain its organizational existence in good standing and all of its rights, privileges, licenses and franchises necessary or desirable in the normal conduct of its business, including its eligibility as lender, seller/servicer or issuer as described under Section 9.1; conduct its business in an orderly and efficient manner; maintain a net worth of acceptable assets as required for maintaining Borrower's eligibility as lender, seller/servicer or issuer as described under Section 9.1; and make no material change in the nature or character of its business or engage in any business in which it was not engaged on the date of this Agreement.

## 7.5.    Compliance with Applicable Laws

Comply with the requirements of all applicable laws, rules, regulations and orders of any legislature, agency, board, bureau, commission, instrumentality or other legislative, administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign), a breach of which could result in a material adverse change in Borrower's business, operations, assets, or financial condition as a whole or on the enforceability of this Agreement, the Warehousing Note, any other Loan Document or any Collateral, except where contested in good faith and by appropriate proceedings.

## 7.6.    Inspection of Properties and Books; Operational Reviews

Permit Lender or any Participant (and their authorized representatives) to discuss the business, operations, assets and financial condition of Borrower and its Subsidiaries with Borrower's Governors, management, officers, agents and employees, and to examine and make copies or

extracts of Borrower's and its Subsidiaries' books of account, all at such reasonable times as Lender or any Participant may request. Provide its accountants with a copy of this Agreement promptly after its execution and authorize and instruct them to answer candidly all questions that the officers of Lender or any Participant or any authorized representatives of Lender or any Participant may address to them in reference to the financial condition or affairs of Borrower and its Subsidiaries. Borrower may have its representatives in attendance at any meetings held between the officers or other representatives of Lender or any Participant and Borrower's accountants under this authorization. Permit Lender or any Participant (and their authorized representatives) access to Borrower's premises and records for the purpose of conducting a review of Borrower's general mortgage business methods, policies and procedures, auditing its loan files and reviewing the financial and operational aspects of Borrower's business.

### 7.7.    Notice

Give prompt Notice to Lender of (a) any action, suit or proceeding instituted by or against Borrower or any of its Subsidiaries in any federal or state court or before any agency, board, bureau, commission, instrumentality or other administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign), which action, suit or proceeding has at issue in excess of $25,000, or any such proceedings threatened against Borrower or any of its Subsidiaries in a writing containing the details of that action, suit or proceeding; (b) the filing, recording or assessment of any Lien for any federal, state or local taxes, assessments or other governmental charges against Borrower, any of its Subsidiaries or any of their respective assets, other than a Lien for taxes, assessments or other governmental charges on real property that does not secure or constitute and has not secured or constituted a Pledged Asset; (c) an Event of Default; (d) a Default that continues for more than 4 days; (e) the suspension, revocation or termination of Borrower's eligibility, in any respect, as lender, seller/servicer or issuer as described under Section 9.1 or the suspension, revocation or termination of any other license or approval required for Borrower to engage in the business of originating, acquiring and, if applicable, servicing Mortgage Loans; (f) the imposition of any other adverse regulatory or administrative action or sanction on or against Borrower by any agency, board, bureau, commission, instrumentality or other administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign) that could result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole or that could affect the validity or enforceability of any Pledged Loan; (g) the transfer, loss, nonrenewal or termination of any Servicing Contracts to which Borrower is a party, or which is held for the benefit of Borrower, and the reason for that transfer, loss, nonrenewal or termination; (h) any Prohibited Transaction with respect to any Plan, specifying the nature of the Prohibited Transaction and what action Borrower proposes to take with respect to it; and (i) any other action, event or condition of any nature that could lead to or result in a material adverse change in the business, operations, assets or financial condition of Borrower or any of its Subsidiaries.

### 7.8.    Payment of Debt, Taxes and Other Obligations

Pay, perform and discharge, or cause to be paid, performed and discharged, all of the obligations and indebtedness of Borrower and its Subsidiaries, all taxes, assessments and governmental charges or levies imposed upon Borrower or its Subsidiaries or upon their respective income, receipts or properties before those taxes, assessments and governmental charges or levies become past due, and all lawful claims for labor, materials and supplies or otherwise that, if unpaid, could become a Lien or charge upon any of their respective properties or assets. Borrower and its Subsidiaries are not required to pay, however, any taxes, assessments and governmental charges or levies or claims for labor, materials or supplies for which Borrower or its Subsidiaries have obtained an adequate bond or insurance or that are being contested in good faith and by proper proceedings that are being reasonably and diligently pursued and for which proper reserves have been created.

## 7.9.  Insurance

Maintain blanket bond coverage and errors and omissions insurance or mortgage impairment insurance with such companies and in such amounts as satisfy prevailing requirements applicable to a lender, seller/servicer or issuer as described under Section 9.1, and liability insurance and fire and other hazard insurance on its properties, in each case with responsible insurance companies acceptable to Lender, in such amounts and against such risks as is customarily carried by similar businesses operating in the same location. Within 30 days after Notice from Lender, obtain such additional insurance as Lender may reasonably require, all at the sole expense of Borrower. Copies of such policies must be furnished to Lender without charge upon request of Lender.

## 7.10.  Closing Instructions

Indemnify and hold Lender harmless from and against any loss, including reasonable attorneys' fees and costs, attributable to the failure of any title insurance company, agent or attorney to comply with Borrower's disbursement or instruction letter relating to any Mortgage Loan. Lender has the right to pre-approve Borrower's choice of title insurance company, agent or attorney and Borrower's disbursement or instruction letter to them in any case in which Borrower intends to obtain a Warehousing Advance against the Mortgage Loan to be created at settlement or to pledge that Mortgage Loan as Collateral under this Agreement. In any event, Borrower's disbursement or instruction letter must include the following language:

> HOME MORTGAGE, INC. has granted its lender a security interest in any amounts advanced by lender to fund this mortgage loan and in the mortgage loan funded with those amounts. You must promptly return any amounts advanced by that lender and not used to fund this mortgage loan.  You also must immediately return all amounts advanced by such lender if this mortgage loan does not close and fund within 1 business day of your receipt of those funds.

## 7.11.  Subordination of Certain Indebtedness

Cause any indebtedness of Borrower for borrowed money to any Covered Debt Holder of Borrower, which indebtedness has a term of more than 1 year or is in excess of $25,000, to be subordinated to the Obligations by the execution and delivery by such Covered Debt Holder to Lender of a Subordination of Debt Agreement, on the form prescribed by Lender, certified by the Borrower's Certifying Officer to be true and complete and in full force and effect.

## 7.12.  Other Loan Obligations

Perform all material obligations under the terms of each loan agreement, note, mortgage, security agreement or debt instrument by which Borrower is bound or to which any of its property is subject, and promptly notify Lender in writing of a declared default under or the termination, cancellation, reduction or nonrenewal of any of its other lines of credit or agreements with any other lender. Exhibit F is a true and complete list of all such lines of credit or agreements as of the date of this Agreement. Borrower must give Lender at least 30 days Notice before entering into any additional lines of credit or agreements.

## 7.13.  ERISA

Maintain and cause each ERISA Affiliate to maintain each Plan in compliance with all material applicable requirements of ERISA and of the Internal Revenue Code and with all applicable rulings and regulations issued under the provisions of ERISA and of the Internal Revenue Code, and not itself or permit any ERISA Affiliate to (a) engage in any transaction in connection with

which Borrower or any ERISA Affiliate would be subject to either a civil penalty assessed pursuant to Section 502(i) of ERISA or a tax imposed by Section 4975 of the Internal Revenue Code, in either case in an amount exceeding $25,000 or (b) fail to make full payment when due of all amounts that, under the provisions of any Plan, Borrower or any ERISA Affiliate is required to pay as contributions to that Plan, or permit to exist any accumulated funding deficiency (as such term is defined in Section 302 of ERISA and Section 412 of the Internal Revenue Code), whether or not waived, with respect to any Plan in an aggregate amount exceeding $25,000.

## 7.14.  Use of Proceeds of Warehousing Advances

Use the proceeds of each Warehousing Advance solely for the purpose of funding Eligible Assets and against the pledge of those Eligible Assets as Collateral.

## 7.15.  Quality Control

Implement, not later than September 1, 2006, a post-closing quality control process that conforms with the GMAC-RFC Client Guide.

**End of Article 7**

## 8.    NEGATIVE COVENANTS

As long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed, Borrower must not, either directly or indirectly, without the prior written consent of Lender:

### 8.1.    Contingent Liabilities

Assume, guarantee, endorse or otherwise become contingently liable for the obligation of any Person except (a) by endorsement of negotiable instruments for deposit or collection in the ordinary course of business and (b) for obligations arising in connection with the sale of Mortgage Loans with recourse in the ordinary course of Borrower's business.

### 8.2.    Pledge of Collateral or Servicing Contracts

Pledge or grant a security interest other than to Lender in any existing or future (a) Pledged Loans, (b) Pledged Securities, (c) Servicing Contracts or (d) other Collateral, or omit to take any action required to keep all of Borrower's (w) Pledged Loans, (x) Pledged Securities, (y) Servicing Contracts and (z) other Collateral in full force and effect.

### 8.3.    Restrictions on Fundamental Changes

8.3 (a)    Consolidate, merge or enter into any analogous reorganization or transaction with any Person.

8.3 (b)    Amend or otherwise modify Borrower's Organizational Documents.

8.3 (c)    Liquidate, wind up or dissolve (or suffer any liquidation or dissolution).

8.3 (d)    Cease actively to engage in the business of originating or acquiring Mortgage Loans or, if applicable, servicing Mortgage Loans, or make any other material change in the nature or scope of the business in which Borrower engages as of the date of this Agreement.

8.3 (e)    Sell, assign, lease, convey, transfer or otherwise dispose of (whether in one transaction or a series of transactions) all or any substantial part of Borrower's business or assets, whether now owned or acquired after the Closing Date, other than, in the ordinary course of business and to the extent not otherwise prohibited by this Agreement, sales of (1) Mortgage Loans, (2) Mortgage-backed Securities and (3) Servicing Contracts.

8.3 (f)    Acquire by purchase or in any other transaction all or substantially all of the business or property, or stock or other ownership interests of any Person.

8.3 (g)    Permit any Subsidiary of Borrower to do or take any of the foregoing actions.

### 8.4.    Subsidiaries

Form or acquire, or permit any Subsidiary of Borrower to form or acquire, any Person that would thereby become a Subsidiary.

### 8.5.  Deferral of Subordinated Debt

Pay any Subordinated Debt of Borrower in advance of its stated maturity or, after a Default or Event of Default under this Agreement has occurred, make any payment of any kind on any Subordinated Debt of Borrower until all of the Obligations have been paid and performed in full and any applicable preference period has expired.

### 8.6.  Loss of Eligibility, Licenses or Approvals

Take any action, or fail or omit to take any action, that would (a) cause Borrower to lose all or any part of its status as an eligible lender, seller/servicer or issuer as described under Section 9.1 or all or any part of any other license or approval required for Borrower to engage in the business of originating, acquiring and, if applicable, servicing Mortgage Loans or (b) result in the imposition of any other adverse regulatory or administrative action or sanction on or against Borrower by any agency, board, bureau, commission, instrumentality or other administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign) that could result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole or that could affect the validity or enforceability of any Pledged Loan.

### 8.7.  Accounting Changes

Make, or permit any Subsidiary of Borrower to make, any significant change in accounting treatment or reporting practices, except as required by GAAP, or change its fiscal year or the fiscal year of any Subsidiary of Borrower.

### 8.8.  Leverage Ratio

Permit Borrower's Leverage Ratio at any time to exceed 15 to 1.

### 8.9.  Minimum Tangible Net Worth

Permit Borrower's Tangible Net Worth at any time to be less than $1,200,000.

### 8.10.  Minimum Liquid Assets

Permit Borrower's Liquid Assets at any time to be less than $350,000.

### 8.11.  Permanent Buydown

On and after the date of the initial Warehousing Advance under this Agreement, permit Borrower's aggregate Buydowns at any time to be less than the Permanent Buydown.

### 8.12.  Net Income/Net Loss

Permit Borrower to have three consecutive months of Net Losses.

### 8.13.  Distributions to Borrower's Equity Holders

Declare or pay any Distribution.

### 8.14. Transactions with Affiliates

Directly or indirectly (a) make any loan, advance, extension of credit or capital contribution to any of Borrower's Affiliates, (b) sell, transfer, pledge or assign any of its assets to or on behalf of those Affiliates, (c) merge or consolidate with or purchase or acquire assets from those Affiliates, or (d) pay management fees to or on behalf of those Affiliates.

### 8.15. Recourse Servicing Contracts

Acquire or enter into Servicing Contracts under which Borrower must repurchase or indemnify the holder of the Mortgage Loans as a result of defaults on the Mortgage Loans at any time during the term of those Mortgage Loans.

**End of Article 8**

**9.    SPECIAL REPRESENTATIONS, WARRANTIES AND COVENANTS CONCERNING COLLATERAL**

**9.1.    Special Representations, Warranties and Covenants Concerning Eligibility as Seller/Servicer of Mortgage Loans**

Borrower represents, warrants and covenants to Lender, as of the date of this Agreement and as of the date of each Warehousing Advance Request and the making of each Warehousing Advance, that (a) Borrower presently has all approvals, licenses, qualifications and authorizations from (including those described in Section 6.7) and is in good standing with each agency, board, bureau, commission, instrumentality or other administrative or regulatory body, including HUD, Ginnie Mae, Fannie Mae, Freddie Mac, VA, and with each Investor, including Lender, as necessary or required to conduct any and all origination, purchase, holding, sales and servicing activities conducted by or on behalf of Borrower with respect to Mortgage Loans, and (b) all origination, purchase, holding, sales and servicing activities previously conducted by or on behalf of Borrower with respect to Mortgage Loans have been conducted while Borrower had such approvals, licenses, qualifications and authorizations and was in such good standing.

**9.2.    Special Representations and Warranties Concerning Warehousing Collateral**

Borrower represents and warrants to Lender, as of the date of this Agreement and as of the date of each Warehousing Advance Request and the making of each Warehousing Advance, that:

9.2 (a)    Borrower has not selected the Collateral in a manner so as to affect adversely Lender's interests.

9.2 (b)    Borrower is the legal and equitable owner and holder, free and clear of all Liens (other than Liens granted under this Agreement), of the Pledged Assets. All Pledged Assets and related Purchase Commitments have been duly authorized and validly issued to Borrower, and all of the foregoing items of Collateral comply with all of the requirements of this Agreement, and have been and will continue to be validly pledged or assigned to Lender, subject to no other Liens.

9.2 (c)    Borrower has, and will continue to have, the full right, power and authority to pledge the Collateral pledged and to be pledged by it under this Agreement.

9.2 (d)    Each Pledged Loan and each related document, instrument and agreement (1) has been duly executed and delivered by the parties to that Pledged Loan and those documents, instruments and agreements, (2) has been made in compliance with all applicable laws, rules and regulations (including all laws, rules and regulations relating to usury), (3) is and will continue to be a legal, valid and binding obligation, enforceable in accordance with its terms, without setoff, counterclaim or defense in favor of the mortgagor under the Pledged Loan or any other obligor on the Mortgage Note and (4) has not been modified, amended or any requirements of which waived, except in a writing that is part of the Collateral Documents.

9.2 (e)    Each Pledged Loan is secured by a Mortgage on real property and improvements located in one of the states of the United States or the District of Columbia.

9.2 (f)    Unless Third Party Originated Loans are permitted, each Pledged Loan has been closed or will be closed and funded with the Warehousing Advance made against it.

9.2 (g)   Except for open-ended Mortgage Loans, each Mortgage Loan has been fully advanced in the face amount of its Mortgage Note.

9.2 (h)   Each First Mortgage Loan is secured by a First Mortgage on the Mortgaged Property described in or covered by that Mortgage.

9.2 (i)   Each First Mortgage Loan has or will have a title insurance policy, in ALTA form or equivalent, from a recognized title insurance company, insuring the priority of the Lien of the Mortgage and meeting the usual requirements of Investors purchasing those Mortgage Loans.

9.2 (j)   Each First Mortgage Loan has been evaluated or appraised in accordance with Title XI of FIRREA.

9.2 (k)   Each Second Mortgage Loan is secured by a Second Mortgage on the Mortgaged Property described in or covered by that Mortgage.

9.2 (l)   To the extent required by the related Purchase Commitment or by Investors generally for similar Mortgage Loans, each Second Mortgage Loan has or will have a title insurance policy, in ALTA form or equivalent, from a recognized title insurance company, insuring the priority of the Lien of the Mortgage and meeting the usual requirements of Investors purchasing those Mortgage Loans.

9.2 (m)   Each Second Mortgage Loan has been evaluated or appraised in accordance with industry standards for Investors providing Purchase Commitments for and purchasing those Mortgage Loans.

9.2 (n)   The Mortgage Note for each Pledged Loan is (1) payable or endorsed to the order of Borrower, (2) an "instrument" within the meaning of Article 9 of the Uniform Commercial Code of all applicable jurisdictions and (3) is denominated and payable in United States dollars.

9.2 (o)   No default has existed for 60 days or more under any Mortgage Loan included in the Pledged Loans.

9.2 (p)   No party to a Pledged Loan or any related document, instrument or agreement is in violation of any applicable law, rule or regulation that would impair the collectibility of the Mortgage Loan or the performance by the mortgagor or any other obligor of his or her obligations under the Mortgage Note or any related document, instrument or agreement.

9.2 (q)   No party involved in the origination of a Pledged Loan, including the originator, broker, title company or appraiser, was named on the version of the Exclusionary List in effect on the date of the Mortgage Note for that particular Pledged Loan.

9.2 (r)   All fire and casualty policies covering the Mortgaged Property encumbered by each Mortgage included in the Pledged Loans (1) name and will continue to name Borrower and its successors and assigns as the insured under a standard mortgagee clause, (2) are and will continue to be in full force and effect and (3) afford and will continue to afford insurance against fire and such other risks as are usually insured against in the broad form of extended coverage insurance generally available.

9.2 (s)   Pledged Loans secured by Mortgaged Property located in a special flood hazard area designated as such by the Director of the Federal Emergency Management Agency are and will continue to be covered by special flood insurance under the National Flood Insurance Program.

9.2 (t)  The Mortgaged Property securing each Pledged Loan is free of damage or waste and is in good repair (other than with respect to any FHA insured loan, the minor property deficiencies permitted to exist under FHA's Minimum Property Requirements that do not affect the safety of the occupants or the security or soundness of the subject Mortgaged Property), and no improvement located on or being a part of such Mortgaged Property violates any applicable zoning law or regulation.

9.2 (u)  No notice of any partial or total condemnation has been given with respect to the Mortgaged Property securing any Pledged Loan.

9.2 (v)  Each Pledged Loan against which a Warehousing Advance has been or will be made on the basis of a Purchase Commitment meets all of the requirements of that Purchase Commitment, and each Pledged Security against which a Warehousing Advance is outstanding meets all of the requirements of the related Purchase Commitment.

9.2 (w)  Pledged Loans that are intended to be exchanged for Agency Securities comply or, prior to the issuance of the Agency Securities will comply, with the requirements of any governmental instrumentality, department or agency issuing or guaranteeing the Agency Securities.

9.2 (x)  Pledged Loans that are intended to be used in the formation of Mortgage-backed Securities (other than Agency Securities) comply with the requirements of the issuer of the Mortgage-backed Securities (or its sponsor) and of the Rating Agencies.

9.2 (y)  The original assignments of Mortgage delivered to Lender for each Pledged Loan are in recordable form and comply with all applicable laws and regulations governing the filing and recording of such documents.

9.2 (z)  Each Pledged Loan secured by real property to which a Manufactured Home is affixed will create a valid Lien on that Manufactured Home that will have priority over any other Lien on the Manufactured Home, whether or not arising under applicable real property law.

9.2 (aa)  No Pledged Loan is a Discontinued Loan.

9.2 (bb)  None of the mortgagors, guarantors or other obligors of any Pledged Loan is a Person named in any Restriction List and to whom the provision of financial services is prohibited or otherwise restricted by applicable law.

9.2 (cc)  Each First Mortgage Loan that is a Prime Mortgage Loan or a Government Mortgage Loan was originated by a Person that is and was at the time of origination either (i) a savings and loan association, savings bank, commercial bank, credit union, insurance company or similar banking institution which is supervised by a federal or state authority of the United States, or (ii) a HUD approved non-supervised or correspondent mortgagee.

## 9.3.  Special Affirmative Covenants Concerning Warehousing Collateral

As long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed under this Agreement or under any other Loan Document, Borrower must:

9.3 (a)  Warrant and defend the right, title and interest of Lender in and to the Collateral against the claims and demands of all Persons.

9.3 (b)   Service or cause to be serviced all Pledged Loans in accordance with the standard requirements of the issuers of Purchase Commitments covering them and all applicable HUD, Fannie Mae and Freddie Mac requirements, including taking all actions necessary to enforce the obligations of the obligors under such Pledged Loans. Service or cause to be serviced all Mortgage Loans backing Pledged Securities in accordance with applicable governmental requirements and requirements of issuers of Purchase Commitments covering them. Hold all escrow funds collected in respect of Pledged Loans and Mortgage Loans backing Pledged Securities in trust, without commingling the same with non-custodial funds, and apply them for the purposes for which those funds were collected.

9.3 (c)   Execute and deliver to Lender, with respect to the Collateral, those further instruments of sale, pledge, assignment or transfer, and those powers of attorney, as required by Lender, and do and perform all matters and things necessary or desirable to be done or observed, for the purpose of effectively creating, maintaining and preserving the security and benefits intended to be afforded Lender under this Agreement (including any such instruments or actions required or necessary to assure Lender's priority in or to any Insurance described in Section 4.1 as and when required by Lender).

9.3 (d)   Notify Lender within 2 Business Days of any default under, or of the termination of, any Purchase Commitment relating to any Pledged Asset or Eligible Mortgage Pool.

9.3 (e)   Promptly comply in all respects with the terms and conditions of all Purchase Commitments, and all extensions, renewals and modifications or substitutions of or to all Purchase Commitments. Deliver or cause to be delivered to the Investor the Pledged Assets to be sold under each Purchase Commitment not later than the mandatory delivery date of the Pledged Assets under the Purchase Commitment.

9.3 (f)   Prior to the origination by Borrower of any Pledged Loans for sale to Fannie Mae, enter into an agreement among Borrower, Lender and Fannie Mae, pursuant to which Fannie Mae agrees to send all cash proceeds of Pledged Loans sold by Borrower to Fannie Mae to the Cash Collateral Account.

9.3 (g)   Prior to the origination by Borrower of any Pledged Loan to be registered on the MERS system, obtain the approval of Lender and enter into an Electronic Tracking Agreement.

9.3 (h)   Compare the names of every mortgagor, guarantor and other obligor of every Mortgage Loan, together with appropriate identifying information concerning those Persons obtained by Borrower, against every Restriction List, and make certain that none of the mortgagors, guarantors or other obligors of any Mortgage Loan is a Person named in any Restriction List and to whom the provision of financial services is prohibited or otherwise restricted by applicable law.

## 9.4.   Special Negative Covenants Concerning Warehousing Collateral

As long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed, Borrower must not, either directly or indirectly, without the prior written consent of Lender:

9.4 (a)   Amend, modify, or waive any of the terms and conditions of, or settle or compromise any claim in respect of, any Pledged Asset.

9.4 (b)   Sell, transfer or assign, or grant any option with respect to, or pledge (except under this Agreement and, with respect to each Pledged Asset, the related Purchase Commitment) any of the Collateral or any interest in any of the Collateral.

9.4 (c)   Make any compromise, adjustment or settlement in respect of any of the Collateral or accept any consideration other than cash in payment or liquidation of the Collateral.

**End of Article 9**

## 10.    DEFAULTS; REMEDIES

### 10.1.  Events of Default

The occurrence of any of the following is an event of default ("Event of Default"):

10.1 (a) Borrower fails to pay the principal of any Warehousing Advance when due, whether at stated maturity, by acceleration, or otherwise; or fails to pay any installment of interest on any Warehousing Advance within 9 days after the date of Lender's invoice; or fails to pay, within any applicable grace period, any other amount due under this Agreement or any other Obligation of Borrower to Lender.

10.1 (b) Borrower fails to perform or comply with any term or condition applicable to it contained in Sections 7.4 or 7.14 or in any Section of Article 8.

10.1 (c) The suspension, revocation or termination of Borrower's eligibility, in any respect, as lender, seller/servicer or issuer as described under Section 9.1 or of any other license or approval required for Borrower to engage in the business of originating, acquiring and, if applicable, servicing Mortgage Loans; or the imposition of any other adverse regulatory or administrative action or sanction on or against Borrower by any agency, board, bureau, commission, instrumentality or other administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign) that could result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole or that could affect the validity or enforceability of any Pledged Loan.

10.1 (d) Any representation or warranty made or deemed made by Borrower under this Agreement, in any other Loan Document or in any written statement or certificate at any time given by Borrower, other than the representations and warranties set forth in Article 9 with respect to specific Pledged Assets, is inaccurate or incomplete in any material respect on the date as of which it is made or deemed made.

10.1 (e) Borrower defaults in the performance of or compliance with any term contained in this Agreement or any other Loan Document other than those referred to in Sections 10.1(a), 10.1(b), 10.1(c) or 10.1(d) and such default has not been remedied or waived within 15 days, in the case of a default in the performance of or compliance with Sections 7.2 and 7.3, and within 30 days in all other cases, after the earliest of (1) receipt by Borrower of Notice from Lender of that default, (2) receipt by Lender of Notice from Borrower of that default or (3) the date Borrower should have notified Lender of that default under Section 7.7(c) or 7.7(d).

10.1 (f) Borrower or any of its Subsidiaries fails to pay, or defaults in the payment of any principal or interest on, any other indebtedness or any contingent obligation within any applicable grace period; breaches or defaults with respect to any other material term of any other indebtedness or of any loan agreement, mortgage, indenture or other agreement relating to that indebtedness, if the effect of that breach or default is to cause, or to permit the holder or holders of that indebtedness (or a trustee on behalf of such holder or holders) to cause, indebtedness of Borrower or its Subsidiaries in the aggregate amount of $50,000 or more to become or be declared due before its stated maturity (upon the giving or receiving of notice, lapse of time, both, or otherwise).

10.1 (g) An "event of default" (however defined) occurs under any agreement between Borrower and Lender or between Borrower and GMAC or any GMAC Affiliate other than this Agreement and the other Loan Documents.

10.1 (h) A case (whether voluntary or involuntary) is filed by or against Borrower or any Subsidiary of Borrower or any Guarantor under any applicable bankruptcy, insolvency or other similar federal or state law; or a court of competent jurisdiction appoints a receiver (interim or permanent), liquidator, sequestrator, trustee, custodian or other officer having similar powers over Borrower or any Subsidiary of Borrower or any Guarantor, or over all or a substantial part of their respective properties or assets; or Borrower or any Subsidiary of Borrower or any Guarantor (1) consents to the appointment of or possession by a receiver (interim or permanent), liquidator, sequestrator, trustee, custodian or other officer having similar powers over Borrower or any Subsidiary of Borrower or any Guarantor, or over all or a substantial part of their respective properties or assets, (2) makes an assignment for the benefit of creditors, or (3) fails, or admits in writing its inability, to pay its debts as those debts become due.

10.1 (i) Borrower fails to perform any contractual obligation to repurchase Mortgage Loans, if such obligations in the aggregate exceed $500,000.

10.1 (j) Any money judgment, writ or warrant of attachment or similar process involving an amount in excess of $50,000 is entered or filed against Borrower or any of its Subsidiaries or any of their respective properties or assets and remains undischarged, unvacated, unbonded or unstayed for a period of 30 days or 5 days before the date of any proposed sale under that money judgment, writ or warrant of attachment or similar process.

10.1 (k) Any order, judgment or decree decreeing the dissolution of Borrower or any non-individual Guarantor is entered and remains undischarged or unstayed for a period of 20 days.

10.1 (l) Borrower purports to disavow any of its Obligations or contests the validity or enforceability of any Loan Document.

10.1 (m) Any Guarantor purports to disavow any of its obligations under its Guaranty or contests the validity or enforceability of the Guaranty.

10.1 (n) Any individual Guarantor dies or becomes incapacitated.

10.1 (o) Lender's security interest on any portion of the Collateral becomes unenforceable or otherwise impaired.

10.1 (p) A material adverse change occurs in Borrower's financial condition, business, properties or assets, operations or prospects, or in Borrower's ability to repay the Obligations.

10.1 (q) Any Lien for any tax, assessment or other governmental charge is filed or is otherwise enforced against Borrower or any of its property, including any of the Collateral, other than a Lien for taxes, assessments or other governmental charges on real property that does not secure or constitute and has not secured or constituted a Pledged Asset.

10.1 (r) A Change of Control occurs with respect to Borrower.

10.1 (s) A Change of Control occurs with respect to any non-individual Guarantor.

## 10.2. Remedies

10.2 (a) If an Event of Default described in Section 10.1(h) occurs with respect to Borrower, the Warehousing Commitment will automatically terminate and the unpaid principal amount of and accrued interest on the Warehousing Note and all other Obligations will

automatically become immediately due and payable, without presentment, demand or other Notice or requirements of any kind, all of which Borrower expressly waives.

10.2 (b)  If any other Event of Default occurs, Lender may, by Notice to Borrower, terminate the Warehousing Commitment and declare the Obligations to be immediately due and payable.

10.2 (c)  If any Event of Default occurs, Lender may also take any of the following actions:

(1)  Foreclose upon or otherwise enforce its security interest in and Lien on the Collateral to secure all payments and performance of the Obligations in any manner permitted by law or provided for in the Loan Documents.

(2)  Notify all obligors under any of the Collateral that the Collateral has been assigned to Lender (or to another Person designated by Lender) and that all payments on that Collateral are to be made directly to Lender (or such other Person); settle, compromise or release, in whole or in part, any amounts any obligor or Investor owes on any of the Collateral on terms acceptable to Lender; enforce payment and prosecute any action or proceeding involving any of the Collateral; and where any Collateral is in default, foreclose on and enforce any Liens securing that Collateral in any manner permitted by law and sell any property acquired as a result of those enforcement actions.

(3)  Prepare and submit for filing Uniform Commercial Code amendment statements evidencing the assignment to Lender or its designee of any Uniform Commercial Code financing statement filed in connection with any item of Collateral.

(4)  Act, or contract with a third party to act at Borrower's expense, as servicer or subservicer of Collateral requiring servicing and perform all obligations required under any Collateral, including Servicing Contracts and Purchase Commitments.

(5)  Require Borrower to assemble and make available to Lender the Collateral and all related books and records at a place designated by Lender.

(6)  Enter onto property where any Collateral or related books and records are located and take possession of those items with or without judicial process; and obtain access to Borrower's data processing equipment, computer hardware and software relating to the Collateral and use all of the foregoing and the information contained in the foregoing in any manner Lender deems necessary for the purpose of effectuating its rights under this Agreement and any other Loan Document.

(7)  Before the disposition of the Collateral, prepare it for disposition in any manner and to the extent Lender deems appropriate.

(8)  Exercise all rights and remedies of a secured creditor under the Uniform Commercial Code of Minnesota or other applicable law, including selling or otherwise disposing of all or any portion of the Collateral at one or more public or private sales, whether or not the Collateral is present at the place of sale, for cash or credit or future delivery, on terms and conditions and in the manner as Lender may determine, including sale under any applicable Purchase Commitment. Borrower waives any right it may have to prior notice of the sale of all or any portion of the Collateral to the extent allowed by applicable law. If notice is required under applicable law, Lender will give Borrower not less than 10 days' notice of any public sale or of the date after which any private sale may

be held. Borrower agrees that 10 days' notice is reasonable notice. Lender may, without notice or publication, adjourn any public or private sale one or more times by announcement at the time and place fixed for the sale, and the sale may be held at any time or place announced at the adjournment. In the case of a sale of all or any portion of the Collateral on credit or for future delivery, the Collateral sold on those terms may be retained by Lender until the purchaser pays the selling price or takes possession of the Collateral. Lender has no liability to Borrower if a purchaser fails to pay for or take possession of Collateral sold on those terms, and in the case of any such failure, Lender may sell the Collateral again upon notice complying with this Section.

(9)     Instead of or in conjunction with exercising the power of sale authorized by Section 10.2(c)(8), Lender may proceed by suit at law or in equity to collect all amounts due on the Collateral, or to foreclose Lender's Lien on and sell all or any portion of the Collateral pursuant to a judgment or decree of a court of competent jurisdiction.

(10)    Proceed against Borrower on the Warehousing Note or against any Guarantor under the Guaranty.

(11)    Retain all excess proceeds from the sale or other disposition of the Collateral, and apply them to the payment of the Obligations under Section 10.3.

10.2 (d)  Lender will incur no liability as a result of the commercially reasonable sale or other disposition of all or any portion of the Collateral at any public or private sale or other disposition. Borrower waives (to the extent permitted by law) any claims it may have against Lender arising by reason of the fact that the price at which the Collateral may have been sold at a private sale was less than the price that Lender might have obtained at a public sale, or was less than the aggregate amount of the outstanding Warehousing Advances, accrued and unpaid interest on those Warehousing Advances, and unpaid fees, even if Lender accepts the first offer received and does not offer the Collateral to more than one offeree. Borrower agrees that any sale of Collateral under the terms of a Purchase Commitment, or any other disposition of Collateral arranged by Borrower, whether before or after the occurrence of an Event of Default, will be deemed to have been made in a commercially reasonable manner.

10.2 (e)  Borrower acknowledges that Mortgage Loans are collateral of a type that is the subject of widely distributed standard price quotations and that Mortgage-backed Securities are collateral of a type that is customarily sold on a recognized market. Borrower waives any right it may have to prior notice of the sale of Pledged Securities, and agrees that Lender may purchase Pledged Loans and Pledged Securities at a private sale of such Collateral.

10.2 (f)  Borrower specifically waives and releases (to the extent permitted by law) any equity or right of redemption, stay or appraisal that Borrower has or may have under any rule of law or statute now existing or adopted after the date of this Agreement, and any right to require Lender to (1) proceed against any Person, (2) proceed against or exhaust any of the Collateral or pursue its rights and remedies against the Collateral in any particular order or (3) pursue any other remedy within its power. Lender is not required to take any action to preserve any rights of Borrower against holders of mortgages having priority to the Lien of any Mortgage or Security Agreement included in the Collateral or to preserve Borrower's rights against other prior parties.

10.2 (g)  Lender may, but is not obligated to, advance any sums or do any act or thing necessary to uphold or enforce the Lien and priority of, or the security intended to be afforded by,

(

any Mortgage or Security Agreement included in the Collateral, including payment of delinquent taxes or assessments and insurance premiums. All advances, charges, costs and expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Lender in exercising any right, power or remedy conferred by this Agreement, or in the enforcement of this Agreement, together with interest on those amounts at the Default Rate, from the time paid by Lender until repaid by Borrower, are deemed to be principal outstanding under this Agreement and the Warehousing Note.

10.2 (h)   No failure or delay on the part of Lender to exercise any right, power or remedy provided in this Agreement or under any other Loan Document, at law or in equity, will operate as a waiver of that right, power or remedy. No single or partial exercise by Lender of any right, power or remedy provided under this Agreement or any other Loan Document, at law or in equity, precludes any other or further exercise of that right, power or remedy by Lender, or Lender's exercise of any other right, power or remedy. Without limiting the foregoing, Borrower waives all defenses based on the statute of limitations to the extent permitted by law. The remedies provided in this Agreement and the other Loan Documents are cumulative and are not exclusive of any remedies provided at law or in equity.

10.2 (i)   Borrower grants Lender a nonexclusive, worldwide and royalty free, license or other right to use, or otherwise exploit all of Borrower's rights in or to any and all, software, computer programs, other programs, labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks and advertising matter, franchises or any property of a similar nature, in each case, as Lender deems necessary or appropriate to the disposition of any Collateral.

## 10.3.  Application of Proceeds

Lender may apply the proceeds of any sale, disposition or other enforcement of Lender's security interest in and Lien on all or any portion of the Collateral to the payment of the Obligations in the order Lender determines in its sole discretion. From and after the indefeasible payment to Lender of all of the Obligations, any remaining proceeds of the Collateral will be paid to Borrower, or to its successors or assigns, or as a court of competent jurisdiction may direct. If the proceeds of any sale, disposition or other enforcement of the Collateral are insufficient to cover the costs and expenses of that sale, disposition or other enforcement and payment in full of all Obligations, Borrower is liable for the deficiency.

## 10.4.  Lender Appointed Attorney-in-Fact

Borrower appoints Lender its attorney-in-fact, with full power of substitution, for the purpose of carrying out the provisions of this Agreement, the Warehousing Note and the other Loan Documents and taking any action and executing any instruments that Lender deems necessary or advisable to accomplish that purpose. Borrower's appointment of Lender as attorney-in-fact is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, Lender may give notice of its security interest in and Lien on the Collateral to any Person, either in Borrower's name or in its own name, endorse all Pledged Assets payable to the order of Borrower, change or cause to be changed the book-entry registration or name of subscriber or investor on any Pledged Security, prepare and submit for filing Uniform Commercial Code amendment statements with respect to any Uniform Commercial Code financing statements filed in connection with any item of Collateral or receive, endorse and collect all checks made payable to the order of Borrower representing payment on account of the principal of or interest on, or the proceeds of sale of, any of the Pledged Assets and give full discharge for those transactions.

## 10.5. Right of Set-Off

If Borrower defaults in the payment of any Obligation or in the performance of any of its duties under the Loan Documents, Lender may, without Notice to or demand on Borrower (which Notice or demand Borrower expressly waives), set-off, appropriate or apply any property of Borrower held at any time by Lender, or any indebtedness at any time owed by Lender to or for the account of Borrower, against the Obligations, whether or not those Obligations have matured.

**End of Article 10**

## 11.    MISCELLANEOUS

### 11.1.  Notices

Except where telephonic Notice is expressly authorized by this Agreement, all communications required or permitted to be given or made under this Agreement ("Notices") must be in writing and must be sent by manual delivery, facsimile transmission, overnight courier or United States mail (postage prepaid), addressed as follows (or at such other address as may be designated by Borrower or Lender in a Notice to the other):

|  |  |
|---|---|
| If to Borrower: | Home Mortgage, Inc.<br>485 South Frontage Road<br>Suite 200<br>Burr Ridge, IL 60527<br>Attention: Larry Luckett, CEO<br>Facsimile: (630) 522-0150 |
| If to Lender: | GMAC Bank<br>7501 Wisconsin Avenue<br>Bethesda, MD 20814<br>Attention: Donna West, Managing Director<br>Facsimile: (301) 215-6288 |

All periods of Notice will be measured from the date of delivery if delivered manually or by facsimile, from the first Business Day after the date of sending if sent by overnight courier or from 4 days after the date of mailing if sent by United States mail, except that Notices to Lender under Article 2 and Section 3.3(f) will be deemed to have been given only when actually received by Lender. Borrower authorizes Lender to accept Borrower's bailee pledge agreements, Warehousing Advance Requests, shipping requests, wire transfer instructions and security delivery instructions transmitted to Lender by facsimile or by RFConnects Delivery, and those documents, when transmitted to Lender by facsimile or RFConnects Delivery, have the same force and effect as the originals.

### 11.2.  Reimbursement of Expenses; Indemnity

11.2 (a) Borrower must:  (a) pay Lender a document production fee in connection with the preparation and negotiation of this Agreement and the other Loan Documents; (b) pay such additional document production fees as Lender may require and all out-of-pocket costs and expenses of Lender, including reasonable fees, service charges and disbursements of counsel to Lender (including allocated costs of internal counsel whether or not out-of-pocket), in connection with the amendment, enforcement and administration of this Agreement, the Warehousing Note and the other Loan Documents (including any action taken by Lender in connection with any bankruptcy case in which Borrower or any of its Affiliates or in which any Guarantor is a debtor), the making, repayment and payment of interest on the Warehousing Advances and the payment of all other Obligations under Loan Documents; and (c) indemnify, pay and hold harmless Lender and any other holder of the Warehousing Note from and against all present and future stamp, documentary and other similar taxes with respect to the foregoing matters and save Lender and any other holder of the Warehousing Note harmless from and against all liabilities with respect to or resulting from any delay or omission to pay such taxes.

11.2(b)  Borrower must: (a) indemnify, pay and hold harmless Lender and any other holder of the Warehousing Note, and all of their respective Affiliates, officers, directors, employees or

agents and the officers, directors, employees or agents of such Affiliates (collectively, the "Indemnitees") from and against the misapplication (whether to an incorrect Person or account or in an incorrect amount) of any wire transfer or check issued by or on behalf of Lender in accordance with Borrower instructions contained in any Warehousing Advance Request and against any loss, misplacement, misapplication or destruction of any check after Borrower or any applicable closing agent, escrow agent, title company, attorney or other authorized Person receives such check (it being understood that any such wire transfer or check will constitute a Warehousing Advance under this Agreement and will be an Obligation of Borrower under this Agreement notwithstanding any indemnity described in this Section); and (b) indemnify, pay and hold harmless the Indemnitees from and against all liabilities, obligations, losses, damages, penalties, judgments, suits, costs, expenses and disbursements of every kind or nature (including the reasonable fees and disbursements of counsel to the Indemnitees (including allocated costs of internal counsel) in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnitees have been designated as parties to such proceeding) that may be imposed upon, incurred by or asserted against such Indemnitees in any manner relating to or arising out of this Agreement, the Warehousing Note or any other Loan Document or any of the transactions contemplated by this Agreement, the Warehousing Note and the other Loan Documents, including against all liabilities, obligations, losses, damages, penalties, judgments, suits, costs, expenses and disbursements of every kind or nature (including the reasonable fees and disbursements of counsel to the Indemnitees (including allocated costs of internal counsel) in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnitees have been designated as parties to such proceeding) arising from any breach of Sections 9.2 (bb) or 9.4 (i) or the making of any Mortgage Loan in which any mortgagor, guarantor or other obligor is a Person named in any Restriction List and to whom the provision of financial services is prohibited or otherwise restricted by applicable law (collectively, the "Indemnified Liabilities"), except that Borrower has no obligation under this Agreement to indemnify any Indemnitee for that Indemnitee's gross negligence or willful misconduct.

11.2(c)  If, after the date of this Agreement, due to either (a) the effectiveness or introduction of, or any change in, or any change in the interpretation of, any law or regulation by any court or administrative or governmental authority charged with administration of such law, regulation or interpretation or (ii) compliance with any guideline or request from any central bank or other governmental authority or official (whether or not having the force of law and including, in any event, any law, regulation or interpretation with respect to capital adequacy or request in connection with any of the foregoing), there is an increase in the cost to Lender of making, funding or maintaining any Warehousing Advance or the Warehousing Commitment under this Agreement or Lender is required to make a payment calculated by reference to the principal of, or interest on, any Warehousing Advance made by it or the Warehousing Commitment (other than any such increased cost, reduction in the amount receivable, or payment required to be made resulting from the imposition or an increase in the rate of any taxes unless such taxes are payable by Borrower under this Section 11.2 or there is an increase in the amount of capital required or expected to be maintained by Lender or any Person controlling Lender and Lender reasonably determines that the amount of such capital is increased by or based upon the existence of Lender's agreement, in its discretion, to make or maintain Warehousing Advances under this Agreement and other similar agreements and facilities), then Borrower must, from time to time, upon demand by Lender, immediately pay to Lender additional amounts sufficient to compensate Lender for any such increased cost or increase in capital (to the extent Lender reasonably determines such increase in capital to be allocable to the existence of Lender's obligations and agreements under this Agreement).  Lender's determination of such amounts (and the calculation of such

amounts) as of any date of determination is conclusive and binding, absent manifest error.

11.2(d) To the extent that any of the undertakings to indemnify, pay and hold harmless described in this Section 11.2 may be unenforceable because it is violative of any law or public policy, Borrower must contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all amounts payable or indemnified against under Sections 11.2(a), (b) and (c). The agreements of Borrower contained in this Article survive the expiration or termination of this Agreement and the payment in full of the Warehousing Note. Attorneys' fees and disbursements incurred in enforcing or on appeal from a judgment under this Agreement are recoverable separately from and in addition to any other amount included in such judgment, and this clause is intended to be severable from the other provisions of this Agreement and to survive and not be merged into such judgment.

## 11.3. Financial Information

All financial statements and reports furnished to Lender under this Agreement must be prepared in accordance with GAAP, applied on a basis consistent with that applied in preparing the financial statements as at the end of and for Borrower's most recent fiscal year (except to the extent otherwise required to conform to good accounting practice).

## 11.4. Terms Binding Upon Successors; Survival of Representations

The terms and provisions of this Agreement are binding upon and inure to the benefit of Borrower, Lender and their respective successors and assigns. All of Borrower's representations, warranties, covenants and agreements survive the making of any Warehousing Advance and, except where a longer period is set forth in this Agreement, remain effective for as long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed.

## 11.5. Assignment

Borrower cannot assign this Agreement. Lender may at any time, without Notice to or the consent of Borrower, transfer or assign, in whole or in part, its interest in this Agreement and the Warehousing Note along with Lender's security interest in and Lien on any of the Collateral, and any assignee of Lender may enforce this Agreement, the Warehousing Note and its security interest in and Lien on the Collateral assigned.

## 11.6. Amendments

Except as otherwise provided in this Agreement, this Agreement may not be amended, modified or supplemented unless the amendment, modification or supplement is set forth in a writing signed by both Borrower and Lender.

## 11.7. Governing Law

This Agreement and the other Loan Documents are governed by the laws of the State of Minnesota, without reference to its principles of conflicts of laws.

## 11.8. Participations

Lender may at any time sell, assign or grant participations in, or otherwise transfer to any other Person ("Participant"), all or part of the Obligations. Without limiting Lender's exclusive right to

collect and enforce the Obligations, Borrower agrees that each participation will give rise to a debtor-creditor relationship between Borrower and the Participant, and Borrower authorizes each Participant, upon the occurrence of an Event of Default, to proceed directly by right of setoff, banker's lien or otherwise, against any assets of Borrower that may be held by that Participant. Borrower authorizes Lender to disclose to prospective and actual Participants all information in Lender's possession concerning Borrower, this Agreement and the Collateral.

## 11.9.  Relationship of the Parties

This Agreement provides for the making and repayment of Warehousing Advances by Lender (in its capacity as a lender) and Borrower (in its capacity as a borrower), for the payment of interest on those Warehousing Advances and for the payment of certain fees by Borrower to Lender. The relationship between Lender and Borrower is limited to that of creditor and secured party on the part of Lender and of debtor on the part of Borrower. The provisions of this Agreement and the other Loan Documents for compliance with financial covenants and the delivery of financial statements and other operating reports are intended solely for the benefit of Lender to protect its interest as a creditor and secured party. Nothing in this Agreement creates or may be construed as permitting or obligating Lender to act as a financial or business advisor or consultant to Borrower, as permitting or obligating Lender to control Borrower or to conduct Borrower's operations, as creating any fiduciary obligation on the part of Lender to Borrower, or as creating any joint venture, partnership, agency or other relationship between Lender and Borrower other than as explicitly and specifically stated in the Loan Documents. Borrower acknowledges that it has had the opportunity to obtain the advice of experienced counsel of its own choice in connection with the negotiation and execution of the Loan Documents and to obtain the advice of that counsel with respect to all matters contained in the Loan Documents, including the waivers of jury trial and of punitive, consequential, special or indirect damages contained in Sections 11.17 and 11.18, respectively.  Borrower further acknowledges that it is experienced with respect to financial and credit matters and has made its own independent decisions to apply to Lender for credit and to execute and deliver this Agreement.

## 11.10. Severability

If any provision of this Agreement or any other Loan Document is declared to be illegal or unenforceable in any respect, that provision is null and void and of no force and effect to the extent of the illegality or unenforceability, and does not affect the validity or enforceability of any other provision of the Agreement or such other Loan Document.

## 11.11. Consent to Credit References

Borrower consents to the disclosure of information regarding Borrower and its Subsidiaries and their relationships with Lender to Persons making credit inquiries to Lender. This consent is revocable by Borrower at any time upon Notice to Lender as provided in Section 11.1.

## 11.12. Consent to Information Sharing with GMAC Affiliates

Borrower consents to the disclosure to GMAC and any and all GMAC Affiliates of any and all information regarding Borrower and its Subsidiaries and their relationships with GMAC, Lender or any other GMAC Affiliates.

## 11.13. Counterparts

This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together constitute but one and the same instrument.

### 11.14. Headings/Captions

The captions or headings in this Agreement and the other Loan Documents are for convenience only and in no way define, limit or describe the scope or intent of any provision of this Agreement or any other Loan Document.

### 11.15. Entire Agreement

This Agreement, the Warehousing Note and the other Loan Documents represent the final agreement among the parties with respect to their subject matter, and may not be contradicted by evidence of prior or contemporaneous oral agreements among the parties. There are no oral agreements among the parties with respect to the subject matter of this Agreement, the Warehousing Note and the other Loan Documents.

### 11.16. Consent to Jurisdiction

AT THE OPTION OF LENDER, THIS AGREEMENT, THE WAREHOUSING NOTE AND THE OTHER LOAN DOCUMENTS MAY BE ENFORCED IN ANY STATE OR FEDERAL COURT WITHIN THE STATE OF MINNESOTA. BORROWER CONSENTS TO THE JURISDICTION AND VENUE OF THOSE COURTS, AND WAIVES ANY OBJECTION TO THE JURISDICTION OR VENUE OF THOSE COURTS, INCLUDING THE OBJECTION THAT VENUE IN THOSE COURTS IS NOT CONVENIENT. ANY SUCH SUIT, ACTION OR PROCEEDING MAY BE COMMENCED AND INSTITUTED BY SERVICE OF PROCESS UPON BORROWER BY FIRST CLASS REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER AT ITS ADDRESS LAST KNOWN TO LENDER. BORROWER'S CONSENT AND AGREEMENT UNDER THIS SECTION DOES NOT AFFECT LENDER'S RIGHT TO ACCOMPLISH SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY OTHER JURISDICTION OR COURT. IN THE EVENT BORROWER COMMENCES ANY ACTION IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, LENDER AT ITS OPTION MAY HAVE THE CASE TRANSFERRED TO A STATE OR FEDERAL COURT WITHIN THE STATE OF MINNESOTA OR, IF A TRANSFER CANNOT BE ACCOMPLISHED UNDER APPLICABLE LAW, MAY HAVE BORROWER'S ACTION DISMISSED WITHOUT PREJUDICE.

### 11.17. Waiver of Jury Trial

BORROWER AND LENDER EACH PROMISES AND AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY A JURY, AND FULLY WAIVES ANY RIGHT TO TRIAL BY JURY TO THE EXTENT THAT ANY SUCH RIGHT NOW EXISTS OR ARISES AFTER THE DATE OF THIS AGREEMENT. THIS WAIVER OF THE RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN, KNOWINGLY AND VOLUNTARILY, BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE FOR WHICH THE RIGHT TO TRIAL BY JURY WOULD OTHERWISE APPLY. LENDER AND BORROWER ARE EACH AUTHORIZED AND DIRECTED TO SUBMIT THIS AGREEMENT TO ANY COURT HAVING JURISDICTION OVER THE SUBJECT MATTER AND THE PARTIES TO THIS AGREEMENT AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF THE RIGHT TO TRIAL BY JURY. FURTHER, BORROWER AND LENDER EACH CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF THE OTHER PARTY, INCLUDING THE OTHER PARTY'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, TO ANY OF ITS REPRESENTATIVES OR AGENTS THAT THE OTHER PARTY WILL NOT SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

## 11.18. Waiver of Punitive, Consequential, Special or Indirect Damages

BORROWER AND LENDER EACH WAIVES ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES FROM THE OTHER PARTY OR ANY OF THE OTHER PARTY'S AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS (OR THE OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS OF SUCH AFFILIATES) WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER PARTY OR ANY OF THE OTHER PARTY'S AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS (OR THE OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS OF SUCH AFFILIATES) WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT. THIS WAIVER OF THE RIGHT TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES IS KNOWINGLY AND VOLUNTARILY GIVEN BY EACH OF BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE FOR WHICH THE RIGHT TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES WOULD OTHERWISE APPLY. EACH OF BORROWER AND LENDER IS AUTHORIZED AND DIRECTED TO SUBMIT THIS AGREEMENT TO ANY COURT HAVING JURISDICTION OVER THE SUBJECT MATTER AND THE PARTIES TO THIS AGREEMENT AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF THE RIGHT TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES.

**End of Article 11**

## 12.  DEFINITIONS

### 12.1.  Defined Terms

As used in this Agreement and the Exhibits to this Agreement, the following terms have the following meanings or, as applicable, the meanings given to those terms elsewhere in this Agreement or in Exhibits to this Agreement:

"Advance Rate" means, with respect to any Eligible Asset, the Advance Rate set forth in Exhibit H for that type of Eligible Asset.

"Affiliate" means, when used with reference to any Person, (a) each Person that, directly or indirectly, controls, is controlled by or is under common control with, the Person referred to, (b) each Person that beneficially owns or holds, directly or indirectly, 5% or more of any class of voting Equity Interests of the Person referred to, (c) each Person, 5% or more of the voting Equity Interests of which is beneficially owned or held, directly or indirectly, by the Person referred to, and (d) each of such Person's officers, managers, directors, joint venturers and partners. For these purposes, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Person in question, whether by contract, ownership of voting securities, membership interests or otherwise.

"Aged Mortgage Loan" means an Aged Pledged Asset that is also a Pledged Loan.

"Aged Pledged Asset" means a Pledged Asset that has been outstanding for longer than the Standard Warehouse Period, provided that the applicable Pledged Asset is permitted to be outstanding beyond the Standard Warehouse Period under Exhibit H.

"Aged Warehouse Period" means, for any Pledged Asset, the maximum number of days a Warehousing Advance against that type of Aged Pledged Asset can remain outstanding under Exhibit H (beginning on the same date as the Standard Warehouse Period).

"Agency Security" means a Mortgage-backed Security issued or guaranteed by Fannie Mae, Freddie Mac or Ginnie Mae.

"Aggregate Warehousing Collateral Value" means, as of any date of determination, the total Warehousing Collateral Value of all Pledged Assets then subject to a perfected, first-priority Lien in favor of Lender under this Agreement.

"Agreement" means this Warehousing Credit and Security Agreement, including each Exhibit and Schedule to this Agreement, either as originally executed or as it or they may be amended, restated, renewed or replaced.

"Appraised Property Value" means with respect to an interest in real property, the then current fair market value of the real property and any improvements on it as of a recent date determined in accordance with Title XI of FIRREA by a qualified appraiser who is a member of the American Institute of Real Estate Appraisers or other group of professional appraisers.

"Approved Custodian" means a pool custodian or other Person that Lender deems acceptable, in its sole discretion, to hold Mortgage Loans for inclusion in a Mortgage Pool or to hold Mortgage Loans as agent for an Investor that has issued a Purchase Commitment for those Mortgage Loans.

"Audited Statement Date" means the date of Borrower's most recent audited financial statements (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) delivered to Lender under this Agreement.

"Base Warehousing Commitment Amount" has the meaning set forth in Exhibit H.

"Borrower" has the meaning set forth in the first paragraph of this Agreement.

"Business Day" means any day other than Saturday, Sunday or any other day on which national banking associations are closed for business.

"Buydown" has the meaning set forth in Section 3.4.

"Calendar Quarter" means the 3 month period beginning on each January 1, April 1, July 1 or October 1.

"Cash Collateral Account" means a demand deposit account maintained at the Funding Bank in Lender's name and designated for receipt of the proceeds of the sale or other disposition of Collateral.

"Certifying Financial Officer" means, with respect to a Person, the chief financial officer or other person or entity having principal responsibility for such Person's financial reporting.

"Certifying Officer" means, with respect to a Person (a) if the matters being certified to relate principally to the financial performance of or accuracy of financial reporting with respect to the Person referred to, the Certifying Financial Officer of such Person, and (b) otherwise, the person or entity (which may include, as applicable, a corporate secretary, managing member or other applicable officer) designated in such Person's Organizational Documents as being authorized to provide the applicable certification.

"Change of Control" means:

   (a)    with respect to Borrower:

          (i)      the Person or Persons owning the Majority Voting Rights on the Closing Date ceases to own the Majority Voting Rights; or

          (ii)     the Person or Persons owning the Majority Voting Rights on the Closing Date ceases to have the right to freely and fully exercise the Majority Voting Rights; or

          (iii)    the Person or Persons having day-to-day control of Borrower's operations on the Closing Date ceases to have such day-to-day control; or

          (iv)     Howard J. Siegel ceases to own, directly or indirectly, a majority of the capital stock of Borrower.

          (iv)     Larry Luckett ceases to be the Chief Executive Officer of Borrower.

   (b)    With respect to any other Person:

          (i)      the Person or Persons owning the Majority Voting Rights on the Closing Date ceases to own the Majority Voting Rights; or

(ii)     the Person or Persons owning the Majority Voting Rights on the Closing Date ceases to have the right to freely and fully exercise the Majority Voting Rights.

"Check Disbursement Account" means a demand deposit account maintained at the Funding Bank in Borrower's name and under the control of Lender for clearing checks written by Borrower to fund Mortgage Loans funded by Warehousing Advances.

"Check Fee" has the meaning set forth in Section 3.6.

"Closing Date" has the meaning set forth in the Recitals to this Agreement.

"Collateral" has the meaning set forth in Section 4.1.

"Collateral Documents" means, with respect to each Mortgage Loan, (a) the Mortgage Note, the Mortgage and all other documents including, if applicable, any Security Agreement, executed in connection with or relating to the Mortgage Loan, (b) as applicable, the original lender's ALTA Policy of Title Insurance or its equivalent, documents evidencing the FHA Commitment to Insure, the VA Guaranty or private mortgage insurance, the appraisal, the Regulation Z statement, the environmental assessment, the engineering report, certificates of casualty or hazard insurance, credit information on the maker of the Mortgage Note, the HUD-1 or corresponding purchase advice, (c) any other document listed in Exhibit B and (d) any other document that is customarily desired for inspection or transfer incidental to the purchase of any Mortgage Note by an Investor or that is customarily executed by the seller of a Mortgage Note to an Investor.

"Committed Purchase Price" means for an Eligible Loan (a) the dollar price as set forth in the Purchase Commitment or, if the price is not expressed in dollars, the product of the Mortgage Note Amount multiplied by the price (expressed as a percentage) as set forth in the Purchase Commitment for the Eligible Loan, or (b) if the Eligible Loan is to be used to back an Agency Security, an amount equal to the product of the Mortgage Note Amount multiplied by the price (expressed as a percentage) as set forth in the Purchase Commitment for the Agency Security.

"Compliance Certificate" means a certificate executed on behalf of Borrower by its Certifying Financial Officer, substantially in the form of Exhibit E.

"Covered Debt Holder" means, with respect to a Person, (a) such Person's Affiliates, (b) such Person's Equity Holders, and (c) the directors, managers, officers and employees of such Person or of any general partner of such Person.

"Covered Obligor" means, with respect to a Person, (a) such Person's Affiliates, (b) such Person's Equity Holders, (c) the directors, managers, officers and employees of such Person or of any general partner of such Person.

"Credit Score" means a mortgagor's overall consumer credit rating, represented by a single numeric credit score using the Fair, Isaac consumer credit scoring system, provided by a credit repository acceptable to Lender and the Investor that issued the Purchase Commitment covering the related Mortgage Loan (if a Purchase Commitment is required by Exhibit H).

"Debt" means (a) all indebtedness or other obligations of a Person (and, if applicable, that Person's Subsidiaries, on a consolidated basis) that, in accordance with GAAP, would be included in determining total liabilities as shown on the liabilities side of a balance sheet of that Person on the date of determination, plus (b) all indebtedness or other obligations of that Person (and, if applicable, that Person's Subsidiaries, on a consolidated basis) for borrowed money or for the deferred purchase price of property or services. For purposes of calculating a Person's Debt,

Subordinated Debt due more than 6 months after the Scheduled Warehousing Maturity Date may be excluded from that Person's indebtedness.

"Default" means the occurrence of any event or existence of any condition that, but for the giving of Notice, the lapse of time or both would constitute an Event of Default.

"Default Rate" means, for any Warehousing Advance, the interest Rate applicable to that Warehousing Advance plus 4% per annum. If no Interest Rate is applicable to a Warehousing Advance, "Default Rate" means, for that Warehousing Advance, the highest Interest Rate then applicable to any outstanding Warehousing Advance plus 4% per annum.

"Discontinued Loan" has the meaning set forth in the GMAC-RFC Client Guide.

"Distribution" means any dividend or distribution of any kind or nature made in respect of any Equity Interest in the Borrower, including any purchase or redemption of any Equity Interest in the Borrower.

"Earnings Credit" has the meaning set forth in Section 3.7.

"Electronic Advance Request" means an electronic transmission through RFConnects Delivery containing the same information as Exhibit A to this Agreement.

"Electronic Tracking Agreement" means an Electronic Tracking Agreement, on the form prescribed by Lender, among Borrower, Lender, MERS and MERSCORP, Inc.

"Eligible Asset" means an Eligible Loan or other loan or asset against which Warehousing Advances are permitted to be made under Exhibit H.

"Eligible Loan" means a Single Family Mortgage Loan against which a Warehousing Advance is permitted to be made under Exhibit H.

"Eligible Mortgage Pool" means a Mortgage Pool for which (a) an Approved Custodian has issued its initial certification, (b) there exists a Purchase Commitment covering the Agency Security to be issued on the basis of that certification and (c) the Agency Security will be delivered to Lender.

"Equity Holder" means, with respect to a Person, any person or entity that owns an Equity Interest in the Person referred to (whether as a shareholder, member, partner, limited partner, general partner or otherwise).

"Equity Interests" means, with respect to a Person, all shares, interests, participations or other equivalents in the equity of such Person, including common stock, preferred stock, warrants, membership interests, partnership interests, limited partnership interests, convertible debentures, other debt securities which include voting rights in the Person referred to, and any and all agreements, instruments and documents convertible, in whole or in part, into any one or more of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974 and all rules and regulations promulgated under that statute, as amended, and any successor statute, rules, and regulations.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is a member of a group of which Borrower is a member and that is treated as a single employer under Section 414 of the Internal Revenue Code.

"Event of Default" means any of the conditions or events set forth in Section 10.1.

"Excess Buydown" has the meaning set forth in Section 3.4.

"Exchange Act" means the Securities Exchange Act of 1934 and all rules and regulations promulgated under that statute, as amended, and any successor statute, rules and regulations.

"Exclusionary List" means the list by that name published and updated periodically by Lender on the www.gmacresidentialfunding.com website.

"Face Amount" means, with respect to a Mortgage Loan, the original face principal amount of the related Mortgage Note.

"Fair Market Value" means, at any time for an Eligible Asset or a related Pledged Security (if the Eligible Asset is an Eligible Loan used to back a Pledged Security) as of any date of determination, the market price for such Eligible Asset or Pledged Security, determined by Lender based on market data for similar Mortgage Loans, assets or Pledged Securities and such other criteria as Lender deems appropriate in its sole discretion. Borrower acknowledges that Lender's determination of Fair Market Value is for the limited purpose of determining the value of Pledged Assets that are subject to Warehousing Advances under this Agreement, and is made without the ability to perform customary purchaser's due diligence. Borrower further acknowledges that Lender's determination of Fair Market Value is not necessarily equivalent to a determination of the fair market value of the Pledged Assets achieved by obtaining competing bids in an orderly market in which the originator/seller/servicer is in good standing under a revolving debt facility and the bidders have adequate opportunity to perform customary loan, property and servicing due diligence.

"Fannie Mae" means Fannie Mae, a corporation created under the laws of the United States, and any successor corporation or other entity.

"Federal Funds Rate" means, for each week, the effective Federal Funds Rate (per annum) of interest in effect on the first Business Day of that week, as published by Bloomberg L.P. If the Federal Funds Rate is not published by Bloomberg L.P. on the first Business Day of any week, then the term "Federal Funds Rate" means the highest Federal Funds Rate published in *The Wall Street Journal* in its regular column entitled "Money Rates" on the first Business Day of that week.

"FHA" means the Federal Housing Administration and any successor agency or other entity.

"FICA" means the Federal Insurance Contributions Act and all rules and regulations promulgated under that statute, as amended, and any successor statute, rules and regulations.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989 and all rules and regulations promulgated under that statute, as amended, and any successor statute, rules, and regulations.

"First Mortgage" means a Mortgage that constitutes a first Lien on the Mortgaged Property described in or covered by that Mortgage.

"First Mortgage Loan" means a Mortgage Loan secured by a First Mortgage.

"Freddie Mac" means the Federal Home Loan Mortgage Corporation, a corporation created under the laws of the United States, and any successor corporation or other entity.

"Funding Bank" means JPMorgan Chase or any other bank designated by Lender as a Funding Bank.

"Funding Bank Accounts" means collectively the Operating Account and any other demand deposit account from time to time established and maintained at the Funding Bank at the direction of or with the permission of Lender for purposes of facilitating (a) funding Warehousing Advances, (b) repayment of Warehousing Advances, or (c) return of excess payments with respect to a Pledged Loan, Pledged Security or other Collateral owing to Borrower under the terms of this Agreement.

"Funding Bank Agreement" means a letter agreement on the form prescribed by Lender between the Funding Bank and Borrower authorizing Lender's access to the Operating Account and the Check Disbursement Account.

"Funding Bank Fees and Charges" means each and every service charge, fee, expense or other amount from time to time charged by or owing to Funding Bank in respect of the maintenance of or any services or transactions relating to any one or more of the Funding Bank Accounts, whether paid or payable by Borrower, Lender or both.

"GAAP" means generally accepted accounting principles set forth in opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and in statements and pronouncements of the Financial Accounting Standards Board, or in opinions, statements or pronouncements of any other entity approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

"Ginnie Mae" means the Government National Mortgage Association, an agency of the United States government, and any successor agency or other entity.

"GMAC" means GMAC, LLC, a Delaware limited liability company.

"GMAC Affiliates" means, as of any date of determination, each and every Affiliate of GMAC.

"GMAC-RFC" means Residential Funding Company, LLC (f/k/a Residential Funding Corporation), a Delaware limited liability company.

"GMAC-RFC Client Guide" means the applicable loan purchase guide issued by Lender, as the same may be amended or replaced.

"GMAC-RFC Warehousing Agreement" means the Fifth Amended and Restated Warehousing Credit and Security Agreement dated as of April 1, 2007, as amended, between Borrower and GMAC-RFC.

"Government Mortgage Loan" means a closed-end First Mortgage Loan that is either HUD/FHA insured (other than a HUD 203(K) Mortgage Loan or a Title I Mortgage Loan) or VA guaranteed.

"Governors" means, with respect to a Person, the directors, managers, governors, general partner or equivalent board, group or Persons having principal control over the management and policies of the Person referred to under the terms of such Person's Organizational Documents or applicable law.

"Guarantor" means, individually and collectively, Larry Luckett and Howard J. Siegel and any other Person that after the date of this Agreement guarantees all or any portion of Borrower's Obligations.

"Guaranty" means a guaranty of all or any portion of Borrower's Obligations, either as originally executed or as it may be amended, restated, renewed or replaced. If more than one Guaranty is

executed and delivered to Lender, the term "Guaranty" means each of the Guaranties and all of them.

"Hedging Arrangements" means, with respect to any Person, any agreements or other arrangements (including interest rate swap agreements, interest rate cap agreements and forward sale agreements) entered into to protect that Person against changes in interest rates or the market value of assets.

"HUD" means the Department of Housing and Urban Development, and any successor agency or other entity.

"HUD 203(K) Mortgage Loan" means an FHA-insured closed-end First Mortgage Loan to an individual obligor the proceeds of which will be used for the purpose of rehabilitating and repairing the related single family property, and which satisfies the definition of "rehabilitation loan" in 24 C.F.R. 203.50(a).

"Income" means, with respect to any Pledged Loan, any principal of such Pledged Loan then payable and all interest, dividends or other distributions payable on such Pledged Loan; and, with respect to any other Pledged Asset, any payments (including rental payments), interest, dividends or other distributions then payable on such Pledged Asset.

"Indemnified Liabilities" has the meaning set forth in Section 11.2(b).

"Indemnitees" has the meaning set forth in Section 11.2(b).

"Interest Rate" means, for any Warehousing Advance, the floating rate of interest per annum obtained by adding the Interest Rate Margin to the Interest Rate Index applicable to such Warehousing Advance in Exhibit H.

"Interest Rate Index" means, as applicable (a) LIBOR, (b) Prime Rate, or (c) Federal Funds Rate.

"Interest Rate Margin" means, with respect to a particular Sublimit, the margin over the applicable Interest Rate Index charged by Lender with respect to Warehousing Advances made against Eligible Assets within such Sublimit.

"Interim Statement Date" means the date of the most recent unaudited financial statements of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) delivered to Lender under this Agreement.

"Internal Revenue Code" means the Internal Revenue Code of 1986, Title 26 of the United States Code, and all rules, regulations and interpretations issued under those statutory provisions, as amended, and any subsequent or successor federal income tax law or laws, rules, regulations and interpretations.

"Investment Company Act" means the Investment Company Act of 1940 and all rules and regulations promulgated under that statute, as amended, and any successor statute, rules and regulations.

"Investor" means Fannie Mae, Freddie Mac or a financially responsible private institution that Lender deems acceptable, in its sole discretion, to issue Purchase Commitments with respect to a particular category of Eligible Assets.

"Investor Proceeds Buydown" has the meaning set forth in Section 3.4(b).

"JPMorgan Chase" means JPMorgan Chase Bank, National Association, Chicago, Illinois, or any successor bank.

"Lender" has the meaning set forth in the first paragraph of this Agreement.

"Leverage Ratio" means the ratio of a Person's Debt to Tangible Net Worth, except that for purposes of calculating a Person's Leverage Ratio, Debt arising under Hedging Arrangements, to the extent of assets arising under those Hedging Arrangements, may be excluded from that Person's Debt.

"LIBOR" means, for each week, the rate of interest per annum that is equal to the arithmetic mean of the U.S. Dollar London Interbank Offered Rates for 1 month periods of certain U.S. banks as of 11:00 a.m. (London time) on the first Business Day of each week on which the London Interbank market is open, as published by Bloomberg L.P. If those interest rates are not offered or published for any period, then during that period LIBOR means the London Interbank Offered Rate for 1 month periods as published in *The Wall Street Journal* in its regular column entitled "Money Rates" on the first Business Day of each week on which the London Interbank market is open.

"Lien" means any lien, mortgage, deed of trust, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature of such an agreement and any agreement to give any security interest).

"Liquid Assets" means the following unrestricted and unencumbered assets owned by a Person (and, if applicable, that Person's Subsidiaries, on a consolidated basis) as of any date of determination: (a) cash, (b) funds on deposit in accounts with any bank located in the United States (net of the aggregate amount payable under all outstanding and unpaid checks, drafts and similar items drawn by a Person against those accounts for purposes other than funding Mortgage Loans against which Warehousing Advances have been or will be made), (c) investment grade commercial paper, (d) money market funds and (e) marketable securities, plus, in the case of Borrower (f) the amount of any Buydown that Borrower is entitled to reborrow under procedures and limitations of Section 3.4, and (g) in the absence of a Default or Event of Default, the amount of any Excess Buydown.

"Loan Documents" means this Agreement, the Warehousing Note, the Guaranty, any agreement of Borrower relating to Subordinated Debt and each other document, instrument or agreement executed by Borrower or any Guarantor, as applicable, in connection with any of those documents, instruments and agreements, as originally executed or as any of the same may be amended, restated, renewed or replaced.

"Loan Package Fee" has the meaning set forth in Section 3.6.

"Loan-to-Value Ratio" means, for any Mortgage Loan, the ratio of (a) the maximum amount that may be borrowed under the Mortgage Loan (whether or not borrowed) at the time of origination, plus the Face Amounts of all other Mortgage Loans secured by senior or pari passu Liens on the related Mortgaged Property, to (b) the Appraised Property Value of the related Mortgaged Property.

"Majority Voting Rights" means, with respect to a Person, 50.1% or more of all Voting Equity Interests in the Person referred to.

"Manufactured Home" means a structure that is built on a permanent chassis (steel frame) with the wheel assembly necessary for transportation in one or more sections to a permanent site or semi-permanent site.

"Margin Stock" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System, as amended.

"MERS" means Mortgage Electronic Registration Systems, Inc. and any successor entity.

"Miscellaneous Fees and Charges" means the Collateral Operations Fees set forth on Lender's fee schedule attached as Exhibit I and all miscellaneous disbursements, charges and expenses incurred by or on behalf of Lender for the handling and administration of Warehousing Advances and Collateral, including costs for Uniform Commercial Code, tax lien and judgment searches conducted by Lender, filing fees, charges for wire transfers and check processing charges, charges for security delivery fees, charges for overnight delivery of Collateral to Investors, recording fees, Funding Bank service fees and overdraft charges. Upon not less than 3 Business Days' prior Notice to Borrower, Lender may modify the Collateral Operations Fees set forth in Exhibit I to conform to current Lender practices and, as so modified, the revised Exhibit I will become part of this Agreement.

"Mortgage" means a mortgage or deed of trust on real property that is improved and substantially completed (including real property to which a Manufactured Home has been affixed in a manner such that the Lien of a mortgage or deed of trust would attach to the Manufactured Home under applicable real property law).

"Mortgage-backed Securities" means securities that are secured or otherwise backed by Mortgage Loans.

"Mortgage Loan" means any loan evidenced by a Mortgage Note and secured by a Mortgage and, if applicable, a Security Agreement.

"Mortgage Note" means a promissory note secured by one or more Mortgages and, if applicable, one or more Security Agreements.

"Mortgage Note Amount" means (a) with respect to an open-ended Mortgage Loan, the then Outstanding Principal Balance of such Mortgage Loan (which Outstanding Principal Balance cannot be greater than the related Face Amount), and (b) with respect to a Mortgage Loan that is not an open-ended Mortgage Loan, the Face Amount of such Mortgage Loan.

"Mortgage Pool" means a pool of one or more Pledged Loans on the basis of which a Mortgage-backed Security is to be issued.

"Mortgaged Property" means, with respect to a Mortgage Loan, the real, personal and mixed property and improvements described in the related Mortgage as securing the related Mortgage Note or Mortgage Loan .

"Mortgagor" means, with respect to a Mortgage Loan, the obligors under the related Mortgage Note.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, to which either Borrower or any ERISA Affiliate of Borrower has any obligation with respect to its employees.

"Net Income" means, with respect to a Person, such Person's after tax net income from continuing operations (and, if applicable, that Person's Subsidiaries, on a consolidated basis) for the applicable period then being measured, determined in accordance with GAAP applied in a manner consistent with the financial statements referred to in Section 5.1(a)(8).

"Net Loss" means, with respect to a Person, failure of such Person (and, if applicable, that Person's Subsidiaries on a consolidated basis) to achieve a Net Income of $0 or greater for the applicable period then being measured.

"Non-Public Organizational Documents" means, with respect to a Person, the documents, instruments and agreements relating to the governance of such Person that are not required to be publicly filed for purposes of preserving such Person's organizational existence, rights and privileges, including, as applicable, bylaws, shareholder agreements, operating agreements, limited partnership agreements, partnership agreements and equivalents.

"Non-Usage Fee" has the meaning set forth in Section 3.5.

"Notices" has the meaning set forth in Section 11.1.

"Obligations" means all indebtedness, obligations and liabilities of Borrower to Lender or Lender's Subsidiaries, including (a) Borrower's obligation to repay all Warehousing Advances and reborrowings of Buydowns, made to or for the account of Borrower under this Agreement, (b) payment or performance of any and all other indebtedness, obligations and liabilities of Borrower owing to Lender under this Agreement and the other Loan Documents, and (c) any other disbursements made by Lender to or for the account of Borrower, whether, in each case, any or all of the foregoing are now existing or arising after the date of this Agreement, voluntary or involuntary, joint or several, direct or indirect, absolute or contingent, primary or secondary, liquidated or unliquidated, or decreased or extinguished and later increased and however and whenever created or incurred.

"Operating Account" means a demand deposit account maintained at the Funding Bank in Borrower's name and designated for funding that portion of each Eligible Asset not funded by a Warehousing Advance made against that Eligible Asset and for returning any excess payment from an Investor for a Pledged Asset.

"Organizational Documents" means, with respect to a Person, such Person's (a) Public Organizational Documents, and (b) Non-Public Organizational Documents.

"Outstanding Principal Balance" means, with respect to a Mortgage Loan, as of any date of determination, the then outstanding and unpaid principal amount of the related Mortgage Note (whether or not an additional amount is available to be drawn under that Mortgage Note).

"Overdraft Advance" has the meaning set forth in Section 3.9.

"Participant" has the meaning set forth in Section 11.8.

"Permanent Buydown" means $280,000.

"Person" means and includes natural persons, corporations, limited liability companies, limited liability partnerships, limited liability limited partnerships, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments and agencies and political subdivisions of those governments.

"Plan" means each employee benefit plan (whether in existence on the date of this Agreement or established after that date), as that term is defined in Section 3 of ERISA, maintained for the benefit of directors, officers or employees of Borrower or any ERISA Affiliate.

"Pledged Assets" means, collectively, Pledged Loans and Pledged Securities.

"Pledged Loans" has the meaning set forth in Section 4.1(a).

"Pledged Securities" has the meaning set forth in Section 4.1(c).

"Prime Mortgage Loan" has the meaning set forth in Exhibit H.

"Prime Rate" means, as of any date of determination, the highest prime rate quoted by JPMorgan Chase and most recently published by Bloomberg L.P. If the prime rate for JPMorgan Chase is not quoted or published for any period, then during that period the term "Prime Rate" means the highest prime rate published in the most recent edition of *The Wall Street Journal* in its regular column entitled "Money Rates."

"Prohibited Transaction" has the meanings set forth for such term in Section 4975 of the Internal Revenue Code and Section 406 of ERISA.

"Public Organizational Documents" means, with respect to a Person, the documents, instruments and agreements relating to the governance of such Person that are required to be publicly filed for purposes of preserving such Person's organizational existence, rights and privileges, including, as applicable, articles of incorporation, articles of organization, certificate of formation, certificate of limited partnership and equivalents.

"Purchase Commitment" means a written commitment, in form and substance satisfactory to Lender, issued in favor of Borrower by an Investor under which that Investor commits to purchase Pledged Assets.

"Rating Agency" means any nationally recognized statistical rating organization that in the ordinary course of its business rates Mortgage-backed Securities.

"Release Amount" has the meaning set forth in Section 4.3(f).

"Restriction List" and "Restriction Lists" means each and every list of Persons to whom the Government of the United States prohibits or otherwise restricts the provision of financial services. For the purposes of this Agreement, Restriction Lists include the list of Specially Designated Nationals and Blocked Persons established pursuant to Executive Order 13224 (September 23, 2001) and maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control or any successor agency or other entity, current as of the day the Restriction List is used for purposes of comparison in accordance with the requirements of this Agreement.

"RFConnects Delivery" means Lender's proprietary service to support the electronic exchange of information between Lender and Borrower, including Warehousing Advance Requests, shipping requests, payoff requests, wire transfer instructions, security delivery instructions, activity reports and exception reports.

"Scheduled Warehousing Maturity Date" means the date certain Warehousing Maturity Date determined by reference to clause (a) of Section 1.2.

"Second Mortgage" means a Mortgage that constitutes a second Lien on the Mortgaged Property described in or covered by that Mortgage.

"Second Mortgage Loan" means a Mortgage Loan secured by a Second Mortgage.

"Security Agreement" means a security agreement or other agreement that creates a Lien on personal property, including furniture, fixtures and equipment, to secure repayment of a Mortgage Loan.

"Servicing Contract" means, with respect to any Person, the arrangement, whether or not in writing, under which that Person has the right to service Mortgage Loans, whether such Mortgage Loans are owned by such Person or by others.

"Servicing Portfolio" means, as to any Person, the unpaid principal balance of Mortgage Loans serviced by that Person under Servicing Contracts, minus the principal balance of all Mortgage Loans that are serviced by that Person for others under subservicing arrangements.

"Servicing Portfolio Report" has the meaning set forth in Section 7.3(a).

"Single Family Mortgage Loan" means a Mortgage Loan secured by a Mortgage on improved real property on which is located a 1-to-4 family residence.

"Standard Warehouse Period" means, for any Pledged Asset, the maximum number of days a Warehousing Advance against that type of Pledged Asset can remain outstanding under Exhibit H without giving effect to any Aged Warehouse Period.

"Statement Date" means the Audited Statement Date or the Interim Statement Date, as applicable.

"Sublimit" means the aggregate amount of Warehousing Advances (expressed as a dollar amount or as a percentage of the Warehousing Commitment Amount) that is permitted to be outstanding at any one time against a specific type of Eligible Asset.

"Subordinated Debt" means all indebtedness of Borrower for borrowed money that is effectively subordinated in right of payment to all present and future Obligations either (1) under a Subordination of Debt Agreement on the form prescribed by Lender or (2) otherwise on terms acceptable to Lender.

"Subsidiary" means, with respect to a Person, any corporation, limited liability company, partnership, limited partnership, association or other business entity in which more than 50% of the Equity Interests having voting power under ordinary circumstances for the election of directors, managers, trustees or other Persons performing similar functions is at the time owned or controlled by the Person referred to either directly or indirectly through one or more Subsidiaries of the Person referred to (irrespective of whether or not at the time Equity Interests of any other class or classes have voting power by reason of the happening of some contingency).

"Tangible Net Worth" means the excess of a Person's (and, if applicable, that Person's Subsidiaries, on a consolidated basis) total assets over total liabilities as of the date of determination, each determined in accordance with GAAP applied in a manner consistent with the financial statements referred to in Section 5.1 (a)(8), plus that portion of Subordinated Debt due more than 6 months after the Scheduled Warehousing Maturity Date. For purposes of calculating a Person's Tangible Net Worth, advances or loans to Covered Obligors, investments in Affiliates, assets pledged to secure any liabilities not included in the Debt of that Person, intangible assets, those other assets that would be deemed by HUD to be non-acceptable in calculating adjusted net worth in accordance with its requirements in effect as of that date, as those requirements appear in the "Consolidated Audit Guide for Audits of HUD Programs," and other assets Lender deems unacceptable, in its sole discretion, must be excluded from that Person's total assets.

"Temporary Increase Amount" means, with respect to the Warehousing Commitment Amount or one or more Sublimits, as applicable, the dollar amount identified in Exhibit H as the Temporary Increase Amount to be added to such Warehousing Commitment Amount or Sublimits for the related Temporary Increase Period.

"Temporary Increase Period" means, with respect to a particular Temporary Increase Amount, the period shown on Exhibit H during which such Temporary Increase Amount applies.

"Third Party Originated Loan" means a Mortgage Loan originated and funded by a third party (other than with funds provided by Borrower at closing to purchase the Mortgage Loan) and subsequently purchased by Borrower.

"Title I Mortgage Loan" means an FHA co-insured closed-end First Mortgage Loan or Second Mortgage Loan that is underwritten in accordance with HUD underwriting standards for the Title I Property Improvement Program set forth in, and that is reported for insurance under, the Mortgage Insurance Program authorized and administered under Title I of the National Housing Act of 1934, as amended, and the regulations related to that statute.

"Trust Receipt" means a trust receipt in a form approved by and under which Lender may deliver any document relating to the Collateral to Borrower for correction or completion.

"Used Portion" has the meaning set forth in Exhibit I.

"VA" means the Veterans Administration and any successor agency or other entity.

"Voting Equity Interests" means, with respect to a Person, all Equity Interests in the Person referred to having voting power under ordinary circumstances to elect the Governors or other Persons performing similar functions with respect to the Person referred to (irrespective of whether or not at the time Equity Interests of any other class or classes have voting power by reason of the happening of some contingency).

"Warehousing Advance" means a disbursement by Lender under Section 1.1.

"Warehousing Advance Request" has the meaning set forth in Section 2.1.

"Warehousing Collateral Value" means, as of any date of determination, (a) with respect to any Eligible Asset, the lesser of (1) the amount of any Warehousing Advance made, or that could be made, against such Eligible Asset under Exhibit H or (2) an amount equal to the Advance Rate for the applicable type of Eligible Asset multiplied by the Fair Market Value of such Eligible Asset; (b) with respect to Eligible Loans that have been exchanged for Agency Securities, the lesser of (1) the amount of any Warehousing Advances outstanding against the Eligible Loans backing the Agency Securities or (2) an amount equal to the Advance Rates for the applicable types of Eligible Loans backing the Agency Securities multiplied by the Fair Market Value of the Agency Securities; and (c) with respect to cash, the amount of the cash.

"Warehousing Commitment" means the obligation of Lender to make Warehousing Advances to Borrower under Section 1.1.

"Warehousing Commitment Amount" means, as of any date of determination, the sum of (a) the dollar amount set forth opposite the term Base Warehousing Commitment Amount in Exhibit H, plus (b) during any Temporary Increase Period, the Temporary Increase Amount applicable to the Warehousing Commitment Amount during such Temporary Increase Period, minus (c) an amount equal to the Warehousing Advances outstanding under the GMAC-RFC Warehousing Agreement.

"Warehousing Fee" has the meaning set forth in Section 3.6.

"Warehousing Maturity Date" has the meaning set forth in Section 1.2.

"Warehousing Note" has the meaning set forth in Section 1.3.

"Wet Settlement Advance" means a Warehousing Advance prior to the end of the Wet Settlement Period.

"Wet Settlement Period" means the period of time from the date a Wet Settlement Advance is made against a Pledged Loan until the earlier of (a) the date the Collateral Documents for the Pledged Loan have been delivered to and examined by the Lender or (b) the date the Wet Settlement Advance made against the Pledged Loan is paid in full.

"Wire Disbursement Account" means a demand deposit account maintained at the Funding Bank in Lender's name for clearing wire transfers requested by Borrower to fund Warehousing Advances.

"Wire Fee" has the meaning set forth in Section 3.6.

## 12.2.  Other Definitional Provisions; Terms of Construction

12.2 (a)  Accounting terms not otherwise defined in this Agreement have the meanings given to those terms under GAAP.

12.2 (b)  Defined terms may be used in the singular or the plural, as the context requires.

12.2 (c)  All references to time of day mean the then applicable time in Chicago, Illinois, unless otherwise expressly provided.

12.2 (d)  References to Sections, Exhibits, Schedules and like references are to Sections, Exhibits, Schedules and the like of this Agreement unless otherwise expressly provided.

12.2 (e)  The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation."

12.2 (f)  Unless the context in which it is used otherwise clearly requires, the word "or" has the inclusive meaning represented by the phrase "and/or."

12.2 (g)  All incorporations by reference of provisions from other agreements are incorporated as if such provisions were fully set forth into this Agreement, and include all necessary definitions and related provisions from those other agreements. All provisions from other agreements incorporated into this Agreement by reference survive any termination of those other agreements until the Obligations of Borrower under this Agreement and the Warehousing Note are irrevocably paid in full and the Warehousing Commitment is terminated.

12.2 (h)  All references to the Uniform Commercial Code are deemed to be references to the Uniform Commercial Code in effect in the State of Minnesota on the Closing Date of this Agreement unless otherwise specifically indicated.

12.2 (i)  Unless the context in which it is used otherwise clearly requires, all references to days, weeks and months mean calendar days, weeks and months.

**End of Article 12**

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first above written.

HOME MORTGAGE, INC.,
an Illinois corporation

By: _____

Its: _____ C E O _____

Closing Date: __9 - 26 - 2007__
(to be completed by Lender)

GMAC BANK,
a Utah industrial bank

By: _____

Name: __Sophie B. Schubert__

Its: __Assistant Secretary__

EXHIBIT A

# WAREHOUSING ADVANCE REQUEST

## HOME MORTGAGE, INC.

Loan Number: _____

| | *(for GMAC Use Only)* |
|---|---|
| Reviewed By: | _____ |
| Warehouse Date: | _____ |
| Effective Date: | _____ |

Mortgagor: _____
SSN: _____
Address: _____
_____
Zip Code: _____

Loan-to-Value Ratio: _____    FICO Score: _____    Debt-to-Income Ratio: _____

Status:
- ☐ Committed
- ☐ Uncommitted
- ☐ Wet Settlement    ☐ Received
- ☐ Repurchased
- ☐ MERS
- ☐ Open-end    ☐ First    ☐ Second
- ☐ Closed-end Second

Loan Type:    ☐ Prime    ☐ FHA    ☐ VA

Term:    ☐ Fixed _____ Term
☐ ARM _____ Adjustment Period
☐ Balloon _____ Term

Interest Rate: _____

Mortgage Note Date: _____
Mortgage Note Amount: _____
Original Lender (if applicable): _____
Requested Warehouse Advance Amount: _____
Investor: _____
Investor Contact: _____
Investor Phone: _____
Committed Purchase Price: _____

Maturity Date: _____
Unpaid Principal Balance: _____
Acquisition Cost (if applicable): _____
Title Company: _____
Title Company Contact: _____
Title Company Phone: _____
Expiration Date: _____
Purchase Commitment No.: _____

## FUNDING INSTRUCTIONS

☐ Wire Funding
Account to Debit: _____
Credit Acct. Name: _____
Bank Name: _____
City and State: _____
Ref: _____

Date of Wire: _____
Amount of Wire: _____
Credit Acct. No.: _____
ABA No.: _____
Advise: _____    Phone: _____

☐ Check Funding
Check No.: _____    Amount: _____

K:\RFCCOMMON\LEGAL\WLD\CUSTOMERS-DATABASE\HOME MORTGAGE, INC\WH GMAC BANK\0 WC&S AGMT (8-20-2007)\IN PROCESS\EXHIBIT A (NOSI).DOC
Dated: 8/20/2007                    Page A-1

## REQUIRED DOCUMENTATION

The following documents in connection with the above request are enclosed:

*RIGHT*

☐  Original and 1 copy of Mortgage Note
☐  Certified copy of Mortgage (not required for Mortgage Loans registered on the MERS system after execution and delivery by all parties of an Electronic Tracking Agreement approved by Lender)
☐  *Copy of Investor Purchase Commitment (or satisfactory evidence thereof)
☐  *Copy of HUD-1 Settlement Statement or equivalent with evidence of initial Advance amount (open-end Mortgage Loans)

*LEFT*

☐  *Warehousing Advance Request (original and 1 copy)
☐  Recordable assignment of Mortgage (not required for Mortgage Loans registered on the MERS system after execution and delivery by all parties of an Electronic Tracking Agreement approved by Lender)
☐       ☐    Certified copies of interim assignments of Mortgage (if applicable)

NOTE: Items designated with the "*" are required prior to a Wet Settlement Advance.

For the new value this day received, Home Mortgage, Inc. ("Borrower"), grants a security interest to GMAC BANK ("Lender") in all of Borrower's right, title and interest in and to the Mortgage Loan described above, together with all related "Collateral," as more particularly described in the Warehousing Credit and Security Agreement (as amended, supplemented or otherwise modified) between Borrower and Lender.

Home Mortgage, Inc.


Authorized Signature: _____

# PROCEDURES AND DOCUMENTATION FOR WAREHOUSING SINGLE FAMILY MORTGAGE LOANS

### HOME MORTGAGE, INC.

HOME MORTGAGE, INC. ("Borrower") must observe the following procedures and documentation requirements in all respects. All documents must be satisfactory to GMAC BANK ("Lender") in its sole discretion. Capitalized terms used in this Exhibit without further definition have the meanings set forth in the Warehousing Credit and Security Agreement between Borrower and Lender (as amended, restated, renewed or replaced, "Agreement"). HUD, Fannie Mae and Freddie Mac form numbers used in this Exhibit are for convenience only and Borrower must use the equivalent forms required at the time of delivery of a Pledged Loan or a Pledged Security. Except for documents submitted through RFConnects Delivery, all Warehousing Advance Requests and Collateral Documents must be submitted to Lender in a top tabbed, legal size manila file folder, hole-punched and acco-fastened in the order specified in the Warehousing Advance Request. Each folder must be labeled with the mortgagor name(s), Borrower loan number and Borrower name. If a Wet Settlement Advance is being requested, the Warehousing Advance Request and required Collateral Documents should be submitted in accordance with the above instructions. The remaining Collateral Documents must be submitted with a cover letter identifying the mortgagor name(s) and Borrower loan number.

I.    PRIOR TO MAKING A WET SETTLEMENT ADVANCE, LENDER MUST RECEIVE THE FOLLOWING:

(1)   An estimate of the amount of the requested Warehousing Advance <u>1 Business Day</u> prior to the date the requested Warehousing Advance is to be made.

(2)   Either an Electronic Advance Request or a written Warehousing Advance Request (Exhibit A) and 1 copy of same.

(3)   A copy of the Purchase Commitment or satisfactory evidence of its existence (if required) .

(4)   A copy of the HUD-1 Settlement Statement or equivalent with evidence of the initial Warehousing Advance amount (open-end Mortgage Loans only).

THE FOLLOWING DOCUMENTS MUST BE RECEIVED BY LENDER WITHIN 7 BUSINESS DAYS OF THE DATE ON WHICH LENDER MAKES A WET SETTLEMENT ADVANCE TO BORROWER:

(5)   The original signed Mortgage Note, endorsed by Borrower in blank with corresponding interim endorsements, if applicable, and 1 copy of same.

(6)   A copy of the Mortgage sent for recording certified true by Borrower or the escrow/title company (not required for Mortgage Loans registered on the MERS system after execution and delivery by all parties of an Electronic Tracking Agreement approved by Lender).

(7)   Copies of all interim assignments of the Mortgage certified true by Borrower or the escrow/title company (recorded or sent for recordation). The Mortgage Note must bear corresponding endorsements.

(8)  An assignment of the Mortgage, endorsed by Borrower in blank, in recordable form but unrecorded (not required for Mortgage Loans registered on the MERS system after execution and delivery by all parties of an Electronic Tracking Agreement approved by Lender).

(9)  A copy of a letter (or other acceptable documentation) from the holder of the Mortgage Loan to Borrower documenting the purchase price for the Mortgage Loan, releasing the holder's ownership interest in the Mortgage Loan against payment of that purchase price by Borrower and containing wire transfer instructions for payment of that purchase price (Third Party Originated Loans only).

II.  PRIOR TO MAKING A WAREHOUSING ADVANCE (OTHER THAN A WET SETTLEMENT ADVANCE), LENDER MUST RECEIVE ALL OF THE COLLATERAL DOCUMENTS LISTED IN SECTION I ABOVE.

III.  LENDER HAS A REASONABLE TIME (1 BUSINESS DAY UNDER ORDINARY CIRCUMSTANCES) TO EXAMINE BORROWER'S WAREHOUSING ADVANCE REQUEST AND THE COLLATERAL DOCUMENTS TO BE DELIVERED BY BORROWER BEFORE FUNDING THE REQUESTED WAREHOUSING ADVANCE OR WET SETTLEMENT ADVANCE, AND MAY REJECT ANY ELIGIBLE LOAN THAT DOES NOT MEET THE REQUIREMENTS OF THIS EXHIBIT, THE AGREEMENT OR THE RELATED PURCHASE COMMITMENT.

Borrower must hold or cause its custodian to hold, in trust for Lender, those original Collateral Documents of which only copies are required to be delivered to Lender under this Exhibit. Promptly upon request by Lender or, if the recorded Collateral Documents have not yet been returned from the recording office, immediately upon receipt by Borrower or its custodian of those recorded Collateral Documents, Borrower must deliver or cause its custodian to deliver to Lender any or all of the original Collateral Documents.

To fund Warehousing Advances under this Exhibit and the Agreement, Lender will cause the Funding Bank to credit the Wire Disbursement Account or the Check Disbursement Account, upon compliance by Borrower with the terms of the Loan Documents.

Lender will determine, in its sole discretion, the method by which Warehousing Advances and other amounts on deposit in the Wire Disbursement Account are disbursed by the Funding Bank to or for the account of Borrower.

IV.  WITHIN 7 BUSINESS DAYS AFTER THE DATE OF A WAREHOUSING ADVANCE AGAINST A MORTGAGE LOAN TO BE REGISTERED ON THE MERS SYSTEM, THE MORTGAGE LOAN MUST BE REGISTERED ON THE MERS SYSTEM, SHOWING BORROWER AS SERVICER OR SUBSERVICER AND LENDER AS INTERIM FUNDER.

V.  ONLY LENDER MAY DELIVER THE MORTGAGE NOTES AND OTHER ORIGINAL COLLATERAL DOCUMENTS REQUIRED BY THIS EXHIBIT EVIDENCING PLEDGED LOANS OR PLEDGED SECURITIES AND RELATED POOL DOCUMENTS TO AN INVESTOR OR POOL CUSTODIAN, UNLESS OTHERWISE AGREED IN WRITING.

A.  Borrower must comply with the following procedures for deliveries of Pledged Loans:

No later than 1 Business Day prior to the requested shipment date for deliveries of less than 100 Pledged Loans and no later than 2 Business Days prior to the requested shipment date for deliveries of 100 or more Pledged Loans, Lender must receive the following:

(1)  Signed shipping instructions or authenticated shipping instructions sent via RFConnects Delivery for the delivery of the Pledged Loans, including the following:

(a)    Name and address of the office of the Investor to which the loan documents are to be shipped, the desired shipping date and the preferred method of delivery;

(b)    Instructions for endorsement of the Mortgage Note;

(c)    Name(s) of the mortgagor(s), Mortgage Note Amounts of the Pledged Loans to be shipped and the Borrower's loan numbers for those Pledged Loans; and

(d)    Commitment number and expiration date of the Purchase Commitment.

(2)    For deliveries of Pledged Loans to Fannie Mae for cash purchase, Borrower must include a Copy of Loan Schedule (Fannie Mae Form 1068 or 1069) showing Lender's designated Fannie Mae payee code as recipient of the loan purchase proceeds.

(3)    For deliveries of Pledged Loans to Freddie Mac for cash purchase, Borrower must include the following additional documents:

(a)    Original completed Warehouse Lender Release of Security Interest (Freddie Mac Form 996) to be executed by Lender, designating Lender as the Warehouse Lender and showing the Cash Collateral Account designated by Lender as the receiving account for loan purchase proceeds; and

(b)    Copy of Wire Transfer Authorization for a Cash Warehouse Delivery (Freddie Mac Form 987), designating Lender as the Warehouse Lender and showing the Cash Collateral Account designated by Lender as the receiving account for loan purchase proceeds.

B.    If Pledged Loans are to be delivered to a pool custodian (other than an Approved Custodian), Borrower must pay the related Warehousing Advance within <u>2 Business Days</u> of shipment.

C.    Borrower must comply with the following procedures for deliveries of Pledged Loans to Approved Custodians:

No later than <u>1 Business Day</u> prior to the requested shipment date for deliveries of less than 100 Pledged Loans and no later than 2 Business Days prior to the requested shipment date for deliveries of 100 or more Pledged Loans, Lender must receive the following:

(1)    Signed shipping instructions or authenticated shipping instructions sent via RFConnects Delivery for the delivery of the Pledged Loans to the Approved Custodian, including the following:

(a)    Name and address of the office of the Approved Custodian to which the loan documents are to be shipped, the desired shipping date and the preferred method of delivery;

(b)    Instructions for endorsement of the Mortgage Note;

(c)    Name(s) of the mortgagor(s), Mortgage Note Amounts of the Pledged Loans to be shipped and the Borrower's loan numbers for those Pledged Loans; and

(d)    Commitment number and expiration date of the Purchase Commitment for the Pledged Securities.

(2)     If Mortgage-backed Securities are to be issued by Fannie Mae, Borrower must include the following additional documents:

(a)     Copy of Schedule of Mortgages (Fannie Mae Form 2005 or 2025); and

(b)     Copy of Delivery Schedule (Fannie Mae Form 2014), instructing Fannie Mae to issue the Mortgage-backed Securities in Borrower's name with Lender as pledgee and to deliver the Mortgage-backed Securities to Lender's custody account at JPMorgan Chase Bank, National Association, ABA No. 021000021 (JPMORGAN CHASE/CUST/G55026).

(3)     If Mortgage-backed Securities are to be issued by Freddie Mac, Borrower must include the following additional documents:

(a)     Copy of Settlement Information and Delivery Authorization (Freddie Mac Form 939), designating Lender as the Warehouse Lender and instructing Freddie Mac to deliver the Mortgage-backed Securities to Lender's custody account at JPMorgan Chase Bank, National Association, ABA No. 021000021 (JPMORGAN CHASE/CUST/G55026); and

(b)     Original Warehouse Lender Release of Security Interest (Freddie Mac Form 996) to be executed by Lender, designating Lender as the Warehouse Lender and instructing Freddie Mac to deliver the Mortgage-backed Securities to Lender's custody account at JPMorgan Chase Bank, National Association, ABA No. 021000021 (JPMORGAN CHASE/CUST/G55026).

(4)     If Mortgage-backed Securities are to be issued by Ginnie Mae, Borrower must include the following additional documents:

(a)     Signed copy of schedule of Mortgages (HUD Form 11706);

(b)     Signed copy of Schedule of Subscribers (HUD Form 11705) instructing Ginnie Mae to issue the Mortgage-backed Securities in Borrower's name, and to deliver the Pledged Securities to Lender's custody account at JPMorgan Chase Bank, National Association, ABA No. 021000021 (JPMORGAN CHASE/CUST/G55026). The Schedule of Subscribers should also bear the following instructions: "These instructions may not be changed without the prior written consent of GMAC Bank, Preston A. Lyvers, Managing Director or Patti Erfan, Director"; and

(c)     Completed Original Release of Security Interest (HUD Form 11711A) to be executed by Lender.

(5)     No later than 2 Business Days prior to the Settlement Date for the Mortgage-backed Securities, Lender must receive signed Securities Delivery Instructions form attached as Schedule I to this Exhibit.

Upon instruction by Borrower, Lender will complete the endorsement of the Mortgage Note and make arrangements for the delivery of the original Collateral Documents evidencing Pledged Loans or Pledged Securities and related original pool documents with the appropriate bailee letter to an Investor, Approved Custodian or other pool custodian. Upon receipt of Mortgage-backed Securities, Lender will cause those Mortgage-backed Securities to be delivered to the Investor that issued the Purchase Commitment. Mortgage-backed Securities will be released to an Investor only upon payment of the purchase proceeds to Lender. Cash proceeds of sales of Pledged Loans and Pledged Securities will be applied to related Warehousing Advances outstanding under the

Warehousing Commitment.  As long as no Default or Event of Default exists, Lender will return any excess proceeds of the sale of Pledged Loans or Pledged  Securities to Borrower, unless otherwise instructed in writing.

SCHEDULE I TO EXHIBIT B

# GMAC BANK
## WAREHOUSE LENDING DIVISION
## SECURITY DELIVERY INSTRUCTIONS

**INSTRUCTIONS MUST BE RECEIVED 2 BUSINESS DAYS IN ADVANCE OF PICK-UP/DELIVERY**

BOOK-ENTRY DATE: _____     SETTLEMENT DATE: _____

ISSUER: _____     SECURITY: $_____

NO. OF CERTIFICATES: _____     1) _____

2) _____

3) _____

CUSIP NO. _____
Pool No. _____     MI No. _____
Issue Date (M/D/Y): _____     Coupon Rate: _____
                                    Maturity Date (M/D/Y): _____

POOL TYPE (circle one):

| | | | | |
|---|---|---|---|---|
| **Ginnie Mae:** | GINNIE MAE I | GINNIE MAE II | | |
| **Freddie Mac:** | FIXED ARM | DISCOUNT NOTE | | |
| **Fannie Mae:** | FIXED ARM | DISCOUNT NOTE | DEBENTURES | REMIC |

DELIVER TO: _____     (   ) Versus Payment

_____     DVP AMOUNT $_____

_____     (   ) Free Delivery

DELIVER TO: _____     (   ) Versus Payment

_____     DVP AMOUNT $_____

_____     (   ) Free Delivery

DELIVER TO: _____     (   ) Versus Payment

_____     DVP AMOUNT $_____

_____     (   ) Free Delivery

AUTHORIZED SIGNATURE: _____

TITLE: _____

K:\RFCCOMMON\LEGALWLD\CUSTOMERS-DATABASE\HOME MORTGAGE, INC\WH GMAC BANK\0 WC&S AGMT (8-20-2007)\IN PROCESS\EXHIBIT B (NOSI).DOC
Dated: 8/20/2007          Page B - 6

EXHIBIT C

# SCHEDULE OF SERVICING PORTFOLIO

## HOME MORTGAGE, INC.

(TO BE COMPLETED BY BORROWER)

(IF NONE, STATE "NONE")

| Investor Name | Unpaid Principal Balance of Loans Serviced as of the Date of this Agreement |
|---|---|
| | |

*NONE*

K:\RFCCOMMON\LEGAL\WLD\CUSTOMERS-DATABASE\HOME MORTGAGE, INC\WH GMAC BANK\0 WC&S AGMT
(8-20-2007)\IN PROCESS\EXHIBIT C.DOC
Dated: 8/20/2007

Page C-1

EXHIBIT D

## BORROWER OWNERSHIP AND SUBSIDIARIES

### HOME MORTGAGE, INC.

### BORROWER EQUITY HOLDERS

| NAME | PERCENTAGE OWNED |
|------|------------------|
| Howard J. Siegel | 75.5 % |
| Lawrence H. Luckett | 24.5 % |

### BORROWER SUBSIDIARIES

| NAME | ADDRESS | STATE OF FORMATION | STATES QUALIFIED TO DO BUSINESS | PERCENTAGE OWNED BY BORROWER |
|------|---------|--------------------|---------------------------------|------------------------------|
| | | NONE | | |
| | | | | |

(TO BE COMPLETED BY BORROWER)

(IF NONE, STATE "NONE")

NONE

# COMPLIANCE CERTIFICATE

This Compliance Certificate is submitted to the Lender pursuant to Section 7.2(c) of the Warehousing Credit and Security Agreement between HOME MORTGAGE, INC. ("Borrower") and GMAC BANK ("Lender"), dated as of August 20, 2007 (as amended, restated, renewed or replaced, "Agreement"). Capitalized terms and Section numbers used in this Compliance Certificate without further definition refer to those terms and Sections set forth in the Agreement.

The undersigned hereby certifies to Lender that as of the close of business on _____, 20__ ("Statement Date") and with respect to Borrower (and, if applicable, Borrower's Subsidiaries on a consolidated basis):

1.  As demonstrated by the attached calculations supporting this Compliance Certificate, Borrower satisfied the covenants set forth in Sections 8.8, 8.9, 8.10, 8.11, 8.12, 8.13 and 8.14 or, if Borrower did not satisfy any of those covenants, a detailed explanation is attached setting forth the nature and the period of existence of any Default or Event of Default and the action Borrower has taken, is taking or proposes to take with respect to that Default or Event of Default.

2.  Borrower has not transferred (by sale or otherwise), pledged or granted a security interest in any Servicing Contracts, except as permitted under the terms of the Agreement.

3.  Borrower has not made any payments in advance of the scheduled maturity date on any Subordinated Debt, and Borrower has not incurred any additional Debt that must be subordinated under the terms of Section 7.11.

4.  Borrower was in full compliance with all applicable Investor net worth requirements, and in good standing with each Investor.

5.  I have reviewed the terms of the Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and conditions of Borrower (and, if applicable, Borrower's Subsidiaries). That review has not disclosed, and I have no other knowledge of the existence of, any Default or Event of Default, or if any Default or Event of Default existed or exists, a detailed explanation is attached setting forth the nature and the period of existence of the Default or Event of Default and the action Borrower has taken, is taking or proposes to take with respect that Default or Event of Default.

6.  Pursuant to Section 7.2 of the Agreement, enclosed are the financial statements of Borrower as of the Statement Date. The financial statements for the period ending on the Statement Date fairly present the financial condition and results of operations of Borrower (and, if applicable, Borrower's Subsidiaries on consolidated basis) as of the Statement Date.

Dated: _____

HOME MORTGAGE, INC.,
an Illinois corporation

By: _____

Its: _____

# CALCULATIONS SUPPORTING COMPLIANCE CERTIFICATE

Borrower Name:     HOME MORTGAGE, INC.
                   (and, if applicable, its Subsidiaries)

Statement Date:     _____

All financial calculations set forth in this Compliance Certificate are as of the Statement Date.

1.    TANGIBLE NET WORTH

    A.    Net Worth of Borrower is:

        Excess of total assets over total liabilities:                    $ _____

        Plus:    Subordinated Debt (or any portion of that Subordinated Debt) due on or after ____ (must be more than 6 months after the Scheduled Warehousing Maturity Date):    $ _____

        Minus:   Advances or loans to Covered Obligors (Affiliates, Equity Holders, directors, managers, officers, employees and general partners):    $ _____

        Minus:   Investments in Affiliates:    $ _____

        Minus:   Assets pledged to secure liabilities not included in Debt:    $ _____

        Minus:   Intangible assets:    $ _____

        Minus:   Other assets that HUD deems non-acceptable:    $ _____

        Minus:   Other assets that Lender deems unacceptable:    $ _____

        TANGIBLE NET WORTH    $ _____

    B.    Requirements of Section 8.9 of the Agreement:

        BORROWER'S TANGIBLE NET WORTH MUST NOT AT ANY TIME BE LESS THAN $1,200,000.

    C.    Covenant Satisfied: _____ Covenant Not Satisfied: _____

2.    DEBT OF BORROWER

    A.    Borrower's total liabilities calculated in accordance with GAAP, *plus* all indebtedness or other obligations for borrowed money or for the deferred purchase price of property or services:    $ _____

|  |  | Minus: | Subordinated Debt (or any portion of that Subordinated Debt) due on or after _____ (must be more than 6 months after the Scheduled Warehousing Maturity Date): | $ _____ |
|  | B. | | DEBT (Total): | $ _____ |
|  |  | Minus: | Debt arising under Hedging Arrangements (to the extent of assets arising under those Hedging Arrangements): | $ _____ |
|  | C. | | DEBT (adjusted for Hedging Arrangements): | $ _____ |

3.    LEVERAGE RATIO

    A.    The ratio of Debt to Tangible Net Worth is (2.C. to 1.A.):    ____ to 1

    B.    Requirements of Section 8.8 of the Agreement:

        BORROWER'S LEVERAGE RATIO MUST NOT AT ANY TIME EXCEED 15 TO 1.

4.    LIQUID ASSETS OF BORROWER

    A.    The following unrestricted and unencumbered assets:

| | | |
|---|---|---|
| | Cash | $ _____ |
| | Funds on deposit in any United States bank (net of all outstanding checks, drafts and similar items): | $ _____ |
| | Investment grade commercial paper: | $ _____ |
| | Money market funds: | $ _____ |
| | Buydown (to the extent it may be reborrowed): | $ _____ |
| | Excess Buydown: | $ _____ |

    B.    LIQUID ASSETS    $ _____

    C.    Requirements of Section 8.10 of the Agreement:

        BORROWER'S LIQUID ASSETS MUST NOT BE LESS THAN $300,000.

    D.    Covenant Satisfied: _____ Covenant Not Satisfied: _____

5.    PERMANENT BUYDOWN

    A.    Aggregate Buydowns:    $ _____

B.    Permanent Buydown:                             $ _____

C.    Requirements of Section 8.11 of the Agreement:

ON AND AFTER THE DATE OF THE INITIAL WAREHOUSING ADVANCE, BORROWER'S AGGREGATE BUYDOWNS MUST NOT AT ANY TIME BE LESS THAN THE PERMANENT BUYDOWN.

D.    **Covenant Satisfied:**  _____    **Covenant Not Satisfied:**  _____

6.    NET INCOME/NET LOSS

A. Borrower's Net Income (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) for the month ending _____, 20___ is:                $ _____

B. Borrower's Net Income (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) for the month ending _____, 20___ is:                $ _____

C. Borrower's Net Income (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) for the month ending _____, 20___ is:                $ _____

F.    **Requirements of Section 8.12 of the Agreement:**

BORROWER MUST NOT HAVE THREE CONSECUTIVE MONTHS OF NET LOSSES.

F.    **Covenant Satisfied:**  _____    **Covenant Not Satisfied:**  _____

7..    DISTRIBUTIONS TO EQUITY HOLDERS

A.    Distributions to Equity Holders declared or paid by Borrower during the current fiscal year (including any purchase or redemption of Equity Interests) were:                $ _____

B.  Requirements of Section 8.13 of the Agreement:

BORROWER MUST NOT DECLARE OR PAY ANY DISTRIBUTION.

C.    **Covenant Satisfied:**  _____    **Covenant Not Satisfied:**  _____

8.    TRANSACTIONS WITH AFFILIATES

A.    Loans, advances, and extensions of credit by Borrower to its Affiliates during the current fiscal year: $ _____

B.    Capital contributions made by Borrower to its Affiliates during the current fiscal year:        $ _____

C.    Transfers, sales, pledges, assignments or other dispositions of assets made by Borrower to or on

behalf of its Affiliates during the current fiscal year:     $ _____

D.   Acquisitions of assets from Affiliates during the
     current fiscal year:                                    $ _____

E.   Management fees paid by Borrower to or on behalf of
     its Affiliates during the current fiscal year:          $ _____

F.   Requirements of Section 8.14 of the Agreement:

     BORROWER MAY NOT MAKE ANY LOANS, ADVANCES, EXTENSIONS OF CREDIT
     OR CAPITAL CONTRIBUTIONS TO ITS AFFILIATES.

G.   Covenant Satisfied:  _____     Covenant Not Satisfied:  _____

     BORROWER MAY NOT TRANSFER, SELL, PLEDGE, ASSIGN OR MAKE ANY OTHER
     DISPOSITION OF ASSETS TO OR ON BEHALF OF ITS AFFILIATES.

H.   Covenant Satisfied:  _____     Covenant Not Satisfied:  _____

     BORROWER MAY NOT MERGE OR CONSOLIDATE WITH, OR PURCHASE OR
     ACQUIRE ANY ASSETS FROM, ITS AFFILIATES.

I.   Covenant Satisfied:  _____     Covenant Not Satisfied:  _____

     BORROWER MAY NOT PAY ANY MANAGEMENT FEES TO OR ON BEHALF OF ITS
     AFFILIATES.

J.   Covenant Satisfied:  _____     Covenant Not Satisfied:  _____

9.   LOAN PRODUCTION VOLUME

| Loan Type | Monthly | | Year-to-Date | |
|---|---|---|---|---|
| | Number of Mortgage Loans | Aggregate Mortgage Note Amount | Number of Mortgage Loans | Aggregate Mortgage Note Amount |
| Government Mortgage Loans | | | | |
| Conforming Mortgage Loans | | | | |
| Jumbo Mortgage Loans | | | | |
| Subprime Mortgage Loans | | | | |
| HLTV (over 100% LTV) Mortgage Loans | | | | |
| Total | | | | |

EXHIBIT F

## SCHEDULE OF EXISTING LINES OF CREDIT

### HOME MORTGAGE, INC.

(TO BE COMPLETED BY BORROWER)

(IF NONE, STATE "NONE")

| Lender Name | Commitment Amount | Expiration Date |
|---|---|---|
| Gatway Bank | 10,000,000 | 5/08 |

EXHIBIT G

## ASSUMED NAMES

HOME MORTGAGE, INC.

(TO BE COMPLETED BY BORROWER)

(IF NONE, STATE "NONE")

*NONE*

EXHIBIT H
ADOPTED BY AGREEMENT DATED 8/20/2007

# ELIGIBLE ASSETS

### HOME MORTGAGE, INC.

## LIMITATIONS ON WAREHOUSING ADVANCES

Lender's obligation to make Warehousing Advances under the Agreement is subject to the following limitations:

1) No Warehousing Advance will be made against any Mortgage Loan that has been previously sold or pledged to obtain financing (whether or not such financing constitutes Debt) under another warehousing financing arrangement or a gestation agreement.

2) No Warehousing Advance will be made against any Mortgage Loan that Lender believes may be based on untrue, incomplete or inaccurate or fraudulent information or may otherwise be subject to fraud.

3) No Warehousing Advance will be made against a Mortgage Loan if any of the limitations set forth in this Exhibit H would be exceeded after giving effect to the Warehousing Advance.

4) No Warehousing Advance will be made against a Mortgage Loan with an original principal balance in excess of $2,000,000.

5) No Warehousing Advance (including a Wet Settlement Advance) will be made against a Mortgage Loan or REO Property if the amount of such Warehousing Advance, when combined with Warehousing Advances against similar Mortgage Loans and against REO Properties outstanding under the GMAC-RFC Warehousing Agreement, would exceed the amount of any Sublimit (including Sublimits for Wet Settlement Advances and Aged Mortgage Loans) set forth in this Exhibit H.

6) No Warehousing Advance will be made against Third Party Originated Loans

## WAREHOUSING COMMITMENT AMOUNT

Base Warehousing Commitment Amount: $17,000,000

Temporary Increase Amount: $N/A

Temporary Increase Period: Beginning N/A to and including N/A

## GLOBAL SUBLIMITS

The Sublimits specified under this Global Sublimits heading are aggregate limits that apply across all Sublimits.

1. Wet Settlement Advances:          30% of the Warehousing Commitment Amount

2. Aged Mortgage Loans              $1,000,000

0299.2

Dated: 4/1/2007
Amended: 5/24/07                    Page H-1

## APPLICATION OF TEMPORARY INCREASES

From time to time Lender may agree to temporarily increase the Warehousing Commitment Amount or a specific Sublimit by designating a Temporary Increase Amount to apply to the Warehousing Commitment Amount or that specific Sublimit for a designated Temporary Increase Period. In such case, the subject Temporary Increase Amount will be added to, as applicable, the Warehousing Commitment Amount or the specific Sublimit for the duration of the Temporary Increase Period. A Temporary Increase Amount and the related Temporary Increase Period are specific to the Warehousing Commitment Amount or designated specific Sublimit or Sublimit(s) to which they apply (to be shown in each case by the presence or absence of a Temporary Increase Amount and Temporary Increase Period under the appropriate headings in this Exhibit H or, in the case of certain short term increases permitted to be made without amending this Exhibit H, as specified in the Lender loan officer writing described below). When the Temporary Increase Period expires, the Warehousing Commitment Amount or the specific Sublimit will no longer be calculated using such Temporary Increase Amount. In most cases, the Temporary Increase Amount and Temporary Increase Period will be documented by an amendment to this Exhibit H. However, subject to the applicable limits of Lender's credit policy, a Lender loan officer can provide a Temporary Increase Amount for a Temporary Increase Period not to exceed 5 Business Days without amending this Exhibit H by separately communicating the Temporary Increase Amount, the start and end of such Temporary Increase Period and the Warehousing Commitment Amount or specific Sublimit to which they apply to Borrower in writing.

:0299.2

Dated: 4/1/2007
Amended: 5/24/07

## ELIGIBLE ASSET DEFINITIONS

Below are the Eligible Asset types (and related defining criteria) against which Warehousing Advances may be made under this Agreement:

1.    **Prime Mortgage Loan**

Definition:  A First Mortgage Loan or a Second Mortgage Loan with the following characteristics:

(i)    For a First Mortgage Loan:

A.    Underwritten substantially in accordance with Fannie Mae or Freddie Mac underwriting standards (except as to maximum amount); and

B.    Loan-to-Value Ratio not to exceed 80% or, if the Loan-to-Value Ratio exceeds 80%, the Prime Mortgage Loan is insured by or subject to a commitment for mortgage insurance in an amount and on terms and conditions that satisfy the underwriting standards of Fannie Mae or Freddie Mac; or

C.    A Government Mortgage Loan.

(ii)    For a Second Mortgage Loan:

A.    The credit of the obligor has been underwritten substantially in accordance with Fannie Mae or Freddie Mac underwriting standards; and

B.  Loan-to-Value Ratio not more than 100%.

## ELIGIBLE ASSET SUBLIMITS

The Sublimits specified below apply only to the designated Eligible Asset type and do not apply across all Eligible Assets types.

# PRIME MORTGAGE LOANS

**Prime Sublimit Amount:  $17,000,000**

**Prime Temporary Increase Amount:  $ N/A**

**Prime Temporary Increase Period:  Beginning N/A to and including N/A**

| | Interest Rate | Sublimit Amount | Purchase Commitment Required | Wet Settlement Advances Permitted | Aged Mortgage Loans Permitted | Advance Rate | Warehouse Period |
|---|---|---|---|---|---|---|---|
| First Mortgage Loans | 2.50% over LIBOR; **Aged Mortgage Loans:** 2.65% over LIBOR | $17,000,000 of the Prime Sublimit | Yes | Yes | Yes | Committed: *100% of the least of (i) the Mortgage Note Amount, (ii) the Committed Purchase Price, or (iii) Fair Market Value. (*requires Permanent Buydown) | Standard: 60 days; Aged: 120 days |
| Second Mortgage Loans | 2.50% over LIBOR; **Aged Mortgage Loans:** 2.65% over LIBOR | $1,500,000 of the Prime Sublimit | Yes | Yes | Yes | Committed: *100% of the least of (i) the Mortgage Note Amount, (ii) the Committed Purchase Price, or (ii) Fair Market Value. (*requires Permanent Buydown) | Standard: 60 days; Aged: 120 days |

**Required Prepayments (Prime Mortgage Loans):**

On the day a Pledged Loan becomes an Aged Mortgage Loan, the Warehousing Advance against such Pledged Loan must be (a) repaid in full, to the extent the Aged Mortgage Loan Sublimit would be exceeded, or (b) otherwise, reduced by 10% of the Face Amount. Every 30 days thereafter, the Warehousing Advance must be further reduced by 10% of the Face Amount and must be repaid in full on the last day of the Aged Warehouse Period.

Page H-4

10430299.2
Dated: 4/1/2007
Amended: 5/24/07

EXHIBIT I

# COLLATERAL OPERATIONS FEE SCHEDULE

## HOME MORTGAGE, INC.

| LOAN FEES | |
|---|---|
| *Fee* | *Calculation* |
| Non-Usage Fee | 0.125% per annum of the positive difference (such difference, if any, being the "Unused Portion") obtained by subtracting:<br><br>(a) the arithmetic daily average of outstanding Warehousing Advances during the subject month (the "Used Portion"), from<br><br>(b) the arithmetic daily average of the Warehousing Commitment Amount during the period in (a) above.<br><br>Notes:<br><br>(i)    As long as no Default or Event of Default exists, no Non-Usage Fee will be calculated or collected for the period from the Closing Date to and including December 31, 2007.<br><br>(ii)    If the Used Portion is greater than or equal to 50% of the Warehousing Commitment Amount for a given month, no Non-Usage Fee will be charged for such month. |
| Loan Package Fee | $35 |
| Wire Fee | $12.50 |

| COLLATERAL OPERATIONS FEES | |
|---|---|
| Reservation Number Fee | $5 per Reservation Number (Good funds states only) |

| COLLATERAL OPERATIONS FEES | |
|---|---|
| Restocking Fee for Mortgage Loans returned to Lender by Investors | $10 per Mortgage Loan |
| Returned Wire Fee | $10 per wire |
| Early Payoff Fee (payoff of Warehousing Advance prior to check clearance or wire disbursement) | $25 per Mortgage Loan |
| Late Fee for Interest or Fees not paid within Time period specified in Agreement | $50 per occurrence |
| Overdraft Fee | $60 per occurrence |
| Security Pick-up, Delivery and DK Fees | $45 per transaction |
| **Prior Day Bank Reporting Fee:** | |
| • Warehousing Commitments of up to $50 million | $300 per month |
| • Warehousing Commitments of more than $50 million but less than $100 million | $400 per month |
| • Warehousing Commitments of more than $100 million | $500 per month |
| Intra-Day Bank Reporting Fee | $300 per month |

**EXHIBIT C**

# WAREHOUSING CREDIT AND SECURITY AGREEMENT

BETWEEN

**HOME MORTGAGE, INC.,**
**an Illinois corporation**

AND

**GMAC BANK,**
**a Utah industrial bank**

**Dated as of August 20, 2007**



# TABLE OF CONTENTS

1.  THE CREDIT...................................................................................................1-1
    1.1.    The Warehousing Commitment.........................................................1-1
    1.2.    Expiration of Warehousing Commitment...........................................1-1
    1.3.    Warehousing Note............................................................................1-1
2.  PROCEDURES FOR OBTAINING ADVANCES.............................................2-1
    2.1.    Warehousing Advances....................................................................2-1
3.  INTEREST, PRINCIPAL AND FEES..............................................................3-1
    3.1.    Interest..............................................................................................3-1
    3.2.    Interest Limitation.............................................................................3-1
    3.3.    Principal Payments...........................................................................3-1
    3.4.    Buydowns..........................................................................................3-4
    3.5.    Non-Usage Fees................................................................................3-5
    3.6.    Loan Package Fees, Wire Fees, Check Fees and Warehousing Fees....3-5
    3.7.    Earnings Credit..................................................................................3-5
    3.8.    Miscellaneous Fees and Charges.....................................................3-5
    3.9.    Overdraft Advances...........................................................................3-6
    3.10.   Method of Making Payments.............................................................3-6
4.  COLLATERAL................................................................................................4-1
    4.1.    Grant of Security Interest..................................................................4-1
    4.2.    Maintenance of Collateral Records...................................................4-2
    4.3.    Release of Security Interest in Pledged Assets................................4-2
    4.4.    Collection and Servicing Rights........................................................4-4
    4.5.    Return of Collateral at End of Warehousing Commitment.................4-4
    4.6.    Delivery of Collateral Documents......................................................4-4
5.  CONDITIONS PRECEDENT...........................................................................5-1
    5.1.    Initial Advance...................................................................................5-1
    5.2.    Each Advance....................................................................................5-2
    5.3.    Force Majeure....................................................................................5-3
6.  GENERAL REPRESENTATIONS AND WARRANTIES.................................6-1
    6.1.    Place of Business..............................................................................6-1
    6.2.    Organization; Good Standing; Subsidiaries......................................6-1
    6.3.    Authorization and Enforceability.......................................................6-1
    6.4.    Authorization and Enforceability of Guaranty...................................6-1
    6.5.    Approvals...........................................................................................6-2
    6.6.    Financial Condition............................................................................6-2
    6.7.    Borrower SMMEA Qualification........................................................6-2
    6.8.    Litigation............................................................................................6-2
    6.9.    Compliance with Laws.......................................................................6-3
    6.10.   Regulation U......................................................................................6-3
    6.11.   Investment Company Act...................................................................6-3
    6.12.   Payment of Taxes..............................................................................6-3
    6.13.   Agreements........................................................................................6-3
    6.14.   Title to Properties..............................................................................6-4
    6.15.   ERISA.................................................................................................6-4
    6.16.   No Retiree Benefits............................................................................6-4
    6.17.   Assumed Names................................................................................6-4
    6.18.   Servicing............................................................................................6-4

| | | |
|---|---|---|
| 7. | **AFFIRMATIVE COVENANTS** | 7-1 |
| | 7.1. | Payment of Obligations | 7-1 |
| | 7.2. | Financial Statements | 7-1 |
| | 7.3. | Other Borrower Reports | 7-1 |
| | 7.4. | Maintenance of Existence; Conduct of Business | 7-1 |
| | 7.5. | Compliance with Applicable Laws | 7-2 |
| | 7.6. | Inspection of Properties and Books; Operational Reviews | 7-2 |
| | 7.7. | Notice | 7-3 |
| | 7.8. | Payment of Debt, Taxes and Other Obligations | 7-3 |
| | 7.9. | Insurance | 7-4 |
| | 7.10. | Closing Instructions | 7-4 |
| | 7.11. | Subordination of Certain Indebtedness | 7-4 |
| | 7.12. | Other Loan Obligations | 7-4 |
| | 7.13. | ERISA | 7-4 |
| | 7.14. | Use of Proceeds of Warehousing Advances | 7-5 |
| | 7.15. | Quality Control | 7-5 |
| 8. | **NEGATIVE COVENANTS** | 8-1 |
| | 8.1. | Contingent Liabilities | 8-1 |
| | 8.2. | Pledge of Collateral or Servicing Contracts | 8-1 |
| | 8.3. | Restrictions on Fundamental Changes | 8-1 |
| | 8.4. | Subsidiaries | 8-1 |
| | 8.5. | Deferral of Subordinated Debt | 8-2 |
| | 8.6. | Loss of Eligibility, Licenses or Approvals | 8-2 |
| | 8.7. | Accounting Changes | 8-2 |
| | 8.8. | Leverage Ratio | 8-2 |
| | 8.9. | Minimum Tangible Net Worth | 8-2 |
| | 8.10. | Minimum Liquid Assets | 8-2 |
| | 8.11. | Permanent Buydown | 8-2 |
| | 8.12. | Net Income/Net Loss | 8-2 |
| | 8.13. | Distributions to Borrower's Equity Holders | 8-2 |
| | 8.14. | Transactions with Affiliates | 8-3 |
| | 8.15. | Recourse Servicing Contracts | 8-3 |
| 9. | **SPECIAL REPRESENTATIONS, WARRANTIES AND COVENANTS CONCERNING COLLATERAL** | 9-1 |
| | 9.1. | Special Representations, Warranties and Covenants Concerning Eligibility as Seller/Servicer of Mortgage Loans | 9-1 |
| | 9.2. | Special Representations and Warranties Concerning Warehousing Collateral | 9-1 |
| | 9.3. | Special Affirmative Covenants Concerning Warehousing Collateral | 9-3 |
| | 9.4. | Special Negative Covenants Concerning Warehousing Collateral | 9-4 |
| 10. | **DEFAULTS; REMEDIES** | 10-1 |
| | 10.1. | Events of Default | 10-1 |
| | 10.2. | Remedies | 10-2 |
| | 10.3. | Application of Proceeds | 10-5 |
| | 10.4. | Lender Appointed Attorney-in-Fact | 10-5 |
| | 10.5. | Right of Set-Off | 10-6 |
| 11. | **MISCELLANEOUS** | 11-1 |
| | 11.1. | Notices | 11-1 |
| | 11.2. | Reimbursement of Expenses; Indemnity | 11-1 |
| | 11.3. | Financial Information | 11-2 |
| | 11.4. | Terms Binding Upon Successors; Survival of Representations | 11-3 |
| | 11.5. | Assignment | 11-3 |
| | 11.6. | Amendments | 11-3 |
| | 11.7. | Governing Law | 11-3 |

| | | |
|---|---|---|
| 11.8. | Participations | 11-3 |
| 11.9. | Relationship of the Parties | 11-3 |
| 11.10. | Severability | 11-4 |
| 11.11. | Consent to Credit References | 11-4 |
| 11.12. | Consent to Information Sharing with GMAC Affiliates | 11-4 |
| 11.13. | Counterparts | 11-4 |
| 11.14. | Headings/Captions | 11-4 |
| 11.15. | Entire Agreement | 11-4 |
| 11.16. | Consent to Jurisdiction | 11-4 |
| 11.17. | Waiver of Jury Trial | 11-5 |
| 11.18. | Waiver of Punitive, Consequential, Special or Indirect Damages | 11-5 |
| 12. | DEFINITIONS | 12-1 |
| 12.1. | Defined Terms | 12-1 |
| 12.2. | Other Definitional Provisions; Terms of Construction | 12-14 |

# EXHIBITS

| | |
|---|---|
| Exhibit A | Warehousing Advance Request |
| Exhibit B | Procedures and Documentation for Warehousing Mortgage Loans |
| Exhibit C | Schedule of Servicing Portfolio |
| Exhibit D | Borrower Ownership and Subsidiaries |
| Exhibit E | Compliance Certificate |
| Exhibit F | Schedule of Lines of Credit |
| Exhibit G | Assumed Names |
| Exhibit H | Eligible Assets |
| Exhibit I | Schedule of Miscellaneous Fees |

# WAREHOUSING CREDIT AND SECURITY AGREEMENT

**WAREHOUSING CREDIT AND SECURITY AGREEMENT**, dated as of August 20, 2007 between HOME MORTGAGE, INC., an Illinois corporation ("Borrower"), and GMAC BANK, a Utah industrial bank ("Lender").

A.      Borrower has requested certain financing from Lender.

B.      Lender has agreed to provide that financing to Borrower, subject to the terms and conditions of this Agreement.

C.      Subject to Borrower's satisfaction of the conditions set forth in Article 5, the "Closing Date" for the transactions contemplated by this Agreement is the date set forth as the Closing Date on the signature page to this Agreement.

NOW, THEREFORE, the parties to this Agreement agree as follows:

## 1.    THE CREDIT

### 1.1.    The Warehousing Commitment

On the terms and subject to the conditions and limitations of this Agreement, including Exhibit H, Lender agrees to make Warehousing Advances to Borrower from the Closing Date to the Business Day immediately preceding the Warehousing Maturity Date, during which period Borrower may borrow, repay and reborrow in accordance with the provisions of this Agreement. Lender has no obligation to make Warehousing Advances in an aggregate amount outstanding at any time in excess of the lesser of (a) the Warehousing Commitment Amount, or (b) the Aggregate Warehousing Collateral Value. While a Default or Event of Default exists, Lender may refuse to make any additional Warehousing Advances to Borrower. All Warehousing Advances under this Agreement constitute a single indebtedness, and all of the Collateral is security for the Warehousing Note and for the performance of all of the Obligations. If the initial Warehousing Advance has not been made within 15 days after the Closing Date, the Warehousing Commitment and Lender's obligation to make Warehousing Advances to Borrower under this Agreement will automatically terminate, and all Obligations (including any Obligations arising under Section 11.2) will automatically become due and payable, without presentment, demand or other Notice or requirements of any kind, all of which Borrower expressly waives.

### 1.2.    Expiration of Warehousing Commitment

The Warehousing Commitment expires on the earlier of ("Warehousing Maturity Date"): (a) May 1, 2008, as such date may be extended in writing by Lender, in its sole discretion, on which date the Warehousing Commitment will expire of its own term and the Warehousing Advances will become due and payable without the necessity of Notice or action by Lender, (b) the date that is 90 days after Lender gives Notice to the other of termination of the Warehousing Commitment, on which date the Warehousing Commitment will expire of its own term and the Warehousing Advances will become due and payable without the necessity of any further Notice or action by Lender, and (c) the date the Warehousing Commitment is terminated and the Warehousing Advances become due and payable under Section 10.2.

### 1.3.    Warehousing Note

Warehousing Advances are evidenced by Borrower's promissory note, payable to Lender on the form prescribed by Lender ("Warehousing Note"). The term "Warehousing Note" as used in this Agreement includes all amendments, restatements, renewals or replacements of the original Warehousing Note and all substitutions for it. All terms and provisions of the Warehousing Note are incorporated into this Agreement.

**End of Article 1**

## 2.    PROCEDURES FOR OBTAINING ADVANCES

### 2.1.    Warehousing Advances

To obtain a Warehousing Advance under this Agreement, Borrower must deliver to Lender either a completed and signed request for a Warehousing Advance on Lender's then current form or an Electronic Advance Request ("Warehousing Advance Request"), not later than (a) in the case of Electronic Advance Requests, 2:30 p.m. on the Business Day, and (b) in all other cases, 1 Business Day before the Business Day on which Borrower desires the Warehousing Advance. Subject to the delivery of a Warehousing Advance Request and the satisfaction of the conditions and limitations of this Agreement, including the conditions set forth in Sections 5.1 and 5.2, Borrower may obtain a Warehousing Advance under this Agreement upon compliance with the procedures set forth in this Section and in the applicable Exhibit B, including delivery to Lender of all required Collateral Documents. Lender's current form of Warehousing Advance Request is set forth in the applicable Exhibit A. Upon not less than 3 Business Days' prior Notice to Borrower, Lender may modify its form of Warehousing Advance Request and any other Exhibit or document referred to in this Section to conform to current legal requirements or Lender practices and, as so modified, those Exhibits and documents will become part of this Agreement.

**End of Article 2**

## 3.    INTEREST, PRINCIPAL AND FEES

### 3.1.    Interest

3.1 (a)    Except as otherwise provided in this Section, Borrower must pay interest on the unpaid amount of each Warehousing Advance from the date the Warehousing Advance is made until it is paid in full at the Interest Rate specified in Exhibit H.

3.1 (b)    Lender computes interest on the basis of the actual number of days in each month and a year of 360 days.  Borrower must pay interest monthly in arrears, not later than 9 days after the date of Lender's monthly invoice and on the Warehousing Maturity Date.

3.1 (c)    If, for any reason Borrower repays a Warehousing Advance on the same day that it was made by Lender, Borrower must pay Lender an administrative fee equal to 1 day of interest on that Warehousing Advance at the Interest Rate that would otherwise have been applicable under Exhibit H.  Borrower must pay all administrative fees within 9 days after the date of Lender's invoice.

3.1 (d)    Lender will adjust the rates of interest provided for in this Agreement as of the effective date of each change in the applicable Interest Rate Index. Lender's determination of such rates of interest as of any date of determination is conclusive and binding, absent manifest error.

3.1 (e)    After an Event of Default occurs and upon Notice to Borrower by Lender, the unpaid amount of each Warehousing Advance will bear interest at the Default Rate until paid in full.

### 3.2.    Interest Limitation

Lender does not intend, by reason of this Agreement, the Warehousing Note or any other Loan Document, to receive interest in excess of the amount permitted by applicable law. If Lender receives any interest in excess of the amount permitted by applicable law, whether by reason of acceleration of the maturity of this Agreement, the Warehousing Note or otherwise, Lender will apply the excess to the unpaid principal balance of the Warehousing Advances and not to the payment of interest. If all Warehousing Advances have been paid in full and the Warehousing Commitment has expired or has been terminated, Lender will remit any excess to Borrower. This Section controls every other provision of all agreements between Borrower and Lender and is binding upon and available to any subsequent holder of the Warehousing Note.

### 3.3.    Principal Payments

3.3 (a)    Borrower must pay Lender the outstanding principal amount of all Warehousing Advances on the Warehousing Maturity Date.

3.3 (b)    Except as otherwise provided in Section 3.1, Borrower may prepay any portion of the Warehousing Advances without premium or penalty at any time pursuant to Section 3.4 or Section 4.3(d).  If at any time the Warehousing Advances outstanding under this Agreement exceed the lesser of (i) the Warehousing Commitment Amount or (ii) the Aggregate Warehousing Collateral Value, Borrower must immediately pay to Lender without the necessity of prior demand or Notice from Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, the amount of such excess.

3.3 (c)   Borrower must pay to Lender, without the necessity of prior demand or Notice from Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, the amount of any outstanding Warehousing Advance against a specific Pledged Asset upon the earliest occurrence of any of the following events:

> (1)   One (1) Business Day elapses from the date a Warehousing Advance was made if the Pledged Loan to be funded by that Warehousing Advance has not closed and funded.

> (2)   Ten (10) Business Days elapse without the return of a Collateral Document delivered by Lender to Borrower under a Trust Receipt for correction or completion.

> (3)   On the date on which a Pledged Loan is determined to have been originated based on untrue, incomplete or inaccurate information or otherwise to be subject to fraud, whether or not Borrower had knowledge of the misrepresentation, incomplete or inaccurate information or fraud, or on the date on which Borrower knows, or has reason to know, or receives Notice from Lender, that (A) one or more of the representations and warranties set forth in Article 9 were inaccurate or incomplete in any material respect on any date when made or deemed made or became inaccurate or incomplete after any such date with respect to such Pledged Loan or (B) Borrower has failed to perform or comply with any covenant, term or condition set forth in Article 9 with respect to such Pledged Loan.

> (4)   On the date on which any other Pledged Asset is determined to be subject to fraud, whether or not Borrower had knowledge of the fraud, or on the date on which Borrower knows, or has reason to know, or receives Notice from Lender, that (A) one or more of the representations and warranties set forth in Article 9 were inaccurate or incomplete in any material respect on any date when made or deemed made or became inaccurate or incomplete after any such date with respect to such other Pledged Asset or (B) Borrower has failed to perform or comply with any covenant, term or condition set forth in Article 9 with respect to such other Pledged Asset.

> (5)   On the date on which a Pledged Loan or a Lien prior to the Mortgage securing repayment of the Pledged Loan has been in default for a period of 60 days or more.

> (6)   Upon the sale, other disposition or prepayment of any Pledged Asset or, with respect to a Pledged Loan included in an Eligible Mortgage Pool, upon the sale or other disposition of the related Agency Security.

> (7)   One (1) Business Day immediately preceding the date scheduled for the foreclosure or trustee sale of the Mortgaged Property securing a Pledged Loan.

3.3 (d)   Upon telephonic or written Notice to Borrower by Lender, Borrower must pay to Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, the amount of any outstanding Warehousing Advance against a specific Pledged Asset upon the earliest occurrence of any of the following events:

> (1)   For any Pledged Asset other than an Aged Pledged Asset, the Standard Warehouse Period elapses and, for any Aged Pledged Asset, the Aged Warehouse Period elapses.

(2)    Forty-five (45) days elapse from the date a Pledged Asset was delivered to an Investor or Approved Custodian for examination and purchase or for inclusion in a Mortgage Pool, without the purchase being made or an Eligible Mortgage Pool being initially certified, or upon rejection of a Pledged Asset as unsatisfactory by an Investor or Approved Custodian.

(3)    Seven (7) Business Days elapse from the date a Wet Settlement Advance was made against a Pledged Loan without receipt by Lender of all Collateral Documents relating to the Pledged Loan.

(4)    With respect to any Pledged Asset, any of the Collateral Documents, upon examination by Lender, are found not to be in compliance with the requirements of this Agreement or the related Purchase Commitment (if a Purchase Commitment is required by Exhibit H).

(5)    If, after giving effect to a new Warehousing Advance against a Pledged Asset or to the payment of existing Warehousing Advances against Pledged Assets, any of the limitations set forth in Exhibit H have been exceeded.

(6)    Three (3) Business Days after the mandatory delivery date of the related Purchase Commitment if the specific Pledged Asset has not been delivered under the Purchase Commitment prior to such mandatory delivery date, or on the date the related Purchase Commitment expires or is terminated, unless, in each case, the Pledged Asset is eligible for delivery to another Investor under a comparable Purchase Commitment.

3.3 (e)    In addition to the payments required by Sections 3.3(a), 3.3(c) and 3.3(d), if the principal amount owing by the obligor(s) on any Pledged Asset is prepaid in whole or in part while a Warehousing Advance is outstanding against the Pledged Asset, Borrower must pay to Lender, without the necessity of prior demand or Notice from Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, the amount of the prepayment, to be applied against the related Warehousing Advance.

3.3 (f)    The proceeds of the sale or other disposition of Pledged Assets must be paid directly by the Investor to the Cash Collateral Account. Borrower must give Notice to Lender in writing, by telephone or by RFConnects Delivery (and if by telephone, followed promptly by written Notice) of the Pledged Assets for which proceeds have been received. Upon receipt of Borrower's Notice, Lender will apply any proceeds deposited into the Cash Collateral Account to the payment of the Warehousing Advances related to the Pledged Assets identified by Borrower in its Notice, and those Pledged Assets will be considered to have been redeemed from pledge. Lender is entitled to rely upon Borrower's affirmation that deposits in the Cash Collateral Account represent payments from Investors for the purchase of the Pledged Assets specified by Borrower in its Notice. If the payment from an Investor for the purchase of Pledged Assets is less than the outstanding Warehousing Advances against the Pledged Assets identified by Borrower in its Notice, Borrower must pay to Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, an amount equal to that deficiency. As long as no Default or Event of Default exists, Lender will return to Borrower any excess payment from an Investor for Pledged Assets.

3.3 (g)    Lender reserves the right to revalue any Pledged Asset. Borrower must pay to Lender, without the necessity of prior demand or Notice from Lender, and Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for, any amount required after any such revaluation to reduce the principal amount of the

Warehousing Advance outstanding against the revalued Pledged Asset to an amount equal to the Advance Rate for the applicable type of Pledged Asset multiplied by the Fair Market Value of the Pledged Asset.

### 3.4.  Buydowns

3.4 (a)   Borrower may prepay a portion of the Warehousing Advances outstanding under this Agreement (individually "Buydown" and collectively "Buydowns") upon Notice to Lender not later than (a) 1:00 p.m. on the Business Day immediately preceding the Business Day on which Borrower desires to make a Buydown in the amount of $10,000,000 or more or (b) 1:00 p.m. on the Business Day on which Borrower desires to make a Buydown in an amount less than $10,000,000. Each Buydown must be in an amount not less than $5,000, and Borrower may not make Buydowns that, together with any outstanding Investor Proceeds Buydowns, exceed the aggregate principal balance of all Warehousing Advances outstanding under this Agreement. A Buydown is a reduction in the aggregate amount of the Warehousing Advances outstanding under this Agreement, but does not represent the prepayment of any particular Warehousing Advance for the purposes of any Pledged Assets specifically related to such Warehousing Advances, and does not entitle Borrower to the release of any Collateral, including Collateral consisting of the proceeds of Pledged Assets described in Sections 3.3(e) or 3.3(f). To reduce interest payable by Borrower, Lender may apply Buydowns to Warehousing Advances outstanding under this Agreement in any order determined by Lender in its sole discretion. Subject to the satisfaction of the conditions set forth in Sections 5.2(d) and 5.2(e) (which apply as if the requested reborrowing were a Warehousing Advance), Borrower may, from the Closing Date to the Business Day immediately preceding the Warehousing Maturity Date, reborrow all or any portion of the Buydowns in excess of any Permanent Buydown upon Notice to Lender not later than (c) 1:00 p.m. on the Business Day immediately preceding the Business Day on which Borrower desires to reborrow $10,000,000 or more or (d) 1:00 p.m. on the Business Day that Borrower desires to reborrow an amount less than $10,000,000. If Lender receives Buydowns or a combination of Buydowns, together with any outstanding Investor Proceeds Buydowns, and payments of Warehousing Advances that exceed the aggregate principal balance of the Warehousing Advances outstanding under this Agreement ("Excess Buydown"), as long as no Default or Event of Default exists, Borrower may request that Lender return all or any portion of an Excess Buydown in excess of any Permanent Buydown upon Notice to Lender not later than (y) 1:00 p.m. on the Business Day immediately preceding the Business Day on which Borrower requests the return of $10,000,000 or more or (z) 1:00 p.m. on the Business Day that Borrower requests the return of less than $10,000,000. Alternatively, Lender may, in its sole discretion, return to Borrower all or any portion of an Excess Buydown in excess of any Permanent Buydown by causing the Funding Bank to credit the Operating Account in that amount. Lender has no obligation to pay or provide to Borrower any interest, dividends or other benefits on an Excess Buydown.

3.4 (b)   From proceeds of each sale or other disposition of Pledged Assets, Borrower must prepay a portion of the Warehousing Advances outstanding under this Agreement (each an "Investor Proceeds Buydown" and collectively "Investor Proceeds Buydowns") in an amount equal to 0.25% of such sale or other disposition proceeds. Borrower must make Investor Proceeds Buydowns as long as any Obligations, other than Obligations arising under this Agreement, remain outstanding, whether or not disputed, until the aggregate amount of such Investor Proceeds Buydowns equals $300,000. An Investor Proceeds Buydown is a reduction in the aggregate amount of the Warehousing Advances outstanding under this Agreement, but does not represent the prepayment of any particular Warehousing Advance, and does not entitle Borrower to the release of any Collateral. Lender will apply Investor Proceeds Buydowns to Warehousing Advances outstanding under this Agreement to reduce interest payable by Borrower or apply

those Investor Proceeds Buydowns to outstanding Obligations, in each case, in any order determined by Lender in its sole discretion. Lender may, from time to time in its sole discretion, readvance all or any portion of the Investor Proceeds Buydowns and apply the amount readvanced to satisfy any Obligations of Borrower to Lender then due and payable. Any such readvance to Borrower will increase the amount of Warehousing Advances outstanding under this Agreement by the amount of such readvance. Unless a Default or Event of Default exists, Borrower may reborrow all or any portion of the Investor Proceeds Buydowns in excess of $300,000 upon Notice to Lender not later than (m) 1:00 p.m. on the Business Day immediately preceding the Business Day on which Borrower desires to reborrow $10,000,000 or more or (n) 1:00 p.m. on the Business Day that Borrower desires to reborrow an amount less than $10,000,000.

### 3.5. Non-Usage Fees

Borrower must pay to Lender a fee ("Non-Usage Fee") in the amount set forth in Exhibit I. The Non-Usage Fee is payable monthly, in arrears and will be calculated and payable for each month during the term of this Agreement as further described in Exhibit I. Borrower must pay the Non-Usage Fee within 9 days after the date of Lender's invoice. On the Warehousing Maturity Date, Borrower must pay the prorated portion of the Non-Usage Fee for the period from and including the first day following the month and for which the Non-Usage Fee was last paid through and including the Warehousing Maturity Date. Each increase and each decrease in the Warehousing Commitment Amount will be given effect for purposes of calculating the Non-Usage Fee during the period any such increase or decrease applies. Lender's determination of the Non-Usage Fee for any period is conclusive and binding, absent manifest error.

### 3.6. Loan Package Fees, Wire Fees, Check Fees and Warehousing Fees

At the time of each Warehousing Advance against an Eligible Asset, Borrower will incur a loan package fee ("Loan Package Fee") and either or both of (depending on the applicable disbursement methods) a wire fee ("Wire Fee") or a check fee ("Check Fee"). At Lender's discretion, Loan Package Fees, Wire Fees or Check Fees may be billed separately or combined into a single warehousing fee ("Warehousing Fee"). Borrower must pay all Loan Package Fees, Wire Fees and Check Fees, or as applicable, Warehousing Fees in the amount set forth in Exhibit I within 9 days after the date of Lender's invoice.

### 3.7. Earnings Credit

Each month Funding Bank provides a benefit to Lender in the form of an earnings credit ("Earnings Credit") based on Borrower amounts held on deposit in Funding Bank Accounts. The Earnings Credit provided to Lender each month cannot exceed the Funding Bank Fees and Charges for the related month. Each month Lender will apply the Earnings Credit for such month (a) first against Funding Bank Fees and Charges for such month paid or payable by Borrower, and (b) second against Funding Bank Fees and Charges for such month paid or payable by Lender. The Earnings Credit for a particular month can only be applied against the Funding Bank Fees and Charges for such month and cannot and will not be applied (a) against any Funding Bank Fees and Charges for any other month, (b) against any other amount owing by Borrower under this Agreement, or (c) as any sort of cash benefit payable to Borrower.

### 3.8. Miscellaneous Fees and Charges

Borrower must reimburse Lender for all Miscellaneous Fees and Charges. Borrower must pay all Miscellaneous Fees and Charges within 9 days after the date of Lender's invoice.

### 3.9.   Overdraft Advances

If, under the authorization given by Borrower in the Funding Bank Agreement or pursuant to this Agreement, Lender debits Borrower's Operating Account or directs the Funding Bank to honor an item presented against the Operating Account or against the Check Disbursement Account, and that debit or direction results in an overdraft, Lender may make an additional advance to fund that overdraft ("Overdraft Advance").  Borrower must pay (a) the outstanding amount of any Overdraft Advance, within 1 Business Day after the date of the Overdraft Advance, and (b) interest on the amount of the Overdraft Advance, at a rate per annum equal to the Prime Rate plus 2%, within 9 days after the date of Lender's invoice.

### 3.10.   Method of Making Payments

3.10 (a)  Unless otherwise specified in this Agreement, Borrower must make all payments under this Agreement to Lender by the close of business on the date when due unless the date is not a Business Day. If the due date is not a Business Day, payment is due on, and interest will accrue to, the next Business Day. Borrower must make all payments in United States dollars in immediately available funds transferred by wire transfer to accounts designated by Lender.

3.10 (b)  Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for any interest or fees due and payable to Lender on or after the 9th day after the date of Lender's invoice without the necessity of prior demand or Notice from Lender.

3.10 (c)  While a Default or Event of Default exists, Borrower authorizes Lender to cause the Funding Bank to charge Borrower's Operating Account for any Obligations due and payable to Lender, without the necessity of prior demand or Notice from Lender.

**End of Article 3**

## 4.    COLLATERAL

### 4.1.    Grant of Security Interest

Borrower pledges and assigns to Lender and grants Lender a continuing security interest in all of Borrower's right, title and interest in and to each and every asset, right and property described in this Section 4.1 whether now existing or later arising, whether presently owned or later acquired and wherever located ("Collateral"), as security for the payment and performance of each and all of the Obligations:

4.1 (a)    All Mortgage Loans (i) against which Lender has made a Warehousing Advance, (ii) identified as being pledged to Lender on any Warehousing Advance Request or other agreement of pledge, or (iii) for which the related Mortgage Note has been delivered to or has otherwise come into the possession, custody or control of Lender or a third party acting on Lender's behalf (collectively, the "Pledged Loans" and each a "Pledged Loan"), together with all Income from the foregoing;

4.1 (b)    All Mortgage Notes, Mortgages and Security Agreements and other instruments, documents, chattel paper and agreements evidencing or securing any or all of the Pledged Loans;

4.1 (c)    All Mortgage-backed Securities (i) that are backed in whole or in part by any Pledged Loan, (ii) identified as being pledged to Lender on any Warehousing Advance Request or other agreement of pledge, (iii) with respect to which Lender or a third party acting on Lender's behalf has been identified as the nominal or beneficial owner of such Mortgage-backed Security, or (iv) which have been delivered to or have otherwise come into the possession, custody or control of Lender or a third party acting on Lender's behalf, together with all cash and non-cash distributions in respect of the foregoing (collectively, the "Pledged Securities" and each a "Pledged Security");

4.1 (d)    All rights (but no obligations) under any and all Purchase Commitments relating to or covering Pledged Loans or Pledged Securities and any and all rights (but no obligations) to sell, transfer or otherwise deliver any Pledged Loan or Pledged Security to any Investor or other purchaser, whether arising under Purchase Commitments or otherwise;

4.1 (e)    All rights to service, administer or collect Pledged Loans (whether such rights are owned, arise under a Servicing Contract or otherwise) and all fees, income, reimbursements, damages, termination or cancellation rights, remedies or payments, interest, other rights to payment, rights under related subservicing arrangements, and all other rights relating to or arising out of the foregoing rights;

4.1 (f)    All insurance, guarantees, letters of credit and letter-of-credit rights and supporting obligations of any kind or nature insuring, guaranteeing or supporting the payment or performance of any Pledged Loan, including private mortgage insurance, any commitments, insurance or guarantees issued by the VA or FHA and any and all premiums or rights to the return of premiums relating to the foregoing;

4.1 (g)    All rights in and to the Mortgaged Property securing any Pledged Loan and in any insurance (whether title, casualty, fire, extended coverage, flood or otherwise), guarantee, supporting obligation, agreement, document, rents, leases, subleases, licenses, profits or other right with respect to such Mortgaged Property, all awards for any condemnation or taking with respect to such Mortgaged Property, and all impounds,

insurance premiums or rights to the return of premiums relating to the foregoing and other funds held on account of such Mortgaged Property;

4.1 (h) All rights (but no obligations) under any Hedging Arrangements relating to any or all of the Pledged Loans or Pledged Securities and all securities accounts, securities entitlements and other investment property relating to such Hedging Arrangements;

4.1 (i) With respect to any or all of the foregoing Collateral, all accounts, instruments, chattel paper, contract rights, general intangibles (including payment intangibles), documents, letter-of-credit rights, investment property, deposit accounts and money (whether held in a deposit account, in the possession of the Lender or a third party acting on Lender's behalf or otherwise);

4.1 (j) All files, documents, instruments, surveys, certificates, correspondence, appraisals, broker price opinions, computer programs, software, tapes, discs, cards, accounting records, and other books and records, information and data necessary or useful in the servicing, administration, collection, disposition of or otherwise relating to the Collateral;

4.1 (k) All products and Proceeds of the foregoing Collateral. For purposes of this Section 4.1, the term "Proceeds" has the meaning given in the Uniform Commercial Code, and will in all events include whatever is receivable or received when Collateral or proceeds of Collateral are sold, leased, licensed, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary;

4.1 (l) All equipment and inventory, but only to the extent constituting Proceeds of any of the other Collateral;

4.1 (m) The terms used in this Section 4.1 (whether or not capitalized) to describe the Collateral (whether directly or as part of another defined term) include the meanings ascribed to such terms in Articles 8 or 9 of the Uniform Commercial Code (including any terms used in such Articles which are defined in other Articles of the Uniform Commercial Code), except that (i) the meaning of such terms will not be limited by reason of any limitation on the scope of the Uniform Commercial Code, by reason of federal preemption or otherwise, and (ii) to the extent the definition of any category or type of Collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

## 4.2.    Maintenance of Collateral Records

As long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed under this Agreement or under any other Loan Document, Borrower must preserve and maintain, at its chief executive office and principal place of business or in a regional office approved by Lender, or in the office of a computer service bureau engaged by Borrower and approved by Lender and, upon request, make available to Lender the originals, or copies in any case where the originals have been delivered to Lender or to an Investor, of all documents, instruments, agreements, books, records, data, information and other materials necessary to identify, enforce or realize against any item of Collateral.

## 4.3.    Release of Security Interest in Pledged Assets

4.3 (a)    Except as provided in Section 4.3(b), Lender will release its security interest in a Pledged Asset only against payment to Lender of the Release Amount for such Pledged Asset.  If Pledged Loans are transferred to a pool custodian or an Investor for inclusion in a Mortgage Pool and Lender's security interest in the Pledged Loans included in the

Mortgage Pool is not released before the issuance of the related Mortgage-backed Security, then that Mortgage-backed Security, when issued, is a Pledged Security, Lender's security interest continues in the Pledged Loans backing that Pledged Security and Lender is entitled to possession of the Pledged Security in the manner provided in this Agreement.

4.3 (b)    If Pledged Loans are transferred to an Approved Custodian and included in an Eligible Mortgage Pool, Lender's security interest in the Pledged Loans included in the Eligible Mortgage Pool will be released upon the delivery of the Agency Security to Lender (including delivery to or registration in the name of a third party on behalf of Lender) and that Agency Security is a Pledged Security. Lender's security interest in that Pledged Security will be released only against payment to Lender of the Release Amount in connection with the Mortgage Loans backing that Pledged Security.

4.3 (c)    Lender has the exclusive right to possession of all Pledged Securities or, if Pledged Securities are issued in book-entry form or issued in certificated form and delivered to a clearing corporation (as that term is defined in the Uniform Commercial Code) or its nominee, Lender has the right to have the Pledged Securities registered in the name of a securities intermediary (as that term is defined in the Uniform Commercial Code) in an account containing only customer securities and credited to an account of Lender. Lender has no duty or obligation to deliver Pledged Securities to an Investor or to credit Pledged Securities to the account of an Investor or an Investor's designee except against payment for those Pledged Securities. Borrower acknowledges that Lender may enter into one or more standing arrangements with securities intermediaries with respect to Pledged Securities issued in book entry form or issued in certificated form and delivered to a clearing corporation or its designee, under which the Pledged Securities are registered in the name of the securities intermediary, and Borrower agrees, upon request of Lender, to execute and deliver to those securities intermediaries Borrower's written concurrence in any such standing arrangements.

4.3 (d)    As long as no Default or Event of Default exists or would occur as a result, Borrower may redeem a Pledged Asset from Lender's security interest by notifying Lender of its intention to redeem the Pledged Asset from pledge and either (1) paying, or causing an Investor to pay, to Lender, for application as a prepayment on the principal balance of the Warehousing Note, the Release Amount in connection with the Pledged Asset, or (2) delivering substitute Collateral that, in addition to being acceptable to Lender in its sole discretion, will, when included with the remaining Collateral included in the calculation of Aggregate Warehousing Collateral Value, result in an Aggregate Warehousing Collateral Value that is at least equal to the aggregate outstanding Warehousing Advances.

4.3 (e)    After a Default or Event of Default occurs, Lender may, with no liability to Borrower or any Person, continue to release its security interest in any Pledged Asset against payment of the Release Amount for that Pledged Asset.

4.3 (f)    The amount to be paid by Borrower to obtain the release of Lender's security interest in a Pledged Asset ("Release Amount") will be (1) in connection with the sale of a Pledged Asset by Borrower, the payment required in any bailee letter pursuant to which Lender ships that Pledged Asset to an Investor, Approved Custodian, pool custodian or other party, (2) in connection with the sale of a Pledged Asset by Lender while an Event of Default exists, the amount paid to Lender in a commercially reasonable disposition of that Pledged Asset and (3) otherwise, until an Event of Default occurs, the principal amount of the Warehousing Advance outstanding against the Pledged Asset (which, with respect to the sale of a Pledged Asset constituting a Pledged Security backed by

Pledged Loans, will be the amount of the Warehousing Advances outstanding against the Pledged Loans backing such Pledged Security).

### 4.4.   Collection and Servicing Rights

4.4 (a)   If no Event of Default exists, Borrower may service and receive and collect directly all sums payable to Borrower in respect of the Collateral other than proceeds of any Purchase Commitment or proceeds of the sale of any Collateral. All proceeds of any Purchase Commitment or any other sale of Collateral must be paid directly to the Cash Collateral Account for application as provided in this Agreement.

4.4 (b)   During the period beginning on the occurrence of an Event of Default and ending on the date Lender waives such Event of Default or determines that it has been cured (each such determination to be made in Lender's sole discretion), Lender or its designee is entitled to service and receive and collect all sums payable to Borrower in respect of the Collateral, and in such case (1) Lender or its designee in its discretion may, in its own name, in the name of Borrower or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but Lender has no obligation to do so, (2) Borrower must, pursuant to Section 4.4(a), continue to hold in trust for the benefit of Lender and, if Lender requests it to do so, immediately pay to Lender at its office designated by Notice, all amounts received by Borrower upon or in respect of any of the Collateral, advising Lender as to the source of those funds and (3) all amounts so received and collected by Lender will be held by it as part of the Collateral and applied by Lender as provided in this Agreement.

### 4.5.   Return of Collateral at End of Warehousing Commitment

If (a) the Warehousing Commitment has expired or been terminated and (b) no Warehousing Advances, interest or other Obligations are outstanding and unpaid, Lender will release its security interest and will deliver all Collateral in its possession to Borrower at Borrower's expense. Borrower's acknowledgement or receipt for any Collateral released or delivered to Borrower under any provision of this Agreement is a complete and full acquittance for the Collateral so returned, and Lender is discharged from any liability or responsibility for that Collateral.

### 4.6.   Delivery of Collateral Documents

4.6 (a)   Lender may deliver documents relating to the Collateral to Borrower for correction or completion under a Trust Receipt.

4.6 (b)   If no Default or Event of Default exists, upon delivery by Borrower to Lender of shipping instructions pursuant to the applicable Exhibit B, Lender will deliver the Mortgage Notes evidencing the Pledged Assets to be shipped together with all related loan documents and pool documents previously received by Lender under the requirements of the applicable Exhibit B, to the designated Investor or Approved Custodian or to another party designated by Borrower and acceptable to Lender in its sole discretion.

4.6 (c)   If a Default or Event of Default exists, Lender may, without liability to Borrower or any other Person, continue to deliver Pledged Assets, together with all related loan documents and pool documents in Lender's possession, to the applicable Investor or Approved Custodian or to another party acceptable to Lender in its sole discretion.

**End of Article 4**

## 5.    CONDITIONS PRECEDENT

### 5.1.    Initial Advance

Lender's obligation to make the initial Warehousing Advance, is subject to the satisfaction, in the sole discretion of Lender, of the following conditions precedent:

5.1 (a)    Lender must receive the following, all of which must be satisfactory in form and content to Lender, in its sole discretion:

(1)    The Warehousing Note and this Agreement duly executed by Borrower.

(2)    Borrower's Public Organizational Documents, together with all amendments, as certified by the Secretary of State of Illinois.

(3)    Borrower's Non-Public Organizational Documents, together with all amendments, as certified by Borrower's Certifying Officer.

(4)    Certificates of good standing dated not more than 30 days prior to the date of this Agreement, together with a certification from the Franchise Tax Board or other state tax authority stating that Borrower is in good standing with the Franchise Tax Board or such state tax authority, if applicable.

(5)    A resolution of the Borrower's Governors, certified as of the date of the Agreement by its Certifying Officer, of Borrower authorizing the execution, delivery and performance of this Agreement and the other Loan Documents, each Warehousing Advance Request and all other agreements, instruments or documents to be delivered by or on behalf of Borrower under this Agreement.

(6)    A certificate of Borrower's Certifying Officer as to the incumbency and authenticity of the signatures of the Persons executing this Agreement and the other Loan Documents on Borrower's behalf.

(7)    Assumed Name Certificates dated not more than 30 days prior to the date of this Agreement for any assumed name used by Borrower in the conduct of its business.

(8)    Fiscal year-end financial statements of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) containing a balance sheet as of December 31, 2006 and related statements of income, cash flows and changes in equity for the period ended on that date, all prepared in accordance with GAAP applied on a basis consistent with prior periods and accompanied by (A) an opinion as to those financial statements in form and substance satisfactory to Lender and prepared by independent certified public accountants of recognized standing acceptable to Lender and (B) any audit letters, management letters, management reports or other supplementary comments or reports delivered by those accountants to Borrower or its Governors.

(9)    Interim financial statements of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) containing a balance sheet as of June 30, 2007, and a related statement of income, for the period ended on that date prepared in accordance with GAAP applied on a basis consistent with Borrower's most recent audited financial statements.

(10)    A Compliance Certificate as of the date of the financial statements required by Section (9) substantially in the form of Exhibit E.

(11)    The Guaranty, on the form prescribed by Lender, duly executed by the Guarantor.

(12)    Financial statements, signed by the applicable Guarantor, with respect to (i) Hward J. Siegel, dated as of December 31, 2006; and (ii) Larry Luckett, dated as of April 20, 2007.

(13)    A favorable written opinion of counsel to Borrower and the Guarantor (or of separate counsel at the option of Borrower and the Guarantor), addressed to Lender and dated as of the date of this Agreement, covering such matters as Lender may reasonable request.

(14)    Uniform Commercial Code, tax lien and judgment searches of the appropriate public records for Borrower that do not disclose the existence of any Lien on the Collateral other than in favor of Lender or as permitted under this Agreement.

(15)    Copies of the certificates, documents or other written instruments that evidence Borrower's eligibility described in Section 9.1, all in form and substance satisfactory to Lender.

(16)    Copies of Borrower's errors and omissions insurance policy (or mortgage impairment insurance policy) and blanket bond coverage policy, or certificates in lieu of policies, showing compliance by Borrower as of the date of this Agreement with the provisions of Section 7.9.

(17)    Receipt by Lender of any fees due on the date of this Agreement.

(18)    A fully-executed Funding Bank Agreement and evidence that all accounts into which Warehousing Advances will be funded have been established at the Funding Bank.

(19)    A fully-executed amendment to the GMAC-RFC Warehousing Agreement dated as of the date of this Agreement, which terminates all funding of warehousing advances under that agreement as of the Closing Date of this Agreement.

5.1 (b)    If, as of the date of this Agreement, Borrower has any indebtedness for borrowed money to any Covered Debt Holder, which indebtedness has a term of more than 1 year or is in excess of $25,000, the Covered Debt Holder must have executed a Subordination of Debt Agreement, on the form prescribed by Lender; and Lender must have received an executed copy of that Subordination of Debt Agreement, certified by the Borrower's Certifying Officer to be true and complete and in full force and effect as of the date of the Warehousing Advance.

5.1 (c)    Borrower must not have incurred any material liabilities, direct or contingent, other than in the ordinary course of its business, since the Audited Statement Date.

## 5.2.    Each Advance

Lender's obligation to make the initial and each subsequent Warehousing Advance is subject to the satisfaction, in the sole discretion of Lender, as of the date of each Warehousing Advance, of the following additional conditions precedent:

5.2 (a)   Borrower must have delivered to Lender the Warehousing Advance Request and Collateral Documents required by, and must have satisfied the procedures and substantive requirements set forth in, Article 2 and the Exhibits described in that Article. All items delivered to Lender must be satisfactory to Lender in form and content, and Lender may reject any item that does not satisfy the requirements of this Agreement or any applicable Purchase Commitment.

5.2 (b)   Receipt by Lender of evidence that, not later than immediately after the first Warehousing Advance, Borrower has made and continues to maintain Buydowns equal to or greater than the Permanent Buydown.

5.2 (c)   Lender must have received evidence satisfactory to it as to the making or continuation of any book entry or the due filing and recording in all appropriate offices of all financing statements and other instruments necessary to perfect the security interest of Lender in the Collateral under the Uniform Commercial Code or other applicable law.

5.2 (d)   The representations and warranties of Borrower contained in Article 6 and Article 9 must be accurate and complete in all material respects as if made on and as of the date of each Warehousing Advance.

5.2 (e)   Borrower must have performed all agreements to be performed by it under this Agreement, and after giving effect to the requested Warehousing Advance, no Default or Event of Default will exist under this Agreement.

5.2 (f)   After giving effect to the requested Warehousing Advance, the Warehousing Advances outstanding under this Agreement will not exceed the lesser of (i) the Warehousing Commitment Amount or (ii) the Aggregate Warehousing Collateral Value.

5.2 (g)   The Guarantor must have performed all agreements to be performed by the Guarantor under the Guaranty.

Delivery of a Warehousing Advance Request by Borrower will be deemed a representation by Borrower that all conditions set forth in this Section have been satisfied as of the date of the Warehousing Advance.

### 5.3.   Force Majeure

Notwithstanding Borrower's satisfaction of the conditions set forth in this Agreement, Lender has no obligation to make a Warehousing Advance if Lender is prevented from obtaining the funds necessary to make a Warehousing Advance, or is otherwise prevented from making a Warehousing Advance as a result of any fire, flood or other casualty, failure of power, strike, lockout or other labor trouble, banking moratorium, embargo, sabotage, confiscation, condemnation, riot, civil disturbance, insurrection, act of terrorism, war or other activity of armed forces, act of God or other similar reason beyond the control of Lender. Lender will make the requested Warehousing Advance as soon as reasonably possible following the occurrence of such an event.

**End of Article 5**

## 6.    GENERAL REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender, as of the date of this Agreement and as of the date of each Warehousing Advance Request and the making of each Warehousing Advance, that:

### 6.1.    Place of Business

Borrower's chief executive office and principal place of business is 485 South Frontage Road, Suite 200, Burr Ridge, IL, 60527.

### 6.2.    Organization; Good Standing; Subsidiaries

Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois, and has the full legal power and authority to own its property and to carry on its business as currently conducted. Borrower is duly qualified to do business and is in good standing in each jurisdiction in which the transaction of its business makes qualification necessary, except in jurisdictions, if any, where a failure to be in good standing has no material adverse effect on Borrower's business, operations, assets or financial condition as a whole. For the purposes of this Agreement, good standing includes qualification for all licenses and payment of all taxes required in the jurisdiction of its organization and in each jurisdiction in which Borrower transacts business. The identity and percentage ownership of Borrower's Equity Holders is set forth on Exhibit D, and Exhibit D also lists each Subsidiary of Borrower and includes each such Subsidiary's name, address, jurisdiction of organization, each state in which it is qualified to do business and the percentage ownership of its Equity Interests by Borrower. Each of Borrower's Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and has the full legal power and authority to own its property and to carry on its business as currently conducted.

### 6.3.    Authorization and Enforceability

Borrower has the power and authority to execute, deliver and perform this Agreement, the Warehousing Note and the other Loan Documents to which Borrower is a party and to make the borrowings under this Agreement. The execution, delivery and performance by Borrower of this Agreement, the Warehousing Note and the other Loan Documents to which Borrower is party and the making of the borrowings under this Agreement, and the Warehousing Note, have been duly and validly authorized by all necessary organizational action on the part of Borrower (none of which actions has been modified or rescinded, and all of which actions are in full force and effect) and do not and will not conflict with or violate any provision of law, of any judgments binding upon Borrower, or of the Organizational Documents of Borrower, conflict with or result in a breach of, constitute a default or require any consent under, or result in or require the acceleration of any indebtedness of Borrower under any agreement, instrument or indenture to which Borrower is a party or by which Borrower or its property may be bound or affected, or result in the creation of any Lien upon any property or assets of Borrower (other than the Lien on the Collateral granted under this Agreement). This Agreement, the Warehousing Note and the other Loan Documents to which Borrower is a party constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their respective terms, except that enforceability may be limited by bankruptcy, insolvency or other such laws affecting the enforcement of creditors' rights and general principles of equity.

### 6.4.    Authorization and Enforceability of Guaranty

Each non-individual Guarantor has the power and authority, and each individual Guarantor has the legal capacity to execute, deliver and perform the Guaranty. The Guaranty constitutes the

legal, valid, and binding obligation of each Guarantor, enforceable in accordance with its terms, except that enforceability may be limited by bankruptcy, insolvency or other such laws affecting creditors' rights and general principles of equity.

### 6.5.    Approvals

The execution and delivery of this Agreement, the Warehousing Note and the other Loan Documents and the performance of Borrower's obligations under this Agreement, the Warehousing Note and the other Loan Documents and the validity and enforceability of this Agreement, the Warehousing Note and the other Loan Documents do not require any license, consent, approval or other action of any agency, board, bureau, commission, instrumentality or other administrative or regulatory body or authority (in each case, whether federal, state or local, domestic or foreign) other than those that have been obtained and remain in full force and effect.

### 6.6.    Financial Condition

The balance sheet of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) as of each Statement Date, and the related statements of income, cash flows and changes in equity for the fiscal period ended on each Statement Date, furnished to Lender, fairly present the financial condition of Borrower (and, if applicable, Borrower's Subsidiaries) as at that Statement Date and the results of its operations for the fiscal period ended on that Statement Date. Borrower had, on each Statement Date, no known material liabilities, direct or indirect, fixed or contingent, matured or unmatured, or liabilities for taxes, long-term leases or unusual forward or long-term commitments of Borrower not disclosed by, or reserved against in, those financial statements, and at the present time there are no material unrealized or anticipated losses from any loans, advances or other commitments of Borrower except as previously disclosed to Lender in writing. Those financial statements were prepared in accordance with GAAP applied on a consistent basis throughout the periods involved. Since the Audited Statement Date, there has been no material adverse change in the business, operations, assets or financial condition of Borrower (and, if applicable, Borrower's Subsidiaries), nor is Borrower aware of any state of facts that (with or without notice or lapse of time or both) would or could result in any such material adverse change.

### 6.7.    Borrower SMMEA Qualification

If Borrower originates any First Mortgage Loans that are Prime Mortgage Loans or Government Mortgage Loans, Borrower is either (i) a savings and loan association, savings bank, commercial bank, credit union, insurance company or similar banking institution which is supervised by a federal or state authority of the United States, or (ii) a HUD approved non-supervised or correspondent mortgagee.

### 6.8.    Litigation

There are no actions, claims, suits or proceedings pending or, to Borrower's knowledge, threatened or reasonably anticipated against or affecting Borrower or any Subsidiary of Borrower in any court or before any arbitrator or before any agency, board, bureau, commission, instrumentality or other administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign) that, if adversely determined, may reasonably be expected to result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole, or that would affect the validity or enforceability of this Agreement, the Warehousing Note or any other Loan Document.

## 6.9.   Compliance with Laws

Neither Borrower nor any Subsidiary of Borrower is in violation of any provision of any law, or of any judgment, award, rule, regulation, order, decree, writ or injunction of any court or any legislature, agency, board, bureau, commission, instrumentality or other legislative, administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign) that could result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole or that would affect the validity or enforceability of this Agreement, the Warehousing Note or any other Loan Document.

## 6.10.  Regulation U

Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Warehousing Advance made under this Agreement will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

## 6.11.  Investment Company Act

Borrower is not an "investment company" or controlled by an "investment company" within the meaning of the Investment Company Act.

## 6.12.  Payment of Taxes

Borrower and each of its Subsidiaries has filed or caused to be filed all federal, state and local income, excise, property and other tax returns that are required to be filed with respect to the operations of Borrower and its Subsidiaries, all such returns are true and correct and Borrower and each of its Subsidiaries has paid or caused to be paid all taxes shown on those returns or on any assessment, to the extent that those taxes have become due, including all FICA payments and withholding taxes, if appropriate. The amounts reserved as a liability for income and other taxes payable in the financial statements described in Section 6.6 are sufficient for payment of all unpaid federal, state and local income, excise, property and other taxes, whether or not disputed, of Borrower and its Subsidiaries accrued for or applicable to the period and on the dates of those financial statements and all years and periods prior to those financial statements and for which Borrower and its Subsidiaries may be liable in their own right or as transferee of the assets of, or as successor to, any other Person. No tax Liens have been filed and no material claims are being asserted against Borrower, any Subsidiary of Borrower or any property of Borrower or any Subsidiary of Borrower with respect to any taxes, fees or charges.

## 6.13.  Agreements

Neither Borrower nor any Subsidiary of Borrower is a party to any agreement, instrument or indenture or subject to any restriction materially and adversely affecting its business, operations, assets or financial condition, except as disclosed in the financial statements described in Section 6.6.  Neither Borrower nor any Subsidiary of Borrower is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement, instrument, or indenture which default could result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole. No holder of any indebtedness of Borrower or of any of its Subsidiaries has given notice of any asserted default under that indebtedness, and no liquidation or dissolution of Borrower or of any of its Subsidiaries and no receivership, insolvency, bankruptcy, reorganization or other similar proceedings relative to Borrower or of any of its Subsidiaries or any of its or their properties is pending or, to the knowledge of Borrower, threatened.

### 6.14.  Title to Properties

Borrower and each Subsidiary of Borrower has good, valid, insurable and (in the case of real property) marketable title to all of its properties and assets (whether real, personal or mixed, tangible or intangible) reflected on the financial statements described in Section 6.6, except for those properties and assets that Borrower has disposed of since the date of those financial statements either in the ordinary course of business or because they were no longer used or useful in the conduct of Borrower's or the Subsidiary's business. All of Borrower's properties and assets are free and clear of all Liens except as disclosed in Borrower's financial statements.

### 6.15.  ERISA

Each Plan is in compliance with all applicable requirements of ERISA and the Internal Revenue Code and with all material applicable rulings and regulations issued under the provisions of ERISA and the Internal Revenue Code setting forth those requirements, except where any failure to comply would not result in a material loss to Borrower or any ERISA Affiliate. All of the minimum funding standards or other contribution obligations applicable to each Plan have been satisfied. No Plan is a Multiemployer Plan or a defined-benefit pension plan subject to Title IV of ERISA.

### 6.16.  No Retiree Benefits

Except as required under Section 4980B of the Internal Revenue Code, Section 601 of ERISA or applicable state law, neither Borrower nor any Subsidiary is obligated to provide post-retirement medical or insurance benefits with respect to employees or former employees.

### 6.17.  Assumed Names

Borrower does not originate Mortgage Loans or otherwise conduct business under any names other than its legal name and the assumed names set forth on Exhibit G. Borrower has made all filings and taken all other action as may be required under the laws of any jurisdiction in which it originates Mortgage Loans or otherwise conducts business under any assumed name. Borrower's use of the assumed names set forth on Exhibit G does not conflict with any other Person's legal rights to any such name, nor otherwise give rise to any liability by Borrower to any other Person.  Borrower may amend Exhibit G to add or delete any assumed names used by Borrower to conduct business.  An amendment to Exhibit G to add an assumed name is not effective until Borrower has delivered to Lender an assumed name certificate in the jurisdictions in which the assumed name is to be used, which must be satisfactory in form and content to Lender in its sole discretion.  In connection with any amendment to delete a name from Exhibit G, Borrower represents and warrants that it has ceased using that assumed name in all jurisdictions.

### 6.18.  Servicing

Exhibit C is a true and complete list of Borrower's Servicing Portfolio. All of Borrower's Servicing Contracts are in full force and effect, and are unencumbered by Liens other than Liens disclosed in Exhibit C. No default or event that, with notice or lapse of time or both, would become a default, exists under any of Borrower's Servicing Contracts.

**End of Article 6**

## 7.    AFFIRMATIVE COVENANTS

As long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed under this Agreement or under any other Loan Document, Borrower must:

### 7.1.    Payment of Obligations

Punctually pay or cause to be paid all Obligations, Including the Obligations payable under this Agreement and the Warehousing Note, in accordance with their terms.

### 7.2.    Financial Statements

Deliver to Lender:

7.2 (a)    As soon as available and in any event within 30 days after the end of each month, including the last month of Borrower's fiscal year, an Interim statement of income of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) for the immediately preceding month and for the period from the beginning of the fiscal year to the end of that month, and the related balance sheet as at the end of the Immediately preceding month, all in reasonable detail, subject, however, to year-end audit adjustments.

7.2 (b)    As soon as available and in any event within 90 days after the end of each fiscal year of Borrower, fiscal year-end statements of income, cash flows and changes in equity of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) for that year, and the related balance sheet as of the end of that year (setting forth In comparative form the corresponding figures for the preceding fiscal year), all in reasonable detail and accompanied by (1) an opinion as to those financial statements in form and substance satisfactory to Lender and prepared by Independent certified public accountants of recognized standing acceptable to Lender and (2) any audit letters, management letters, management reports or other supplementary comments or reports delivered by those accountants to Borrower or its Governors.

7.2 (c)    Together with each delivery of financial statements required by this Section, a Compliance Certificate substantially in the form of Exhibit E.

7.2 (d)    As soon as available and in any event within 90 days after the end of each fiscal year of Borrower, current financial statements of the Guarantor, signed by the Guarantor and dated not more than 90 days before the date the statements are delivered to Lender.

7.2 (e)    Copies of all regular or periodic financial and other reports that Borrower files with the Securities and Exchange Commission or any successor governmental agency or other entity.

### 7.3.    Other Borrower Reports

Deliver to Lender:

7.3 (a)    If Borrower has a Servicing Portfolio, then as soon as available and in any event within 30 days after the end of each month, a consolidated report ("Servicing Portfolio Report") as of the end of the month, as to all Mortgage Loans the servicing rights to which are owned by Borrower (specified by investor type, recourse and non-recourse) regardless of whether the Mortgage Loans are Pledged Loans. The Servicing Portfolio Report must

indicate which Mortgage Loans (1) are current and in good standing, (2) are more than 30, 60 or 90 days past due, (3) are the subject of pending bankruptcy or foreclosure proceedings, or (4) have been converted (through foreclosure or other proceedings in lieu of foreclosure) into real estate owned by Borrower.

7.3 (b)  As soon as available and in any event within 30 days after the end of each month, a consolidated loan production report as of the end of that month, presenting the total dollar volume and the number of Mortgage Loans originated and closed or purchased during that month and for the fiscal year-to-date, specified by property type and loan type.

7.3 (c)  Unless the Funding Bank has previously provided Lender with a copy of the Funding Bank's monthly statement for the Check Disbursement Account, as soon as available and in any event within 30 days after the end of each month, a copy of that monthly statement.

7.3 (d)  As soon as available and in any event within 30 days after the end of each month, a report as of the end of that month detailing all requests that Borrower repurchase Mortgage Loans from an Investor out of an Eligible Mortgage Pool or from any other Person, the status of each such request and any indemnification or similar agreement to which Borrower is a party in connection with any such request.

7.3 (e)  Other reports in respect of Pledged Assets, including copies of purchase confirmations issued by Investors purchasing Pledged Loans from Borrower, in such detail and at such times as Lender in its discretion may reasonably request.

7.3 (f)  With reasonable promptness, all further information regarding the business, operations, assets or financial condition of Borrower as Lender may reasonably request, including copies of any audits completed by HUD, Ginnie Mae, Fannie Mae or Freddie Mac.

### 7.4.    Maintenance of Existence; Conduct of Business

Preserve and maintain its organizational existence in good standing and all of its rights, privileges, licenses and franchises necessary or desirable in the normal conduct of its business, including its eligibility as lender, seller/servicer or issuer as described under Section 9.1; conduct its business in an orderly and efficient manner; maintain a net worth of acceptable assets as required for maintaining Borrower's eligibility as lender, seller/servicer or issuer as described under Section 9.1; and make no material change in the nature or character of its business or engage in any business in which it was not engaged on the date of this Agreement.

### 7.5.    Compliance with Applicable Laws

Comply with the requirements of all applicable laws, rules, regulations and orders of any legislature, agency, board, bureau, commission, instrumentality or other legislative, administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign), a breach of which could result in a material adverse change in Borrower's business, operations, assets, or financial condition as a whole or on the enforceability of this Agreement, the Warehousing Note, any other Loan Document or any Collateral, except where contested in good faith and by appropriate proceedings.

### 7.6.    Inspection of Properties and Books; Operational Reviews

Permit Lender or any Participant (and their authorized representatives) to discuss the business, operations, assets and financial condition of Borrower and its Subsidiaries with Borrower's Governors, management, officers, agents and employees, and to examine and make copies or

extracts of Borrower's and its Subsidiaries' books of account, all at such reasonable times as Lender or any Participant may request. Provide its accountants with a copy of this Agreement promptly after its execution and authorize and instruct them to answer candidly all questions that the officers of Lender or any Participant or any authorized representatives of Lender or any Participant may address to them in reference to the financial condition or affairs of Borrower and its Subsidiaries. Borrower may have its representatives in attendance at any meetings held between the officers or other representatives of Lender or any Participant and Borrower's accountants under this authorization. Permit Lender or any Participant (and their authorized representatives) access to Borrower's premises and records for the purpose of conducting a review of Borrower's general mortgage business methods, policies and procedures, auditing its loan files and reviewing the financial and operational aspects of Borrower's business.

## 7.7.    Notice

Give prompt Notice to Lender of (a) any action, suit or proceeding instituted by or against Borrower or any of its Subsidiaries in any federal or state court or before any agency, board, bureau, commission, instrumentality or other administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign), which action, suit or proceeding has at issue in excess of $25,000, or any such proceedings threatened against Borrower or any of its Subsidiaries in a writing containing the details of that action, suit or proceeding; (b) the filing, recording or assessment of any Lien for any federal, state or local taxes, assessments or other governmental charges against Borrower, any of its Subsidiaries or any of their respective assets, other than a Lien for taxes, assessments or other governmental charges on real property that does not secure or constitute and has not secured or constituted a Pledged Asset; (c) an Event of Default; (d) a Default that continues for more than 4 days; (e) the suspension, revocation or termination of Borrower's eligibility, in any respect, as lender, seller/servicer or issuer as described under Section 9.1 or the suspension, revocation or termination of any other license or approval required for Borrower to engage in the business of originating, acquiring and, if applicable, servicing Mortgage Loans; (f) the imposition of any other adverse regulatory or administrative action or sanction on or against Borrower by any agency, board, bureau, commission, instrumentality or other administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign) that could result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole or that could affect the validity or enforceability of any Pledged Loan; (g) the transfer, loss, nonrenewal or termination of any Servicing Contracts to which Borrower is a party, or which is held for the benefit of Borrower, and the reason for that transfer, loss, nonrenewal or termination; (h) any Prohibited Transaction with respect to any Plan, specifying the nature of the Prohibited Transaction and what action Borrower proposes to take with respect to it; and (i) any other action, event or condition of any nature that could lead to or result in a material adverse change in the business, operations, assets or financial condition of Borrower or any of its Subsidiaries.

## 7.8.    Payment of Debt, Taxes and Other Obligations

Pay, perform and discharge, or cause to be paid, performed and discharged, all of the obligations and indebtedness of Borrower and its Subsidiaries, all taxes, assessments and governmental charges or levies imposed upon Borrower or its Subsidiaries or upon their respective income, receipts or properties before those taxes, assessments and governmental charges or levies become past due, and all lawful claims for labor, materials and supplies or otherwise that, if unpaid, could become a Lien or charge upon any of their respective properties or assets. Borrower and its Subsidiaries are not required to pay, however, any taxes, assessments and governmental charges or levies or claims for labor, materials or supplies for which Borrower or its Subsidiaries have obtained an adequate bond or insurance or that are being contested in good faith and by proper proceedings that are being reasonably and diligently pursued and for which proper reserves have been created.

### 7.9. Insurance

Maintain blanket bond coverage and errors and omissions insurance or mortgage impairment insurance with such companies and in such amounts as satisfy prevailing requirements applicable to a lender, seller/servicer or issuer as described under Section 9.1, and liability insurance and fire and other hazard insurance on its properties, in each case with responsible insurance companies acceptable to Lender, in such amounts and against such risks as is customarily carried by similar businesses operating in the same location. Within 30 days after Notice from Lender, obtain such additional insurance as Lender may reasonably require, all at the sole expense of Borrower. Copies of such policies must be furnished to Lender without charge upon request of Lender.

### 7.10. Closing Instructions

Indemnify and hold Lender harmless from and against any loss, including reasonable attorneys' fees and costs, attributable to the failure of any title insurance company, agent or attorney to comply with Borrower's disbursement or instruction letter relating to any Mortgage Loan. Lender has the right to pre-approve Borrower's choice of title insurance company, agent or attorney and Borrower's disbursement or instruction letter to them in any case in which Borrower intends to obtain a Warehousing Advance against the Mortgage Loan to be created at settlement or to pledge that Mortgage Loan as Collateral under this Agreement. In any event, Borrower's disbursement or instruction letter must include the following language:

> HOME MORTGAGE, INC. has granted its lender a security interest in any amounts advanced by lender to fund this mortgage loan and in the mortgage loan funded with those amounts. You must promptly return any amounts advanced by that lender and not used to fund this mortgage loan. You also must immediately return all amounts advanced by such lender if this mortgage loan does not close and fund within 1 business day of your receipt of those funds.

### 7.11. Subordination of Certain Indebtedness

Cause any indebtedness of Borrower for borrowed money to any Covered Debt Holder of Borrower, which indebtedness has a term of more than 1 year or is in excess of $25,000, to be subordinated to the Obligations by the execution and delivery by such Covered Debt Holder to Lender of a Subordination of Debt Agreement, on the form prescribed by Lender, certified by the Borrower's Certifying Officer to be true and complete and in full force and effect.

### 7.12. Other Loan Obligations

Perform all material obligations under the terms of each loan agreement, note, mortgage, security agreement or debt instrument by which Borrower is bound or to which any of its property is subject, and promptly notify Lender in writing of a declared default under or the termination, cancellation, reduction or nonrenewal of any of its other lines of credit or agreements with any other lender. Exhibit F is a true and complete list of all such lines of credit or agreements as of the date of this Agreement. Borrower must give Lender at least 30 days Notice before entering into any additional lines of credit or agreements.

### 7.13. ERISA

Maintain and cause each ERISA Affiliate to maintain each Plan in compliance with all material applicable requirements of ERISA and of the Internal Revenue Code and with all applicable rulings and regulations issued under the provisions of ERISA and of the Internal Revenue Code, and not itself or permit any ERISA Affiliate to (a) engage in any transaction in connection with

which Borrower or any ERISA Affiliate would be subject to either a civil penalty assessed pursuant to Section 502(i) of ERISA or a tax imposed by Section 4975 of the Internal Revenue Code, in either case in an amount exceeding $25,000 or (b) fail to make full payment when due of all amounts that, under the provisions of any Plan, Borrower or any ERISA Affiliate is required to pay as contributions to that Plan, or permit to exist any accumulated funding deficiency (as such term is defined in Section 302 of ERISA and Section 412 of the Internal Revenue Code), whether or not waived, with respect to any Plan in an aggregate amount exceeding $25,000.

### 7.14.  Use of Proceeds of Warehousing Advances

Use the proceeds of each Warehousing Advance solely for the purpose of funding Eligible Assets and against the pledge of those Eligible Assets as Collateral.

### 7.15.  Quality Control

Implement, not later than September 1, 2006, a post-closing quality control process that conforms with the GMAC-RFC Client Guide.

**End of Article 7**

## 8.    NEGATIVE COVENANTS

As long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed, Borrower must not, either directly or indirectly, without the prior written consent of Lender:

### 8.1.    Contingent Liabilities

Assume, guarantee, endorse or otherwise become contingently liable for the obligation of any Person except (a) by endorsement of negotiable instruments for deposit or collection in the ordinary course of business and (b) for obligations arising in connection with the sale of Mortgage Loans with recourse in the ordinary course of Borrower's business.

### 8.2.    Pledge of Collateral or Servicing Contracts

Pledge or grant a security interest other than to Lender in any existing or future (a) Pledged Loans, (b) Pledged Securities, (c) Servicing Contracts or (d) other Collateral, or omit to take any action required to keep all of Borrower's (w) Pledged Loans, (x) Pledged Securities, (y) Servicing Contracts and (z) other Collateral in full force and effect.

### 8.3.    Restrictions on Fundamental Changes

8.3 (a)    Consolidate, merge or enter into any analogous reorganization or transaction with any Person.

8.3 (b)    Amend or otherwise modify Borrower's Organizational Documents.

8.3 (c)    Liquidate, wind up or dissolve (or suffer any liquidation or dissolution).

8.3 (d)    Cease actively to engage in the business of originating or acquiring Mortgage Loans or, if applicable, servicing Mortgage Loans, or make any other material change in the nature or scope of the business in which Borrower engages as of the date of this Agreement.

8.3 (e)    Sell, assign, lease, convey, transfer or otherwise dispose of (whether in one transaction or a series of transactions) all or any substantial part of Borrower's business or assets, whether now owned or acquired after the Closing Date, other than, in the ordinary course of business and to the extent not otherwise prohibited by this Agreement, sales of (1) Mortgage Loans, (2) Mortgage-backed Securities and (3) Servicing Contracts.

8.3 (f)    Acquire by purchase or in any other transaction all or substantially all of the business or property, or stock or other ownership interests of any Person.

8.3 (g)    Permit any Subsidiary of Borrower to do or take any of the foregoing actions.

### 8.4.    Subsidiaries

Form or acquire, or permit any Subsidiary of Borrower to form or acquire, any Person that would thereby become a Subsidiary.

## 8.5.  Deferral of Subordinated Debt

Pay any Subordinated Debt of Borrower in advance of its stated maturity or, after a Default or Event of Default under this Agreement has occurred, make any payment of any kind on any Subordinated Debt of Borrower until all of the Obligations have been paid and performed in full and any applicable preference period has expired.

## 8.6.  Loss of Eligibility, Licenses or Approvals

Take any action, or fail or omit to take any action, that would (a) cause Borrower to lose all or any part of its status as an eligible lender, seller/servicer or issuer as described under Section 9.1 or all or any part of any other license or approval required for Borrower to engage in the business of originating, acquiring and, if applicable, servicing Mortgage Loans or (b) result in the imposition of any other adverse regulatory or administrative action or sanction on or against Borrower by any agency, board, bureau, commission, instrumentality or other administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign) that could result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole or that could affect the validity or enforceability of any Pledged Loan.

## 8.7.  Accounting Changes

Make, or permit any Subsidiary of Borrower to make, any significant change in accounting treatment or reporting practices, except as required by GAAP, or change its fiscal year or the fiscal year of any Subsidiary of Borrower.

## 8.8.  Leverage Ratio

Permit Borrower's Leverage Ratio at any time to exceed 15 to 1.

## 8.9.  Minimum Tangible Net Worth

Permit Borrower's Tangible Net Worth at any time to be less than $1,200,000.

## 8.10.  Minimum Liquid Assets

Permit Borrower's Liquid Assets at any time to be less than $350,000.

## 8.11.  Permanent Buydown

On and after the date of the initial Warehousing Advance under this Agreement, permit Borrower's aggregate Buydowns at any time to be less than the Permanent Buydown.

## 8.12.  Net Income/Net Loss

Permit Borrower to have three consecutive months of Net Losses.

## 8.13.  Distributions to Borrower's Equity Holders

Declare or pay any Distribution.

## 8.14. Transactions with Affiliates

Directly or indirectly (a) make any loan, advance, extension of credit or capital contribution to any of Borrower's Affiliates, (b) sell, transfer, pledge or assign any of its assets to or on behalf of those Affiliates, (c) merge or consolidate with or purchase or acquire assets from those Affiliates, or (d) pay management fees to or on behalf of those Affiliates.

## 8.15. Recourse Servicing Contracts

Acquire or enter into Servicing Contracts under which Borrower must repurchase or indemnify the holder of the Mortgage Loans as a result of defaults on the Mortgage Loans at any time during the term of those Mortgage Loans.

**End of Article 8**

9.     **SPECIAL REPRESENTATIONS, WARRANTIES AND COVENANTS CONCERNING COLLATERAL**

9.1.    **Special Representations, Warranties and Covenants Concerning Eligibility as Seller/Servicer of Mortgage Loans**

Borrower represents, warrants and covenants to Lender, as of the date of this Agreement and as of the date of each Warehousing Advance Request and the making of each Warehousing Advance, that (a) Borrower presently has all approvals, licenses, qualifications and authorizations from (including those described in Section 6.7) and is in good standing with each agency, board, bureau, commission, instrumentality or other administrative or regulatory body, including HUD, Ginnie Mae, Fannie Mae, Freddie Mac, VA, and with each Investor, including Lender, as necessary or required to conduct any and all origination, purchase, holding, sales and servicing activities conducted by or on behalf of Borrower with respect to Mortgage Loans, and (b) all origination, purchase, holding, sales and servicing activities previously conducted by or on behalf of Borrower with respect to Mortgage Loans have been conducted while Borrower had such approvals, licenses, qualifications and authorizations and was in such good standing.

9.2.    **Special Representations and Warranties Concerning Warehousing Collateral**

Borrower represents and warrants to Lender, as of the date of this Agreement and as of the date of each Warehousing Advance Request and the making of each Warehousing Advance, that:

9.2 (a)    Borrower has not selected the Collateral in a manner so as to affect adversely Lender's interests.

9.2 (b)    Borrower is the legal and equitable owner and holder, free and clear of all Liens (other than Liens granted under this Agreement), of the Pledged Assets. All Pledged Assets and related Purchase Commitments have been duly authorized and validly issued to Borrower, and all of the foregoing items of Collateral comply with all of the requirements of this Agreement, and have been and will continue to be validly pledged or assigned to Lender, subject to no other Liens.

9.2 (c)    Borrower has, and will continue to have, the full right, power and authority to pledge the Collateral pledged and to be pledged by it under this Agreement.

9.2 (d)    Each Pledged Loan and each related document, instrument and agreement (1) has been duly executed and delivered by the parties to that Pledged Loan and those documents, instruments and agreements, (2) has been made in compliance with all applicable laws, rules and regulations (including all laws, rules and regulations relating to usury), (3) is and will continue to be a legal, valid and binding obligation, enforceable in accordance with its terms, without setoff, counterclaim or defense in favor of the mortgagor under the Pledged Loan or any other obligor on the Mortgage Note and (4) has not been modified, amended or with any requirements of which waived, except in a writing that is part of the Collateral Documents.

9.2 (e)    Each Pledged Loan is secured by a Mortgage on real property and improvements located in one of the states of the United States or the District of Columbia.

9.2 (f)    Unless Third Party Originated Loans are permitted, each Pledged Loan has been closed or will be closed and funded with the Warehousing Advance made against it.

9.2 (g)   Except for open-ended Mortgage Loans, each Mortgage Loan has been fully advanced in the face amount of its Mortgage Note.

9.2 (h)   Each First Mortgage Loan is secured by a First Mortgage on the Mortgaged Property described in or covered by that Mortgage.

9.2 (i)   Each First Mortgage Loan has or will have a title insurance policy, in ALTA form or equivalent, from a recognized title insurance company, insuring the priority of the Lien of the Mortgage and meeting the usual requirements of Investors purchasing those Mortgage Loans.

9.2 (j)   Each First Mortgage Loan has been evaluated or appraised in accordance with Title XI of FIRREA.

9.2 (k)   Each Second Mortgage Loan is secured by a Second Mortgage on the Mortgaged Property described in or covered by that Mortgage.

9.2 (l)   To the extent required by the related Purchase Commitment or by Investors generally for similar Mortgage Loans, each Second Mortgage Loan has or will have a title insurance policy, in ALTA form or equivalent, from a recognized title insurance company, insuring the priority of the Lien of the Mortgage and meeting the usual requirements of Investors purchasing those Mortgage Loans.

9.2 (m)   Each Second Mortgage Loan has been evaluated or appraised in accordance with industry standards for Investors providing Purchase Commitments for and purchasing those Mortgage Loans.

9.2 (n)   The Mortgage Note for each Pledged Loan is (1) payable or endorsed to the order of Borrower, (2) an "instrument" within the meaning of Article 9 of the Uniform Commercial Code of all applicable jurisdictions and (3) is denominated and payable in United States dollars.

9.2 (o)   No default has existed for 60 days or more under any Mortgage Loan included in the Pledged Loans.

9.2 (p)   No party to a Pledged Loan or any related document, instrument or agreement is in violation of any applicable law, rule or regulation that would impair the collectibility of the Mortgage Loan or the performance by the mortgagor or any other obligor of his or her obligations under the Mortgage Note or any related document, instrument or agreement.

9.2 (q)   No party involved in the origination of a Pledged Loan, including the originator, broker, title company or appraiser, was named on the version of the Exclusionary List in effect on the date of the Mortgage Note for that particular Pledged Loan.

9.2 (r)   All fire and casualty policies covering the Mortgaged Property encumbered by each Mortgage included in the Pledged Loans (1) name and will continue to name Borrower and its successors and assigns as the insured under a standard mortgagee clause, (2) are and will continue to be in full force and effect and (3) afford and will continue to afford insurance against fire and such other risks as are usually insured against in the broad form of extended coverage insurance generally available.

9.2 (s)   Pledged Loans secured by Mortgaged Property located in a special flood hazard area designated as such by the Director of the Federal Emergency Management Agency are and will continue to be covered by special flood insurance under the National Flood Insurance Program.

9.2 (t)   The Mortgaged Property securing each Pledged Loan is free of damage or waste and is in good repair (other than with respect to any FHA insured loan, the minor property deficiencies permitted to exist under FHA's Minimum Property Requirements that do not affect the safety of the occupants or the security or soundness of the subject Mortgaged Property), and no improvement located on or being a part of such Mortgaged Property violates any applicable zoning law or regulation.

9.2 (u)   No notice of any partial or total condemnation has been given with respect to the Mortgaged Property securing any Pledged Loan.

9.2 (v)   Each Pledged Loan against which a Warehousing Advance has been or will be made on the basis of a Purchase Commitment meets all of the requirements of that Purchase Commitment, and each Pledged Security against which a Warehousing Advance is outstanding meets all of the requirements of the related Purchase Commitment.

9.2 (w)   Pledged Loans that are intended to be exchanged for Agency Securities comply or, prior to the issuance of the Agency Securities will comply, with the requirements of any governmental instrumentality, department or agency issuing or guaranteeing the Agency Securities.

9.2 (x)   Pledged Loans that are intended to be used in the formation of Mortgage-backed Securities (other than Agency Securities) comply with the requirements of the issuer of the Mortgage-backed Securities (or its sponsor) and of the Rating Agencies.

9.2 (y)   The original assignments of Mortgage delivered to Lender for each Pledged Loan are in recordable form and comply with all applicable laws and regulations governing the filing and recording of such documents.

9.2 (z)   Each Pledged Loan secured by real property to which a Manufactured Home is affixed will create a valid Lien on that Manufactured Home that will have priority over any other Lien on the Manufactured Home, whether or not arising under applicable real property law.

9.2 (aa)  No Pledged Loan is a Discontinued Loan.

9.2 (bb)  None of the mortgagors, guarantors or other obligors of any Pledged Loan is a Person named in any Restriction List and to whom the provision of financial services is prohibited or otherwise restricted by applicable law.

9.2 (cc)  Each First Mortgage Loan that is a Prime Mortgage Loan or a Government Mortgage Loan was originated by a Person that is and was at the time of origination either (i) a savings and loan association, savings bank, commercial bank, credit union, insurance company or similar banking institution which is supervised by a federal or state authority of the United States, or (ii) a HUD approved non-supervised or correspondent mortgagee.

## 9.3.   Special Affirmative Covenants Concerning Warehousing Collateral

As long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed under this Agreement or under any other Loan Document, Borrower must:

9.3 (a)   Warrant and defend the right, title and interest of Lender in and to the Collateral against the claims and demands of all Persons.

9.3 (b)    Service or cause to be serviced all Pledged Loans in accordance with the standard requirements of the issuers of Purchase Commitments covering them and all applicable HUD, Fannie Mae and Freddie Mac requirements, including taking all actions necessary to enforce the obligations of the obligors under such Pledged Loans. Service or cause to be serviced all Mortgage Loans backing Pledged Securities in accordance with applicable governmental requirements and requirements of issuers of Purchase Commitments covering them. Hold all escrow funds collected in respect of Pledged Loans and Mortgage Loans backing Pledged Securities in trust, without commingling the same with non-custodial funds, and apply them for the purposes for which those funds were collected.

9.3 (c)    Execute and deliver to Lender, with respect to the Collateral, those further instruments of sale, pledge, assignment or transfer, and those powers of attorney, as required by Lender, and do and perform all matters and things necessary or desirable to be done or observed, for the purpose of effectively creating, maintaining and preserving the security and benefits intended to be afforded Lender under this Agreement (including any such instruments or actions required or necessary to assure Lender's priority in or to any insurance described in Section 4.1 as and when required by Lender).

9.3 (d)    Notify Lender within 2 Business Days of any default under, or of the termination of, any Purchase Commitment relating to any Pledged Asset or Eligible Mortgage Pool.

9.3 (e)    Promptly comply in all respects with the terms and conditions of all Purchase Commitments, and all extensions, renewals and modifications or substitutions of or to all Purchase Commitments. Deliver or cause to be delivered to the Investor the Pledged Assets to be sold under each Purchase Commitment not later than the mandatory delivery date of the Pledged Assets under the Purchase Commitment.

9.3 (f)    Prior to the origination by Borrower of any Pledged Loans for sale to Fannie Mae, enter into an agreement among Borrower, Lender and Fannie Mae, pursuant to which Fannie Mae agrees to send all cash proceeds of Pledged Loans sold by Borrower to Fannie Mae to the Cash Collateral Account.

9.3 (g)    Prior to the origination by Borrower of any Pledged Loan to be registered on the MERS system, obtain the approval of Lender and enter into an Electronic Tracking Agreement.

9.3 (h)    Compare the names of every mortgagor, guarantor and other obligor of every Mortgage Loan, together with appropriate identifying information concerning those Persons obtained by Borrower, against every Restriction List, and make certain that none of the mortgagors, guarantors or other obligors of any Mortgage Loan is a Person named in any Restriction List and to whom the provision of financial services is prohibited or otherwise restricted by applicable law.

## 9.4.    Special Negative Covenants Concerning Warehousing Collateral

As long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed, Borrower must not, either directly or indirectly, without the prior written consent of Lender:

9.4 (a)    Amend, modify, or waive any of the terms and conditions of, or settle or compromise any claim in respect of, any Pledged Asset.

9.4 (b)    Sell, transfer or assign, or grant any option with respect to, or pledge (except under this Agreement and, with respect to each Pledged Asset, the related Purchase Commitment) any of the Collateral or any interest in any of the Collateral.

9.4 (c)   Make any compromise, adjustment or settlement in respect of any of the Collateral or accept any consideration other than cash in payment or liquidation of the Collateral.

**End of Article 9**

## 10.   DEFAULTS; REMEDIES

### 10.1.  Events of Default

The occurrence of any of the following is an event of default ("Event of Default"):

10.1 (a)  Borrower fails to pay the principal of any Warehousing Advance when due, whether at stated maturity, by acceleration, or otherwise; or fails to pay any installment of interest on any Warehousing Advance within 9 days after the date of Lender's invoice; or fails to pay, within any applicable grace period, any other amount due under this Agreement or any other Obligation of Borrower to Lender.

10.1 (b)  Borrower fails to perform or comply with any term or condition applicable to it contained in Sections 7.4 or 7.14 or in any Section of Article 8.

10.1 (c)  The suspension, revocation or termination of Borrower's eligibility, in any respect, as lender, seller/servicer or issuer as described under Section 9.1 or of any other license or approval required for Borrower to engage in the business of originating, acquiring and, if applicable, servicing Mortgage Loans; or the imposition of any other adverse regulatory or administrative action or sanction on or against Borrower by any agency, board, bureau, commission, instrumentality or other administrative or regulatory body (in each case, whether federal, state or local, domestic or foreign) that could result in a material adverse change in Borrower's business, operations, assets or financial condition as a whole or that could affect the validity or enforceability of any Pledged Loan.

10.1 (d)  Any representation or warranty made or deemed made by Borrower under this Agreement, in any other Loan Document or in any written statement or certificate at any time given by Borrower, other than the representations and warranties set forth in Article 9 with respect to specific Pledged Assets, is inaccurate or incomplete in any material respect on the date as of which it is made or deemed made.

10.1 (e)  Borrower defaults in the performance of or compliance with any term contained in this Agreement or any other Loan Document other than those referred to in Sections 10.1(a), 10.1(b), 10.1(c) or 10.1(d) and such default has not been remedied or waived within 15 days, in the case of a default in the performance of or compliance with Sections 7.2 and 7.3, and within 30 days in all other cases, after the earliest of (1) receipt by Borrower of Notice from Lender of that default, (2) receipt by Lender of Notice from Borrower of that default or (3) the date Borrower should have notified Lender of that default under Section 7.7(c) or 7.7(d).

10.1 (f)  Borrower or any of its Subsidiaries fails to pay, or defaults in the payment of any principal or interest on, any other indebtedness or any contingent obligation within any applicable grace period; breaches or defaults with respect to any other material term of any other indebtedness or of any loan agreement, mortgage, indenture or other agreement relating to that indebtedness, if the effect of that breach or default is to cause, or to permit the holder or holders of that indebtedness (or a trustee on behalf of such holder or holders) to cause, indebtedness of Borrower or its Subsidiaries in the aggregate amount of $50,000 or more to become or be declared due before its stated maturity (upon the giving or receiving of notice, lapse of time, both, or otherwise).

10.1 (g)  An "event of default" (however defined) occurs under any agreement between Borrower and Lender or between Borrower and GMAC or any GMAC Affiliate other than this Agreement and the other Loan Documents.

10.1 (h)  A case (whether voluntary or involuntary) is filed by or against Borrower or any Subsidiary of Borrower or any Guarantor under any applicable bankruptcy, insolvency or other similar federal or state law; or a court of competent jurisdiction appoints a receiver (interim or permanent), liquidator, sequestrator, trustee, custodian or other officer having similar powers over Borrower or any Subsidiary of Borrower or any Guarantor, or over all or a substantial part of their respective properties or assets; or Borrower or any Subsidiary of Borrower or any Guarantor (1) consents to the appointment of or possession by a receiver (interim or permanent), liquidator, sequestrator, trustee, custodian or other officer having similar powers over Borrower or any Subsidiary of Borrower or any Guarantor, or over all or a substantial part of their respective properties or assets, (2) makes an assignment for the benefit of creditors, or (3) fails, or admits in writing its inability, to pay its debts as those debts become due.

10.1 (i)  Borrower fails to perform any contractual obligation to repurchase Mortgage Loans, if such obligations in the aggregate exceed $500,000.

10.1 (j)  Any money judgment, writ or warrant of attachment or similar process involving an amount in excess of $50,000  is entered or filed against Borrower or any of its Subsidiaries or any of their respective properties or assets and remains undischarged, unvacated, unbonded or unstayed for a period of 30 days or 5 days before the date of any proposed sale under that money judgment, writ or warrant of attachment or similar process.

10.1 (k)  Any order, judgment or decree decreeing the dissolution of Borrower or any non-individual Guarantor is entered and remains undischarged or unstayed for a period of 20 days.

10.1 (l)  Borrower purports to disavow any of its Obligations or contests the validity or enforceability of any Loan Document.

10.1 (m)  Any Guarantor purports to disavow any of its obligations under its Guaranty or contests the validity or enforceability of the Guaranty.

10.1 (n)  Any individual Guarantor dies or becomes incapacitated.

10.1 (o)  Lender's security interest on any portion of the Collateral becomes unenforceable or otherwise impaired.

10.1 (p)  A material adverse change occurs in Borrower's financial condition, business, properties or assets, operations or prospects, or in Borrower's ability to repay the Obligations.

10.1 (q)  Any Lien for any tax, assessment or other governmental charge is filed or is otherwise enforced against Borrower or any of its property, including any of the Collateral, other than a Lien for taxes, assessments or other governmental charges on real property that does not secure or constitute and has not secured or constituted a Pledged Asset.

10.1 (r)  A Change of Control occurs with respect to Borrower.

10.1 (s) A Change of Control occurs with respect to any non-individual Guarantor.

## 10.2.  Remedies

10.2 (a)  If an Event of Default described in Section 10.1(h) occurs with respect to Borrower, the Warehousing Commitment will automatically terminate and the unpaid principal amount of and accrued interest on the Warehousing Note and all other Obligations will

automatically become immediately due and payable, without presentment, demand or other Notice or requirements of any kind, all of which Borrower expressly waives.

10.2 (b)   If any other Event of Default occurs, Lender may, by Notice to Borrower, terminate the Warehousing Commitment and declare the Obligations to be immediately due and payable.

10.2 (c)   If any Event of Default occurs, Lender may also take any of the following actions:

(1)   Foreclose upon or otherwise enforce its security interest in and Lien on the Collateral to secure all payments and performance of the Obligations in any manner permitted by law or provided for in the Loan Documents.

(2)   Notify all obligors under any of the Collateral that the Collateral has been assigned to Lender (or to another Person designated by Lender) and that all payments on that Collateral are to be made directly to Lender (or such other Person); settle, compromise or release, in whole or in part, any amounts any obligor or Investor owes on any of the Collateral on terms acceptable to Lender; enforce payment and prosecute any action or proceeding involving any of the Collateral; and where any Collateral is in default, foreclose on and enforce any Liens securing that Collateral in any manner permitted by law and sell any property acquired as a result of those enforcement actions.

(3)   Prepare and submit for filing Uniform Commercial Code amendment statements evidencing the assignment to Lender or its designee of any Uniform Commercial Code financing statement filed in connection with any item of Collateral.

(4)   Act, or contract with a third party to act at Borrower's expense, as servicer or subservicer of Collateral requiring servicing and perform all obligations required under any Collateral, including Servicing Contracts and Purchase Commitments.

(5)   Require Borrower to assemble and make available to Lender the Collateral and all related books and records at a place designated by Lender.

(6)   Enter onto property where any Collateral or related books and records are located and take possession of those items with or without judicial process; and obtain access to Borrower's data processing equipment, computer hardware and software relating to the Collateral and use all of the foregoing and the information contained in the foregoing in any manner Lender deems necessary for the purpose of effectuating its rights under this Agreement and any other Loan Document.

(7)   Before the disposition of the Collateral, prepare it for disposition in any manner and to the extent Lender deems appropriate.

(8)   Exercise all rights and remedies of a secured creditor under the Uniform Commercial Code of Minnesota or other applicable law, including selling or otherwise disposing of all or any portion of the Collateral at one or more public or private sales, whether or not the Collateral is present at the place of sale, for cash or credit or future delivery, on terms and conditions and in the manner as Lender may determine, including sale under any applicable Purchase Commitment. Borrower waives any right it may have to prior notice of the sale of all or any portion of the Collateral to the extent allowed by applicable law. If notice is required under applicable law, Lender will give Borrower not less than 10 days' notice of any public sale or of the date after which any private sale may

be held. Borrower agrees that 10 days' notice is reasonable notice. Lender may, without notice or publication, adjourn any public or private sale one or more times by announcement at the time and place fixed for the sale, and the sale may be held at any time or place announced at the adjournment. In the case of a sale of all or any portion of the Collateral on credit or for future delivery, the Collateral sold on those terms may be retained by Lender until the purchaser pays the selling price or takes possession of the Collateral. Lender has no liability to Borrower if a purchaser fails to pay for or take possession of Collateral sold on those terms, and in the case of any such failure, Lender may sell the Collateral again upon notice complying with this Section.

(9)      Instead of or in conjunction with exercising the power of sale authorized by Section 10.2(c)(8), Lender may proceed by suit at law or in equity to collect all amounts due on the Collateral, or to foreclose Lender's Lien on and sell all or any portion of the Collateral pursuant to a judgment or decree of a court of competent jurisdiction.

(10)     Proceed against Borrower on the Warehousing Note or against any Guarantor under the Guaranty.

(11)     Retain all excess proceeds from the sale or other disposition of the Collateral, and apply them to the payment of the Obligations under Section 10.3.

10.2 (d) Lender will incur no liability as a result of the commercially reasonable sale or other disposition of all or any portion of the Collateral at any public or private sale or other disposition. Borrower waives (to the extent permitted by law) any claims it may have against Lender arising by reason of the fact that the price at which the Collateral may have been sold at a private sale was less than the price that Lender might have obtained at a public sale, or was less than the aggregate amount of the outstanding Warehousing Advances, accrued and unpaid interest on those Warehousing Advances, and unpaid fees, even if Lender accepts the first offer received and does not offer the Collateral to more than one offeree. Borrower agrees that any sale of Collateral under the terms of a Purchase Commitment, or any other disposition of Collateral arranged by Borrower, whether before or after the occurrence of an Event of Default, will be deemed to have been made in a commercially reasonable manner.

10.2 (e) Borrower acknowledges that Mortgage Loans are collateral of a type that is the subject of widely distributed standard price quotations and that Mortgage-backed Securities are collateral of a type that is customarily sold on a recognized market. Borrower waives any right it may have to prior notice of the sale of Pledged Securities, and agrees that Lender may purchase Pledged Loans and Pledged Securities at a private sale of such Collateral.

10.2 (f) Borrower specifically waives and releases (to the extent permitted by law) any equity or right of redemption, stay or appraisal that Borrower has or may have under any rule of law or statute now existing or adopted after the date of this Agreement, and any right to require Lender to (1) proceed against any Person, (2) proceed against or exhaust any of the Collateral or pursue its rights and remedies against the Collateral in any particular order or (3) pursue any other remedy within its power. Lender is not required to take any action to preserve any rights of Borrower against holders of mortgages having priority to the Lien of any Mortgage or Security Agreement included in the Collateral or to preserve Borrower's rights against other prior parties.

10.2 (g) Lender may, but is not obligated to, advance any sums or do any act or thing necessary to uphold or enforce the Lien and priority of, or the security intended to be afforded by,

any Mortgage or Security Agreement included in the Collateral, including payment of delinquent taxes or assessments and insurance premiums. All advances, charges, costs and expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Lender in exercising any right, power or remedy conferred by this Agreement, or in the enforcement of this Agreement, together with interest on those amounts at the Default Rate, from the time paid by Lender until repaid by Borrower, are deemed to be principal outstanding under this Agreement and the Warehousing Note.

10.2 (h)  No failure or delay on the part of Lender to exercise any right, power or remedy provided in this Agreement or under any other Loan Document, at law or in equity, will operate as a waiver of that right, power or remedy. No single or partial exercise by Lender of any right, power or remedy provided under this Agreement or any other Loan Document, at law or in equity, precludes any other or further exercise of that right, power or remedy by Lender, or Lender's exercise of any other right, power or remedy. Without limiting the foregoing, Borrower waives all defenses based on the statute of limitations to the extent permitted by law. The remedies provided in this Agreement and the other Loan Documents are cumulative and are not exclusive of any remedies provided at law or in equity.

10.2 (i)  Borrower grants Lender a nonexclusive, worldwide and royalty free, license or other right to use, or otherwise exploit all of Borrower's rights in or to any and all, software, computer programs, other programs, labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks and advertising matter, franchises or any property of a similar nature, in each case, as Lender deems necessary or appropriate to the disposition of any Collateral.

## 10.3.  Application of Proceeds

Lender may apply the proceeds of any sale, disposition or other enforcement of Lender's security interest in and Lien on all or any portion of the Collateral to the payment of the Obligations in the order Lender determines in its sole discretion. From and after the indefeasible payment to Lender of all of the Obligations, any remaining proceeds of the Collateral will be paid to Borrower, or to its successors or assigns, or as a court of competent jurisdiction may direct. If the proceeds of any sale, disposition or other enforcement of the Collateral are insufficient to cover the costs and expenses of that sale, disposition or other enforcement and payment in full of all Obligations, Borrower is liable for the deficiency.

## 10.4.  Lender Appointed Attorney-in-Fact

Borrower appoints Lender its attorney-in-fact, with full power of substitution, for the purpose of carrying out the provisions of this Agreement, the Warehousing Note and the other Loan Documents and taking any action and executing any instruments that Lender deems necessary or advisable to accomplish that purpose. Borrower's appointment of Lender as attorney-in-fact is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, Lender may give notice of its security interest in and Lien on the Collateral to any Person, either in Borrower's name or in its own name, endorse all Pledged Assets payable to the order of Borrower, change or cause to be changed the book-entry registration or name of subscriber or investor on any Pledged Security, prepare and submit for filing Uniform Commercial Code amendment statements with respect to any Uniform Commercial Code financing statements filed in connection with any item of Collateral or receive, endorse and collect all checks made payable to the order of Borrower representing payment on account of the principal of or interest on, or the proceeds of sale of, any of the Pledged Assets and give full discharge for those transactions.

## 10.5.  Right of Set-Off

If Borrower defaults in the payment of any Obligation or in the performance of any of its duties under the Loan Documents, Lender may, without Notice to or demand on Borrower (which Notice or demand Borrower expressly waives), set-off, appropriate or apply any property of Borrower held at any time by Lender, or any indebtedness at any time owed by Lender to or for the account of Borrower, against the Obligations, whether or not those Obligations have matured.

**End of Article 10**

## 11.    MISCELLANEOUS

### 11.1.  Notices

Except where telephonic Notice is expressly authorized by this Agreement, all communications required or permitted to be given or made under this Agreement ("Notices") must be in writing and must be sent by manual delivery, facsimile transmission, overnight courier or United States mail (postage prepaid), addressed as follows (or at such other address as may be designated by Borrower or Lender in a Notice to the other):

|  |  |
|---|---|
| If to Borrower: | Home Mortgage, Inc.<br>485 South Frontage Road<br>Suite 200<br>Burr Ridge, IL  60527<br>Attention: Larry Luckett, CEO<br>Facsimile: (630) 522-0150 |
| If to Lender: | GMAC Bank<br>7501 Wisconsin Avenue<br>Bethesda, MD  20814<br>Attention: Senior Credit Officer<br>Facsimile: (301) 215-6288 |

All periods of Notice will be measured from the date of delivery if delivered manually or by facsimile, from the first Business Day after the date of sending if sent by overnight courier or from 4 days after the date of mailing if sent by United States mail, except that Notices to Lender under Article 2 and Section 3.3(f) will be deemed to have been given only when actually received by Lender. Borrower authorizes Lender to accept Borrower's bailee pledge agreements, Warehousing Advance Requests, shipping requests, wire transfer instructions and security delivery instructions transmitted to Lender by facsimile or by RFConnects Delivery, and those documents, when transmitted to Lender by facsimile or RFConnects Delivery, have the same force and effect as the originals.

### 11.2.  Reimbursement of Expenses; Indemnity

11.2 (a) Borrower must:  (a) pay Lender a document production fee in connection with the preparation and negotiation of this Agreement and the other Loan Documents; (b) pay such additional document production fees as Lender may require and all out-of-pocket costs and expenses of Lender, including reasonable fees, service charges and disbursements of counsel to Lender (including allocated costs of internal counsel whether or not out-of-pocket), in connection with the amendment, enforcement and administration of this Agreement, the Warehousing Note and the other Loan Documents (including any action taken by Lender in connection with any bankruptcy case in which Borrower or any of its Affiliates or in which any Guarantor is a debtor), the making, repayment and payment of interest on the Warehousing Advances and the payment of all other Obligations under Loan Documents; and (c) indemnify, pay and hold harmless Lender and any other holder of the Warehousing Note from and against all present and future stamp, documentary and other similar taxes with respect to the foregoing matters and save Lender and any other holder of the Warehousing Note harmless from and against all liabilities with respect to or resulting from any delay or omission to pay such taxes.

11.2(b)  Borrower must: (a) indemnify, pay and hold harmless Lender and any other holder of the Warehousing Note, and all of their respective Affiliates, officers, directors, employees or agents and the officers, directors, employees or agents of such Affiliates (collectively, the "Indemnitees") from and against the misapplication (whether to an incorrect Person or account or in an incorrect amount) of any wire transfer or check issued by or on behalf of Lender in accordance with Borrower instructions contained in any Warehousing Advance Request and against any loss, misplacement, misapplication or destruction of any check after Borrower or any applicable closing agent, escrow agent, title company, attorney or other authorized Person receives such check (it being understood that any such wire transfer or check will constitute a Warehousing Advance under this Agreement and will be an Obligation of Borrower under this Agreement notwithstanding any indemnity described in this Section); and (b) indemnify, pay and hold harmless the Indemnitees from and against all liabilities, obligations, losses, damages, penalties, judgments, suits, costs, expenses and disbursements of every kind or nature (including the reasonable fees and disbursements of counsel to the Indemnitees (including allocated costs of internal counsel) in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnitees have been designated as parties to such proceeding) that may be imposed upon, incurred by or asserted against such Indemnitees in any manner relating to or arising out of this Agreement, the Warehousing Note or any other Loan Document or any of the transactions contemplated by this Agreement, the Warehousing Note and the other Loan Documents, including against all liabilities, obligations, losses, damages, penalties, judgments, suits, costs, expenses and disbursements of every kind or nature (including the reasonable fees and disbursements of counsel to the Indemnitees (including allocated costs of internal counsel) in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnitees have been designated as parties to such proceeding) arising from any breach of Sections 9.2 (bb) or 9.4 (i) or the making of any Mortgage Loan in which any mortgagor, guarantor or other obligor is a Person named in any Restriction List and to whom the provision of financial services is prohibited or otherwise restricted by applicable law (collectively, the "Indemnified Liabilities"), except that Borrower has no obligation under this Agreement to indemnify any Indemnitee for that Indemnitee's gross negligence or willful misconduct.

11.2(c)  If, after the date of this Agreement, due to either (a) the effectiveness or introduction of, or any change in, or any change in the interpretation of, any law or regulation by any court or administrative or governmental authority charged with administration of such law, regulation or interpretation or (ii) compliance with any guideline or request from any central bank or other governmental authority or official (whether or not having the force of law and including, in any event, any law, regulation or interpretation with respect to capital adequacy or request in connection with any of the foregoing), there is an increase in the cost to Lender of making, funding or maintaining any Warehousing Advance or the Warehousing Commitment under this Agreement or Lender is required to make a payment calculated by reference to the principal of, or interest on, any Warehousing Advance made by it or the Warehousing Commitment (other than any such increased cost, reduction in the amount receivable, or payment required to be made resulting from the imposition or an increase in the rate of any taxes unless such taxes are payable by Borrower under this Section 11.2 or there is an increase in the amount of capital required or expected to be maintained by Lender or any Person controlling Lender and Lender reasonably determines that the amount of such capital is increased by or based upon the existence of Lender's agreement, in its discretion, to make or maintain Warehousing Advances under this Agreement and other similar agreements and facilities), then Borrower must, from time to time, upon demand by Lender, immediately pay to Lender additional amounts sufficient to compensate Lender for any such increased cost or increase in capital (to the extent Lender reasonably determines such increase in capital

to be allocable to the existence of Lender's obligations and agreements under this Agreement). Lender's determination of such amounts (and the calculation of such amounts) as of any date of determination is conclusive and binding, absent manifest error.

11.2(d) To the extent that any of the undertakings to indemnify, pay and hold harmless described in this Section 11.2 may be unenforceable because it is violative of any law or public policy, Borrower must contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all amounts payable or indemnified against under Sections 11.2(a), (b) and (c). The agreements of Borrower contained in this Article survive the expiration or termination of this Agreement and the payment in full of the Warehousing Note. Attorneys' fees and disbursements incurred in enforcing or on appeal from a judgment under this Agreement are recoverable separately from and in addition to any other amount included in such judgment, and this clause is intended to be severable from the other provisions of this Agreement and to survive and not be merged into such judgment.

## 11.3. Financial Information

All financial statements and reports furnished to Lender under this Agreement must be prepared in accordance with GAAP, applied on a basis consistent with that applied in preparing the financial statements as at the end of and for Borrower's most recent fiscal year (except to the extent otherwise required to conform to good accounting practice).

## 11.4. Terms Binding Upon Successors; Survival of Representations

The terms and provisions of this Agreement are binding upon and inure to the benefit of Borrower, Lender and their respective successors and assigns. All of Borrower's representations, warranties, covenants and agreements survive the making of any Warehousing Advance and, except where a longer period is set forth in this Agreement, remain effective for as long as the Warehousing Commitment is outstanding or there remain any Obligations to be paid or performed.

## 11.5. Assignment

Borrower cannot assign this Agreement. Lender may at any time, without Notice to or the consent of Borrower, transfer or assign, in whole or in part, its interest in this Agreement and the Warehousing Note along with Lender's security interest in and Lien on any of the Collateral, and any assignee of Lender may enforce this Agreement, the Warehousing Note and its security interest in and Lien on the Collateral assigned.

## 11.6. Amendments

Except as otherwise provided in this Agreement, this Agreement may not be amended, modified or supplemented unless the amendment, modification or supplement is set forth in a writing signed by both Borrower and Lender.

## 11.7. Governing Law

This Agreement and the other Loan Documents are governed by the laws of the State of Minnesota, without reference to its principles of conflicts of laws.

## 11.8.  Participations

Lender may at any time sell, assign or grant participations in, or otherwise transfer to any other Person ("Participant"), all or part of the Obligations. Without limiting Lender's exclusive right to collect and enforce the Obligations, Borrower agrees that each participation will give rise to a debtor-creditor relationship between Borrower and the Participant, and Borrower authorizes each Participant, upon the occurrence of an Event of Default, to proceed directly by right of setoff, banker's lien or otherwise, against any assets of Borrower that may be held by that Participant. Borrower authorizes Lender to disclose to prospective and actual Participants all information in Lender's possession concerning Borrower, this Agreement and the Collateral.

## 11.9.  Relationship of the Parties

This Agreement provides for the making and repayment of Warehousing Advances by Lender (in its capacity as a lender) and Borrower (in its capacity as a borrower), for the payment of interest on those Warehousing Advances and for the payment of certain fees by Borrower to Lender. The relationship between Lender and Borrower is limited to that of creditor and secured party on the part of Lender and of debtor on the part of Borrower. The provisions of this Agreement and the other Loan Documents for compliance with financial covenants and the delivery of financial statements and other operating reports are intended solely for the benefit of Lender to protect its interest as a creditor and secured party. Nothing in this Agreement creates or may be construed as permitting or obligating Lender to act as a financial or business advisor or consultant to Borrower, as permitting or obligating Lender to control Borrower or to conduct Borrower's operations, as creating any fiduciary obligation on the part of Lender to Borrower, or as creating any joint venture, partnership, agency or other relationship between Lender and Borrower other than as explicitly and specifically stated in the Loan Documents. Borrower acknowledges that it has had the opportunity to obtain the advice of experienced counsel of its own choice in connection with the negotiation and execution of the Loan Documents and to obtain the advice of that counsel with respect to all matters contained in the Loan Documents, including the waivers of jury trial and of punitive, consequential, special or indirect damages contained in Sections 11.17 and 11.18, respectively.  Borrower further acknowledges that it is experienced with respect to financial and credit matters and has made its own independent decisions to apply to Lender for credit and to execute and deliver this Agreement.

## 11.10. Severability

If any provision of this Agreement or any other Loan Document is declared to be illegal or unenforceable in any respect, that provision is null and void and of no force and effect to the extent of the illegality or unenforceability, and does not affect the validity or enforceability of any other provision of the Agreement or such other Loan Document.

## 11.11. Consent to Credit References

Borrower consents to the disclosure of information regarding Borrower and its Subsidiaries and their relationships with Lender to Persons making credit inquiries to Lender. This consent is revocable by Borrower at any time upon Notice to Lender as provided in Section 11.1.

## 11.12. Consent to Information Sharing with GMAC Affiliates

Borrower consents to the disclosure to GMAC and any and all GMAC Affiliates of any and all information regarding Borrower and its Subsidiaries and their relationships with GMAC, Lender or any other GMAC Affiliates.

### 11.13. Counterparts

This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together constitute but one and the same instrument.

### 11.14. Headings/Captions

The captions or headings in this Agreement and the other Loan Documents are for convenience only and in no way define, limit or describe the scope or intent of any provision of this Agreement or any other Loan Document.

### 11.15. Entire Agreement

This Agreement, the Warehousing Note and the other Loan Documents represent the final agreement among the parties with respect to their subject matter, and may not be contradicted by evidence of prior or contemporaneous oral agreements among the parties. There are no oral agreements among the parties with respect to the subject matter of this Agreement, the Warehousing Note and the other Loan Documents.

### 11.16. Consent to Jurisdiction

AT THE OPTION OF LENDER, THIS AGREEMENT, THE WAREHOUSING NOTE AND THE OTHER LOAN DOCUMENTS MAY BE ENFORCED IN ANY STATE OR FEDERAL COURT WITHIN THE STATE OF MINNESOTA. BORROWER CONSENTS TO THE JURISDICTION AND VENUE OF THOSE COURTS, AND WAIVES ANY OBJECTION TO THE JURISDICTION OR VENUE OF THOSE COURTS, INCLUDING THE OBJECTION THAT VENUE IN THOSE COURTS IS NOT CONVENIENT. ANY SUCH SUIT, ACTION OR PROCEEDING MAY BE COMMENCED AND INSTITUTED BY SERVICE OF PROCESS UPON BORROWER BY FIRST CLASS REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER AT ITS ADDRESS LAST KNOWN TO LENDER. BORROWER'S CONSENT AND AGREEMENT UNDER THIS SECTION DOES NOT AFFECT LENDER'S RIGHT TO ACCOMPLISH SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY OTHER JURISDICTION OR COURT. IN THE EVENT BORROWER COMMENCES ANY ACTION IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, LENDER AT ITS OPTION MAY HAVE THE CASE TRANSFERRED TO A STATE OR FEDERAL COURT WITHIN THE STATE OF MINNESOTA OR, IF A TRANSFER CANNOT BE ACCOMPLISHED UNDER APPLICABLE LAW, MAY HAVE BORROWER'S ACTION DISMISSED WITHOUT PREJUDICE.

### 11.17. Waiver of Jury Trial

BORROWER AND LENDER EACH PROMISES AND AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY A JURY, AND FULLY WAIVES ANY RIGHT TO TRIAL BY JURY TO THE EXTENT THAT ANY SUCH RIGHT NOW EXISTS OR ARISES AFTER THE DATE OF THIS AGREEMENT. THIS WAIVER OF THE RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN, KNOWINGLY AND VOLUNTARILY, BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE FOR WHICH THE RIGHT TO TRIAL BY JURY WOULD OTHERWISE APPLY. LENDER AND BORROWER ARE EACH AUTHORIZED AND DIRECTED TO SUBMIT THIS AGREEMENT TO ANY COURT HAVING JURISDICTION OVER THE SUBJECT MATTER AND THE PARTIES TO THIS AGREEMENT AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF THE RIGHT TO TRIAL BY

JURY. FURTHER, BORROWER AND LENDER EACH CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF THE OTHER PARTY, INCLUDING THE OTHER PARTY'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, TO ANY OF ITS REPRESENTATIVES OR AGENTS THAT THE OTHER PARTY WILL NOT SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

## 11.18. Waiver of Punitive, Consequential, Special or Indirect Damages

BORROWER AND LENDER EACH WAIVES ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES FROM THE OTHER PARTY OR ANY OF THE OTHER PARTY'S AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS (OR THE OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS OF SUCH AFFILIATES) WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER PARTY OR ANY OF THE OTHER PARTY'S AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS (OR THE OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS OF SUCH AFFILIATES) WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT. THIS WAIVER OF THE RIGHT TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES IS KNOWINGLY AND VOLUNTARILY GIVEN BY EACH OF BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE FOR WHICH THE RIGHT TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES WOULD OTHERWISE APPLY. EACH OF BORROWER AND LENDER IS AUTHORIZED AND DIRECTED TO SUBMIT THIS AGREEMENT TO ANY COURT HAVING JURISDICTION OVER THE SUBJECT MATTER AND THE PARTIES TO THIS AGREEMENT AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF THE RIGHT TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES.

**End of Article 11**

K:\RFCCOMMON\LEGAL\WLD\CUSTOMERS-DATABASE\HOME MORTGAGE, INC\WH GMAC BANK\0 WC&S AGMT (8-20-2007)\IN PROCESS\1-AGREEMENT.DOC
Dated: 8/20/2007
Amended: 1/31/2008

Page 11-6

## 12.    DEFINITIONS

### 12.1.    Defined Terms

As used in this Agreement and the Exhibits to this Agreement, the following terms have the following meanings or, as applicable, the meanings given to those terms elsewhere in this Agreement or in Exhibits to this Agreement:

"Advance Rate" means, with respect to any Eligible Asset, the Advance Rate set forth in Exhibit H for that type of Eligible Asset.

"Affiliate" means, when used with reference to any Person, (a) each Person that, directly or indirectly, controls, is controlled by or is under common control with, the Person referred to, (b) each Person that beneficially owns or holds, directly or indirectly, 5% or more of any class of voting Equity Interests of the Person referred to, (c) each Person, 5% or more of the voting Equity Interests of which is beneficially owned or held, directly or indirectly, by the Person referred to, and (d) each of such Person's officers, managers, directors, joint venturers and partners.  For these purposes, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Person in question, whether by contract, ownership of voting securities, membership interests or otherwise.

"Aged Mortgage Loan" means an Aged Pledged Asset that is also a Pledged Loan.

"Aged Pledged Asset" means a Pledged Asset that has been outstanding for longer than the Standard Warehouse Period, provided that the applicable Pledged Asset is permitted to be outstanding beyond the Standard Warehouse Period under Exhibit H.

"Aged Warehouse Period" means, for any Pledged Asset, the maximum number of days a Warehousing Advance against that type of Aged Pledged Asset can remain outstanding under Exhibit H (beginning on the same date as the Standard Warehouse Period).

"Agency Security" means a Mortgage-backed Security issued or guaranteed by Fannie Mae, Freddie Mac or Ginnie Mae.

"Aggregate Warehousing Collateral Value" means, as of any date of determination, the total Warehousing Collateral Value of all Pledged Assets then subject to a perfected, first-priority Lien in favor of Lender under this Agreement.

"Agreement" means this Warehousing Credit and Security Agreement, including each Exhibit and Schedule to this Agreement, either as originally executed or as it or they may be amended, restated, renewed or replaced.

"Appraised Property Value" means with respect to an interest in real property, the then current fair market value of the real property and any improvements on it as of a recent date determined in accordance with Title XI of FIRREA by a qualified appraiser who is a member of the American Institute of Real Estate Appraisers or other group of professional appraisers.

"Approved Custodian" means a pool custodian or other Person that Lender deems acceptable, in its sole discretion, to hold Mortgage Loans for inclusion in a Mortgage Pool or to hold Mortgage Loans as agent for an Investor that has issued a Purchase Commitment for those Mortgage Loans.

"Audited Statement Date" means the date of Borrower's most recent audited financial statements (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) delivered to Lender under this Agreement.

"Base Warehousing Commitment Amount" has the meaning set forth in Exhibit H.

"Borrower" has the meaning set forth in the first paragraph of this Agreement.

"Business Day" means any day other than Saturday, Sunday or any other day on which national banking associations are closed for business.

"Buydown" has the meaning set forth in Section 3.4.

"Calendar Quarter" means the 3 month period beginning on each January 1, April 1, July 1 or October 1.

"Cash Collateral Account" means a demand deposit account maintained at the Funding Bank in Lender's name and designated for receipt of the proceeds of the sale or other disposition of Collateral.

"Certifying Financial Officer" means, with respect to a Person, the chief financial officer or other person or entity having principal responsibility for such Person's financial reporting.

"Certifying Officer" means, with respect to a Person (a) if the matters being certified to relate principally to the financial performance of or accuracy of financial reporting with respect to the Person referred to, the Certifying Financial Officer of such Person, and (b) otherwise, the person or entity (which may include, as applicable, a corporate secretary, managing member or other applicable officer) designated in such Person's Organizational Documents as being authorized to provide the applicable certification.

"Change of Control" means:

    (a)    with respect to Borrower:

        (i)    the Person or Persons owning the Majority Voting Rights on the Closing Date ceases to own the Majority Voting Rights; or

        (ii)    the Person or Persons owning the Majority Voting Rights on the Closing Date ceases to have the right to freely and fully exercise the Majority Voting Rights; or

        (iii)    the Person or Persons having day-to-day control of Borrower's operations on the Closing Date ceases to have such day-to-day control; or

        (iv)    Howard J. Siegel ceases to own, directly or indirectly, a majority of the capital stock of Borrower.

        (iv)    Larry Luckett ceases to be the Chief Executive Officer of Borrower.

    (b)    With respect to any other Person:

        (i)    the Person or Persons owning the Majority Voting Rights on the Closing Date ceases to own the Majority Voting Rights; or

(ii)     the Person or Persons owning the Majority Voting Rights on the Closing Date ceases to have the right to freely and fully exercise the Majority Voting Rights.

"Check Disbursement Account" means a demand deposit account maintained at the Funding Bank in Borrower's name and under the control of Lender for clearing checks written by Borrower to fund Mortgage Loans funded by Warehousing Advances.

"Check Fee" has the meaning set forth in Section 3.6.

"Closing Date" has the meaning set forth in the Recitals to this Agreement.

"Collateral" has the meaning set forth in Section 4.1.

"Collateral Documents" means, with respect to each Mortgage Loan, (a) the Mortgage Note, the Mortgage and all other documents including, if applicable, any Security Agreement, executed in connection with or relating to the Mortgage Loan, (b) as applicable, the original lender's ALTA Policy of Title Insurance or its equivalent, documents evidencing the FHA Commitment to Insure, the VA Guaranty or private mortgage insurance, the appraisal, the Regulation Z statement, the environmental assessment, the engineering report, certificates of casualty or hazard insurance, credit information on the maker of the Mortgage Note, the HUD-1 or corresponding purchase advice, (c) any other document listed in Exhibit B and (d) any other document that is customarily desired for inspection or transfer incidental to the purchase of any Mortgage Note by an Investor or that is customarily executed by the seller of a Mortgage Note to an Investor.

"Committed Purchase Price" means for an Eligible Loan (a) the dollar price as set forth in the Purchase Commitment or, if the price is not expressed in dollars, the product of the Mortgage Note Amount multiplied by the price (expressed as a percentage) as set forth in the Purchase Commitment for the Eligible Loan, or (b) if the Eligible Loan is to be used to back an Agency Security, an amount equal to the product of the Mortgage Note Amount multiplied by the price (expressed as a percentage) as set forth in the Purchase Commitment for the Agency Security.

"Compliance Certificate" means a certificate executed on behalf of Borrower by its Certifying Financial Officer, substantially in the form of Exhibit E.

"Covered Debt Holder" means, with respect to a Person, (a) such Person's Affiliates, (b) such Person's Equity Holders, and (c) the directors, managers, officers and employees of such Person or of any general partner of such Person.

"Covered Obligor" means, with respect to a Person, (a) such Person's Affiliates, (b) such Person's Equity Holders, (c) the directors, managers, officers and employees of such Person or of any general partner of such Person.

"Credit Score" means a mortgagor's overall consumer credit rating, represented by a single numeric credit score using the Fair, Isaac consumer credit scoring system, provided by a credit repository acceptable to Lender and the Investor that issued the Purchase Commitment covering the related Mortgage Loan (if a Purchase Commitment is required by Exhibit H).

"Debt" means (a) all indebtedness or other obligations of a Person (and, if applicable, that Person's Subsidiaries, on a consolidated basis) that, in accordance with GAAP, would be included in determining total liabilities as shown on the liabilities side of a balance sheet of that Person on the date of determination, plus (b) all indebtedness or other obligations of that Person (and, if applicable, that Person's Subsidiaries, on a consolidated basis) for borrowed money or for the deferred purchase price of property or services. For purposes of calculating a Person's Debt,

Subordinated Debt due more than 6 months after the Scheduled Warehousing Maturity Date may be excluded from that Person's indebtedness.

"Default" means the occurrence of any event or existence of any condition that, but for the giving of Notice, the lapse of time or both would constitute an Event of Default.

"Default Rate" means, for any Warehousing Advance, the Interest Rate applicable to that Warehousing Advance plus 4% per annum. If no Interest Rate is applicable to a Warehousing Advance, "Default Rate" means, for that Warehousing Advance, the highest Interest Rate then applicable to any outstanding Warehousing Advance plus 4% per annum.

"Discontinued Loan" has the meaning set forth in the GMAC-RFC Client Guide.

"Distribution" means any dividend or distribution of any kind or nature made in respect of any Equity Interest in the Borrower, including any purchase or redemption of any Equity Interest in the Borrower.

"Earnings Credit" has the meaning set forth in Section 3.7.

"Electronic Advance Request" means an electronic transmission through RFConnects Delivery containing the same information as Exhibit A to this Agreement.

"Electronic Tracking Agreement" means an Electronic Tracking Agreement, on the form prescribed by Lender, among Borrower, Lender, MERS and MERSCORP, Inc.

"Eligible Asset" means an Eligible Loan or other loan or asset against which Warehousing Advances are permitted to be made under Exhibit H.

"Eligible Loan" means a Single Family Mortgage Loan against which a Warehousing Advance is permitted to be made under Exhibit H.

"Eligible Mortgage Pool" means a Mortgage Pool for which (a) an Approved Custodian has issued its initial certification, (b) there exists a Purchase Commitment covering the Agency Security to be issued on the basis of that certification and (c) the Agency Security will be delivered to Lender.

"Eligible Second Mortgage Loan" has the meaning set forth in Exhibit H.

"Equity Holder" means, with respect to a Person, any person or entity that owns an Equity Interest in the Person referred to (whether as a shareholder, member, partner, limited partner, general partner or otherwise).

"Equity Interests" means, with respect to a Person, all shares, interests, participations or other equivalents in the equity of such Person, including common stock, preferred stock, warrants, membership interests, partnership interests, limited partnership interests, convertible debentures, other debt securities which include voting rights in the Person referred to, and any and all agreements, instruments and documents convertible, in whole or in part, into any one or more of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974 and all rules and regulations promulgated under that statute, as amended, and any successor statute, rules, and regulations.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is a member of a group of which Borrower is a member and that is treated as a single employer under Section 414 of the Internal Revenue Code.

"Event of Default" means any of the conditions or events set forth in Section 10.1.

"Excess Buydown" has the meaning set forth in Section 3.4.

"Exchange Act" means the Securities Exchange Act of 1934 and all rules and regulations promulgated under that statute, as amended, and any successor statute, rules and regulations.

"Exclusionary List" means the list by that name published and updated periodically by Lender on the www.gmacresidentialfunding.com website.

"Face Amount" means, with respect to a Mortgage Loan, the original face principal amount of the related Mortgage Note.

"Fair Market Value" means, at any time for an Eligible Asset or a related Pledged Security (if the Eligible Asset is an Eligible Loan used to back a Pledged Security) as of any date of determination, the market price for such Eligible Asset or Pledged Security, determined by Lender based on market data for similar Mortgage Loans, assets or Pledged Securities and such other criteria as Lender deems appropriate in its sole discretion. Borrower acknowledges that Lender's determination of Fair Market Value is for the limited purpose of determining the value of Pledged Assets that are subject to Warehousing Advances under this Agreement, and is made without the ability to perform customary purchaser's due diligence. Borrower further acknowledges that Lender's determination of Fair Market Value is not necessarily equivalent to a determination of the fair market value of the Pledged Assets achieved by obtaining competing bids in an orderly market in which the originator/seller/servicer is in good standing under a revolving debt facility and the bidders have adequate opportunity to perform customary loan, property and servicing due diligence.

"Fannie Mae" means Fannie Mae, a corporation created under the laws of the United States, and any successor corporation or other entity.

"Federal Funds Rate" means, for each week, the effective Federal Funds Rate (per annum) of interest in effect on the first Business Day of that week, as published by Bloomberg L.P. If the Federal Funds Rate is not published by Bloomberg L.P. on the first Business Day of any week, then the term "Federal Funds Rate" means the highest Federal Funds Rate published in *The Wall Street Journal* in its regular column entitled "Money Rates" on the first Business Day of that week.

"FHA" means the Federal Housing Administration and any successor agency or other entity.

"FICA" means the Federal Insurance Contributions Act and all rules and regulations promulgated under that statute, as amended, and any successor statute, rules and regulations.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989 and all rules and regulations promulgated under that statute, as amended, and any successor statute, rules, and regulations.

"First Mortgage" means a Mortgage that constitutes a first Lien on the Mortgaged Property described in or covered by that Mortgage.

"First Mortgage Loan" means a Mortgage Loan secured by a First Mortgage.

"Freddie Mac" means the Federal Home Loan Mortgage Corporation, a corporation created under the laws of the United States, and any successor corporation or other entity.

"Funding Bank" means JPMorgan Chase or any other bank designated by Lender as a Funding Bank.

"Funding Bank Accounts" means collectively the Operating Account and any other demand deposit account from time to time established and maintained at the Funding Bank at the direction of or with the permission of Lender for purposes of facilitating (a) funding Warehousing Advances, (b) repayment of Warehousing Advances, or (c) return of excess payments with respect to a Pledged Loan, Pledged Security or other Collateral owing to Borrower under the terms of this Agreement.

"Funding Bank Agreement" means a letter agreement on the form prescribed by Lender between the Funding Bank and Borrower authorizing Lender's access to the Operating Account and the Check Disbursement Account.

"Funding Bank Fees and Charges" means each and every service charge, fee, expense or other amount from time to time charged by or owing to Funding Bank in respect of the maintenance of or any services or transactions relating to any one or more of the Funding Bank Accounts, whether paid or payable by Borrower, Lender or both.

"GAAP" means generally accepted accounting principles set forth in opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and in statements and pronouncements of the Financial Accounting Standards Board, or in opinions, statements or pronouncements of any other entity approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

"Ginnie Mae" means the Government National Mortgage Association, an agency of the United States government, and any successor agency or other entity.

"GMAC" means GMAC, LLC, a Delaware limited liability company.

"GMAC Affiliates" means, as of any date of determination, each and every Affiliate of GMAC.

"GMAC-RFC" means Residential Funding Company, LLC (f/k/a Residential Funding Corporation), a Delaware limited liability company.

"GMAC-RFC Client Guide" means the applicable loan purchase guide issued by Lender, as the same may be amended or replaced.

"GMAC-RFC Warehousing Agreement" means the Fifth Amended and Restated Warehousing Credit and Security Agreement dated as of April 1, 2007, as amended, between Borrower and GMAC-RFC.

"Government Mortgage Loan" means a closed-end First Mortgage Loan that is either HUD/FHA insured (other than a HUD 203(K) Mortgage Loan or a Title I Mortgage Loan) or VA guaranteed.

"Governors" means, with respect to a Person, the directors, managers, governors, general partner or equivalent board, group or Persons having principal control over the management and policies of the Person referred to under the terms of such Person's Organizational Documents or applicable law.

"Guarantor" means, individually and collectively, Howard J. Siegel and Larry Luckett and any other Person that after the date of this Agreement guarantees all or any portion of Borrower's Obligations.

"Guaranty" means a guaranty of all or any portion of Borrower's Obligations, either as originally executed or as it may be amended, restated, renewed or replaced. If more than one Guaranty is executed and delivered to Lender, the term "Guaranty" means each of the Guaranties and all of them.

"Hedging Arrangements" means, with respect to any Person, any agreements or other arrangements (including interest rate swap agreements, interest rate cap agreements and forward sale agreements) entered into to protect that Person against changes in interest rates or the market value of assets.

"HUD" means the Department of Housing and Urban Development, and any successor agency or other entity.

"HUD 203(K) Mortgage Loan" means an FHA-insured closed-end First Mortgage Loan to an individual obligor the proceeds of which will be used for the purpose of rehabilitating and repairing the related single family property, and which satisfies the definition of "rehabilitation loan" in 24 C.F.R. 203.50(a).

"Income" means, with respect to any Pledged Loan, any principal of such Pledged Loan then payable and all interest, dividends or other distributions payable on such Pledged Loan; and, with respect to any other Pledged Asset, any payments (including rental payments), interest, dividends or other distributions then payable on such Pledged Asset.

"Indemnified Liabilities" has the meaning set forth in Section 11.2(b).

"Indemnitees" has the meaning set forth in Section 11.2(b).

"Interest Rate" means, for any Warehousing Advance, the floating rate of interest per annum obtained by adding the Interest Rate Margin to the Interest Rate Index applicable to such Warehousing Advance in Exhibit H.

"Interest Rate Index" means, as applicable (a) LIBOR, (b) Prime Rate, or (c) Federal Funds Rate.

"Interest Rate Margin" means, with respect to a particular Sublimit, the margin over the applicable Interest Rate Index charged by Lender with respect to Warehousing Advances made against Eligible Assets within such Sublimit.

"Interim Statement Date" means the date of the most recent unaudited financial statements of Borrower (and, if applicable, Borrower's Subsidiaries, on a consolidated basis) delivered to Lender under this Agreement.

"Internal Revenue Code" means the Internal Revenue Code of 1986, Title 26 of the United States Code, and all rules, regulations and interpretations issued under those statutory provisions, as amended, and any subsequent or successor federal income tax law or laws, rules, regulations and interpretations.

"Investment Company Act" means the Investment Company Act of 1940 and all rules and regulations promulgated under that statute, as amended, and any successor statute, rules and regulations.

"Investor" means Fannie Mae, Freddie Mac or a financially responsible private institution that Lender deems acceptable, in its sole discretion, to issue Purchase Commitments with respect to a particular category of Eligible Assets.

"Investor Proceeds Buydown" has the meaning set forth in Section 3.4(b).

"JPMorgan Chase" means JPMorgan Chase Bank, National Association, Chicago, Illinois, or any successor bank.

"Lender" has the meaning set forth in the first paragraph of this Agreement.

"Leverage Ratio" means the ratio of a Person's Debt to Tangible Net Worth, except that for purposes of calculating a Person's Leverage Ratio, Debt arising under those Hedging Arrangements, to the extent of assets arising under those Hedging Arrangements, may be excluded from that Person's Debt.

"LIBOR" means, for each week, the rate of interest per annum that is equal to the arithmetic mean of the U.S. Dollar London Interbank Offered Rates for 1 month periods of certain U.S. banks as of 11:00 a.m. (London time) on the first Business Day of each week on which the London Interbank market is open, as published by Bloomberg L.P. If those interest rates are not offered or published for any period, then during that period LIBOR means the London Interbank Offered Rate for 1 month periods as published in *The Wall Street Journal* in its regular column entitled "Money Rates" on the first Business Day of each week on which the London Interbank market is open.

"Lien" means any lien, mortgage, deed of trust, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature of such an agreement and any agreement to give any security interest).

"Liquid Assets" means the following unrestricted and unencumbered assets owned by a Person (and, if applicable, that Person's Subsidiaries, on a consolidated basis) as of any date of determination: (a) cash, (b) funds on deposit in accounts with any bank located in the United States (net of the aggregate amount payable under all outstanding and unpaid checks, drafts and similar items drawn by a Person against those accounts for purposes other than funding Mortgage Loans against which Warehousing Advances have been or will be made), (c) investment grade commercial paper, (d) money market funds and (e) marketable securities, plus, in the case of Borrower (f) the amount of any Buydown that Borrower is entitled to reborrow under procedures and limitations of Section 3.4, and (g) in the absence of a Default or Event of Default, the amount of any Excess Buydown.

"Loan Documents" means this Agreement, the Warehousing Note, the Guaranty, any agreement of Borrower relating to Subordinated Debt and each other document, instrument or agreement executed by Borrower or any Guarantor, as applicable, in connection with any of those documents, instruments and agreements, as originally executed or as any of the same may be amended, restated, renewed or replaced.

"Loan Package Fee " has the meaning set forth in Section 3.6.

"Loan-to-Value Ratio" means, for any Mortgage Loan, the ratio of (a) the maximum amount that may be borrowed under the Mortgage Loan (whether or not borrowed) at the time of origination, plus the Face Amounts of all other Mortgage Loans secured by senior or pari passu Liens on the related Mortgaged Property, to (b) the Appraised Property Value of the related Mortgaged Property.

"Majority Voting Rights" means, with respect to a Person, 50.1% or more of all Voting Equity Interests in the Person referred to.

"Manufactured Home" means a structure that is built on a permanent chassis (steel frame) with the wheel assembly necessary for transportation in one or more sections to a permanent site or semi-permanent site.

"Margin Stock" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System, as amended.

"MERS" means Mortgage Electronic Registration Systems, Inc. and any successor entity.

"Miscellaneous Fees and Charges" means the Collateral Operations Fees set forth on Lender's fee schedule attached as Exhibit I and all miscellaneous disbursements, charges and expenses incurred by or on behalf of Lender for the handling and administration of Warehousing Advances and Collateral, including costs for Uniform Commercial Code, tax lien and judgment searches conducted by Lender, filing fees, charges for wire transfers and check processing charges, charges for security delivery fees, charges for overnight delivery of Collateral to Investors, recording fees, Funding Bank service fees and overdraft charges. Upon not less than 3 Business Days' prior Notice to Borrower, Lender may modify the Collateral Operations Fees set forth in Exhibit I to conform to current Lender practices and, as so modified, the revised Exhibit I will become part of this Agreement.

"Mortgage" means a mortgage or deed of trust on real property that is improved and substantially completed (including real property to which a Manufactured Home has been affixed in a manner such that the Lien of a mortgage or deed of trust would attach to the Manufactured Home under applicable real property law).

"Mortgage-backed Securities" means securities that are secured or otherwise backed by Mortgage Loans.

"Mortgage Loan" means any loan evidenced by a Mortgage Note and secured by a Mortgage and, if applicable, a Security Agreement.

"Mortgage Note" means a promissory note secured by one or more Mortgages and, if applicable, one or more Security Agreements.

"Mortgage Note Amount" means (a) with respect to an open-ended Mortgage Loan, the then Outstanding Principal Balance of such Mortgage Loan (which Outstanding Principal Balance cannot be greater than the related Face Amount), and (b) with respect to a Mortgage Loan that is not an open-ended Mortgage Loan, the Face Amount of such Mortgage Loan.

"Mortgage Pool" means a pool of one or more Pledged Loans on the basis of which a Mortgage-backed Security is to be issued.

"Mortgaged Property" means, with respect to a Mortgage Loan, the real, personal and mixed property and improvements described in the related Mortgage as securing the related Mortgage Note or Mortgage Loan .

"Mortgagor" means, with respect to a Mortgage Loan, the obligors under the related Mortgage Note.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, to which either Borrower or any ERISA Affiliate of Borrower has any obligation with respect to its employees.

"Net Income" means, with respect to a Person, such Person's after tax net income from continuing operations (and, if applicable, that Person's Subsidiaries, on a consolidated basis) for the applicable period then being measured, determined in accordance with GAAP applied in a manner consistent with the financial statements referred to in Section 5.1(a)(8).

"Net Loss" means, with respect to a Person, failure of such Person (and, if applicable, that Person's Subsidiaries on a consolidated basis) to achieve a Net Income of $0 or greater for the applicable period then being measured.

"Non-Public Organizational Documents" means, with respect to a Person, the documents, instruments and agreements relating to the governance of such Person that are not required to be publicly filed for purposes of preserving such Person's organizational existence, rights and privileges, including, as applicable, bylaws, shareholder agreements, operating agreements, limited partnership agreements, partnership agreements and equivalents.

"Non-Usage Fee" has the meaning set forth in Section 3.5.

"Notices" has the meaning set forth in Section 11.1.

"Obligations" means all indebtedness, obligations and liabilities of Borrower to Lender or Lender's Subsidiaries, including (a) Borrower's obligation to repay all Warehousing Advances and reborrowings of Buydowns, made to or for the account of Borrower under this Agreement, (b) payment or performance of any and all other indebtedness, obligations and liabilities of Borrower owing to Lender under this Agreement and the other Loan Documents, and (c) any other disbursements made by Lender to or for the account of Borrower, whether, in each case, any or all of the foregoing are now existing or arising after the date of this Agreement, voluntary or involuntary, joint or several, direct or indirect, absolute or contingent, primary or secondary, liquidated or unliquidated, or decreased or extinguished and later increased and however and whenever created or incurred.

"Operating Account" means a demand deposit account maintained at the Funding Bank in Borrower's name and designated for funding that portion of each Eligible Asset not funded by a Warehousing Advance made against that Eligible Asset and for returning any excess payment from an Investor for a Pledged Asset.

"Organizational Documents" means, with respect to a Person, such Person's (a) Public Organizational Documents, and (b) Non-Public Organizational Documents.

"Outstanding Principal Balance" means, with respect to a Mortgage Loan, as of any date of determination, the then outstanding and unpaid principal amount of the related Mortgage Note (whether or not an additional amount is available to be drawn under that Mortgage Note).

"Overdraft Advance" has the meaning set forth in Section 3.9.

"Participant" has the meaning set forth in Section 11.8.

"Permanent Buydown" means $280,000.

"Person" means and includes natural persons, corporations, limited liability companies, limited liability partnerships, limited liability limited partnerships, general partnerships, joint stock

companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments and agencies and political subdivisions of those governments.

"Plan" means each employee benefit plan (whether in existence on the date of this Agreement or established after that date), as that term is defined in Section 3 of ERISA, maintained for the benefit of directors, officers or employees of Borrower or any ERISA Affiliate.

"Pledged Assets" means, collectively, Pledged Loans and Pledged Securities.

"Pledged Loans" has the meaning set forth in Section 4.1(a).

"Pledged Securities" has the meaning set forth in Section 4.1(c).

"Prime Mortgage Loan" has the meaning set forth in Exhibit H.

"Prime Rate" means, as of any date of determination, the highest prime rate quoted by JPMorgan Chase and most recently published by Bloomberg L.P. If the prime rate for JPMorgan Chase is not quoted or published for any period, then during that period the term "Prime Rate" means the highest prime rate published in the most recent edition of *The Wall Street Journal* in its regular column entitled "Money Rates."

"Prohibited Transaction" has the meanings set forth for such term in Section 4975 of the Internal Revenue Code and Section 406 of ERISA.

"Public Organizational Documents" means, with respect to a Person, the documents, instruments and agreements relating to the governance of such Person that are required to be publicly filed for purposes of preserving such Person's organizational existence, rights and privileges, including, as applicable, articles of incorporation, articles of organization, certificate of formation, certificate of limited partnership and equivalents.

"Purchase Commitment" means a written commitment, in form and substance satisfactory to Lender, issued in favor of Borrower by an Investor under which that Investor commits to purchase Pledged Assets.

"Rating Agency" means any nationally recognized statistical rating organization that in the ordinary course of its business rates Mortgage-backed Securities.

"Release Amount" has the meaning set forth in Section 4.3(f).

"Restriction List" and "Restriction Lists" means each and every list of Persons to whom the Government of the United States prohibits or otherwise restricts the provision of financial services. For the purposes of this Agreement, Restriction Lists include the list of Specially Designated Nationals and Blocked Persons established pursuant to Executive Order 13224 (September 23, 2001) and maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control or any successor agency or other entity, current as of the day the Restriction List is used for purposes of comparison in accordance with the requirements of this Agreement.

"RFConnects Delivery" means Lender's proprietary service to support the electronic exchange of information between Lender and Borrower, including Warehousing Advance Requests, shipping requests, payoff requests, wire transfer instructions, security delivery instructions, activity reports and exception reports.

"Scheduled Warehousing Maturity Date" means the date certain Warehousing Maturity Date determined by reference to clause (a) of Section 1.2.

"Second Mortgage" means a Mortgage that constitutes a second Lien on the Mortgaged Property described in or covered by that Mortgage.

"Second Mortgage Loan" means a Mortgage Loan secured by a Second Mortgage.

"Security Agreement" means a security agreement or other agreement that creates a Lien on personal property, including furniture, fixtures and equipment, to secure repayment of a Mortgage Loan.

"Servicing Contract" means, with respect to any Person, the arrangement, whether or not in writing, under which that Person has the right to service Mortgage Loans, whether such Mortgage Loans are owned by such Person or by others.

"Servicing Portfolio" means, as to any Person, the unpaid principal balance of Mortgage Loans serviced by that Person under Servicing Contracts, minus the principal balance of all Mortgage Loans that are serviced by that Person for others under subservicing arrangements.

"Servicing Portfolio Report" has the meaning set forth in Section 7.3(a).

"Single Family Mortgage Loan" means a Mortgage Loan secured by a Mortgage on improved real property on which is located a 1-to-4 family residence.

"Standard Warehouse Period" means, for any Pledged Asset, the maximum number of days a Warehousing Advance against that type of Pledged Asset can remain outstanding under Exhibit H without giving effect to any Aged Warehouse Period.

"Statement Date" means the Audited Statement Date or the Interim Statement Date, as applicable.

"Sublimit" means the aggregate amount of Warehousing Advances (expressed as a dollar amount or as a percentage of the Warehousing Commitment Amount) that is permitted to be outstanding at any one time against a specific type of Eligible Asset.

"Subordinated Debt" means all indebtedness of Borrower for borrowed money that is effectively subordinated in right of payment to all present and future Obligations either (1) under a Subordination of Debt Agreement on the form prescribed by Lender or (2) otherwise on terms acceptable to Lender.

"Subsidiary" means, with respect to a Person, any corporation, limited liability company, partnership, limited partnership, association or other business entity in which more than 50% of the Equity Interests having voting power under ordinary circumstances for the election of directors, managers, trustees or other Persons performing similar functions is at the time owned or controlled by the Person referred to either directly or indirectly through one or more Subsidiaries of the Person referred to (irrespective of whether or not at the time Equity Interests of any other class or classes have voting power by reason of the happening of some contingency).

"Tangible Net Worth" means the excess of a Person's (and, if applicable, that Person's Subsidiaries, on a consolidated basis) total assets over total liabilities as of the date of determination, each determined in accordance with GAAP applied in a manner consistent with the financial statements referred to in Section 5.1 (a)(8), plus that portion of Subordinated Debt

due more than 6 months after the Scheduled Warehousing Maturity Date. For purposes of calculating a Person's Tangible Net Worth, advances or loans to Covered Obligors, investments in Affiliates, assets pledged to secure any liabilities not included in the Debt of that Person, intangible assets, those other assets that would be deemed by HUD to be non-acceptable in calculating adjusted net worth in accordance with its requirements in effect as of that date, as those requirements appear in the "Consolidated Audit Guide for Audits of HUD Programs," and other assets Lender deems unacceptable, in its sole discretion, must be excluded from that Person's total assets.

"Temporary Increase Amount" means, with respect to the Warehousing Commitment Amount or one or more Sublimits, as applicable, the dollar amount identified in Exhibit H as the Temporary Increase Amount to be added to such Warehousing Commitment Amount or Sublimits for the related Temporary Increase Period.

"Temporary Increase Period" means, with respect to a particular Temporary Increase Amount, the period shown on Exhibit H during which such Temporary Increase Amount applies.

"Third Party Originated Loan" means a Mortgage Loan originated and funded by a third party (other than with funds provided by Borrower at closing to purchase the Mortgage Loan) and subsequently purchased by Borrower.

"Title I Mortgage Loan" means an FHA co-insured closed-end First Mortgage Loan or Second Mortgage Loan that is underwritten in accordance with HUD underwriting standards for the Title I Property Improvement Program set forth in, and that is reported for insurance under, the Mortgage Insurance Program authorized and administered under Title I of the National Housing Act of 1934, as amended, and the regulations related to that statute.

"Trust Receipt" means a trust receipt in a form approved by and under which Lender may deliver any document relating to the Collateral to Borrower for correction or completion.

"Used Portion" has the meaning set forth in Exhibit I.

"VA" means the Veterans Administration and any successor agency or other entity.

"Voting Equity Interests" means, with respect to a Person, all Equity Interests in the Person referred to having voting power under ordinary circumstances to elect the Governors or other Persons performing similar functions with respect to the Person referred to (irrespective of whether or not at the time Equity Interests of any other class or classes have voting power by reason of the happening of some contingency).

"Warehousing Advance" means a disbursement by Lender under Section 1.1.

"Warehousing Advance Request" has the meaning set forth in Section 2.1.

"Warehousing Collateral Value" means, as of any date of determination, (a) with respect to any Eligible Asset, the lesser of (1) the amount of any Warehousing Advance made, or that could be made, against such Eligible Asset under Exhibit H or (2) an amount equal to the Advance Rate for the applicable type of Eligible Asset multiplied by the Fair Market Value of such Eligible Asset; (b) with respect to Eligible Loans that have been exchanged for Agency Securities, the lesser of (1) the amount of any Warehousing Advances outstanding against the Eligible Loans backing the Agency Securities or (2) an amount equal to the Advance Rates for the applicable types of Eligible Loans backing the Agency Securities multiplied by the Fair Market Value of the Agency Securities; and (c) with respect to cash, the amount of the cash.

"Warehousing Commitment" means the obligation of Lender to make Warehousing Advances to Borrower under Section 1.1.

"Warehousing Commitment Amount" means, as of any date of determination, the sum of (a) the dollar amount set forth opposite the term Base Warehousing Commitment Amount in Exhibit H, plus (b) during any Temporary Increase Period, the Temporary Increase Amount applicable to the Warehousing Commitment Amount during such Temporary Increase Period, minus (c) an amount equal to the Warehousing Advances outstanding under the GMAC-RFC Warehousing Agreement.

"Warehousing Fee" has the meaning set forth in Section 3.6.

"Warehousing Maturity Date" has the meaning set forth in Section 1.2.

"Warehousing Note" has the meaning set forth in Section 1.3.

"Wet Settlement Advance" means a Warehousing Advance prior to the end of the Wet Settlement Period.

"Wet Settlement Period" means the period of time from the date a Wet Settlement Advance is made against a Pledged Loan until the earlier of (a) the date the Collateral Documents for the Pledged Loan have been delivered to and examined by the Lender or (b) the date the Wet Settlement Advance made against the Pledged Loan is paid in full.

"Wire Disbursement Account" means a demand deposit account maintained at the Funding Bank in Lender's name for clearing wire transfers requested by Borrower to fund Warehousing Advances.

"Wire Fee" has the meaning set forth in Section 3.6.

## 12.2. Other Definitional Provisions; Terms of Construction

12.2 (a)  Accounting terms not otherwise defined in this Agreement have the meanings given to those terms under GAAP.

12.2 (b)  Defined terms may be used in the singular or the plural, as the context requires.

12.2 (c)  All references to time of day mean the then applicable time in Chicago, Illinois, unless otherwise expressly provided.

12.2 (d)  References to Sections, Exhibits, Schedules and like references are to Sections, Exhibits, Schedules and the like of this Agreement unless otherwise expressly provided.

12.2 (e)  The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation."

12.2 (f)  Unless the context in which it is used otherwise clearly requires, the word "or" has the inclusive meaning represented by the phrase "and/or."

12.2 (g)  All incorporations by reference of provisions from other agreements are incorporated as if such provisions were fully set forth into this Agreement, and include all necessary definitions and related provisions from those other agreements. All provisions from other agreements incorporated into this Agreement by reference survive any termination of

those other agreements until the Obligations of Borrower under this Agreement and the Warehousing Note are irrevocably paid in full and the Warehousing Commitment is terminated.

12.2 (h)  All references to the Uniform Commercial Code are deemed to be references to the Uniform Commercial Code in effect in the State of Minnesota on the Closing Date of this Agreement unless otherwise specifically indicated.

12.2 (i)  Unless the context in which it is used otherwise clearly requires, all references to days, weeks and months mean calendar days, weeks and months.

**End of Article 12**

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first above written.

HOME MORTGAGE, INC.,
an Illinois corporation

By: _Linda Gett_

Its: _CEO_


Closing Date: _9-26-2007_
(to be completed by Lender)

GMAC BANK,
a Utah industrial bank

By: _Sophie B. Schu_

Name: _Sophie B. Schubert_

Its: _Assistant Secretary_

EXHIBIT A

# WAREHOUSING ADVANCE REQUEST

HOME MORTGAGE, INC.

Loan Number: _____

|  | *(for GMAC Use Only)* |
|---|---|
| Reviewed By: | _____ |
| Warehouse Date: | _____ |
| Effective Date: | _____ |

Mortgagor: _____
SSN: _____

Address: _____
_____

Zip Code: _____

Loan-to-Value Ratio: _____    Credit Score: _____    Debt-to-Income Ratio: _____

Status:
- ☐ Committed
- ☐ Uncommitted
- ☐ Wet Settlement    ☐ Received
- ☐ Repurchased
- ☐ MERS
- ☐ Open-end First

Loan Type:    ☐ Prime    ☐ FHA    ☐ VA
☐ Eligible Second
___ closed-end
___ home equity line

Term:    ☐ Fixed _____ Term
☐ ARM _____ Adjustment Period
☐ Balloon _____ Term

Interest Rate: _____

Mortgage Note Date: _____    Maturity Date: _____

Mortgage Note Amount: _____    Unpaid Principal Balance: _____

Original Lender (if applicable): _____    Acquisition Cost (if applicable): _____

Requested Warehouse Advance Amount: _____    Title Company: _____

Investor: _____    Title Company Contact: _____

Investor Contact: _____    Title Company Phone: _____

Investor Phone: _____    Expiration Date: _____

Committed Purchase Price: _____    Purchase Commitment No. : _____

## FUNDING INSTRUCTIONS

☐ Wire Funding
Account to Debit: _____    Date of Wire: _____

Credit Acct. Name: _____    Amount of Wire: _____

Bank Name: _____    Credit Acct. No.: _____

City and State: _____    ABA No.: _____
Ref: _____    Advise: _____    Phone: _____

☐ Check Funding
Check No.: _____    Amount: _____

K:\RFCCOMMON\LEGALWLD\CUSTOMERS-DATABASE\HOME MORTGAGE, INC\WH GMAC BANK\0 WC&S AGMT (8-20-2007)\IN PROCESS\1-EXHIBIT A (NOSI).DOC

Dated: 8/20/2007                    Page A-1
Amended: 1/31/2008

## REQUIRED DOCUMENTATION

The following documents in connection with the above request are enclosed:

*RIGHT*

☐    Original and 1 copy of Mortgage Note
☐    Certified copy of Mortgage (not required for Mortgage Loans registered on the MERS system after execution and delivery by all parties of an Electronic Tracking Agreement approved by Lender)
☐    *Copy of Investor Purchase Commitment (or satisfactory evidence thereof)
☐    *Copy of HUD-1 Settlement Statement or equivalent with evidence of initial Advance amount (open-end Mortgage Loans)

*LEFT*

☐    *Warehousing Advance Request (original and 1 copy)
☐    Recordable assignment of Mortgage (not required for Mortgage Loans registered on the MERS system after execution and delivery by all parties of an Electronic Tracking Agreement approved by Lender)
☐    Certified copies of interim assignments of Mortgage (if applicable)

NOTE:  Items designated with the "*" are required prior to a Wet Settlement Advance.

For the new value this day received, Home Mortgage, Inc. ("Borrower"), grants a security interest to GMAC BANK ("Lender") in all of Borrower's right, title and interest in and to the Mortgage Loan described above, together with all related "Collateral," as more particularly described in the Warehousing Credit and Security Agreement (as amended, supplemented or otherwise modified) between Borrower and Lender.

**Home Mortgage, Inc.**


Authorized Signature: _____

# PROCEDURES AND DOCUMENTATION FOR WAREHOUSING SINGLE FAMILY MORTGAGE LOANS

### HOME MORTGAGE, INC.

HOME MORTGAGE, INC. ("Borrower") must observe the following procedures and documentation requirements in all respects. All documents must be satisfactory to GMAC BANK ("Lender") in its sole discretion. Capitalized terms used in this Exhibit without further definition have the meanings set forth in the Warehousing Credit and Security Agreement between Borrower and Lender (as amended, restated, renewed or replaced, "Agreement"). HUD, Fannie Mae and Freddie Mac form numbers used in this Exhibit are for convenience only and Borrower must use the equivalent forms required at the time of delivery of a Pledged Loan or a Pledged Security. Except for documents submitted through RFConnects Delivery, all Warehousing Advance Requests and Collateral Documents must be submitted to Lender in a top tabbed, legal size manila file folder, hole-punched and acco-fastened in the order specified in the Warehousing Advance Request. Each folder must be labeled with the mortgagor name(s), Borrower loan number and Borrower name. If a Wet Settlement Advance is being requested, the Warehousing Advance Request and required Collateral Documents should be submitted in accordance with the above instructions. The remaining Collateral Documents must be submitted with a cover letter identifying the mortgagor name(s) and Borrower loan number.

I.     PRIOR TO MAKING A WET SETTLEMENT ADVANCE, LENDER MUST RECEIVE THE FOLLOWING:

    (1)   An estimate of the amount of the requested Warehousing Advance 1 Business Day prior to the date the requested Warehousing Advance is to be made.

    (2)   Either an Electronic Advance Request or a written Warehousing Advance Request (Exhibit A) and 1 copy of same.

    (3)   A copy of the Purchase Commitment or satisfactory evidence of its existence (if required) .

    (4)   A copy of the HUD-1 Settlement Statement or equivalent with evidence of the initial Warehousing Advance amount (open-end Mortgage Loans only).

THE FOLLOWING DOCUMENTS MUST BE RECEIVED BY LENDER WITHIN 7 BUSINESS DAYS OF THE DATE ON WHICH LENDER MAKES A WET SETTLEMENT ADVANCE TO BORROWER:

    (5)   The original signed Mortgage Note, endorsed by Borrower in blank with corresponding interim endorsements, if applicable, and 1 copy of same.

    (6)   A copy of the Mortgage sent for recording certified true by Borrower or the escrow/title company (not required for Mortgage Loans registered on the MERS system after execution and delivery by all parties of an Electronic Tracking Agreement approved by Lender).

    (7)   Copies of all interim assignments of the Mortgage certified true by Borrower or the escrow/title company (recorded or sent for recordation). The Mortgage Note must bear corresponding endorsements.

(8)     An assignment of the Mortgage, endorsed by Borrower in blank, in recordable form but unrecorded (not required for Mortgage Loans registered on the MERS system after execution and delivery by all parties of an Electronic Tracking Agreement approved by Lender).

(9)     A copy of a letter (or other acceptable documentation) from the holder of the Mortgage Loan to Borrower documenting the purchase price for the Mortgage Loan, releasing the holder's ownership interest in the Mortgage Loan against payment of that purchase price by Borrower and containing wire transfer instructions for payment of that purchase price (Third Party Originated Loans only).

II.     PRIOR TO MAKING A WAREHOUSING ADVANCE (OTHER THAN A WET SETTLEMENT ADVANCE), LENDER MUST RECEIVE ALL OF THE COLLATERAL DOCUMENTS LISTED IN SECTION I ABOVE.

III.    LENDER HAS A REASONABLE TIME (1 BUSINESS DAY UNDER ORDINARY CIRCUMSTANCES) TO EXAMINE BORROWER'S WAREHOUSING ADVANCE REQUEST AND THE COLLATERAL DOCUMENTS TO BE DELIVERED BY BORROWER BEFORE FUNDING THE REQUESTED WAREHOUSING ADVANCE OR WET SETTLEMENT ADVANCE, AND MAY REJECT ANY ELIGIBLE LOAN THAT DOES NOT MEET THE REQUIREMENTS OF THIS EXHIBIT, THE AGREEMENT OR THE RELATED PURCHASE COMMITMENT.

Borrower must hold or cause its custodian to hold, in trust for Lender, those original Collateral Documents of which only copies are required to be delivered to Lender under this Exhibit. Promptly upon request by Lender or, if the recorded Collateral Documents have not yet been returned from the recording office, immediately upon receipt by Borrower or its custodian of those recorded Collateral Documents, Borrower must deliver or cause its custodian to deliver to Lender any or all of the original Collateral Documents.

To fund Warehousing Advances under this Exhibit and the Agreement, Lender will cause the Funding Bank to credit the Wire Disbursement Account or the Check Disbursement Account, upon compliance by Borrower with the terms of the Loan Documents.

Lender will determine, in its sole discretion, the method by which Warehousing Advances and other amounts on deposit in the Wire Disbursement Account are disbursed by the Funding Bank to or for the account of Borrower.

IV.     WITHIN 7 BUSINESS DAYS AFTER THE DATE OF A WAREHOUSING ADVANCE AGAINST A MORTGAGE LOAN TO BE REGISTERED ON THE MERS SYSTEM, THE MORTGAGE LOAN MUST BE REGISTERED ON THE MERS SYSTEM, SHOWING BORROWER AS SERVICER OR SUBSERVICER AND LENDER AS INTERIM FUNDER.

V.      ONLY LENDER MAY DELIVER THE MORTGAGE NOTES AND OTHER ORIGINAL COLLATERAL DOCUMENTS REQUIRED BY THIS EXHIBIT EVIDENCING PLEDGED LOANS OR PLEDGED SECURITIES AND RELATED POOL DOCUMENTS TO AN INVESTOR OR POOL CUSTODIAN, UNLESS OTHERWISE AGREED IN WRITING.

A.      Borrower must comply with the following procedures for deliveries of Pledged Loans:

No later than 1 Business Day prior to the requested shipment date for deliveries of less than 100 Pledged Loans and no later than 2 Business Days prior to the requested shipment date for deliveries of 100 or more Pledged Loans, Lender must receive the following:

(1)     Signed shipping instructions or authenticated shipping instructions sent via RFConnects Delivery for the delivery of the Pledged Loans, including the following:

     (a)     Name and address of the office of the Investor to which the loan documents are to be shipped, the desired shipping date and the preferred method of delivery;

     (b)     Instructions for endorsement of the Mortgage Note;

     (c)     Name(s) of the mortgagor(s), Mortgage Note Amounts of the Pledged Loans to be shipped and the Borrower's loan numbers for those Pledged Loans; and

     (d)     Commitment number and expiration date of the Purchase Commitment.

(2)     For deliveries of Pledged Loans to Fannie Mae for cash purchase, Borrower must include a Copy of Loan Schedule (Fannie Mae Form 1068 or 1069) showing Lender's designated Fannie Mae payee code as recipient of the loan purchase proceeds.

(3)     For deliveries of Pledged Loans to Freddie Mac for cash purchase, Borrower must include the following additional documents:

     (a)     Original completed Warehouse Lender Release of Security Interest (Freddie Mac Form 996) to be executed by Lender, designating Lender as the Warehouse Lender and showing the Cash Collateral Account designated by Lender as the receiving account for loan purchase proceeds; and

     (b)     Copy of Wire Transfer Authorization for a Cash Warehouse Delivery (Freddie Mac Form 987), designating Lender as the Warehouse Lender and showing the Cash Collateral Account designated by Lender as the receiving account for loan purchase proceeds.

B.     If Pledged Loans are to be delivered to a pool custodian (other than an Approved Custodian), Borrower must pay the related Warehousing Advance within 2 Business Days of shipment.

C.     Borrower must comply with the following procedures for deliveries of Pledged Loans to Approved Custodians:

No later than 1 Business Day prior to the requested shipment date for deliveries of less than 100 Pledged Loans and no later than 2 Business Days prior to the requested shipment date for deliveries of 100 or more Pledged Loans, Lender must receive the following:

(1)     Signed shipping instructions or authenticated shipping instructions sent via RFConnects Delivery for the delivery of the Pledged Loans to the Approved Custodian, including the following:

     (a)     Name and address of the office of the Approved Custodian to which the loan documents are to be shipped, the desired shipping date and the preferred method of delivery;

     (b)     Instructions for endorsement of the Mortgage Note;

     (c)     Name(s) of the mortgagor(s), Mortgage Note Amounts of the Pledged Loans to be shipped and the Borrower's loan numbers for those Pledged Loans; and

     (d)     Commitment number and expiration date of the Purchase Commitment for the Pledged Securities.

(                                                    (

(2)    If Mortgage-backed Securities are to be issued by Fannie Mae, Borrower must include the following additional documents:

    (a)    Copy of Schedule of Mortgages (Fannie Mae Form 2005 or 2025); and

    (b)    Copy of Delivery Schedule (Fannie Mae Form 2014), instructing Fannie Mae to issue the Mortgage-backed Securities in Borrower's name with Lender as pledgee and to deliver the Mortgage-backed Securities to Lender's custody account at JPMorgan Chase Bank, National Association, ABA No. 021000021 (JPMORGAN CHASE/CUST/G55026).

(3)    If Mortgage-backed Securities are to be issued by Freddie Mac, Borrower must include the following additional documents:

    (a)    Copy of Settlement Information and Delivery Authorization (Freddie Mac Form 939), designating Lender as the Warehouse Lender and instructing Freddie Mac to deliver the Mortgage-backed Securities to Lender's custody account at JPMorgan Chase Bank, National Association, ABA No. 021000021 (JPMORGAN CHASE/CUST/G55026); and

    (b)    Original Warehouse Lender Release of Security Interest (Freddie Mac Form 996) to be executed by Lender, designating Lender as the Warehouse Lender and instructing Freddie Mac to deliver the Mortgage-backed Securities to Lender's custody account at JPMorgan Chase Bank, National Association, ABA No. 021000021 (JPMORGAN CHASE/CUST/G55026).

(4)    If Mortgage-backed Securities are to be issued by Ginnie Mae, Borrower must include the following additional documents:

    (a)    Signed copy of schedule of Mortgages (HUD Form 11706);

    (b)    Signed copy of Schedule of Subscribers (HUD Form 11705) instructing Ginnie Mae to issue the Mortgage-backed Securities in Borrower's name, and to deliver the Pledged Securities to Lender's custody account at JPMorgan Chase Bank, National Association, ABA No. 021000021 (JPMORGAN CHASE/CUST/G55026). The Schedule of Subscribers should also bear the following instructions: "These instructions may not be changed without the prior written consent of GMAC Bank, Preston A. Lyvers, Managing Director or Patti Erfan, Director"; and

    (c)    Completed Original Release of Security Interest (HUD Form 11711A) to be executed by Lender.

(5)    No later than 2 Business Days prior to the Settlement Date for the Mortgage-backed Securities, Lender must receive signed Securities Delivery Instructions form attached as Schedule I to this Exhibit.

Upon instruction by Borrower, Lender will complete the endorsement of the Mortgage Note and make arrangements for the delivery of the original Collateral Documents evidencing Pledged Loans or Pledged Securities and related original pool documents with the appropriate bailee letter to an Investor, Approved Custodian or other pool custodian. Upon receipt of Mortgage-backed Securities, Lender will cause those Mortgage-backed Securities to be delivered to the Investor that issued the Purchase Commitment. Mortgage-backed Securities will be released to an Investor only upon payment of the purchase proceeds to Lender. Cash proceeds of sales of Pledged Loans and Pledged Securities will be applied to related Warehousing Advances outstanding under the

Warehousing Commitment.  As long as no Default or Event of Default exists, Lender will return any excess proceeds of the sale of Pledged Loans or Pledged  Securities to Borrower, unless otherwise instructed in writing.

(                     (

SCHEDULE I TO EXHIBIT B

# GMAC BANK
## WAREHOUSE LENDING DIVISION
## SECURITY DELIVERY INSTRUCTIONS

**INSTRUCTIONS MUST BE RECEIVED 2 BUSINESS DAYS IN ADVANCE OF PICK-UP/DELIVERY**

BOOK-ENTRY DATE: _____    SETTLEMENT DATE: _____

ISSUER: _____    SECURITY: $_____

NO. OF CERTIFICATES: _____    1) _____

   2) _____

   3) _____

CUSIP NO. _____
Pool No. _____    MI No. _____
Issue Date (M/D/Y): _____    Coupon Rate: _____
   Maturity Date (M/D/Y): _____

POOL TYPE (circle one):

| | | |
|---|---|---|
| *Ginnie Mae:* | GINNIE MAE I | GINNIE MAE II |
| *Freddie Mac:* | FIXED ARM | DISCOUNT NOTE |
| *Fannie Mae:* | FIXED ARM | DISCOUNT NOTE    DEBENTURES    REMIC |

DELIVER TO: _____    ( ) Versus Payment

_____    DVP AMOUNT $_____

_____    ( ) Free Delivery

DELIVER TO: _____    ( ) Versus Payment

_____    DVP AMOUNT $_____

_____    ( ) Free Delivery

DELIVER TO: _____    ( ) Versus Payment

_____    DVP AMOUNT $_____

_____    ( ) Free Delivery

AUTHORIZED SIGNATURE: _____

TITLE: _____

K:\RFCCOMMON\LEGALWLD\CUSTOMERS-DATABASE\HOME MORTGAGE, INC\WH GMAC BANK\0 WC&S AGMT (8-20-2007)\IN PROCESS\EXHIBIT B (NOSI).DOC
Dated: 8/20/2007        Page B - 6

EXHIBIT C

## SCHEDULE OF SERVICING PORTFOLIO

### HOME MORTGAGE, INC.

(TO BE COMPLETED BY BORROWER)

(IF NONE, STATE "NONE")

| Investor Name | Unpaid Principal Balance of Loans Serviced as of the Date of this Agreement |
|---|---|
| | |

*NONE*

EXHIBIT D

## BORROWER OWNERSHIP AND SUBSIDIARIES

### HOME MORTGAGE, INC.

### BORROWER EQUITY HOLDERS

| NAME | PERCENTAGE OWNED |
|------|------------------|
| Howard J. Siegel | 75.5 % |
| Lawrence H. Luckett | 24.5 % |

### BORROWER SUBSIDIARIES

| NAME | ADDRESS | STATE OF FORMATION | STATES QUALIFIED TO DO BUSINESS | PERCENTAGE OWNED BY BORROWER |
|------|---------|--------------------|-----|----|
| | | NONE | | |
| | | | | |

(TO BE COMPLETED BY BORROWER)

(IF NONE, STATE "NONE")

NONE

EXHIBIT E

## COMPLIANCE CERTIFICATE

This Compliance Certificate is submitted to the Lender pursuant to Section 7.2(c) of the Warehousing Credit and Security Agreement between HOME MORTGAGE, INC. ("Borrower") and GMAC BANK ("Lender"), dated as of August 20, 2007 (as amended, restated, renewed or replaced, "Agreement"). Capitalized terms and Section numbers used in this Compliance Certificate without further definition refer to those terms and Sections set forth in the Agreement.

The undersigned hereby certifies to Lender that as of the close of business on _____, 20__ ("Statement Date") and with respect to Borrower (and, if applicable, Borrower's Subsidiaries on a consolidated basis):

1.  As demonstrated by the attached calculations supporting this Compliance Certificate, Borrower satisfied the covenants set forth in Sections 8.8, 8.9, 8.10, 8.11, 8.12, 8.13 and 8.14 or, if Borrower did not satisfy any of those covenants, a detailed explanation is attached setting forth the nature and the period of existence of any Default or Event of Default and the action Borrower has taken, is taking or proposes to take with respect to that Default or Event of Default.

2.  Borrower has not transferred (by sale or otherwise), pledged or granted a security interest in any Servicing Contracts, except as permitted under the terms of the Agreement.

3.  Borrower has not made any payments in advance of the scheduled maturity date on any Subordinated Debt, and Borrower has not incurred any additional Debt that must be subordinated under the terms of Section 7.11.

4.  Borrower was in full compliance with all applicable Investor net worth requirements, and in good standing with each Investor.

5.  I have reviewed the terms of the Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and conditions of Borrower (and, if applicable, Borrower's Subsidiaries). That review has not disclosed, and I have no other knowledge of the existence of, any Default or Event of Default, or if any Default or Event of Default existed or exists, a detailed explanation is attached setting forth the nature and the period of existence of the Default or Event of Default and the action Borrower has taken, is taking or proposes to take with respect that Default or Event of Default.

6.  Pursuant to Section 7.2 of the Agreement, enclosed are the financial statements of Borrower as of the Statement Date. The financial statements for the period ending on the Statement Date fairly present the financial condition and results of operations of Borrower (and, if applicable, Borrower's Subsidiaries on consolidated basis) as of the Statement Date.

Dated: _____

HOME MORTGAGE, INC.,
an Illinois corporation

By: _____

Its: _____

## CALCULATIONS SUPPORTING COMPLIANCE CERTIFICATE

Borrower Name:  HOME MORTGAGE, INC.
(and, if applicable, its Subsidiaries)

Statement Date: _____

All financial calculations set forth in this Compliance Certificate are as of the Statement Date.

1.   TANGIBLE NET WORTH

    A.   Net Worth of Borrower is:

          Excess of total assets over total liabilities:  $ _____

          Plus:   Subordinated Debt (or any portion of that Subordinated Debt) due on or after _____ (must be more than 6 months after the Scheduled Warehousing Maturity Date):  $ _____

          Minus:   Advances or loans to Covered Obligors (Affiliates, Equity Holders, directors, managers, officers, employees and general partners):  $ _____

          Minus:   Investments in Affiliates:  $ _____

          Minus:   Assets pledged to secure liabilities not included in Debt:  $ _____

          Minus:   Intangible assets:  $ _____

          Minus:   Other assets that HUD deems non-acceptable:  $ _____

          Minus:   Other assets that Lender deems unacceptable:  $ _____

          TANGIBLE NET WORTH  $ _____

    B.   Requirements of Section 8.9 of the Agreement:

          BORROWER'S TANGIBLE NET WORTH MUST NOT AT ANY TIME BE LESS THAN $1,200,000.

    C.   **Covenant Satisfied:** _____   **Covenant Not Satisfied:** _____

2.   DEBT OF BORROWER

    A.   Borrower's total liabilities calculated in accordance with GAAP, *plus* all indebtedness or other obligations for borrowed money or for the deferred purchase price of property or services:  $ _____

<table>
<tr><td>Minus:</td><td>Subordinated Debt (or any portion of that Subordinated Debt) due on or after _____ (must be more than 6 months after the Scheduled Warehousing Maturity Date):</td><td>$ _____</td></tr>
</table>

B.    DEBT (Total):    $ _____

Minus:  Debt arising under Hedging Arrangements (to the extent of assets arising under those Hedging Arrangements):    $ _____

C.    DEBT (adjusted for Hedging Arrangements):    $ _____

3.    LEVERAGE RATIO

A.    The ratio of Debt to Tangible Net Worth is (2.C. to 1.A.):    ____ to 1

B.    Requirements of Section 8.8 of the Agreement:

BORROWER'S LEVERAGE RATIO MUST NOT AT ANY TIME EXCEED 15 TO 1.

4.    LIQUID ASSETS OF BORROWER

A.    The following unrestricted and unencumbered assets:

Cash:    $ _____

Funds on deposit in any United States bank (net of all outstanding checks, drafts and similar items):    $ _____

Investment grade commercial paper:    $ _____

Money market funds:    $ _____

Buydown (to the extent it may be reborrowed):    $ _____

Excess Buydown:    $ _____

B.    LIQUID ASSETS    $ _____

C.    Requirements of Section 8.10 of the Agreement:

BORROWER'S LIQUID ASSETS MUST NOT BE LESS THAN $300,000.

D.    Covenant Satisfied: ____    Covenant Not Satisfied:

5.    PERMANENT BUYDOWN

A.    Aggregate Buydowns:    $ _____

B.    Permanent Buydown:                                    $ _____

C.    Requirements of Section 8.11 of the Agreement:

ON AND AFTER THE DATE OF THE INITIAL WAREHOUSING ADVANCE,
BORROWER'S AGGREGATE BUYDOWNS MUST NOT AT ANY TIME BE LESS THAN
THE PERMANENT BUYDOWN.

D.    **Covenant Satisfied:** _____  **Covenant Not Satisfied:** _____

6.    NET INCOME/NET LOSS

A.    Borrower's Net Income (and, if applicable, Borrower's
Subsidiaries, on a consolidated basis) for the month
ending _____, 20___ is:              $ _____

B.    Borrower's Net Income (and, if applicable, Borrower's
Subsidiaries, on a consolidated basis) for the month
ending _____, 20___ is:              $ _____

C.    Borrower's Net Income (and, if applicable, Borrower's
Subsidiaries, on a consolidated basis) for the month
ending _____, 20___ is:              $ _____

F.    **Requirements of Section 8.12 of the Agreement:**

BORROWER MUST NOT HAVE THREE CONSECUTIVE MONTHS OF NET LOSSES.

F.    **Covenant Satisfied:** _____  **Covenant Not Satisfied:** _____

7..   DISTRIBUTIONS TO EQUITY HOLDERS

A.    Distributions to Equity Holders declared or paid by
Borrower during the current fiscal year (including
any purchase or redemption of Equity Interests)
were:                                              $ _____

B.    Requirements of Section 8.13 of the Agreement:

BORROWER MUST NOT DECLARE OR PAY ANY DISTRIBUTION.

C.    **Covenant Satisfied:** _____  **Covenant Not Satisfied:** _____

8.    TRANSACTIONS WITH AFFILIATES

A.    Loans, advances, and extensions of credit by
Borrower to its Affiliates during the current fiscal year:  $ _____

B.    Capital contributions made by Borrower to its
Affiliates during the current fiscal year:         $ _____

C.    Transfers, sales, pledges, assignments or other
dispositions of assets made by Borrower to or on

behalf of its Affiliates during the current fiscal year:          $ _____

D.    Acquisitions of assets from Affiliates during the
      current fiscal year:                                          $ _____

E.    Management fees paid by Borrower to or on behalf of
      its Affiliates during the current fiscal year:               $ _____

F.    Requirements of Section 8.14 of the Agreement:

      BORROWER MAY NOT MAKE ANY LOANS, ADVANCES, EXTENSIONS OF CREDIT
      OR CAPITAL CONTRIBUTIONS TO ITS AFFILIATES.

G.    **Covenant Satisfied:** _____    **Covenant Not Satisfied:** _____

      BORROWER MAY NOT TRANSFER, SELL, PLEDGE, ASSIGN OR MAKE ANY OTHER
      DISPOSITION OF ASSETS TO OR ON BEHALF OF ITS AFFILIATES.

H.    **Covenant Satisfied:** _____    **Covenant Not Satisfied:** _____

      BORROWER MAY NOT MERGE OR CONSOLIDATE WITH, OR PURCHASE OR
      ACQUIRE ANY ASSETS FROM, ITS AFFILIATES.

I.    **Covenant Satisfied:** _____    **Covenant Not Satisfied:** _____

      BORROWER MAY NOT PAY ANY MANAGEMENT FEES TO OR ON BEHALF OF ITS
      AFFILIATES.

J.    **Covenant Satisfied:** _____    **Covenant Not Satisfied:** _____

9.    **LOAN PRODUCTION VOLUME**

| Loan Type | Monthly | | Year-to-Date | |
|---|---|---|---|---|
| | Number of Mortgage Loans | Aggregate Mortgage Note Amount | Number of Mortgage Loans | Aggregate Mortgage Note Amount |
| Government Mortgage Loans | | | | |
| Conforming Mortgage Loans | | | | |
| Jumbo Mortgage Loans | | | | |
| Subprime Mortgage Loans | | | | |
| HLTV (over 100% LTV) Mortgage Loans | | | | |
| Total | | | | |

EXHIBIT F

## SCHEDULE OF EXISTING LINES OF CREDIT

### HOME MORTGAGE, INC.

(TO BE COMPLETED BY BORROWER)

(IF NONE, STATE "NONE")

| Lender Name | Commitment Amount | Expiration Date |
|---|---|---|
| Gateway Bank | 10,000,000 | 5/08 |

EXHIBIT G

## ASSUMED NAMES

### HOME MORTGAGE, INC.

(TO BE COMPLETED BY BORROWER)

(IF NONE, STATE "NONE")

*NONE*

EXHIBIT H
ADOPTED BY THIRD AMENDMENT DATED 3/3/2008

# ELIGIBLE ASSETS

## HOME MORTGAGE, INC.

## LIMITATIONS ON WAREHOUSING ADVANCES

Lender's obligation to make Warehousing Advances under the Agreement is subject to the following limitations:

1) No Warehousing Advance will be made against any Mortgage Loan that has been previously sold or pledged to obtain financing (whether or not such financing constitutes Debt) under another warehousing financing arrangement or a gestation agreement.

2) No Warehousing Advance will be made against any Mortgage Loan that Lender believes may be based on untrue, incomplete or inaccurate or fraudulent information or may otherwise be subject to fraud.

3) No Warehousing Advance will be made against a Mortgage Loan if any of the limitations set forth in this Exhibit H would be exceeded after giving effect to the Warehousing Advance.

4) No Warehousing Advance will be made against a Mortgage Loan with an original principal balance in excess of $750,000.

5) No Warehousing Advance (including a Wet Settlement Advance) will be made against a Mortgage Loan or REO Property if the amount of such Warehousing Advance, when combined with Warehousing Advances against similar Mortgage Loans and against REO Properties outstanding under the GMAC-RFC Warehousing Agreement, would exceed the amount of any Sublimit (including Sublimits for Wet Settlement Advances and Aged Mortgage Loans) set forth in this Exhibit H.

6) No Warehousing Advance will be made against Third Party Originated Loans

## WAREHOUSING COMMITMENT AMOUNT

Base Warehousing Commitment Amount: $17,000,000

Temporary Increase Amount: $1,500,000

Temporary Increase Period: Beginning March 3, 2008 to and including March 14, 2008

## GLOBAL SUBLIMITS

The Sublimits specified under this Global Sublimits heading are aggregate limits that apply across all Sublimits.

1.   Wet Settlement Advances:        30% of the Warehousing Commitment Amount

2.   Aged Mortgage Loans            $1,000,000

## APPLICATION OF TEMPORARY INCREASES

From time to time Lender may agree to temporarily increase the Warehousing Commitment Amount or a specific Sublimit by designating a Temporary Increase Amount to apply to the Warehousing Commitment Amount or that specific Sublimit for a designated Temporary Increase Period. In such case, the subject Temporary Increase Amount will be added to, as applicable, the Warehousing Commitment Amount or the specific Sublimit for the duration of the Temporary Increase Period. A Temporary Increase Amount and the related Temporary Increase Period are specific to the Warehousing Commitment Amount or designated specific Sublimit or Sublimit(s) to which they apply (to be shown in each case by the presence or absence of a Temporary Increase Amount and Temporary Increase Period under the appropriate headings in this Exhibit H or, in the case of certain short term increases permitted to be made without amending this Exhibit H, as specified in the Lender loan officer writing described below). When the Temporary Increase Period expires, the Warehousing Commitment Amount or the specific Sublimit will no longer be calculated using such Temporary Increase Amount. In most cases, the Temporary Increase Amount and Temporary Increase Period will be documented by an amendment to this Exhibit H. However, subject to the applicable limits of Lender's credit policy, a Lender loan officer can provide a Temporary Increase Amount for a Temporary Increase Period not to exceed 5 Business Days without amending this Exhibit H by separately communicating the Temporary Increase Amount, the start and end of such Temporary Increase Period and the Warehousing Commitment Amount or specific Sublimit to which they apply to Borrower in writing.

## ELIGIBLE ASSET DEFINITIONS

Below are the Eligible Asset types (and related defining criteria) against which Warehousing Advances may be made under this Agreement:

1.  **Prime Mortgage Loan**

    Definition: A First Mortgage Loan with the following characteristics:

    A.      Underwritten substantially in accordance with Fannie Mae or Freddie Mac underwriting standards (except as to maximum amount); and

    B.      Loan-to-Value Ratio not to exceed 80% or, if the Loan-to-Value Ratio exceeds 80%, the Prime Mortgage Loan is insured by or subject to a commitment for mortgage insurance in an amount and on terms and conditions that satisfy the underwriting standards of Fannie Mae or Freddie Mac; or

    C.      A Government Mortgage Loan.

2.  **Eligible Second Mortgage Loan**

    Definition: A closed-end Second Mortgage Loan or an open-end home equity line of credit secured by a Second Mortgage Loan with the following characteristics:

    A.      The credit of the obligor has been underwritten substantially in accordance with Fannie Mae or Freddie Mac underwriting standards; and

    B.      Loan-to-Value Ratio not more than 100%.

## ELIGIBLE ASSET SUBLIMITS

The Sublimits specified below apply only to the designated Eligible Asset type and do not apply across all Eligible Assets types.

# PRIME MORTGAGE LOANS

**Prime Sublimit Amount:  $17,000,000**

**Prime Temporary Increase Amount:  $1,500,000**

**Prime Temporary Increase Period:  Beginning March 3, 2008 to and including March 14, 2008**

| | Interest Rate | Sublimit Amount | Purchase Commitment Required | Wet Settlement Advances Permitted | Aged Mortgage Loans Permitted | Advance Rate | Warehouse Period |
|---|---|---|---|---|---|---|---|
| First Mortgage Loans | 2.50% over LIBOR<br><br>Aged Mortgage Loans:<br>2.65% over LIBOR | $17,000,000 of the Prime Sublimit<br><br>$1,500,000 of the Prime Temporary Increase | Yes | Yes | Yes | Committed:<br>*100% of the least of (i) the Mortgage Note Amount, (ii) the Committed Purchase Price, or (iii) Fair Market Value.<br><br>(*requires Permanent Buydown) | Standard: 60 days<br><br>Aged: 120 days |

**Required Prepayments (Prime Mortgage Loans):**

On the day a Pledged Loan becomes an Aged Mortgage Loan, the Warehousing Advance against such Pledged Loan must be (a) repaid in full, to the extent the Aged Mortgage Loan Sublimit would be exceeded, or (b) otherwise, reduced by 10% of the Face Amount. Every 30 days thereafter, the Warehousing Advance must be further reduced by 10% of the Face Amount and must be repaid in full on the last day of the Aged Warehouse Period.

K:\RFC\COMMON\LEGAL\WLD\CUSTOMERS-DATABASE\HOME MORTGAGE, INC\WH GMAC BANK\0 WC&S AGMT (8-20-2007)\IN PROCESS\3-EXHIBIT H.DOC
Dated: 8/20/2007
Amended: 3/3/2008

Page H-4

# ELIGIBLE SECOND MORTGAGE LOANS

**Eligible Second Sublimit Amount:  $1,500,000**

**Eligible Second Temporary Increase Amount:  $ N/A**

**Eligible Second Temporary Increase Period:  Beginning <u>N/A</u> to and including <u>N/A</u>**

| | Interest Rate | Sublimit Amount | Purchase Commitment Required | Wet Settlement Advances Permitted | Aged Mortgage Loans Permitted | Advance Rate | Warehouse Period |
|---|---|---|---|---|---|---|---|
| Second Mortgage Loans | 2.50% over LIBOR<br><br>Aged Mortgage Loans:<br>2.65% over LIBOR | $1,500,000 of the Eligible Second Sublimit | Yes | Yes | Yes | Committed:<br>•100% of the least of (i) the Mortgage Note Amount, (ii) the Committed Purchase Price, or (iii) Fair Market Value.<br><br>(•requires Permanent Buydown) | Standard: 60 days<br>Aged: 120 days |

**Required Prepayments (Eligible Second Mortgage Loans):**

On the day a Pledged Loan becomes an Aged Mortgage Loan, the Warehousing Advance against such Pledged Loan must be (a) repaid in full, to the extent the Aged Mortgage Loan Sublimit would be exceeded, or (b) otherwise, reduced by 20% of the Face Amount. Every 30 days thereafter, the Warehousing Advance must be further reduced by 20% of the Face Amount and must be repaid in full on the last day of the Aged Warehouse Period.

EXHIBIT I

# COLLATERAL OPERATIONS FEE SCHEDULE

## HOME MORTGAGE, INC.

| LOAN FEES | |
|---|---|
| **Fee** | **Calculation** |
| Non-Usage Fee | 0.125% per annum of the positive difference (such difference, if any, being the "Unused Portion") obtained by subtracting:<br><br>(a) the arithmetic daily average of outstanding Warehousing Advances during the subject month (the "Used Portion"), from<br><br>(b) the arithmetic daily average of the Warehousing Commitment Amount during the period in (a) above.<br><br>Notes:<br><br>(i)   As long as no Default or Event of Default exists, no Non-Usage Fee will be calculated or collected for the period from the Closing Date to and including December 31, 2007.<br><br>(ii)   If the Used Portion is greater than or equal to 50% of the Warehousing Commitment Amount for a given month, no Non-Usage Fee will be charged for such month. |
| Loan Package Fee | $35 |
| Wire Fee | $12.50 |

| COLLATERAL OPERATIONS FEES | |
|---|---|
| Reservation Number Fee | $5 per Reservation Number<br>(Good funds states only) |

| COLLATERAL OPERATIONS FEES | |
|---|---|
| Restocking Fee for Mortgage Loans returned to Lender by Investors | $10 per Mortgage Loan |
| Returned Wire Fee | $10 per wire |
| Early Payoff Fee (payoff of Warehousing Advance prior to check clearance or wire disbursement) | $25 per Mortgage Loan |
| Late Fee for Interest or Fees not paid within Time period specified in Agreement | $50 per occurrence |
| Overdraft Fee | $60 per occurrence |
| Security Pick-up, Delivery and DK Fees | $45 per transaction |
| **Prior Day Bank Reporting Fee:**<br><br>• Warehousing Commitments of up to $50 million<br><br>• Warehousing Commitments of more than $50 million but less than $100 million<br><br>• Warehousing Commitments of more than $100 million | <br><br>$300 per month<br><br>$400 per month<br><br>$500 per month |
| Intra-Day Bank Reporting Fee | $300 per month |

**EXHIBIT D**

# PROMISSORY NOTE

Date: August 20, 2007

**FOR VALUE RECEIVED**, the undersigned, HOME MORTGAGE, INC., an Illinois corporation ("Borrower"), promises to pay to the order of GMAC BANK, a Utah industrial bank ("Lender" or, together with its successors and assigns, "Holder"), whose principal place of business is 1100 Virginia Drive, Fort Washington, Pennsylvania 19034, or at such other place as the Holder may designate from time to time, (i) a principal sum equal to the amount of Warehousing Advances outstanding under the Agreement (as that term is defined below), (ii) interest on that amount from the date of each Warehousing Advance until repaid in full, and (iii) all other fees, charges and other Obligations due under the Agreement (including reasonable attorneys' fees and expenses incurred in connection with the collection of this Note), at the rates and at the times set forth in the Agreement. All payments under this Note and the Agreement must be made in lawful money of the United States and in immediately available funds.

This Note evidences a line of credit and is the Warehousing Note referred to in that certain Warehousing Credit and Security Agreement dated August 20, 2007 between Borrower and Lender (as amended, restated, renewed or replaced, the "Agreement"). Reference is made to the Agreement (which is incorporated by reference as fully and with the same effect as if set forth at length in this Note) for a description of the Collateral and a statement of (x) the covenants and agreements made by Borrower, (y) the rights and remedies granted to Lender and (z) the other matters governed by the Agreement. Capitalized terms not otherwise defined in this Note have the meanings set forth in the Agreement.

In addition to principal, interest, fees and other charges payable by Borrower under this Note and the Agreement, Borrower must pay all out-of-pocket costs and expenses of Lender, including reasonable fees, service charges and disbursements of counsel (including allocated costs of internal counsel), in connection with the enforcement and collection of this Note.

Borrower waives demand, notice, protest and presentment in connection with collection of amounts outstanding under this Note.

This Note is governed by the laws of the State of Minnesota, without reference to its principles of conflicts of laws.

**IN WITNESS WHEREOF**, Borrower has executed this Note as of the day and year first above written.

HOME MORTGAGE, INC.,
an Illinois corporation

By: _Laurence Sickett_

Its: _CEO_

**EXHIBIT E**

MIN: 100254900000040149                              Loan Number: 1120073

# NOTE

FEBRUARY 14, 2008                    BURR RIDGE                    ILLINOIS
[Date]                                    [City]                        [State]

3512 W MELROSE ST, CHICAGO, ILLINOIS 60618

[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 288,750.00        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  HOME MORTGAGE, INC., AN ILLINOIS CORPORATION

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        6.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

(A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  1st  day of each month beginning on   APRIL 1
2008    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  MARCH 1, 2038        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  485 S. FRONTAGE RD., SUITE 200, BURR RIDGE, ILLINOIS 60527

or at a different place if required by the Note Holder.

(B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,777.88

## 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

---

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of     15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5 . 000   % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                                    Page 2 of 3

DocMagic *eForms* 800-649-1362
www.docmagic.com

Us3200.not-a

the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_____ (Seal)
NEDSON MURPHY            -Borrower

_____ (Seal)
                         -Borrower


_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower


_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower


*[Sign Original Only]*

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                    Page 3 of 3

DocMagic *ERerees* 800-649-1362
www.docmagic.com

Us3200.not-a

# ALLONGE TO NOTE

LOAN #: 1120073

PROPERTY ADDRESS: 3512 W MELROSE ST, CHICAGO, ILLINOIS 60618

PRINCIPAL BALANCE: $288,750.00

ALLONGE TO NOTE DATED: FEBRUARY 14, 2008

IN FAVOR OF HOME MORTGAGE, INC., AN ILLINOIS CORPORATION

AND EXECUTED BY
NELSON MURPHY

PAY TO THE ORDER OF
AMTRUST BANK, a federal savings bank, 1801 E. 9TH STREET,
CLEVELAND, OH 44114

WITHOUT RECOURSE
HOME MORTGAGE, INC., AN ILLINOIS CORPORATION

BY: _____

TITLE:

WITHOUT RECOURSE PAY TO THE ORDER OF

HOME MORTGAGE, INC., AN ILLINOIS CORPORATION
DATED: 2/27/08
BY: _Lawrence A. Luckett_
Lawrence A. Luckett, C.E.O.

**EXHIBIT F**

MIN: 100254900000040149    Loan Number: 1120073

# NOTE

FEBRUARY 14, 2008                BURR RIDGE              ILLINOIS
      [Date]                        [City]                 [State]

3512 W MELROSE ST, CHICAGO, ILLINOIS 60618

[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 288,750.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  HOME MORTGAGE, INC., AN ILLINOIS CORPORATION
I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      6.250 %.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

### (A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.
I will make my monthly payment on the  1st  day of each month beginning on  APRIL 1 2008  . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  MARCH 1, 2038      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at  485 S. FRONTAGE RD., SUITE 200, BURR RIDGE, ILLINOIS 60527
                                                    or at a different place if required by the Note Holder.

### (B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,777.88

## 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                        Page 1 of 3

DocMagic ⟨Farms⟩ 800-649-1362
www.docmagic.com

Us3200.not.1

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of     15
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be
5.000  % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

---

Us3200.not.4

the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Nelson Nemeth_ _____ (Seal)
NELSON NEMETH          -Borrower

_____ (Seal)
                       -Borrower

_____ (Seal)
                       -Borrower

_____ (Seal)
                       -Borrower

_____ (Seal)
                       -Borrower

_____ (Seal)
                       -Borrower

*[Sign Original Only]*

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200   1/01                        Page 3 of 3

DocMagic *eFarms* 800-649-1362
www.docmagic.com

Us3200.pot.s

# ALLONGE TO NOTE

LOAN #: 1120073

PROPERTY ADDRESS: 3512 W MELROSE ST, CHICAGO, ILLINOIS 60618

PRINCIPAL BALANCE: $288,750.00

ALLONGE TO NOTE DATED: FEBRUARY 14, 2008

IN FAVOR OF HOME MORTGAGE, INC., AN ILLINOIS CORPORATION

AND EXECUTED BY
NELSON NEMETH

PAY TO THE ORDER OF
AMTRUST BANK, a federal savings bank, 1801 E. 9TH STREET,
CLEVELAND, OH 44114

WITHOUT RECOURSE
HOME MORTGAGE, INC., AN ILLINOIS CORPORATION

BY:_____

TITLE:

WITHOUT RECOURSE PAY TO THE ORDER OF

HOME MORTGAGE, INC., AN ILLINOIS CORPORATION
DATED: 3/10/08
BY: _____
Lawrence A. Luckett, C.E.O.

DocMagic eFcrms 800-649-1362
www.docmagic.com

**EXHIBIT G**

FROM HOME MORTGAGE INC 630 522 0151

# AMTRUST
## MORTGAGE BANKING

**Funding Reconciliation**

| | |
|---|---|
| **Disbursement Date:** | February 28, 2008 |
| **Receiver Bank:** | JPMORGAN CHASE BANK, NA |
| **ABA Number:** | |
| **IMAD Number:** | 2008022811K |
| **Amount:** | $303,306.92 |
| **Loan Number:** | 1120033 |
| **Borrower:** | ROBERT BURR |
| **Pay To:** | Home Mortgage, Inc |
| | 485 S. Frontage Rd. Ste 2 |
| | Burr Ridge, IL 60527 |
| **Account Number:** | |
| **Disbursed By:** | AmTrust Bank |
| **Submitted By:** | Joan Sobel |
| **Approved By:** | _____   _____ |

**Instructions:**

## Purchase Advice

| | | | |
|---|---|---|---|
| **Correspondent:** | Home Mortgage, Inc | **Borrower:** | ROBERT BURR |
| **Phone Number:** | (630)522-0140 | **Property Address:** | 6535 N OXFORD AVE |
| **Fax Number:** | (630)522-0150 | | CHICAGO, IL 60631 |
| **Loan Amount:** | $299,250.00 | **Loan Program:** | Fixed Rate 30 Year |
| **Net Premium:** | $2992.50 | **Paid to Date at** | March 01, 2008 |
| **Refundable Fees:** | $0.00 | **Funding:** | |
| **Interim Interest:** | $1,528.42 | **Days Interest:** | 28 |
| **Escrows** | $0.00 | **Escrows Collected:** | |
| **Loan Setup Fee** | $-455.00 | **Tax** | 0 mos at  $0.00  = $0.00 |
| **Loan Setup Fee** | $-9.00 | | |
| **Total Funding Amount:** | $303,306.92 | | |
| **Previously Disbursed Funds:** | $0.00 | **Aggregate Adjustment:** | $0.00 |
| **Interest Rate:** | 6.810% | **Total Escrows:** | $0.00 |
| **Lock-in Expiration Date:** | March 28, 2008 | | |

AmTrust Mortgage Banking
www.AmTrustgemstone.com

http://www.amtrustgemstone.com/fund/puchadv/1.39

**EXHIBIT H**

Batch: 51121
File: hmrt_2008026111920
Received: 2/26/2008 12:19:20 PM

Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (IL) (8)

Tue, Feb 26 2008 12:21 PM
Page 1 of 4

| Loan # SSN Takeout | Mortgagor Address | Investor | Obligation City C-Exp-Date | Unpaid Prin | St Third Party Name | W/C Zip | Acq Cost FICO | DTI | Note Amt Note Date | Advance Amt Note Mat Status | Wire-Check Note Rt Type | LTV MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0000004096 | PLANE, THEODORE 1626 N. BOSWORTH AVENUE | OHBK | 00021 Prime Single Family Mortgage Loans CHICAGO 04/07/2008 | 294,300.00 | IL | W 60622 | .00 699 | 46 | 294,300.00 02/20/2008 | 285,471.00 03/01/2038 | 285,471.00 6.28 CF30 | 75 1 |
| 101.25 | | | | | | | | | | | | |

Effective 02/26/2008    Bank ABA    Benefit Account    Destination Bank Name    JPMORGAN CHASE BANK, NA    Bank City NEW YORK    Benefit Account Name COMPANION TITLE    Transfer Amount 0.00
Wire: 02/26/2008
Severity    Message
1    Wire Detail is blank.
Error Code 0210

| 0000004058 | SHELTON, CORY 5900 N. NAVARRE AVENUE | OHBK | 00021 Prime Single Family Mortgage Loans CHICAGO 04/21/2008 | 298,500.00 | IL | W 60631 | .00 716 | 50 | 298,500.00 02/26/2008 | 289,545.00 03/01/2038 | 289,545.00 6.19 CF30 | 80 1 |
| 100.975 | | | | | | | | | | | | |

Effective 02/26/2008    Bank ABA    Benefit Account    Destination Bank Name    JPMORGAN CHASE BANK, NA    Bank City NEW YORK    Benefit Account Name COMPANION TITLE    Transfer Amount 0.00
Wire: 02/26/2008
Severity    Message
1    Wire Detail is blank.
Error Code 0210

| 0000004007 356458428 | RATHING, JACOB 3317 N. PONTIAC AVENUE | OHBK | 00021 Prime Single Family Mortgage Loans CHICAGO 04/15/2008 | 315,200.00 | IL | W 60634 | .00 702 | 48 | 315,200.00 02/26/2008 | 305,744.00 03/01/2038 | 305,744.00 6.35 CF30 | 80 1 |
| 101.10 | | | | | | | | | | | | |

Effective 02/26/2008    Bank ABA    Benefit Account    Destination Bank Name    JPMORGAN CHASE BANK, NA    Bank City NEW YORK    Benefit Account Name COMPANION TITLE    Transfer Amount 0.00
Wire: 02/26/2008
Severity    Message
1    Wire Detail is blank.
1    User modified this record: shutchi 2/26/2008 12:21 PM LTV_Pct was changed from 81 to 80
Error Code 0210 0210 0600

Batch: 51121
File: hmrt_2008022611920
Received: 2/26/2008 12:19:20 PM

Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (1L) (B)

Tue, Feb 26 2008 12:21 PM
Page 2 of 4

| Loan # | Mortgagor | W/C | Note Amt | Advance Amt | Wire Check Account | Payee Name | Bank ABA | Wire Detail |
|--------|-----------|-----|----------|-------------|--------------------|-----------| ---------|-------------|
| 0000004096 | PLANE, THEODORE | W | 294,300.00 | 285,471.00 | 285,471.00 | COMPANION TITLE | | |
| 0000004058 | SHELTON, CORY | W | 298,500.00 | 289,545.00 | 289,545.00 | COMPANION TITLE | | |
| 0000004007 | RATHING, JACOB | W | 315,200.00 | 305,744.00 | 305,744.00 | COMPANION TITLE | | |
| | 0 Checks: | | .00 | .00 | .00 | | | |
| | 3 Wires | | 908,000.00 | 880,760.00 | 880,760.00 | | | |
| | 3 Total: | | 908,000.00 | 880,760.00 | 880,760.00 | | | |



COMPLETE

Batch: 51121
File: hmrt_2008022611920
Received: 2/26/2008 12:19:20 PM

Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (1L) (B)

Tue, Feb 26 2008 12:21 PM

Page 3 of 4

| Limit | Committed | ------- Before ------- | | ---------- After ---------- | | Charge |
| | | Outstanding | Available | Outstanding | Available | |
| --- | --- | --- | --- | --- | --- | --- |
| Company Total | | | | | | |
| Total | 18,500,000.00 | 16,525,416.56 | 1,974,583.44 | 17,406,176.56 | 1,093,823.44 | 880,760.00 |
| Committed | 18,500,000.00 | 16,988,632.83 | 1,511,367.17 | 17,869,392.83 | 630,607.17 | 880,760.00 |
| Committed 1st | 18,500,000.00 | 16,988,632.83 | 1,511,367.17 | 17,869,392.83 | 630,607.17 | 880,760.00 |
| Wet | 5,550,000.00 | 3,738,120.72 | 1,811,879.28 | 4,618,880.72 | 931,119.28 | 880,760.00 |
| 00021 Prime Single Family Mortgage Loans | | | | | | |
| Total | 18,500,000.00 | 16,525,416.56 | 1,974,583.44 | 17,406,176.56 | 1,093,823.44 | 880,760.00 |
| Committed | 18,500,000.00 | 16,988,632.83 | 1,511,367.17 | 17,869,392.83 | 630,607.17 | 880,760.00 |
| Committed 1st | 18,500,000.00 | 16,988,632.83 | 1,511,367.17 | 17,869,392.83 | 630,607.17 | 880,760.00 |
| Wet | | 3,738,120.72 | | 4,618,880.72 | | 0.00 |

COMPLETE

Batch: 51121
File: hmrt_2008022611920
Received: 2/26/2008 12:19:20 PM

Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (IL) (B)

Tue, Feb 26 2008 12:21:21 PM          Page 4 of 4

Summary List of Errors:

| Severity | Message | Error Code |
|---|---|---|
| 0000004-007 RATHING, JACOB | | |
| 1 | Wire Detail is blank. | 0210 |
| 1 | User modified this record: shutchi 2/26/2008 12:21:21 PM LTV_Pct was changed from 81 to 80 | 0600 |
| 0000004058 SHELTON, CORY | | |
| 1 | Wire Detail is blank. | 0210 |
| 0000004096 PLANE, THEODORE | | |
| 1 | Wire Detail is blank. | 0210 |

Batches will not load if there are severity 9 errors.



**EXHIBIT I**

MIN: 100254900000040073                                    Loan Number: 1120066

# NOTE

FEBRUARY 26, 2008                 BURR RIDGE                    ILLINOIS
[Date]                              [City]                        [State]

3317 N PONTIAC AVE, CHICAGO, ILLINOIS 60634
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 315,200.00        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  HOME MORTGAGE, INC., AN ILLINOIS CORPORATION

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        6.350 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  1st  day of each month beginning on   APRIL 1 2008   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  MARCH 1, 2038        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  485 S. FRONTAGE RD., SUITE 200, BURR RIDGE, ILLINOIS 60527

                                            or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,961.29

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200 1/01                         Page 1 of 3

DocMagic *eForms* 800-649-1362
www.docmagic.com

Ils3200.nok.s

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of        15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be         5.000  % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

MULTISTATE FIXED RATE NOTE—Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                                    Page 2 of 3

DocMagic €Forms 800-649-1362
www.docmagic.com

Us3200 not a

the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

      If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

      If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JACOB RATHING                -Borrower

_____ (Seal)
KIMBERLY RATHING            -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

*[Sign Original Only]*

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                    Page 3 of 3

DocMagic *EFsrms* 800-649-1362
www.docmagic.com

Us3200.not s

# ALLONGE TO NOTE

LOAN #: 1120066

PROPERTY ADDRESS: 3317 N PONTIAC AVE, CHICAGO, ILLINOIS 60634

PRINCIPAL BALANCE: $315,200.00

ALLONGE TO NOTE DATED: FEBRUARY 26, 2008

IN FAVOR OF HOME MORTGAGE, INC., AN ILLINOIS CORPORATION

AND EXECUTED BY
JACOB RATHING, KIMBERLY RATHING

PAY TO THE ORDER OF
AMTRUST BANK, a federal savings bank, 1801 E. 9TH STREET,
CLEVELAND, OH 44114

WITHOUT RECOURSE
HOME MORTGAGE, INC., AN ILLINOIS CORPORATION

BY: _____

TITLE:

WITHOUT RECOURSE PAY TO THE ORDER OF

HOME MORTGAGE, INC., AN ILLINOIS CORPORATION
DATED: 3/10/08
BY: _Laura Luckett_
Lawrence A. Luckett, C.E.O.

**EXHIBIT J**

Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (IL) (B)

Mon, Feb 11 2008 02:55 PM
Page 1 of 4

Batch: 48306
File: hmrt_20080211133934
Received: 2/11/2008 2:39:34 PM

| Loan #<br>SSN<br>Takeout | Mortgagor<br>Address | Investor | Obligation<br>City | St | W/C<br>Zip | Acq Cost<br>FICO | Note Amt<br>Note Date | Advance Amt<br>Note Mat Status | Wire-Check<br>Note Rt Type | LTV<br>MT |
|---|---|---|---|---|---|---|---|---|---|---|
| 000003989<br>100.968 | PARTIPILO<br>7710 W. VICTORIA STREET<br>OHBK | Investor<br>Loans | CHICAGO | IL | 60631 | 736 | 284,750.00<br>02/05/2008 | 276,207.50<br>03/01/2038 | 276,207.50<br>6.35 CF30 | 78 |

Wire: 02/11/2008

| Effective | Bank ABA | Benefit Account | Destination Bank Name | Bank City | Benefit Account Name | Transfer Amount | Error Code |
|---|---|---|---|---|---|---|---|
| 04/03/2008 | 284,750.00 | | JPMORGAN CHASE BANK, NA | NEW YORK | COMPANION TITLE | 0.00 | 0210 |
| | 49 | | | | | | 0600 |

Severity  Message
1  Wire Detail is blank.

00021 Prime Single Family Mortgage

| 000004045 | PEDROZA, DIANE | Loans | | IL | 60631 | .00 | 276,900.00 | 268,593.00 | 268,593.00 | 79 |
|---|---|---|---|---|---|---|---|---|---|---|
| 100.945 | 3915 N. SACRAMENTO AVENUE<br>OHBK | | CHICAGO | | 702 | 48 | 02/05/2008 | 03/01/2038 | 6.45 CF30 | |

Wire: 02/11/2008

| Effective | Bank ABA | Benefit Account | Destination Bank Name | Bank City | Benefit Account Name | Transfer Amount | Error Code |
|---|---|---|---|---|---|---|---|
| 04/03/2008 | 276,900.00 | | JPMORGAN CHASE BANK, NA | NEW YORK | COMPANION TITLE | 0.00 | 0210 |

Severity  Message
1  Wire Detail is blank.
1  User modified this record: shutchi 2/11/2008 2:55:01 PM LTV_Pct was changed from 89 to 79

00021 Prime Single Family Mortgage

| 000004020 | CHILELLI, FRANCESCO | Loans | | IL | 60618 | .00 | 278,400.00 | 270,048.00 | 270,048.00 | 80 |
|---|---|---|---|---|---|---|---|---|---|---|
| 101.00 | 3204 W. BELMONT AVENUE<br>OHBK | | CHICAGO | | 728 | 50 | 02/05/2008 | 03/01/2038 | 6.39 CF30 | |
| 348756756 | | | | | | | | | | |

Wire: 02/11/2008

| Effective | Bank ABA | Benefit Account | Destination Bank Name | Bank City | Benefit Account Name | Transfer Amount | Error Code |
|---|---|---|---|---|---|---|---|
| 04/03/2008 | 278,400.00 | | JPMORGAN CHASE BANK, NA | NEW YORK | COMPANION TITLE | 0.00 | 0210 |
| | | | | | | | 0600 |

Severity  Message
1  Wire Detail is blank.
1  User modified this record: shutchi 2/11/2008 2:55:11 PM LTV_Pct was changed from 81 to 80

COMPLETE

Batch: 48306
File: hmrt_2008021113934
Received: 2/11/2008 2:39:34 PM

Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (IL) (8)

Mon, Feb 11 2008 02:55 PM
Page 2 of 4

| Loan # | Mortgagor | W/C | Note Amt | Advance Amt | Wire Check Account | Payee Name | Bank ABA | Wire Detail |
|--------|-----------|-----|----------|-------------|--------------------|------------|----------|-------------|
| 000003989 | PARTIPILO | W | 284,750.00 | 276,207.50 | 276,207.50 | COMPANION TITLE | | |
| 000004045 | PEDROZA, DIANE | W | 276,900.00 | 268,593.00 | 268,593.00 | COMPANION TITLE | | |
| 000004020 | CHILELLI, FRANCESCO | W | 278,400.00 | 270,048.00 | 270,048.00 | COMPANION TITLE | | |
| | 0 Checks: | | .00 | .00 | .00 | | | |
| | 3 Wires | | 840,050.00 | 814,848.50 | 814,848.50 | | | |
| | 3 Total: | | 840,050.00 | 814,848.50 | 814,848.50 | | | |

COMPLETE

Batch: 48306
File: hmrt_2008021113934
Received: 2/11/2008 2:39:34 PM

Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (1L) (8)

Mon, Feb 11 2008 02:55 PM

| Limit | Committed | Before Outstanding | Before Available | After Outstanding | After Available | Change |
|---|---|---|---|---|---|---|
| Company Total | | | | | | |
| Total | 18,500,000.00 | 15,887,518.10 | 2,612,481.90 | 16,702,366.60 | 1,797,633.40 | 814,848.50 |
| Committed | 18,500,000.00 | 16,333,084.79 | 2,166,915.21 | 17,147,933.29 | 1,352,066.71 | 814,848.50 |
| Committed 1st | 18,500,000.00 | 16,333,084.79 | 2,166,915.21 | 17,147,933.29 | 1,352,066.71 | 814,848.50 |
| Wet | 5,500,000.00 | 4,254,202.42 | 1,245,797.58 | 5,069,050.92 | 430,949.08 | 814,848.50 |
| 00021 Prime Single Family Mortgage Loans | | | | | | |
| Total | 18,500,000.00 | 15,887,518.10 | 2,612,481.90 | 16,702,366.60 | 1,797,633.40 | 814,848.50 |
| Committed | 18,500,000.00 | 16,333,084.79 | 2,166,915.21 | 17,147,933.29 | 1,352,066.71 | 814,848.50 |
| Committed 1st | 18,500,000.00 | 16,333,084.79 | 2,166,915.21 | 17,147,933.29 | 1,352,066.71 | 814,848.50 |
| Wet | | 4,254,202.42 | 2,166,915.21 | 5,069,050.92 | 1,352,066.71 | 0.00 |

COMPLETE

Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (1L) (8)

Mon, Feb 11 2008 02:55 PM

Page 4 of 4

Batch: 48306
File: hmrt_2008021113934
Received: 2/11/2008 2:39:34 PM

Summary List of Errors:

Severity Message                                                                                                    Error Code

000003989 PARTIPILO
  1    Wire Detail is blank.                                                                                        0210
000004020 CHILELLI, FRANCESCO
  1    Wire Detail is blank.                                                                                        0210
  1    User modified this record: shutchi 2/11/2008 2:55:11 PM LTV_Pct was changed from 81 to 80                   0600
000004045 PEDROZA, DIANE
  1    Wire Detail is blank.                                                                                        0210
  1    User modified this record: shutchi 2/11/2008 2:55:01 PM LTV_Pct was changed from 89 to 89                   0600

Batches will not load if there are Severity 9 errors.

COMPLETE

**EXHIBIT K**

MIN NO.: 100254900000039893

# NOTE

February 5, 2008                 BURR RIDGE                ILLINOIS
[Date]                        [City]                      [State]

7710 WEST VICTORIA STREET, CHICAGO, ILLINOIS  60631

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 284,750.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Home Mortgage, Inc.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.3540 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st    day of each month beginning on April 1, 2008    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on March 1, 2038    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 485 South Frontage Road
Burr Ridge, Illinois  60527                or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,772.56

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

1120048
MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Wolters Kluwer Financial Services    Form 3200 1/01
VMP®-5N (0207)02
Page 1 of 3        Initials:                      20204-01

**5.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen**      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be            **5.0000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

1120048

VMP®-5N (0207)07                                             Page 2 of 3                                              Form 3200 1/01
                                                                                                                     Initials _____
                                                                                                                     20204-02

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
MICHAEL PARTIPILO              -Borrower          MARY PARTIPILO              -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                     -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                     -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                     -Borrower

*[Sign Original Only]*

1120048

VMP®-SN (0207)02                    Page 3 of 3                    Form 3200 1/01

20204-03

# ENDORSEMENT ALLONGE
### To be made a part of the Mortgage Note referenced herein

Re: Mortgage Note Dated: February 5, 2008                    Loan Number: 1120048

Mortgagors:  MICHAEL PARTIPILO
             MARY PARTIPILO

Property Address: 7710 WEST VICTORIA STREET
                  CHICAGO, ILLINOIS  60631

Loan Amount: $284,750.00

WITHOUT RECOURSE PAY TO THE ORDER OF:

BY: _____

DATED: _____

WITHOUT RECOURSE PAY TO THE ORDER OF

HOME MORTGAGE, INC., AN ILLINOIS CORPORATION
DATED:
BY: _____  CEO  2/15/08
    Lawrence A. Luckett, C.E.O.

20484
(03/1508)

**EXHIBIT L**

MIN NO.: 100254900000040206

# NOTE

| February 5, 2008 | BURR RIDGE | ILLINOIS |
|---|---|---|
| [Date] | [City] | [State] |

3204 WEST BELMONT AVENUE, CHICAGO, ILLINOIS  60618

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 278,400.00       (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Home Mortgage, Inc.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        6.3900 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st        day of each month beginning on April 1, 2008        . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on March 1, 2038        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 485 South Frontage Road
Burr Ridge, Illinois  60527                                      or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,739.59

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

1120079
MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Wolters Kluwer Financial Services       Form 3200 1/01
VMP®-5N (0207).02
Page 1 of 3                    Initials:

20204-01

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.0000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

1120079

VMP®-5N (0207)02                                    Page 2 of 3                              Form 3200 1/01

                                                                                            20204-02

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
FRANCESCO CHILELLI                  -Borrower                                            -Borrower


_____ (Seal)          _____ (Seal)
                                    -Borrower                                            -Borrower


_____ (Seal)          _____ (Seal)
                                    -Borrower                                            -Borrower


_____ (Seal)          _____ (Seal)
                                    -Borrower                                            -Borrower


*[Sign Original Only]*

1120079

VMP®-5N (0207).02                          Page 3 of 3                          Form 3200 1/01

20204-03

# ENDORSEMENT ALLONGE
To be made a part of the Mortgage Note referenced herein

Re: Mortgage Note Dated: February 5, 2008                    Loan Number: 1120079

Mortgagors: FRANCESCO CHILELLI

Property Address: 3204 WEST BELMONT AVENUE
CHICAGO, ILLINOIS 60618

Loan Amount: $278,400.00

WITHOUT RECOURSE PAY TO THE ORDER OF:

BY: _____

DATED: _____

WITHOUT RECOURSE PAY TO THE ORDER OF

HOME MORTGAGE, INC., AN ILLINOIS CORPORATION
DATED: _____  CEO 2/15/08
BY: _____
Lawrence A. Luckett, C.E.O.

20484
(03/1505)

**EXHIBIT M**



Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (IL) (8)

Fri, Feb 08 2008 01:40 PM
Page 1 of 4

Batch: 48042
File: hmrt_200802081123008
Received: 2/8/2008 1:30:08 PM

| Loan #<br>SSN<br>Takeout | Mortgagor<br>Address | Investor | Obligation<br>City<br>C-Exp-Date | W/C<br>St<br>Unpaid Prin | Acq Cost<br>Zip<br>Third Party Name | Note Amt<br>FICO<br>Note Date<br>DTI | Advance Amt<br>Note Mat<br>Status | Wire-Check<br>Note Rt Type | LTV<br>MI |
|---|---|---|---|---|---|---|---|---|---|
| 351674862<br>101.00 | GENNETT, KENNETH<br>5442 W. CULLOM AVENUE<br>OHBK | 00021 Prime Single Family Mortgage<br>Loans<br>CHICAGO<br>03/29/2008 | IL<br>294,900.00 | 60641<br>745 | 294,900.00<br>50<br>02/01/2008 | 286,053.00<br>03/01/2038 | 6.25 CF30 | 80<br>1 |

Effective   Bank ABA    Benefit Account                    Destination Bank Name &        Bank City          Benefit Account Name
Wire: 02/08/2008                                           JPMORGAN CHASE BANK, NA        NEW YORK           COMPANION TITLE                    Transfer Amount
Severity   Message                                                                                                                            0.00
   1       Wire Detail is blank.                                                                                                              Error Code
                                                                                                                                             0210

| 000004078<br>101.975 | ADKINS, BRANDON<br>3751 N. RIDGEWAY<br>OHBK | 00021 Prime Single Family Mortgage<br>Loans<br>CHICAGO<br>04/06/2008 | IL<br>299,550.00 | 60618<br>69?<br>45 | 299,550.00<br>50<br>02/08/2008 | 290,563.50<br>03/01/2036 | 6.29 CF30 | 80<br>1 |

Effective   Bank ABA    Benefit Account                    Destination Bank Name &        Bank City          Benefit Account Name
Wire: 02/08/2008                                           JPMORGAN CHASE BANK, NA        NEW YORK           COMPANION TITLE                    Transfer Amount
Severity   Message                                                                                                                            0.00
   1       Wire Detail is blank.                                                                                                              Error Code
                                                                                                                                             0210



Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (IL) (8)

Page 2 of 4
Fri, Feb 08 2008 01:40 PM

Wire Detail

Batch: 48042
File: hmrt_20080208123008
Received: 2/8/2008 1:30:08 PM

| Loan # | Mortgagor | W/C | Note Amt | Advance Amt | Wire Check Account | Payee Name | Bank ABA |
|--------|-----------|-----|----------|-------------|--------------------|------------|----------|
| 000000004079 | GENNETT, KENNETH | W | 294,900.00 | 286,053.00 | 286,053.00 | COMPANION TITLE | |
| 000000004078 | ADKINS, BRANDON | W | 299,550.00 | 290,563.50 | 290,563.50 | COMPANION TITLE | |

| 0 Checks: | | .00 | .00 | |
| 2 Wires | 594,450.00 | 576,616.50 | 576,616.50 |
| 2 Total: | 594,450.00 | 576,616.50 | 576,616.50 |

Batch: 48042
File: hmrt_2008020081232008
Received: 2/8/2008 1:30:08 PM

Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (IL) (8)

Page 3 of 4
Fri, Feb 08 2008 01:40 PM



| Limit | Committed | Outstanding Before | Available | Outstanding After | Available | Change |
|---|---|---|---|---|---|---|
| Company Total | | | | | | |
| Total | 18,500,000.00 | 15,888,101.33 | 2,611,898.67 | 16,464,717.83 | 2,035,282.17 | 576,616.50 |
| Committed | 18,500,000.00 | 16,332,163.29 | 2,167,836.71 | 16,908,779.79 | 1,591,220.21 | 576,616.50 |
| Committed 1st | 18,500,000.00 | 16,332,163.29 | 2,167,836.71 | 16,908,779.79 | 1,591,220.21 | 576,616.50 |
| Wet | 5,500,000.00 | 3,677,585.92 | 1,822,414.08 | 4,254,202.42 | 1,245,797.58 | 576,616.50 |
| 00021 Prime Single Family Mortgage Loans | | | | | | |
| Total | 18,500,000.00 | 15,888,101.33 | 2,611,898.67 | 16,464,717.83 | 2,035,282.17 | 576,616.50 |
| Committed | 18,500,000.00 | 16,332,163.29 | 2,167,836.71 | 16,908,779.79 | 1,591,220.21 | 576,616.50 |
| Committed 1st | 18,500,000.00 | 16,332,163.29 | 2,167,836.71 | 16,908,779.79 | 1,591,220.21 | 576,616.50 |
| Wet | 18,500,000.00 | 3,677,585.92 | 4,254,202.42 | 4,254,202.42 | 1,591,220.21 | 0.00 |

Residential Funding Corporation
RFConnects Loan File Upload Report
HMRT: Home Mortgage, Inc. (IL) (B)

Page 4 of 4
Fri, Feb 08 2008 01:40 PM

Batch: 48042
File: hmrt_20080208123008
Received: 2/8/2008 1:30:08 PM

Summary List of Errors:

| Severity | Message | Error Code |
|---|---|---|
| 0000004078 ADKINS, BRANDON | | |
| 1 | Wire Detail is blank. | 0210 |
| 0000004079 GENNETT, KENNETH | | |
| 1 | Wire Detail is blank. | 0210 |

Batches will not load if there are Severity 9 errors.

COMPLETE

**EXHIBIT N**

MIN NO.: 100254900000040784

# NOTE

February 8, 2008                     BURR RIDGE                          ILLINOIS
   [Date]                                [City]                             [State]

3751 NORTH RIDGEWAY AVENUE, CHICAGO, ILLINOIS  60618

[Property Address]

**1. BORROWER'S PROMISE TO PAY**

    In return for a loan that I have received, I promise to pay U.S. $ 299,550.00        (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is Home Mortgage, Inc.

    I will make all payments under this Note in the form of cash, check or money order.
    I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of        6.2900 %.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

**3. PAYMENTS**

    **(A) Time and Place of Payments**
    I will pay principal and interest by making a payment every month.
    I will make my monthly payment on the 1st        day of each month beginning on April 1, 2008        . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest
before Principal. If, on March 1, 2038        , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."
    I will make my monthly payments at 485 South Frontage Road
Burr Ridge, Illinois  60527                               or at a different place if required by the Note Holder.

    **(B) Amount of Monthly Payments**
    My monthly payment will be in the amount of U.S. $ 1,852.18

**4. BORROWER'S RIGHT TO PREPAY**

    I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.
    I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

1120137.1
**MULTISTATE FIXED RATE NOTE**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Wolters Kluwer Financial Services    Form 3200 1/01
VMP ®.5N (0207).02
Page 1 of 3        Initials: _P.G_

20204-01

### 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 6. BORROWER'S FAILURE TO PAY AS REQUIRED

#### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen**      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     **5.0000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

#### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

#### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

#### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

#### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

1120137.1

VMP®-5N (0207)02      Page 2 of 3      Form 3209 1/01
Initials: _____
20204-02

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
BRANDON ADKINS                   -Borrower                                        -Borrower


_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower


_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower


_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower


                                                          [Sign Original Only]


1120137.1

VMP®-5N (0207)02                        Page 3 of 3                        Form 3200 1/01

                                                                          20204-03

# ENDORSEMENT ALLONGE
### To be made a part of the Mortgage Note referenced herein

Re: Mortgage Note Dated: **February 8, 2008**                    Loan Number: **1120137.1**

Mortgagors: **BRANDON ADKINS**

Property Address: **3751 NORTH RIDGEWAY AVENUE**
**CHICAGO, ILLINOIS  60618**

Loan Amount: **$299,550.00**

**WITHOUT RECOURSE PAY TO THE ORDER OF:**

**BY:** _____

**DATED:** _____

WITHOUT RECOURSE PAY TO THE ORDER OF

HOME MORTGAGE, INC., AN ILLINOIS CORPORATION
DATED: _____
BY: _____
Lawrence A. Luckett, C.E.O.



20484
(02/1505)

**EXHIBIT O**

MIN NO.: 100254900000040792

# NOTE

January 31, 2008            BURR RIDGE            ILLINOIS
[Date]                  [City]                  [State]

5442 WEST CULLOM AVENUE, CHICAGO, ILLINOIS 60641

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 294,900.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Home Mortgage, Inc.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.2500 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on April 1, 2008 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on March 1, 2038 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 485 South Frontage Road
Burr Ridge, Illinois 60527            or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,815.75

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

1120138.1
MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Wolters Kluwer Financial Services   Form 3200 1/01
VMP®-5N (0207).02
Page 1 of 3       Initials: KS

20204-01

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.0000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

1120138.1

VMP ®-5N (0207).02                      Page 2 of 3                      Form 3200 1/01
Initials: _____
20204-02

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
KENNETH GENNETT          -Borrower

_____ (Seal)
ELIZABETH GENNETT        -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

[Sign Original Only]

1120138.1

VMP®-5N (0207)02                    Page 3 of 3                    Form 3200 1/01
                                                                    ( ● 20204-03

# ENDORSEMENT ALLONGE
### To be made a part of the Mortgage Note referenced herein

Re: Mortgage Note Dated:  January 31, 2008                    Loan Number:  1120138.1

Mortgagors:  KENNETH GENNETT
             ELIZABETH GENNETT

Property Address:  5442 WEST CULLON AVENUE
                   CHICAGO, ILLINOIS  60641

Loan Amount: $294,900.00

WITHOUT  RECOURSE PAY TO THE ORDER OF:

BY: _____

DATED: _____

WITHOUT RECOURSE PAY TO THE ORDER OF

HOME MORTGAGE, INC. AN ILLINOIS CORPORATION

DATED: _____  CEO    3/11/8



Lawrence A. Luckett, C.E.O.

20484
(03/15/05)